# EXHIBIT B

Lenore L. Albert, Esq. SBN 210876
LAW OFFICES OF LENORE
ALBERT
~~31872 Joshua Dr #22C~~
~~Trabuco Canyon, CA 92679~~
1968 S. Coast Hwy
#3960 Laguna Beach,
CA 92651 Telephone
(424)365-0741
Email: lenalbert@InteractiveCounsel.com Attorney for Plaintiffs, John Roe 1, Jane
Roe 1, Jane Roe 2, Jane Roe 3, and John Roe 2, *on behalf of themselves and all others
similarly situated*

# ~~SUPERIOR~~UNITED STATES DISTRICT COURT ~~OF CALIFORNIA~~

# ~~COUNTY~~FOR THE CENTRAL DISTRICT OF ~~ORANGE~~CALIFORNIA

| | |
|---|---|
| JOHN ROE 1, an individual; JANE ROE 1, an individual; JANE ROE 2 an individual; JANE ROE 3, an individual, JOHN ROE 2, *on behalf of themselves and all others similarly situated*, | CASE NO. ~~30-2022-01250695-CU-AT-CXC~~22-cv-00983-DFM |
| | Assigned to the Hon. ~~Randall J. Sherman, CX-105 Complaint filed: 03-18-2022~~Douglas F. McCormick Crtm. 6B |
| | Complaint filed: 03-18-2022 |
| Plaintiff, | ~~FIRST~~SECOND AMENDED CLASS ACTION COMPLAINT |
| vs. | |
| THE STATE BAR OF CALIFORNIA; TYLER TECHNOLOGIES, INC.; KEVAN SCHWITZER; RICK RANKIN; and DOES 4 through 10, inclusive, | 1. Violation of Cal. Information Practices Act of 1977 |
| Defendants. | 2. Invasion of Privacy (Cal. Const. Art I § 1) |
| | 3. Invasion of Privacy (Civ. Code § 1798.53) |

4. Antitrust Violation - Sherman Act § ~~2~~1

5. Antitrust Violation - Sherman Act § ~~3~~2

6. Negligence

7. Negligence per Se

**[DEMAND FOR JURY TRIAL**]

Plaintiffs John Roe 1, Jane Roe 1, Jane Roe 2 ~~and~~, Jane Roe 3 and John Roe 2
(referred to collectively as "Plaintiff" or "Plaintiffs"), by and through their attorney,
amend their pleadings ~~as a matter of right~~pursuant to Court Order and bring this action
against Defendants, the State Bar of California, Tyler Technologies, Inc., ~~Kevan
Schwitzer (JudyRecords.com),~~Rick Rankin, and Does 4 through 10, and each of
them so captioned, (collectively the "Defendants") and alleges the following on
information and belief, except as to those allegations which pertain to the Plaintiffs and
are within their personal knowledge:

## PARTIES

1.    Plaintiff, John Roe 1, at all times mentioned herein relevant to this complaint is
employed in and is a resident of Orange County, California and had filed a confidential
Complaint with the State Bar of California. Plaintiff sues under the pseudonym of "John
Roe 1" to protect his legitimate interests in his privacy. Plaintiff John Roe 1 filed a claim
with the State Bar prior to this complaint being filed on March 18, 2022, on his behalf
and others similarly situation. The claim was denied a few weeks thereafter. John Roe 1
is not an attorney but employed in public relations mainly for cybersecurity firms. In or
about 2018 he complained against an attorney who represented he was making mistakes
in his legal work and was not able to practice law due to an ongoing medical condition
but continued the practice of law anyway.

2.    Plaintiff, Jane Roe 1, at all times mentioned herein relevant to this complaint was
a resident of Los Angeles County, California and had filed a confidential Complaint
with the State Bar of California. Plaintiff sues under the pseudonym of "Jane Roe 1" to
protect her legitimate interests in her privacy. Plaintiff Jane Roe 1 filed a claim with the
State Bar prior to this complaint being filed on March 18, 2022 on her behalf and all
others similarly situated. The State Bar denied the claim a few weeks thereafter. Jane

Roe 1 is not an attorney, but a college student. In or about 2014 she complained against an attorney as part of a campaign and later regretted being a part of that campaign. Complainant CX is willing to step into the shoes of Jane Roe 1, she filed a complaint against a District Attorney in San Mateo County, California. She received an Odyssey Notice in May 2022.

3.      Plaintiff, Jane Roe 2, at all times mentioned herein relevant to this complaint was a former judge licensed by the State Bar of California and resident of San Diego County, California and was the subject of a confidential investigation filed with the State Bar of California. Plaintiff sues under the pseudonym of "Jane Roe 2" to protect her legitimate interests in her privacy. Plaintiff Jane Roe 2 was investigated for a medical condition and is informed and believes and alleges thereon that the State Bar file contains her private medical records. No public disciplinary action shows on her member profile. A claim was filed with the State Bar on her behalf on March 14, 2022 prior to the filing of this lawsuit and was later denied by the State Bar. On or about September 20, 2022, another claim was filed with the State Bar in her own name.

4.      Plaintiff, Jane Roe 3, at all times mentioned herein relevant to this complaint was an attorney licensed by the State Bar of California and resident of Contra Costa County, California and was the subject of a confidential Complaint filed with the State Bar of California. Plaintiff sues under the pseudonym of "Jane Roe 3" to protect her legitimate interests in her privacy. Plaintiff Jane Roe 3 was a mediator and member of the Bar. A family member filed one or more complaints against her during a probate dispute over property they inherited that were never made public and never went beyond the investigation stage. Public disciplinary action shows on her member profile. A claim was filed with the State Bar on her behalf on March 14, 2022 prior to the filing of this lawsuit and was later denied by the State Bar. On or about September 20, 2022, another claim was filed with the State Bar in her own name. Attorney DE is willing to step into

the shoes of Jane Roe 3. He is an attorney from San Francisco and had a highly
confidential proceeding under Bus & Prof Code § 6007(b)(3) wherein those records
were also supposed to remain highly confidential under both state and federal HIPAA
laws. Attorney DE did receive an Odyssey notice in May 2022.

5.    Plaintiff, John Roe 2, at all times mentioned herein relevant to this complaint is an
attorney licensed by the State Bar of California and resident of Los Angeles County,
California and was the subject of a confidential investigation filed with the State Bar of
California. Plaintiff sues under the pseudonym of "John Roe 2" to protect ~~her~~his
legitimate interests in ~~her privacy.~~his privacy. Plaintiff John Roe 2 is a solo practitioner
protecting consumers in litigation and/or criminal defense and was investigated for
representing homeowners seeking loan modifications approximately a decade ago. He
has a disciplinary record wherein he has been disciplined repeatedly over the same
practice when new complaints are made by those who sought services a decade ago. A
claim was filed with the State Bar on his behalf on March 14, 2022 prior to the filing of
this lawsuit and was later denied by the State Bar. On or about September 20, 2022,
another claim was filed with the State Bar in his own name. If the Court should deny a
protective order, putative class member NZ is also a consumer rights attorney in Los
Angeles County, California who has no disciplinary record on his member profile. The
State Bar investigated him for several complaints that never ended up with public
disciplinary charges. He is willing to put his name on the caption of this pleading in
order to allow the complaint to go forward. A claim was filed with the State Bar on his
behalf on March 14, 2022 prior to the filing of this lawsuit and was later denied by the
State Bar. On or about September 20, 2022, another claim was filed with the State Bar in
his own name.

6.    Defendant THE STATE BAR OF CALIFORNIA, is a public corporation created
by the Legislature passing the State Bar Act in 1927 and has two main offices located in

(1) San Francisco, California; and (2) Los Angeles, California. On or about February 24, 2022, the State Bar announced that it released approximately 260,000 (later 322,525) confidential disciplinary records to a third party through one of its ports which displayed those records on a website with the URL JudyRecords.com. It was not the result of a hack.

7.    ~~Defendant~~ KEVAN SCHWITZER ~~fictitiously sued as JUDYRECORDS.COM~~ is a resident of Texas and operates a website called JudyRecords.com that freely publishes information from various federal and state agencies. ~~260,000~~On or about October 15, 2022 approximately 322,525 confidential State Bar of California records were published on this website.

8.    Plaintiff is informed and believes and alleges thereon that Defendant RICK RANKIN, principal of RPR Impact, LLC, was hired to perform the services as interim Director of the Information Technology Department of the State Bar of California fictitiously sued as EMPLOYEE DOE at all times mentioned herein and is the person employed by the State Bar of California designated with the responsibility for ensuring the agency complies with all of the provisions of the Information Practices Act of 1977 ("IPA") and/or ensure that confidential information in digital form would be secure from being released to third parties by accessing the internet.

~~8~~9.    Plaintiff is informed and believes and alleges thereon that Defendant TYLER TECHNOLOGIES, INC. ("Tyler Technologies") fictitiously sued as DOE 3 is the vendor that has supplied the case management software referred to as Odyssey being used by the State Bar of California. Due to a failure with the Odyssey portal, the State Bar reported nonpublic records were swept up by JudyRecords.com and published.

~~9~~10.    Plaintiff does not know the true names and capacities of the Defendants DOES 4 through 10, inclusive, and, as such, names said Defendants by such fictitious names. Plaintiff will amend the complaint to state the true name and capacity of the DOE

Defendant(s) when such information is ascertained.

~~10~~11. Plaintiff is informed and believes, and alleges thereon, that each Defendant assisted, adopted, ratified, approved, conspired, or acted in concert therewith with the other Defendant(s).

~~11~~12. Plaintiff is informed and believes, and alleges thereon, that each Defendant is responsible in some manner for the occurrences alleged in this complaint, and that Plaintiff's' damages were proximately caused by the Defendants at all times mentioned in this complaint.

## **FACTS**

~~12~~13. In 1927, the California Legislature enacted the State Bar Act which created The State Bar of California. It is a public corporation with an annual budget ~~that exceeds~~of $~~200~~244.3 million for 2022.

14.    The State Bar of California has its own disciplinary system wherein State Bar investigations and prosecutions are housed within the Office of Chief Trial Counsel.

~~It~~15.  The State Bar's Office of Chief Trial Counsel investigates and pursues complaints about members of the Bar. It collects confidential information from *both* its members and the public ~~who files State Bar complaints against~~. Sometimes it collects confidential information from all members of the Bar. For example, a few years ago, the State Bar.~~It~~ collected fingerprints of all members of the Bar then used that electronic database to determine which attorneys had a criminal conviction in order to investigate and prosecute. The State Bar also collects financial records, such as bank statements when there is a complaint of misused or unearned fees and medical records when there is a decision to investigate a mental or physical health issue of a member or a prospective member of the Bar. These records include address history, email history and telephone history from the date the individual became a member to the present date of investigation. These records also include birthdates, social security numbers and in some

cases family names (relatives). In sum, the State Bar maintains a large volume of sensitive private information, ~~which was recently expanded to include~~ including but not limited to an attorney's financial records, banking records, medical records, and fingerprints (biometric data) about members of the State Bar.

16.     The information in these records is so wide spreading in detail that they can be used to make it easy for a third party to bypass "forgot password" checks, to harass opponents, to obtain online credit reports, to commit extortion or bribery, or to commit other frauds via identity theft.

17.     The State Bar 2020 Annual Discipline Report acknowledged that the Disciplinary System is slanted toward the small practitioner:

    a.    "A report commissioned by the State Bar found that the sector of the profession serving individuals as opposed to businesses experienced fewer paying clients and declining attorney income starting in the mid–1970s. Between 2007 and 2012, this sector's revenues shrank by 10 percent while the number of self-represented parties in state court continued to increase. Given that the vast majority of complaints are filed by individual consumers, fewer underlying transactions between individuals (as opposed to businesses) and attorneys have likely led to fewer complaints per attorney being filed with the State Bar." (2020 State Bar Annual Discipline Report pg. 14).

18.     The State Bar, including the Office of Chief Trial Counsel and the State Bar Court is self-funded by the members. A substantial portion of the revenue come from the member's mandatory annual fees which the Legislature sets. Active attorneys must pay $463.00 annually to maintain their license which includes a $25.00 discipline fee and $40.00 client security fee according to the State Bar of California Annual Budget Report Feb. 2022.

19.     Other revenues are provided from fees the members pay for Disciplinary Costs,

Client Security fund fees and lawyer assistance fees. The State Bar discipline system is considered a "fee-for-services" activity. A fixed cost sheet is created by the State Bar annually. The most recently published Cost Sheet is attached as Exhibit A.

20.    The State Bar has internally controlled the price of Disciplinary Costs that falls more heavily on lawyers in the People market much more than lawyers in the Organizational Clients Market.

21.    In a study of 874 lawyers in the disciplinary system from 2014 to 2016 eleven percent (11%) sought a waiver or modification of the discipline costs imposed based on financial hardship. Plaintiffs are informed and believe that the members seeking the waivers or modification were members in the declining sector of the People Market and who defended against the charges made against them up to trial.

22.    Plaintiffs are further informed and believe and allege thereon that a substantial portion of lawyers in the disciplinary system that did not seek a waiver or modification of the costs imposed were provided a payment plan at a reduced cost and/or most likely stipulated to the charges instead of going to trial to defend against them.

23.    The Cost structure is akin to a regressive tax which becomes unaffordable to the solo practitioner at the bottom of the lawyer rate scale who wants to defend against the charges by a huge margin.

24.    In 2014, it cost a member of the Bar $2,992.00 to stipulate to discipline if offered by the Office of Chief Trial Counsel before charges were filed. On the other hand, that cost increased over 200% to $7,253.00 for a member to defend against the charges in a one-day trial. To have the ruling reviewed, it costs a member $20,005.00 in 2014 if they can pay for the costs of transcripts upfront.

25.    In 2022, the cost to stipulate to discipline before charges are publicly filed is $3,693.00. The cost for a member to defend in a one-day trial is $8,952.00. To have the ruling reviewed, it costs a member $24,695.00 if they can pay for the costs of transcripts

upfront.(Exhibit A).

26.     Attorneys must pay this discipline cost even if the most egregious charges which impugned the lawyer's character are never proven.

27.     It is common that the member will be suspended until the attorney pays the discipline costs owed creating a barrier to reentry.

28.     Furthermore, unlike ABA Model Rule 10 which does not allow any "and until" conditions to attach to the length of the period of suspension, in California, an "and until" condition can attach to any condition laid out in the order, including financial payments.

29.     During this time period, the member is not allowed to practice law in the state of California. A notation of the member being ineligible to practice law along with the date of suspension is placed on the attorney member's public profile online without distinction between the length of suspension or remaining ineligible due to inability or failure to pay the discipline costs as the sole barrier to reinstatement.

30.     One percent of all disciplinary investigations that were opened were made public in 2020. In raw numbers, approximately the Office of Chief Trial Counsel opened 17,500 cases to investigate for possible discipline in 2020. The Office of Chief Trial Counsel filed 180 Notice of Public Disciplinary Charges in 2020. (2020 State Bar Annual Discipline Report).

~~13~~31. All State Bar complaints and investigations are confidential until public Notice of Disciplinary Charges are filed. ~~Some~~Approximately 97% of all complaints and investigations never end up being prosecuted, others remain confidential through prosecution, and still others become confidential after being "expunged."

~~14.     State Bar Rules of Procedure, Rule 2301 provides: "Except as otherwise provided by law or by these rules, the files and records of the Office of Chief Trial Counsel are confidential."~~

15.    State Bar Rules of Procedure, Rule 2302(e)(2) provides: "(a) Except as otherwise provided by law or these rules, information concerning inquiries, complaints or investigations is confidential, and shall not be shared outside of the State Bar Office of Chief Trial Counsel."

16.    In or about 2019, sometime after March 16, 2018, the State Bar of California intentionally transferred some or all their confidential records contained in their AS-400 Case Management System to a new Case Management System referred to as "Odyssey" which it purchased for approximately $3 million from Tyler Technologies.

32.    In 2018, the Office of Chief Trial Counsel ("OCTC") launched an online complaint portal, allowing complaining witnesses to file complaints electronically, rather than on paper via mail in both English and Spanish. For approximately 10 months afterwards, OCTC saw a significant increase in the number of complaints received overall. Four additional languages (Vietnamese, Korean, Russian, and Chinese) were added to the system in 2019 to further expand access to complaining witnesses in their preferred language.

33.    This online complaint portal could contain confidential information such as bank account information or even medical records of either the complaining witness or the attorney or both.

34.    Because the State Bar decided to collect confidential information from complainants and its members (attorneys), the State Bar was under a duty to appoint someone to make sure all confidential information was secure from public disclosure and that adequate security measures were in place in accordance with a set of policies and procedures, both online and offline.

35.    Plaintiff is informed and believes and alleges thereon that Defendant Rick Rankin as interim IT Director was either assigned that duty or had the authority to assign that duty to an employee within the State Bar who is named a Doe Defendant because that

identity is not yet known.

36.     Plaintiff is informed and believes and alleges thereon that Defendant Rick Rankin and/or Doe Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information such as their port which gave JudyRecords.com the ability to obtain the confidential information and place it in the public domain which the State Bar now denies any such duty.

37.     That duty was breached due to the failure to discover an access control check was missing which allowed the public to access any confidential information stored in its database online which included confidential investigation files maintained by the Office of Chief Trial Counsel.

38.     That breach was discovered by the State Bar when a complainant notified the State Bar on or about February 21, 2022 that a confidential matter was contained in a free public records website called JudyRecords.com.

39.     The confidential matter was harvested or scraped from the State Bar of California's online discipline records page which was created to store records on a platform called Odyssey.

40.     State Bar of California purchased or subscribed to a cloud case management platform named Odyssey from Tyler Technologies, Inc. for approximately $3 million as an initial payment.

1741. The State Bar directly or indirectly through Tyler Technologies intentionally decided to open its port(s) and publish all its public records concerning disciplinary proceedings online, including but not limited to dockets, disciplinary files, recommendations, and review department opinions. It

42.     The State Bar also created a log in space called "My State Bar Portal" for all members to provide confidential information in paying their annual fees, Client Security Fund reimbursement costs and Disciplinary Costs that were assessed. Defendant, State

Bar would also use ~~this online site to upload~~"My State Bar Portal" to communicate with its members by uploading "important communications" such as confidential State Bar investigation correspondence to the internet for the State Bar member such as Jane Roe 3 to log in, retrieve and download.

~~18.    In 2018, the Office of Chief Trial Counsel ("OCTC") launched an online complaint portal, allowing complaining witnesses to file complaints electronically, rather than on paper via mail in both English and Spanish. For approximately 10 months afterwards, OCTC saw a significant increase in the number of complaints received overall. Four additional languages (Vietnamese, Korean, Russian, and Chinese) were added to the system in 2019 to further expand access to complaining witnesses in their preferred language.~~

43.    The State Bar of California then intentionally migrated approximately 516,000 Office of Chief Trial Counsel investigations from the AS 400 case management system to the cloud onto Tyler Technologies' Odyssey platform and created a public facing portal for free retrieval of public disciplinary records which went live on May 31, 2019.

44.    These migrated files included approximately 325,525 confidential investigations in addition to the approximately 48,114 public disciplinary matters it intended to share with the public that ended up on JudyRecords.com.

45.    Defendant Tyler Technologies, Inc. describes Odyssey as follows:

"What is Odyssey by Tyler Technologies?

Odyssey — An Open Platform At Tyler Technologies, we understand and embrace the benefits of open systems to allow courts to work most efficiently. Odyssey® leverages hundreds of APIs to connect and securely share data across multiple systems." (Exhibit B)

46.    The California State Bar never encrypted the 322,525 confidential investigation files it migrated over to Odyssey that ended up in JudyRecords.com website nor proof

that HIPAA was followed when migrating files online. Plaintiff is informed and believes and alleges thereon that either Rick Rankin and Doe Defendant never advised the State Bar that it should encrypt confidential information held by the State Bar including the 322,525 confidential investigation files it migrated to Odyssey or the State Bar refused to encrypt the files.

47.    Failing to encrypt confidential information that can be accessed by an authorized user online by the State Bar fell below the industry standard of care and was reckless, if not intentional.

~~19~~48. In August 2020, ~~OCTC~~the Office of Chief Trial Counsel integrated the online complaint portal that was launched in 2018 with the Odyssey case management system that was launched on May 31, 2019 so that, after verification, complaints submitted, including attachments, were automatically uploaded to the case management system and a new case was opened. ~~This eliminated~~

49.    The publicly stated purpose of this integration was to eliminate the need for staff to manually enter data for complaints submitted on-line. Plaintiff is informed and believes and alleges thereon that Defendant Tyler Technologies administered or assisted in this integration and was paid additional monies for it.

50.    Plaintiff is also informed and believes and alleges that Tyler Technologies failed to implement a basic online security measure called an access control check as part of the Odyssey platform that the State Bar of California (and thirteen other California county agencies) purchased.

51.    The State Bar of California failed to perform due diligence to ensure basic security measures were employed by Tyler Technologies such as "access control" prior to purchasing its software platform Odyssey.

52.    The definition of access control according to techtarget.com is "**a security technique that regulates who or what can view or use resources in a computing**

**environment**. It is a fundamental concept in security that minimizes risk to the business or organization. There are two types of access control: physical and logical."

53.    Plaintiff is further informed and believes and alleges that the State Bar of California, Tyler Technologies, Inc., Rick Rankin, Does 4 through 10, and each of them, failed to properly check or test to determine that the confidential State Bar investigation files that were migrated over to Odyssey could not be accessed online by the public on or before May 31, 2019 through February 24, 2022.

54.    Normal testing prior to bringing records online for public access where the database includes confidential information would include penetration testing ("pen testing") of portals, and to determine if the access control check was broken or missing.

55.    It is also custom and practice in the industry to maintain security measures are in place which includes, but is not limited to, periodically checking to determine if the access control check has been broken or is missing, and then to fix it after migration.

56.    Plaintiff is informed that the State Bar of California, Rick Rankin, Tyler Technologies, Inc. and Does 1 through 4 failed to maintain adequate security measures, which would include checking to see if the access control check had been broken or was missing, to prevent the release of plaintiffs' confidential information at all times mentioned in this complaint.

57.    Because either no measures were taken or inadequate measures were taken on double checking to ensure the confidential investigation files that the State Bar brought to the cloud through Tyler Technologies Odyssey were secure, the confidential investigation files held by the State Bar was open for any member of the public to scrape or harvest since May 31, 2019.

58.    This lack of access control check allowed former defendant Kevan Schwitzer to scrape or harvest 370,489 State Bar disciplinary records which included both 48,114 public records and 322,525 confidential records on or about October 15, 2021 which he

put on his free online public records search database called JudyRecords.com.

59.    Defendant California State Bar did not publish a warning that prohibited third parties from obtaining records through the same webpage.

60.    Prior to the breach, employees of the State Bar had brought it to the attention of the Board that the system was bloated with over 513,000 old confidential complaints that the employees wanted purged from the system.

~~20~~61. The State Bar ~~and Odyssey's vendor, Tyler Technologies knew the system~~has not notified the people contained ~~over~~in the 513,000 confidential complaints ~~more than five years old that were closed without discipline prior to the breach.~~that there was a data breach, even though it was confirmed after Kevan Schwitzer took down the records contained on his website, confidential State Bar records were still publicly available and indexed on Google.

62.    Jeremy Ward, employee of Tyler Technologies, Inc. confirmed in writing from Kevan Schwitzer that he did not index the California State Bar records with Google.

63.    As such, Plaintiffs are informed and believe and allege thereon a third party other than Kevan Schwitzer had already obtained the confidential State Bar investigations and distributed them elsewhere on the internet.

64.    Additionally, after this lawsuit was filed, plaintiffs discovered there was a "second vulnerability" to Odyssey the State Bar of California, Tyler Technologies, Rick Rankin, Does 4 through 10 and Kevan Schwitzer either discovered or had knowledge of, but it was not identified what that second vulnerability was in the communications produced by Kevan Schwitzer.

65.    The State Bar of California retained E-magined, a forensic security firm, which instructed the defendants to label their communications as "attorney-client" communications.

66.    Plaintiff is informed and believes and alleges thereon that Defendants Tyler

Technologies and the State Bar of California conspired to keep this breach quiet in order
to preserve their own reputation.

67.    On or about February 21, 2022, a complainant alerted the State Bar of California
that her confidential complaint was online and thought that it meant public charges were
filed against the attorney she complained about.

68.    After receiving this notification, the State Bar was able to, and should have, but
did not advise its members to change their login passwords to the Online State Bar
Portal which also holds confidential investigation correspondence, licensee information,
private email and mail addresses and a portal to pay fees by credit card.

69.    On March 1, 2022 when inquired, the State Bar responded that it cannot answer
individual questions from its members about the data breach and directed members to
the State Bar's press releases on its website.

70.    On March 3, 2022 when inquired, the State Bar again responded that it cannot
answer individual questions from its members about the data breach and directed
members to the State Bar's press releases on its website.

71.    As a result, information was requested by plaintiff's counsel as to what
confidential information that the State Bar was storing about the member, but the State
Bar refused to reveal that information based on – the information being confidential: In
response to a request for all open disciplinary investigations against a member, the State
Bar responded:

>    To the extent this request could be construed as a request for all records
>    concerning open State Bar investigations against you, all such records
>    are confidential and exempt from disclosure. (Gov. Code § 6254(f)
>    [Investigatory files compiled by a state agency for licensing purposes are
>    not subject to disclosure under the California Public Records Act]; Bus.
>    & Prof. Code § 6086.1(b) ["[D]isciplinary investigations ... shall not be
>    disclosed pursuant to any state law, including, but not limited to, the
>    California Public Records Act."].

Please be advised that these records would also be exempt pursuant to
Government Code section 6254(k), which exempts from disclosure
"records, the disclosure of which is exempted or prohibited pursuant to
federal or state law, including, but not limited to, provisions of the
Evidence Code relating to privilege." Here, any withheld records are
exempt from disclosure pursuant to the Official Information Privilege
contained in Evidence Code sections 1040 - 1042 (protecting information
"acquired in confidence by a public employee in the course of his or her
duty and not open, or officially disclosed, to the public prior to the time
the claim of privilege is made"), and the Attorney Work Product
Privilege contained in the Code of Civil Procedure section 2018.030
("Any writing that reflects an attorney's impressions, conclusions,
opinions, or legal research or theories shall not be discoverable under
any circumstances.")

State Bar Letter dated April 14, 2022.

72.    The response was the same for any confidential closed disciplinary investigation
files:

The CPRA requires that the State Bar respond to requests for reasonably
identifiable records. (Cal. Gov. Code § 6253). It does not obligate the
State Bar to answer questions or create new records in order to respond
to a records request. *Fredericks v. Sup. Ct.* (2015) 233 Cal.App.4th 209,
227 (citing *Haynie v. Sup. Ct.* (2001) 26 Cal.4th 1061, 1075). It is not
clear from your Request what record(s) you are requesting from the State
Bar. To the extent this could be construed as a request for all records
concerning closed State Bar investigations against you, all such records
are confidential and exempt from disclosure. (Gov. Code § 6254(f)
[Investigatory files compiled by a state agency for licensing purposes are
not subject to disclosure under the California Public Records Act]; Bus.
& Prof. Code § 6086.1(b) ["[D]isciplinary investigations ... shall not be
disclosed pursuant to any state law, including, but not limited to, the
California Public Records Act."].

Please be advised that these records would also be exempt pursuant to
Government Code section 6254(k), which exempts from disclosure
"records, the disclosure of which is exempted or prohibited pursuant to
federal or state law, including, but not limited to, provisions of the
Evidence Code relating to privilege." Here, any withheld records are

exempt from disclosure pursuant to the Official Information Privilege
contained in Evidence Code sections 1040 - 1042 (protecting information
"acquired in confidence by a public employee in the course of his or her
duty and not open, or officially disclosed, to the public prior to the time
the claim of privilege is made"), and the Attorney Work Product
Privilege contained in the Code of Civil Procedure section 2018.030
("Any writing that reflects an attorney's impressions, conclusions,
opinions, or legal research or theories shall not be discoverable under
any circumstances.")

State Bar Letter Dated April 14, 2022.

21~~73~~. Plaintiffs are informed and believe and allege thereon that ~~the State Bar has
published that approximately 322,525 confidential records were not published as a result
of a breach, but it was through a port that third parties such as JudyRecords.com used to
access public records from. It did not publish a warning that prohibited third parties
from obtaining records through the same port.~~based on the response given to plaintiff's
counsel, it would be a futile exercise to attempt to individually request what information
was contained in the breach from the State Bar.

~~22.    In or about October 2021, Kevan Schwitzer decided to make the California State
Bar disciplinary records part of the court records his website (JudyRecords.com)
published and he intentionally interfaced with the Odyssey portal set up by Tyler
Technologies that contained an enormous amount of confidential information from the
State Bar and published some or all of the confidential and public disciplinary data i
obtained on its website which was free and open to the public to search.~~

74.    Up to this point in time, each Plaintiff knew there was a confidential investigation
by the State Bar that had not been revealed to the public. The State Bar refused to inform
each Plaintiff whether or not that confidential investigation was part of the data breach.
The failure to inform whether or not that confidential investigation was part of the data
breach was the direct and proximate cause of plaintiff's harm. Plaintiffs suffered angst,

worry, paranoia, that their information would be in the hands of competitors, opposing
counsel, other clients, their insurance carriers or never do wells that could then steal
their identity, harass them, or commit other frauds.

75.    Up until May 19, 2022, the State Bar of California had refused to provide
Plaintiffs and all Classes any specific information about the breach, when requested,
including but not limited to whether their confidential information was breached, what
information was in the breach, and what next steps the individual can take to protect
themselves. They were merely directed to the Data Breach release on
www.Calbar.ca.gov website.

76.    Notices dated May 18, 2022 through July 11, 2022 failed to provide the
information required by the Information Practices Act of 1977. As of October 7, 2022
these failures have not been cured by the State Bar of California making their actions
willfully egregious as further alleged herein.

77.    Prior to learning of the data breach, attorneys, including plaintiffs identified in
this action, who were asked by the State Bar to turn over their private financial records
including bank statements, documents relating to family issues, medical records, social
security numbers, and biometric data such as their fingerprints, did so voluntarily
believing the information would be kept safe and remain confidential.

78.    The plaintiffs' belief and reliance that information would be kept confidential was
reasonable because multiple rules created this pocket of confidentiality surrounding the
private and confidential information of the State Bar's members. For example, the State
Bar Rules of Procedure, Rule 2301 provides: "Except as otherwise provided by law or
by these rules, the files and records of the Office of Chief Trial Counsel are
confidential." As another example, the State Bar Rules of Procedure, Rule 2302(e)(2)
provides: "(a) Except as otherwise provided by law or these rules, information
concerning inquiries, complaints or investigations is confidential, and shall not be

shared outside of the State Bar Office of Chief Trial Counsel."

79.    As a direct and proximate result of the data breach, sixty-eight percent (68%) of the members of the California State Bar who took a public online survey on or about October 5, 2022 which asked "Knowing that the California State Bar suffered a data breach which leaked out 322,525 confidential State Bar investigations, would you be less likely to submit bank records, medical records, or other sensitive information if asked by the State Bar during an investigation (even if you knew you did nothing wrong?)," responded "Yes."

80.    Plaintiff is informed and believes and alleges thereon that this will increase the fees the State Bar will charge its members and decrease the efficiency of State Bar disciplinary proceedings leading to harm to both the members of the State Bar and the public who rely on State Bar disciplinary proceedings to protect them.

~~23~~81. The Plaintiffs and all Classes did not consent, permit, let, authorize, or acquiesce in the State Bar of California to allow others to gain access to the confidential information in the custody of the State Bar of California.

~~24~~82. The Plaintiffs and all Classes did not consent, permit, let, authorize, or acquiesce in the Kevan Schwitzer (JudyRecords.com) to obtain or publish confidential information it obtained from the State Bar of California.

83.    The Plaintiffs and all Classes did not consent, permit, let, authorize, or acquiesce in any Doe Defendant to obtain or publish confidential information it obtained from the State Bar of California or index the records to Google or place them on the dark web.

~~25~~84. As a direct and proximate result of the intentional conduct by Rick Rankin, Tyler Technologies, the State Bar of California, and Kevan Schwitzer (JudyRecords.com), details of approximately ~~100 to~~ 322,525 to 513,000 confidential disciplinary records or other confidential information was ~~transferred to JudyRecords.com~~publicly searchable on the internet between May 31, 2019 and February 26, 2022, and either all or a portion

were published on JudyRecords.com for about four months from October 15, 2021 through at least February 24, 2022.

85.    Since the data breach, Jane Roe 2 has complained of identity theft resulting in the loss of money; John Roe 2 has been receiving new annoying spam to his cellphone which he did not receive before. Others similarly situated have complained about instances of either identity theft or receiving new annoying spam since the breach.

86.    Plaintiffs are informed and believe and allege thereon that Defendants State Bar of California, Tyler Technologies, Inc., Rick Rankin and Does 4 through 10 are a substantial factor in causing that harm.

## ADDITIONAL FACTS ABOUT THE CONSPIRACY

2687. Judyrecords.com site is set up to do a search by name wherein one can see the details of the investigation without having to click on the record. The search results are not uniform, but some level of detailed information shows up in a general search without having to select and view the actual file. The data includes the venue, the names of the parties, a URL to the record, and a case number.

27.    On or about February 24, 2022, a third-party complainant informed the State Bar of California that confidential records were being published on a third-party search engine at https://Judysrecords.com.

2888. As of the filing of this actionWhen this lawsuit was filed on March 18, 2022, Defendant State Bar hashad not notified the members or complainants of the breach or what confidential information (other than generically stating disciplinary records) were obtained leaving them to guess if they should do something or what they should do next, although it is best practices to notify each victim of a data breach within 10 days using an address coming from the State Bar of California.

29.    As of the filing of this action, Defendant State Bar has not reported the breach to the California Attorney General's office or local law enforcement. Instead, it used the

~~time and press to obfuscate, downplay, and deny against any liability. It has the specter
of destroying and/or covering up the evidence or wrongdoing.~~

~~30~~89. ~~As of the filing of this action~~When this lawsuit was originally filed on March 18,
2022, the California State Bar ~~has~~had only reported the public disclosure of this massive
number of confidential records on its website wherein it further states it is working on
trying to identify 1,000 out of the 322,525 confidential records that have had unique
views on the JudyRecords.com website.

~~31.    Plaintiff is informed and believes and alleges thereon that approximately 322,525
nonpublic records maintained by the State Bar of California were published on
https://Judysrecords.com website from October 15, 2021 to on or about February 24,
2022.~~

90.    When this lawsuit was originally filed on March 18, 2022, Defendant State Bar
had not reported the breach to the California Attorney General's office or local law
enforcement. Instead, it used the time and press to obfuscate, downplay, and deny
against any liability. It has the specter of destroying and/or covering up the evidence or
wrongdoing.

~~32~~91. An obscure online report by the Whittier Daily News provided "the confidential
documents published by JudyRecords.com included case number, type, status, file date
and respondent and complaining witness names" which the State Bar has now –
reduced.

~~33~~92. Plaintiff is informed and believes and alleges thereon that ~~Defendant Rick Rankin
failed to implement and maintain reasonable security procedures and practices
appropriate to the nature of the information such as their port which gave
JudyRecords.com the ability to obtain the confidential information and place it in the
public domain which the State Bar now denies any such duty.~~Defendants State Bar of
California and Tyler Technologies entered into a conspiracy to minimize the data breach

in order to preserve their reputation.

93.     The Defendants worked with E-magined and Kevan Schwitzer to obfuscate the

breach in order to maintain their reputation without regard to the victims of the breach.

94.     Coincidentally, on or about October 6, 2022 in a similar attempt to cover up a data

breach, Fortune.com reported that U.S. Attorney Stephanie M. Hinds said:

      a.     "Technology companies in the Northern District of California collect and

      store vast amounts of data from users," U.S. Attorney Stephanie M. Hinds said in

      a statement. "We will not tolerate concealment of important information from the

      public by corporate executives more interested in protecting their reputation and

      that of their employers than in protecting users."

95.     Like Uber, Tyler Technologies is a technology company that has collected a vast

amount of confidential information stored in the public sector. In California alone, it has

collected data not only from the State Bar of California but also from Merced, San

Mateo, Butte, Kings County, Sutter, Sonoma, Yuba, Stanislaus, Calaveras, Mendocino,

Tehama, and San Diego counties. All of these confidential court files were also swept up

into JudyRecords.com or other sites because the access control check was missing there

and plaintiff is informed and believes and alleges thereon that Defendants were helping

them to obfuscate the data breach too.

96.     However, it restricted access to its press release of the data breach to its paying

customers on its website because it was not only the State Bar of California Odyssey's

portal that had a missing access control check, but all of Tyler Technologies Odyssey's

platforms had missing access control checks throughout the state of California and the

United States.

97.     Over the last several years, Tyler Technologies has acquired approximately a

dozen or so companies in the information technology sector, multiplying the number of

APIs, thus expanding services it can have customers subscribe to. "API stands for

application programming interface, which is a set of definitions and protocols for building and integrating application software." (Redhat.com).

98.    One of the largest companies it recently acquired was NIC which provides online payment portals to government websites which recently had handled $84 billion dollars' worth of transactions for government entities.

~~34~~99. This money generating enterprise complements Tyler Technologies ~~has partnered with AWS to shift data to the cloud~~data management enterprise tying them together.

100.    This meant that every federal, state, and local agency using Odyssey from Tyler Technology had no access control. The door was left wide open for any third party to scrape or harvest confidential information stored in those databases, from confidential court records to State Bar disciplinary investigations. However, none of the people were provided with notice, it was just Tyler's customers.

101.    For example, putative Class Member, complaining witness CX filed a State Bar complaint concerning a criminal matter in San Mateo about a District Attorney working there. Theoretically speaking CX could have been a victim both of a County of San Mateo and a California State Bar breach where confidential records identifying her was breached because there was no access control check on either system.

102.    Defendant State Bar of California did not try to contact JudyRecords.com's owner when it first learned of the breach. It also initially lied to the public by saying they contacted law enforcement.

103.    On February 26, 2022 Kevan Schwitzer found out that the records were being reported as hacked and, not hearing from the State Bar he emailed them:

Hey, I saw these pages just a bit ago

First thing, I removed all the CA state bar court cases in the judyrecords search index. All the records downloaded were publicly accessible on this portal: https://discipline.calbar.ca.gov/

Second, I haven't been contacted about this issue and just checked for any communication from my hosting provider. Also, anyone can contact me for example on reddit with a simple google search.

These cases were publicly accessible, so my assumption is that those are the cases open to the public. They weren't protected from public access.

104. A few days later, the State Bar via Rick Rankin replied: From: Rankin, Rick

Sent: Monday, February 28, 2022 2:12:37 AM To: Kevan Schwitzer Subject: Re: ca state bar confidential data publicly accessible

Hi Kevan,

We greatly appreciate you making contact with us, for taking down the records, and for being willing to speak with us tomorrow.

It is not our current belief that any unlawful or malicious hacking occurred.

We look forward to learning more about your statement that the records were publicly available. Understanding how the nonpublic records may have been unintentionally swept up with the public records will help us to better secure our data.

Sending over the invite for tomorrow's call

shortly. Sincerely,
Rick
--

35. Using low-code or no-code solutions to build a program is quick but when integrating with databases or using other cloud services and letting the software leave the native platform endpoint security issues arise. Moreover, there was nothing in the Gannt chart or specified as to encryption of personal information or installing firewalls. A portal fix is not a reasonable industry standard solution to secure confidential records that are not encrypted.

Rick Rankin | IT Director (Interim)

The State Bar of California

105.   On February 27, 2022 Kevan Schwitzer informed Rick Rankin that the
confidential State Bar records were indexed on Google, but the State Bar did not take
action to notify the plaintiffs or other victims of the breach.

106.   Jeremy Ward of Tyler Technologies, Inc. then asked Kevan Schwitzer to pull the
records from the California Counties of Merced, San Mateo, Butte, Kings County,
Sutter, Sonoma, Yuba, Stanislaus, Calaveras, Mendocino, State Bar, Tehama, San
Diego, and Forsyth County Georgia.

107.   Kevan Schwitzer and Jeremy Ward of Tyler Technologies then worked together to
create a process to minimize exposure to create an analytic of "page views" which
Defendant State Bar of California either directed, requested, agreed to, or acquiesced in.

108.   Kevan Schwitzer started working on the project and Jeremy Ward which is
depicted as the blue Martian on the left of the text message below is crunching the
numbers:



109.

110.    Using the analytics created, the State Bar was going to say their investigation was
completed by March 7, 2022 and only 600 records were breached.

On Mon, Mar 07, 2022 at 02:18 PMjudyrecordssite@gmail.com wrote:

Also, just a few thoughts.

I believe CA Bar is basically already close to finishing their analysis of
the exposure. To the extent that they are able to say that only say 600
cases were exposed, esp. compared to the numbers that were thrown out
individually, I think that can be a big win as far as being able to pigging
back on Cal Bar's analysis, as well as being able to point to their ability
to specifically determine which cases were affected.

They were basically able to tie up loose ends with the
investigation/analysis portion within 1 week. In my opinion, that's
incredible for being able to give other jurisdictions a similar level of

> confidence both in scope and ability to take appropriate action for the
> exact affected cases.
>
> Re:a few thoughts
> **W** jeremy.ward@tylertech.com
> Mar 07, 2022, 2:49 PM
>
> That is a very good point. I'm hoping that we can use CA Bar as an
> example of what can be done here once they have the right information.

111.   Based on the communications between Rick Rankin, Jeremy Ward and Kevan
Schwitzer, plaintiffs are informed and believe and allege thereon that the State Bar
requested a way to message that the breach was very small and agreed with Tyler
Technology to use the model developed for Tyler Technologies purposes of having the
rest of its customers also publish that there was minimal harm as a result.

112.   Plaintiffs are informed and believe and allege thereon that both the State Bar of
California and Tyler Technologies, Inc.'s sole concern was to get the information to
their clients as to how to minimize exposure.

113.   On March 8, 2022 Kevan Schwitzer (identified as judyrecordssite@gmail.com
received a communication from Rick Rankin that the State Bar determined the number
of confidential records viewed would be around 1100.

> On Tue, Mar 08, 2022 at 10:48 AM judyrecordssite@gmail.com wrote:
>
> fyi, rick from cal bar said preliminarily 1100 cases were viewed that
> were meant to be confidential.
>
> i don't think he would mind me sharing that, so maybe that gives
> some helpful context. cal bar also seemed to have an unrepresentative
> high% of non-confdidential cases.
> Re: cal bar tentative case count
> **W** jeremy.ward@tylertech.com
> Mar 08, 2022, 1 :59 PM

That's great info. I believe you said CalBar had approximately 20,000 non- public cases in your system. Is that correct? If so, that would be a great percentage for us.

On Tue, Mar 08, 2022 at 03:05 PM judyrecordssite@gmail.com wrote:

322,375 non-public cases in Cal Bar system, which I would tentatively say is extremely high.
Total count was 370,489. After removing non-public cases, I have 48,114 cases currently.

114.    A few hours later, the defendants started getting into a disagreement about the messaging:

On Tue, Mar 08, 2022 at 05:00 PM judyrecordssite@gmail.com wrote:

OK, I have already mentioned what is the most important issue. I do not want to have to fight against the idea that you either think I intentionally downloaded non-public records or are not sure and are keeping your options open to legally come after me. After having given a mile already, I DO NOT want to be backed into a corner.

Also, in case it will help to calm the situation, there are certain things I can say that I think would help calm the situation as well.

For example, when I was able to say the Cal Bar number of affected cases is tentatively < 1,000 I think that helped put perspective on the issue, and even allowed them to refer to this comment on their data breach FAQ page. Cal Bar wasn't in a position to make a statement like that, and I'm in a position to make a similar kind of estimate on the outstanding data sources as well. My estimate proved to be pretty close the first time.

Being able to say my estimate for the total number of affected cases 6-7k or less across spread out over 30 jurisdictions I think would be useful. That would amount to an average of 200 cases per portal that has the technical issue. I personally think that would be huge to be able to say that.

**W** jeremy.ward@tylertech.com
Mar 08, 2022, 4:13 PM

I understand your perspective and I've tried to represent that to the best
of my ability. If the statement gets posted and you have additional
comments, I can try to get those updated as the page will be a living
document based on our continued collaboration. We appreciate how
much

you have provided already and look forward to continuing that
relationship in an attempt to calm the tension between Tyler's clients
and you/us.

As far as the estimates you provided, I'll share those with our teams. That
number should help calm our internal teams. I do not think we could put
those in our communication yet, but they can potentially be used verbally
when talking with clients.

**W** jeremy.ward@tylertech.com
Mar 08, 2022, 8:20 PM

We actually did a fair bit of research on Scraping vs. Harvesting after
you mentioned it. From the attached screenshot, Harvesting and Scraping
are both mentioned. We also checked with outside legal counsel and they
said that from a purely court case perspective, Scraping has been cited as
malicious in many court cases. By their definition, Harvesting would be
considered less malicious from a Legal perspective…

On Tue, Mar 08, 2022 at 09:30 PM judyrecordssite@gmail.com wrote:

OK, at the end of the day I'm not going to put words in your mouth. In
my opinion, there is nothing unambiguous about the access method or
the lack of authorization checking.

I have to defend myself about any doubt of malicious/criminal intent and
am not going to sit around with that being an open question.

Here are a few things I remember my boss telling me after I showed him
what happened and to get his feedback:

"Are you serious?"
"Wow."
"That's a rookie mistake."

36.    The State Bar of California has refused to provide Plaintiffs and all Classes any
specific information about the breach, when requested, including but not limited to if
their confidential information was breached, what information was in the breach, and
what next steps the individual can take to protect themselves. They have been merely
directed to the Data Breach release on  www.Calbar.ca.gov  website which does not
provide the information required by the Information Practices Act of 1977.

**W** jeremy.ward@tylertech.com
Mar 09, 2022, 12:59 PM

For clarity's sake, we are ready to pull the trigger on Dallas and when
they respond to us, we'll provide the results right back. Once we get you
the results for Forsyth, would you be willing to provide the full set for
Dallas?

Re:plan for short update
points **W**
jeremy.ward@tylertech.com
Mar 09, 2022, 3:24 PM

Is there a way for you to "officially confirm" that you remove the
Forsyth records from your system?

Also, at this point we are holding on the CA clients you shared as we need to
deal with them as a single bucket. We are working Dallas Co TX now
and should be sending that back to you as soon as we can.
Where do we stand on the remaining Tyler clients?

On Wed, Mar 09, 2022 at 04:42 PM judyrecordssite@gmail.com wrote:

This is the gist of what I intend to say, and reflecting our progress today
as well. I may add a bit more to the end to clarify why this is important
to me, but I'm not sure what I'll say exactly.

There have been significant steps in collaboration with Tyler
Technologies and the State Bar of California over the last week.n

I believe the Cal Bar will be releasing more detailed information soon,
but anticipate that the number of estimated cases exposed to be
relatively close to my original estimate of &lt; 1,000.n

Working with Tyler Technologies, we have identified a subset of portals that
may be similarly impacted, and judyrecords has saved case identifiers
that will allow cross-referencing between systems.n

**W** jeremy.ward@tylertech.com
Mar 09, 2022, 5:27 PM


Any chance You could say that "Together, we have tentatively identified a

process

**W** jeremy.ward@tylertech.com
Mar 10, 2022, 5:00 PM

We have not communicated that page broadly, other than to our clients. …

On Thu, Mar 10, 2022 at 08:56 PM judyrecordssite@gmail.com wrote:

I initially considered all the direct access data sources as not having the
authentication on direct access, but did not clarify those specifically.
I think you may be thinking of me mentioning to Rick/Nick about a
vulnerability I found a long time ago in an Odyssey system, where it
showed all confidential documents and the ssns contained within them,
and I submitted that to the clerk.

I actually have a screenshot of this from 2013 when I submitted the
issue and the corresponding email.

On Thu, Mar 10, 2022 at 07:39 PM jeremy.ward@tylertech.com wrote:

Ahh, I understand. I'll have to get with our internal team on your
question. Let me get back to you as soon as possible.

Does this have anything to do with the 2nd "vulnerability" that we had
initially discussed?

> Re:New question
> **W** jeremy.ward@tylertech.com
> Mar 18, 2022, 10:35 AM
>
> Morning, we've noticed that some of the pages from your site are being
> indexed by google (and presumably other search engines). We're not
> sure yet, but the concern would be that some of the non-public cases
> might have been indexed and are still visible.

115.   But Kevan Schwitzer did not have the records indexed on Google making it

plausible another party had already accessed those confidential records and placed them

on the internet.

116.   Plaintiffs are informed and believe and allege thereon this massive data breach

was contained because the federal, state, county and local agencies followed suit of the

State Bar of California and kept the issue quiet going along with the lead Tyler

Technologies, Inc. and the State Bar of California were doing.

> Re: What happened With Tyler Technologies
> **W** jeremy.ward@tylertech.com
> Mar 21, 2022, 6:46 PM
>
> In reviewing your most recent posts on this page, we see that you have
> posted information about Forsyth, GA. Posting information of that
> nature without consent from Forsyth may put them in an unexpected
> situation that they do not desire. It may dis-incentivize other Tyler
> clients from providing information to us (and you) if they are
> concerned that you will post sensitive information about their ongoing
> investigations.
> We request that you remove the info regarding Forsyth,
> GA. Thanks.

117.   Tyler Technologies intentionally limited access to its communications about the

data breach to its customers that could access the information online by logging in

instead of being forthright and addressing the public as a whole whose confidential data

in court systems, State Bar and other agencies had been put at risk and or published on

JudyRecords.com.

118.    Defendant State Bar immediately hired E-magined to work on the data breach,
which plaintiffs are informed and believe demonstrate Defendant State Bar of
California's attempt to quickly shut down access to communications about the data
breach by having E-magined direct Kevan Schwitzer and others to cloak their
communications as "attorney client privileged"

> Re: State Bar of California + judyrecords.com connect
>
> Hi Kevin. Great work today sir, I appreciate all of the collaboration you've
> had with us!
> For future communication, let's leverage the following tag:
> Attorney-Client Privileged/Attorney Work
> Product on all emails.
>
> Additionally, if you'd like to connect over signal, my number is [redacted]
> Thanks again,
> Nicholas
>
>
> Nicholas Albright
> CTO/VP, Managed Security Services
> Office: [redacted]
> Mobile: [redacted]

119.    From communications obtained, plaintiffs are informed and believe and allege
thereon there were approximately 141 records (plus or minus 34) where Complainants
were identified. JudyRecords was able to also extract social security numbers and date
of birth although the former was not a designated column, and the latter was.

120.    JudyRecords apparently downloaded whatever the web case URL returned instead
of specific fields. In the case of the confidential State Bar investigations, the breach was
the public knowledge the record itself existed which identified a person by name, not
that any part of the record had to contain confidential information itself.

121.   Public knowledge of disciplinary investigations and the number provoke others to perceive the attorney negatively as demonstrated by Kevan Schwitzer's email to Rick Rankin where he implies the same related to this lawsuit.

122.   As such, the State Bar of California, Tyler Technologies, Inc., Rick Rankin and Defendant Does 4 through 10 chose to protect their reputation over the reputation of the victims of the data breach knowing that the breach automatically would generate some sort of reputational harm to the victim aka plaintiffs and putative class.

123.   The breached confidential disciplinary records indexed on Google and elsewhere are nothing more than fake public disciplinary records floating around on the internet or dark web which poses the same risk to the attorneys who have been publicly disciplined.

124.   On or about May 18, 2022, after this lawsuit was filed, the State Bar through a third party with an email address from admin@castatebarodysseynotice.com sent out emails which said in pertinent part…We are notifying you because your nonpublic State Bar record(s) showed evidence of a page view on judyrecords….The State Bar verified that this vulnerability allowed judyrecords to scrape both public and nonpublic State Bar attorney discipline case records from the Odyssey Portal. The scraping occurred on or about October 15, 2021…Importantly, the Odyssey vulnerability was only triggered by web scraping; regular searches of the Odyssey Portal did not permit access to nonpublic records. There is no evidence to suggest the Odyssey Portal was scraped by any entity besides judyrecords. The investigation revealed no evidence that scraped State Bar records were on internet archive sites.

125.   Plaintiffs are informed and believe that the statement that there was not evidence that the State Bar records were not otherwise on the internet is not true because it is clear from the communications provided by Kevan Schwitzer the records were indexed on Google and Kevan Schwitzer never indexed the records on his site to google.

126.   Additionally, on May 23, 2022 admin@castatebarodyssyenotice.com sent other

emails that stated basically the same thing but there was "no evidence" of a "page view."

127.    Similar types of email and mail correspondence went out to members of the State Bar and complaining witnesses through July 11, 2022.

128.    The emails were below the standard of best practices because the email obfuscated the breach, did not come from a familiar and trusted email address from the State Bar of California, and the subject line did not refer to the State Bar Data Breach. Instead, the Subject line of the email provided "Informational Notice Re Odyssey Portal Vulnerability."

129.    Plaintiffs are informed and believe and allege thereon many of these emails went unopened and into spam as a result giving no notice to plaintiffs and the putative class. Moreover, the contents of the notice did not contain the sections required under the Information Practices Act.

130.    Additionally, it was evidence of the conspiracy to reduce the potential harm by focusing on "page views" based on a model the defendants created and has not been tested by an unbiased source or firm that did not have a motive to make those numbers or the breach as low as possible.

131.    Some attorneys who received the notice did not properly understand the notice to mean that a confidential disciplinary record appeared on JudyRecords.com because the notice said there were no page views making the notice deceitful.

37132.    Members of the State Bar of California and members of the public rely on the State Bar of California to keep disciplinary records confidential until formal charges are filed for the safety and protection of everyone involved.

38133.    The delay in providing specific and unambiguous information andalong with meaningful steps for the victim plaintiffs to take, harms the Plaintiffs and all members of all Classes because the Plaintiffs and all members of all Classes are being prevented from taking any steps to mitigate the fallout from their information being

published for others to see. They need to know what information was out there so they can mitigate harm. ~~The State Bar~~, how far it reached or at least what was potentially open to be exposed.

134.    The State Bar notice clearly discloses at least one social security number was found in the batch they reviewed. As such, it is irrelevant what the fields in JudyRecords.com were labeled.

135.    The State Bar could have released the members fingerprints and social security numbers along with investigation information. The State Bar could have released the Complainants home address or an investigation of a supervisor. Not knowing and not getting any specific information when requested is causing anxiety, worry, and emotional distress.

~~39~~136.        Public disclosure of such private facts including the identity of a complainant or member under investigation can lead to reputation loss, job loss, identity theft, extortion, blackmail, emotional distress, paranoia, annoyances, harassment, anxiety, other frauds, and in extreme cases bodily injury or loss of life. A complainant may suffer in their employment if they complained about their boss or may have a chilling effect on finding future representation to their injury. Likewise, an attorney could be harmed by others knowing the State Bar opened an investigation thus causing a chilling effect where potential clients will look elsewhere for representation. Additionally, an investigation on a complaint of stalking or violence leaked out to the public could lead to the respondent prematurely learning of it, leading to potential bodily harm upon the complaining victim. Likewise, not all investigations or even most complaints are meritorious; having an unmeritorious complaint land on a public website can lead to reputational harm, threats of extortion, or even job loss or loss of job opportunities. The reputation of an attorney is one of the most valuable assets an attorney has, and this can devastate his or her entire livelihood. It can cost anywhere

between $10,000.00 to $25,000.00 per year to just try to combat and repair reputational harm on the internet.

40137.    This is not the first time the State Bar of California has been notified that it has released the confidential information of complainants or members. There are two decades of complaints by attorneys and complaining witnesses that have been engaged in the disciplinary system showing State Bar's reckless conduct in disclosing confidential information without recourse.

41138.    This disclosure of approximately 100 to 322,525 confidential records by Defendants and failureunreasonable delay to notify has caused harm to the Plaintiff and all Classes, including but not limited to, time, expense, worry, anxiety, reputational harm, and emotional distress.

139.    After this action was filed, the State Bar began using the Odyssey case management system and online portal again without any assurance it took all proper security measures to keep the information confidential causing additional distress to the plaintiffs and all classes. Investigation is still continuing, and Plaintiffs and all members of all Classes reserve the right to amend the factual allegations as more information is discovered.

42140.    A claim wasThree claims were filed with the State Bar of California even though a private right of action exists outside the Tort Claims Act which—then the State Bar started to sweep it all under the rug.on March 13, 2022 for both attorneys and complainants in compliance with the California State Bar tort claims act. Those claims were denied by the State Bar. Approximately six more tort claims were filed with the State Bar of California on September 20, 2022 representing both plaintiffs and complainants. None of those claims have been accepted by the State Bar of California. Those plaintiffs identified to the State Bar prior to the May communications sent by a third party on behalf of the State Bar, did not receive a communication.

## **CLASS ALLEGATIONS**

~~43~~141.        Class Definition: Plaintiffs bring this suit as a class action pursuant to

California Information Practices Act of 1977, rights under the California and United

States Constitution, and Antitrust laws, on behalf of themselves and all other similarly

situated persons as a member of a Class defined as follows:

    a.  All California residents identified in the approximately 188 to 322,525

       confidential aka "nonpublic" California State Bar records received by Kevan

       Schwitzer, the owner/operator of

       ~~https://JudyRecords.com~~https://JudyRecords.com which include both:

         i.    Complainants; and

         ii.   Members of the State Bar of California

~~44~~142.        Excluded from the Class are the Court, Defendants, and their affiliates,

subsidiaries, current or former employees, officers, directors, agents, representatives,

and their family members.

~~45~~143.        Numerosity: The persons who comprise the Plaintiff Class are so numerous

that the joinder of all such persons is impracticable and the disposition of their claims as

a class will benefit the parties and the Court. Class members are so numerous and are

dispersed throughout the state that joinder of all Class members is impracticable. Class

members can be identified, *inter alia*, through records maintained by the Defendants.

~~46~~144.        Common Questions of Fact and Law: Nearly all factual, legal, statutory,

declaratory, and injunctive relief issues that are raised in this Complaint are common to

the Plaintiff Class and will apply uniformly to every member of the Plaintiff Class:

    a.    Whether Defendants violated the California Information Practices

    Act of 1977.

    b.    Whether Defendants violated the Plaintiff Classes constitutional rights.

    c.    Whether Defendants violated antitrust laws.

d.    Whether Defendants were negligent.

~~47~~145.    Defendants have acted or refused to act on grounds generally applicable to the class.

~~48~~146.    A class action is superior to other methods for the fast and efficient adjudication of this controversy and to avoid the risk of disparate and inconsistent rulings in different courts. A class action regarding the issues in this case does not create any problems of manageability.

~~49~~147.    The nature of notice to the proposed class required and/or contemplated would Defendant's list, when disclosed, would most likely be notice through email from Defendant's list which already identifies the complainants and attorney members along with their contact information, including email is the best practicable method possible. Also, mailing, media, the internet and/or other general notices are contemplated to ensure notice.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of California Information Practices Act of 1977**
**(All Plaintiffs and All Classes Against Defendant State Bar of California)**

~~50~~148.    Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through ~~49~~147 above as though fully set forth herein.

~~51~~149.    Plaintiffs bring this claim on their behalf and on behalf of all other Class members.

~~52~~150.    Defendant, State Bar of California, is a public corporation that owns or licenses computerized data that includes personal information of California residents. It is therefore subject to the Cal. Civil Code § 1798.29.

~~53~~151.    Defendant, State Bar of California, has a duty under California Civil Code § 1798.24 to not disclose personal information in a manner that would link the information disclosed to the individual to whom it pertains.

a.  As identified herein, Defendant failed to do so with 260,000 records or so.

      b. As a direct and proximate result of Defendant's acts, Plaintiffs', and
class members' unencrypted confidential information was subjected
to unauthorized access and exfiltration, theft, or disclosure.

~~54~~152.      Defendant, State Bar of California, also has a duty under California Civil
Code § 1798.29 to prevent Plaintiffs' and class members' nonencrypted and nonredacted
personal information from unauthorized access and exfiltration, theft, or disclosure.

      a. As identified herein, Defendant failed to do so with 260,000 records or so.

      b. As a direct and proximate result of Defendant's acts, Plaintiffs', and
class members' unencrypted confidential information was subjected
to unauthorized access and exfiltration, theft, or disclosure.

~~55~~153.      Defendant, State Bar of California, has a duty under California Civil Code
1798.21 to establish appropriate and reasonable administrative, technical, and physical
safeguards to ensure compliance with the Information Practices Act of 1977 ("IPA") for
it to follow to ensure the security and confidentiality of records, and to protect against
anticipated threats or hazards to their security or integrity which could result in any
injury.

      a. As identified herein, Defendant failed to do so.

      b. As a direct and proximate result of Defendant's acts, Plaintiffs', and
class members' unencrypted confidential information was subjected
to unauthorized access and exfiltration, theft, or disclosure.

~~56~~154.      Defendant, State Bar of California, also has a duty to implement and
maintain reasonable security procedures and practices to protect this personal
information.

      a. As identified herein, Defendant failed to do so.

      b. As a direct and proximate result of Defendant's acts, Plaintiffs', and
class members' unencrypted confidential information was subjected
to unauthorized access and exfiltration, theft, or disclosure.

57155.    Defendant, State Bar of California, also has a duty to disclose any breach of
the security of the system following discovery or notification of the breach in the
security of the data to any resident of California in the most expedient time possible and
without unreasonable delay (1) whose unencrypted personal information was, or is
reasonably believed to have been, acquired by an unauthorized person, or, (2) whose
encrypted personal information was, or is reasonably believed to have been, acquired by
an unauthorized person and the encryption key or security credential was, or is
reasonably believed to have been, acquired by an unauthorized person and the agency
that owns or licenses the encrypted information has a reasonable belief that the
encryption key or security credential could render that personal information readable or
usable.

      a. As identified herein, Defendant failed to do so.

      b. As a direct and proximate result of Defendant's acts, Plaintiffs' and
class members' have been left to worry, anxious to know if their
information was contained in the breach and what information that was
causing emotional distress. Others still do not know about the breach
and cannot take steps to protect themselves due to the breach.

58156.    Defendant, State Bar of California, has a duty to issue a security breach
notification (1) written in plain language, shall be titled "Notice of Data Breach," and
shall present the information described in paragraph (2) under the following headings:
"What Happened," "What Information Was Involved," "What We Are Doing," "What
You Can Do," and "For More Information."

a. As identified herein, Defendant failed to do so.

b. As a direct and proximate result of Defendant's acts, Plaintiffs' and
class members' have been harmed.

59157.         Defendant, State Bar of California, also has a duty to report the breach to
the California Attorney General and ensure that a sample copy of a breach notice sent to
more than 500California residents was provided to the California Attorney General.

a. As identified herein, Defendant failed to do so.

b. As a direct and proximate result of Defendant's acts, notice to Plaintiffs
and class members has been further delayed.

60158.         Plaintiffs and Class Members seek injunctive or other equitable relief to
ensure Defendant adequately safeguard all confidential information going forward, by
implementing reasonable security procedures and practices. This relief is particularly
important because Defendant continues to hold Plaintiffs' and Class Members'
confidential information which includes biometric information of other members of the
State Bar of California.

61159.         Plaintiffs and Class Members have an interest in ensuring that their
confidential information is reasonably protected, and Defendant has demonstrated a
pattern of failing to adequately safeguard this information.

62160.         As a direct and proximate result of Defendant's conduct alleged above,
Plaintiffs and the Class have been harmed entitling them to injunctive relief. Plaintiffs
and all Classes are also entitled to actual and/or statutory damages, online reputation
repair/branding subscription, emotional distress damages for the worry, delay, anxiety
and extreme distress, costs, and an award of attorney fees.

63161.         Plaintiffs and the class are also entitled to exemplary damages due to
Defendant's act(s) of oppression, malice, or fraud, including but not limited to the

events laid out herein showing that Defendant's conduct subjected Plaintiff and all
Classes to cruel and unjust hardship in conscious disregard of their rights.

## SECOND CAUSE OF ACTION
### Invasion of Privacy – Cal Constitution
### (All Plaintiffs and All Classes Against All Defendants)

~~64~~162.        Plaintiffs incorporate herein by reference paragraphs 1 through ~~63~~161
above in this pleading as though fully set forth herein.

~~65~~163.        This cause of action is being brought on behalf of Plaintiffs and all
members of all Classes.

~~66~~164.        Plaintiffs and the class had a legally protected privacy interest in the
322,525 confidential records released from the State Bar of California.

~~67~~165.        Defendant represented the information would be confidential, including but
not limited to during the investigation stage, while in the special program, and/or that
the records were sealed.

~~68~~166.        Plaintiffs and the class had a reasonable expectation of privacy in the
confidential information under the circumstances laid out in the complaint.

~~69~~167.        The Defendants, Tyler Technologies, State Bar of California, Rick Rankin,
Kevan Schwitzer (JudyRecords.com), and Does 4 through 10's conduct constituted a
serious invasion of privacy causing injury to the Plaintiffs and all Classes because those
records were confidential and/or the public access to the confidential records would be
highly offensive to an objective reasonable person.

~~70~~168.        Plaintiffs are informed and believe that Defendants still have not encrypted
the information before going back online and taken other standard industry security
measures leaving plaintiffs at further risk.

~~71~~169.        As such, Plaintiffs and the Class members are entitled to injunctive relief
against all Defendants.

72170.       Plaintiffs and the Class are entitled to costs and reasonable attorney fees.

### THIRD CAUSE OF ACTION
**Invasion of Privacy**
**(All Plaintiffs against Defendant Tyler Technologies, Kevan Schwitzer (JudyRecords.com) and Does 4 to 10)**

73171.       Plaintiffs incorporate herein by reference paragraphs 1 through 72170 above in this pleading as though fully set forth herein.

74172.       This cause of action is being brought on behalf of all Plaintiffs and all members of all Classes.

75173.       Defendant, Kevan Schwitzer (JudyRecords.com), Tyler Technologies, and Does 4 to 10, intentionally (1) received information, not otherwise public, (the confidential disciplinary records); and/or (2) released some or all of that information which it knows or should reasonably have known was obtained from personal information maintained by the State Bar of California, invading the privacy of the Plaintiffs and all members of all Classes pursuant to Cal. Civ. Code § 1798.53.

76174.       Public disclosure of these private facts (the confidential disciplinary records) would be offensive and objectionable to the reasonable person and were not a legitimate public concern.

77175.       As a direct and proximate cause, Tyler Technologies and Kevan Schwitzer's conduct and the conduct of Does 4 to 10 harmed the Plaintiffs and all members of all Classes.

78176.       Defendant Tyler Technologies, Defendant Kevan Schwitzer (JudyRecords.com) and Defendant Does 4 to 10's invasion of the Plaintiffs' and class members' privacy has been a substantial factor in causing them to expend unnecessary time in trying to figure out what is going on, also shock, fear, mental suffering, anxiety, humiliation, emotional distress; harm to reputation and/or loss of standing in the community entitling them to special and general damages.

79177.      Plaintiffs and all members of all Classes are entitled to costs and attorney
fees.

80178.      Plaintiffs and all members of all Classes are also entitled to exemplary
damages of at least

$2,500.00 each pursuant to Cal. Civ. Code § 1798.53.

## FOURTH CAUSE OF ACTION
### ~~Antitrust Violation Under the Sherman Act § 2~~
### (Sherman Act § 1 brought pursuant to authorization under §4 of the Clayton Act (All Attorney Member Plaintiffs ~~Against~~against Defendants ~~Tyler Technologies, the~~ State Bar of California, ~~and~~Tyler Technologies, Does ~~4 to 10~~4-10)

81179.      Plaintiffs incorporate herein by reference paragraphs 1 through 80178
above in this pleading as though fully set forth herein.

82180.      This cause of action is being brought on behalf of ~~the~~ Attorney Member
Plaintiffs and all members of the Attorney Member Class.

~~83.    The State Bar of California bought and installed Tyler Technologies Odyssey case management system for approximately $5 million in 2019.~~

181.    This cause of action is being brought pursuant to the authorization under § 4 of the Clayton Act.

182.    Defendants State Bar of California, Tyler Technologies and Does 4-10 made an agreement or entered a conspiracy resulting in an unreasonable restraint of trade, and causing antitrust injury as specifically alleged below in the Conspiracy to Restrain Trade by Obfuscating the Data Breach Section.

183.    The State Bar of California Board is controlled in part by marketplace participants (7 board members out of 13 members are attorneys). Defendants State Bar of California, Board and Does 4-10 made an agreement to create a regressive fixed disciplinary cost sheet resulting in an unreasonable restraint of trade, and causing antitrust injury as specifically alleged below in the Price Fixing Section.

184.   Plaintiffs are informed and believe and allege thereon, both restraints combined have exponentially caused harm to the plaintiffs and the class as well as increased inefficiencies in the market, although one restraint alone is enough to and has injured competition in the PeopleLaw Market.

185.   The John Roe and Jane Roe plaintiffs have been injured based on the State Bar's price fixing scheme and their conspiracy with Tyler Technologies to restrain trade as further alleged in this cause of action.

## CONSPIRACY TO RESTRAIN TRADE BY OBFUSCATING THE DATA BREACH

84186.          Defendants, Tyler Technologies, and the State Bar of California, Tyler Technologies, Inc. and Does 4 tothrough 10 have violated Section 2§1 of the Sherman Antitrust Act by attempting to monopolize to the injury of the Attorney members plaintiffs and the class.when they conspired to cover up the lack of security of plaintiffs' confidential information and/or minimize the data breach by recasting the breach as "page views" when the Defendants actually knew that 322,525 confidential disciplinary investigations from the State Bar were open on the internet as more fully alleged above. The motive was to preserve the reputation of the State Bar, Tyler Technologies and Does 4-10 by obfuscating the same breach involving other agencies over 30 different jurisdictions including a dozen or so counties in California.

85.    The market in this case is comprised of the approximately 250,000 members of the California State Bar.

187.   The conspiracy to cover this up in order to preserve their own reputations was illegal and/or violated policies, procedures or best practices when it comes to notifying victims as quickly as possible in order to mitigate any future harm that could be caused by the breach.

188.   Neither the California Supreme Court acting legislatively nor the state legislature has articulated a clear policy to allow this anticompetitive conduct which was an abuse or misuse of their power and even if it did, the state is not actively supervising this anticompetitive conduct of the State Bar and Tyler Technologies in downplaying, concealing, obfuscating, or covering up the data breach by sending confusing "notices" to plaintiffs and all Class members about "page views;" or not revealing the data breach connection with the other agencies to the plaintiffs and all Class members; or concealing there was evidence the records were found indexed on Google; or delaying the notices to the plaintiffs and all Class members so this page view model could be used for messaging to protect the Defendants' reputations and downplay the size of the breach which confused the plaintiffs and class, if they received any notice at all.

189.   Plaintiffs allege the defendant's conduct not only harmed the plaintiff attorneys but also adversely affected competition generally by decreasing the client's ability to freely choose amongst members of the Bar by improperly tainting the plaintiffs and putative class in this pool with fake disciplinary dockets floating around the internet about the member attorneys, thus causing an antitrust injury. It has also exploited a section of the Bar leaving them open to exploitation by the Organization Clients sector.

190.   Plaintiffs are informed and believe and allege thereon this unlawful conduct by Defendants State Bar of California, Tyler Technologies, Inc. and Does 4-10 caused an injury to the plaintiffs and Class members that flows from that which makes the conduct unlawful (the conspiracy obfuscating the data breach and price fixing reducing the PeopleLaw Market and making it more costly), and that is of the type the antitrust laws were intended to prevent causing antitrust injury as more fully alleged below.

## MARKET POWER

~~86~~191.        The State Bar ~~of California is a public corporation with a $200 million budget that has monopoly power over licensed attorneys~~has legally acquired market

power over the members who can practice law in the State of California having an effect
on interstate commerce. The disciplinary system in the State Bar mainly disciplines solo
practitioners and consumer lawyers that represent plaintiffs against large corporations,
insurance companies, or the government.and who are the plaintiffs/breach victims
identified in this complaint. There is market power held by the State Bar in the market
upstream which is licensing of attorneys and there is another market downstream which
is providing legal services. To practice in state court one must be a member of the State
Bar.

87.    One theory why solo practitioners are disciplined more than defense counsel of
large firms is that large corporations hire large firms to defend them and if there is
dissatisfaction in the legal representation, the large corporation merely takes their
business (and money) elsewhere.

88.    Defendant Tyler Technologies is a $1.8 billion dollar company and the leading
provider of technology solutions to local, state, and federal public sector agencies using
a "Low-code platform allowing for rapid deployment of new technologies and
services." "Low-code" simply means they use elements such as those offered by AWS
to build software platforms rather than having to know how to code or having to write
the code software program itself.

89.    In or about 2016, the State Bar accepted the bid from Tyler Technologies to
build out a case management system called Odyssey for the OCTC, State Bar Court and
Office of Probation although that bid was nearly $1 million more than the bid from its
competitor, thus having the ability to profitably raise prices above those that would be
charged in a competitive market.

## THE PEOPLELAW MARKET

192.   The Legal Market Landscape Report linked in the 2020 State Bar Discipline
Report suggests "[t]here is ample evidence that the legal profession is divided into two

segments, one serving individuals (PeopleLaw) and the other serving corporations (Organizational Clients)." As such, the Market in this complaint consists of mainly solo practitioners like John Roe 2, Jane Roe 2 and Jane Roe 3 which represent the people called the PeopleLaw Market. At the high end of the pay scale is the Organizational Clients Market which consists of lawyers who work in large firms representing large organizations.

## DIFFERENT MARKET BEHAVIOR

193.    Clients obtaining legal services in the two market sectors behave differently economically speaking: the people in the PeopleLaw Market will file complaints against their attorney when dissatisfied, but clients in the Organizational Clients Market will merely move their money to another large firm when dissatisfied.

194.    The Legal Market Landscape Report also provides "solo practitioners…were much more likely to serve individuals," i.e., the PeopleLaw market.

195.    The 2020 State Bar Annual Discipline Report further explains that "solo practitioners are at greater risk of having complaints filed against them."

196.    This creates a breeding ground for inefficiencies in the market. The State Bar 2020 Annual Discipline Report suggests the decline in solo practitioners (who tend to serve the PeopleLaw market) led to a rise in self-representation which would be "output reduction." As such, a conspiracy that hurts solo practitioners can be expected to reduce output and therefore cause antitrust harm.

197.    The Office of Chief Trial Counsel in turn also behaves differently depending on the market it deals with. For example, putative class member DG defending mainly DUI clients (a member of the PeopleLaw Market) had a local District Attorney (part of the Organizational Clients Market) encourage the State Bar OCTC to push through a State Bar disciplinary complaint against the attorney in the PeopleLaw Market. The Office of Chief Trial Counsel took the complaint and decided to actively participate in the process

all the way to acting Chief at the time, to formulate it in a way that by sending it to the
Intake Unit it would get sent back to the OCTC for prosecution.

198.    The anticompetitive conduct affected interstate commerce because the conspiracy
between the State Bar and Tyler Technologies and Does 4 through 10 affected members
of the Bar who lived outside the state of California or out of state consumers needing
representation from members of the Bar in California. Their model using a "page view"
to downplay the scope of the breach and additional vulnerabilities was also used in
interstate commerce.

199.    Plaintiffs allege that the Conspiracy to restrain trade under § 1 of the Sherman
Antitrust Act between Defendant State Bar of California and Tyler Technologies makes
it less likely that attorneys will continue to volunteer information in State Bar
investigations which will increase costs for investigations and decrease public protection
of accurately filtering the bad attorneys out of the PeopleLaw Market.

200.    The State Bar of California and other agencies continues to Tyler Technologies,
Inc. Odyssey and related software programs and APIs due to Tyler Technologies' own
market power in the public sector that is currently increasing. PeopleLaw Market
members are not as willing to volunteer confidential information anymore to the State
Bar which reduces efficiency in the market because there is a risk of a future data breach
covered up by Tyler Technologies, Inc. and the State Bar of California blocking the
member plaintiffs and Class will not be able to ameliorate the harm. It makes State Bar
investigations less efficient and makes it harder for consumers to choose quality
attorneys because the State Bar will be even less effective at eliminating the bad ones.
This overall affects consumer welfare and competition that the antitrust laws were
enacted to protect.

201.    As shown in the survey taken of members after the breach, nearly 68% of the
members of the California State Bar are no longer willing to voluntarily provide

confidential information during an investigation such as their financial records or medical records. The qualitative analysis combined with this small quantitative data supports rational behavior of the plaintiffs and class.

202.   This new reluctance to volunteer information will increase the costs of State Bar investigations because the State Bar Office of Chief Trial Counsel will be required to do more investigative work than before the breach driving up the costs for State Bar investigations.

203.   As alleged above, the member plaintiffs will have to pay for the increased investigative work at the State Bar because State Bar investigations are self-funded by members, causing injury to the plaintiffs and putative class.

204.   This transfer of costs will not be a perfect substitute for voluntary submission of confidential information by members so the State Bar investigations will be less efficient, leading to less protection of the public at the same cost base, too.

205.   If the plaintiff attorneys and members in the PeopleMarket are charged too much, they will be compelled to pass that extra cost off to consumers seeking services (potential clients in the PeopleLaw Market), increasing prices thus cutting out the people at the lowest rung in the PeopleLaw Market of obtaining legal representation at one of their most vulnerable times in their life, forcing them to represent themselves.

206.   Increasing the number of self-represented people in the PeopleLaw Market creates further inefficiencies in the administration of the court and justice, which is an issue the State Bar is currently dealing with because the PeopleLaw Market has decreased as shown in the study above.

207.   The data breach caused by the Defendants which released fake disciplinary records on the internet, has created a negative reputation of plaintiffs and the class, and when a potential client runs into that information, the potential client, making an economically rational choice, will choose the attorney without a disciplinary record

without knowing the internet disciplinary record (which may have led to a negative
Google or Yelp review) was fake. Once something is on the internet, it is impossible to
ensure it remains deleted from the internet. Yet, there has been nothing done by the State
Bar to inform the people that an internet search of an attorney may show fake results
about the attorney's competency or reputation. This creates an inefficiency in the
PeopleLaw Market when consumers are trying to make an economic choice when
selecting an attorney. Additionally, there will be additional inefficiencies in the State
Bar disciplinary process leading to less public protection.

90208.    ~~Plaintiff alleges~~Defendants Tyler Technologies ~~had market power in the
public sector by 2021, when Defendant Tyler Technologies acquired NIC the leading
provider of digital services to state and federal government agencies, making Tyler
Technologies the dominant technology provider to public agencies in the United States.
Many of the business leaders come from the public sector.~~, Inc. and the State Bar of
California conspired to withhold the information about the breach. They obfuscated the
breadth and impact in order to protect their own reputation making the breach worse for
the member victims.

~~91.    After receiving notice that 260,000 confidential disciplinary records were
publicized on www.JudyRecords.com, the Board of the State Bar failed to notify the
California Attorney General or the 260,000 members and complainants in violation of
state law.~~

~~92.    Instead, the Board of the State Bar of California decided to leave the
complainants and members under investigation to be castigated by the wiles of the
internet and worked with, conspired, partnered, joined, permitted, or acted in concert
with Tyler Technologies and Kevan Schwitzer (JudyRecords.com to try to obfuscate
and minimize what happened rather than use any of the powers at its disposal that
would invoke oversight by a politically accountable official, including but not limited~~

to, failing to report the breach to the California Attorney General as required by
California law.

93.    Plaintiff is informed, believes, and alleges thereon that Defendant Tyler
Technologies and the State Bar of California failed to create a secure environment to
store or manage confidential State Bar disciplinary records online in Odyssey which
was paid for in part by the members of the State Bar.

94.    Defendant Tyler Technologies chose to act with the State Bar violating the rights
of the plaintiffs and the class members.

95.    As a result, the breach only concerned attorneys that the State Bar chose to
investigate for disciplinary actions; plaintiffs allege that the State Bar Board's failure to
act was due to anticompetitive animus.

96.    As a direct and proximate result, Tyler Technologies and the State Bar of
California joined in anticompetitive behavior which benefited lawyers who did not
have confidential disciplinary records in the State Bar Odyssey case management
system.

97.    This interfered with trade and the economic competition amongst the attorneys of
the State Bar of California.

98.    By exposing confidential records online and then not giving the plaintiffs or
class the information required by law so that they could mitigate their fears or
exposure, the Defendants' conduct, and each of them, is akin to pernicious
monopolistic behavior no less harmful than if they had published sham litigation
shaming the attorneys to drive out competitors.

99.    Publication of confidential disciplinary complaints (1) unreasonably restricts
competition in the legal profession because potential clients are advised to avoid
attorneys who have been disciplined or are being investigated for alleged unethical

conduct; and (2) unreasonably restricts access to justice or legal representation for the
complainants because attorneys are advised to avoid clients who have had multiple
attorneys or attorneys that have been disciplined.

100209.    This injury to the Plaintiffs and all members of this class is the type that
antitrust laws were made to prevent.

101210.    Prior to the data breach, the State Bar was already set up to allow
decisionmakers in the State Bar and those outside of the process to destroy competing
members through the disciplinary process like DG above. This could be achieved in
many ways, including but not limited to, conditioning reinstatement on a payment that
the member had no financial means to pay, or making false complaints outside the
system like the price fixing scheme alleged below.

211.    Plaintiff attorneys and the Class have and/or will suffer harm in the form of
increased State Bar costs, possibly fewer clients, reputational harm, paranoia, anxiety,
emotional distress, put at risk of extortion, bribery or other types of frauds, harassment
(spam), and increased risk of loss of income or barrier to reenter the profession that the
plaintiff chose.

102.    This discriminatory conduct stifles competition and restricts equal access to the
courts for consumers and litigants of limited means while also evading violating the
excessive fines clause of the Eighth Amendment because such "and until" conditions
allow the State Bar to impose a discipline akin to disbarment indirectly based on the
attorney's lack of wealth which it could not impose directly, based on the alleged
violation.

103.    Finally, the plaintiffs allege that the State Bar of California Board is not entitled
to Parker state- action immunity because it is controlled in part by marketplace
participants (7 board members out of 13 members are attorneys). The state empowered
a group of active market participants (other lawyers) in the State Bar to decide who can

participate in its market (the legal profession), and on what terms. Yet, the State does
not actively supervise the policymakers and decisionmakers in the State Bar.

~~104~~212.    As a proximate result, the plaintiffs and class have been harmed and the
defendants caused that harm warranting injunctive relief ~~is warranted~~for both the
conspiracy and the illegal price fixing.

~~105.~~   ~~As~~213.    Under the Clayton Act, as a further proximate result, actual damages,
if any, attorney fees, costs and treble damages are warranted.

### PRICE FIXING AS A BARRIER RESTRAINT ON TRADE

214.    Second, the Governing Board, a majority of which are Market participants, agreed
to create a fixed Disciplinary Cost sheet (attached). Plaintiffs and class members must
pay these amounts in order be able to hold an active license if the Office of Chief Trial
Counsel informs the attorney it is going to file charges. The Costs sheet is regressive
because the member must pay more if the member chooses to defend him or herself as
alleged in the facts above.

215.    This price fixing affects interstate commerce because attorneys do not have to
reside in California to be a member of the State Bar, and members of the State Bar who
reside outside the state have been victims of the data breach. Moreover, attorneys who
do reside in California represent clients in California courts that reside outside the state.

216.    Neither the California Supreme Court acting in its legislative capacity, nor the
state legislature required the State Bar to create a Regressive Fixed Cost sheet that
increases in amount based on the stage of the proceeding. Additionally, the court does
not actively supervise this anti-competitive conduct.

217.    The agreement by the Board of the State Bar of California to fix the disciplinary
costs and make the member pay more to defend him or herself if they choose to have a
hearing on the matter in a disciplinary board matter *is illegal* because the statutory
scheme, for example, has no provision requiring the adjudicator to consider the financial

condition of the plaintiffs or class members prior to imposing the costs. (See, *California
Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 349).

218.    The Board of the State Bar has controlled the price of Disciplinary Costs by
creating the Fixed Disciplinary Costs Sheet (attached) that falls more heavily on
PeopleLaw Market lawyers much more than others. In a study of 874 lawyers in the
disciplinary system from 2014 to 2016 eleven percent (11%) sought a waiver or
modification of the costs imposed based on financial hardship. A substantial portion of
lawyers in the disciplinary system that did not seek a waiver or modification of the costs
imposed were provided a payment plan at a reduced cost because they stipulated to the
charges instead of going to trial to defend against them.

219.    The Cost structure is akin to a regressive tax which becomes unaffordable to the
solo practitioner at the bottom of the lawyer rate scale (in the PeopleLaw Market) who
want to defend against the charges by a huge margin. In 2014 the cost to pay before
charges were filed was $2,992.00 but to go to trial was $7,253.00 for one day and to
take the case to the Review Department cost $20,005.00. Today, the cost to pay before
charges is filed is $3,693.00 but to go to a one-day trial is $8,952.00 and to take the case
to the Review Department costs $24,695.00. At trial, the State Bar OCTC goes first,
spending the entire first day trying their case, increasing the disciplinary costs by 225%
on the costs sheet to $20,188.00 for the attorney desiring to put on a defense. Attorneys
must pay this cost even if the most egregious charges which impugned the lawyer's
character are never proven. Furthermore, unlike ABA Model Rule 10 which does not
allow any "and until" conditions to attach to the length of the period of suspension, the
suspension period is prolonged until the attorney pays those State Bar disciplinary costs,
without a stipulation from the OCTC or a waiver or modification granted by the Bar, of
which, there is no absolute right to.

220.    This is a barrier to reentry for those lawyers who are solo practitioners at the

bottom of the fee scale in the PeopleLaw Market. The State Bar controls which attorneys to file charges against and offer a stipulation to at a lower rate. The attorney may accept the charge on grounds other than culpability based on the cost to defend, thus unnecessarily harming his or her reputation. Other attorneys who seek to defend the charges against them must pay more than the attorney offered a stipulation prior to any charges being filed. The existing floor price for legal services in the PeopleLaw Market rises by getting rid of the attorneys who provide legal services at the low end of the hourly fee scale (PeopleLaw Market). The State Bar survey showed from 2014-2016 approximately eleven percent (11%) found this to be a barrier to re-entry which barred them from reentry into the practice of law. That is going to reduce the number of suppliers, which in this case are attorneys providing services to the people such as plaintiff side civil rights/consumer rights lawyers, and criminal defense in the PeopleLaw Market. This barrier to reentry increases the price for legal services at that level for those seeking affordable legal services that solo practitioners and small firms provide. This also takes the pressure off those lawyers providing legal services at the higher end of the pay scale (Organizational Clients Market) from justifying the higher priced hourly rates.

221.    This has reduced and continues to reduce the number of competitors at the lower end of the attorney fee structure offered to the public and since this group of lawyers providing these services exert a pressure to the cost for legal services at the higher end of the food chain that affects competition.

222.    Standing alone, this is the type of anticompetitive conduct the Sherman Act and Clayton Act were created to govern against because trying to provide Legal services in a professional environment where this type of anticompetitive conduct of the Bar exists has an actual sustained adverse effect on the market.

223.    This structure of having the State Bar members pay the disciplinary costs as a

service highlights a recurring problem of public entities imposing fiscal burdens on those that can least afford them.

224.   The California State Bar relies on self-generated revenue, most of which comes from its own members. Seeking to obtain that revenue by pursuing legal actions against lawyers in the PeopleLaw Market can have damaging effects on the community. Not only does it unfairly make the PeopleLaw Market endure most of the costs of the State Bar disciplinary system as a regressive tax, but it takes advantage of the members in the PeopleLaw Market when they are at their most vulnerable stage of their career.

225.   Such practices can undermine the perceived integrity of the legal process, too.

226.   The State Bar Disciplinary Cost Sheet scheduled in this regressive fashion and the way it is enforced constitutes price fixing or other restraint on trade under §1 of the Sherman Antitrust Act.

227.   In other words, by reducing an appreciable number of suppliers in the PeopleLaw Market (by 11% from 2014 to 2016), the price for services in the PeopleLaw Market will increase at that level and at the same time will take the pressure off the lawyers providing services in the Organizational Clients Market to contain their higher hourly fee structure.

228.   This reduced number of competitors in the PeopleLaw Market will raise the price in that market, forcing more people to represent themselves leading to inefficiencies in the legal services sector or eventually closing the ability for some of the most vulnerable people in the PeopleLaw Market to seek meaningful redress at all.

229.   The data breach which distributed confidential investigations on the internet has only exasperated this anti-competitive behavior because as the State Bar study showed the PeopleLaw Market has been declining by 10% and the PeopleLaw Market endures the most complaints. Consumers are less likely to hire this attorney and more likely to "pile on" complaints online or with the State Bar because consumers do not understand

that the confidential investigations on the internet are nothing more than fake disciplinary records. This aggravates the anticompetitive conduct created by the barrier to reentry and makes that barrier even larger – and the risk could make reentry for competent and ethical lawyers in the PeopleMarket no longer attainable on a permanent basis causing injury to the plaintiffs and the class.

230.    As such there is antitrust injury as a result of the fixed State Bar Disciplinary Costs which has caused increased costs to the plaintiffs and a barrier to re-enter the PeopleLaw Market thus decreasing the supply of PeopleLaw Market attorneys for consumers to choose from increasing the costs of legal services in this sector.

231.    As a direct and proximate result, plaintiffs and all Class members will be harmed from the price fixing, in the form of choosing between reputational harm and loss of potential business or risking taking it to trial and being barred from reentry because the price is too high to pay. Further harm as alleged herein includes but is not limited to the possible "pile on" complaints or harassment causing extra time, expense and serious emotional distress, or loss of ability to practice in one's chosen profession, and depression.

232.    As a proximate result, injunctive relief is warranted for the illegal price fixing.

233.    Under the Clayton Act, as a further proximate result, actual damages, if any, attorney fees, costs and treble damages are warranted.

### THE COMPOUNDED EFFECT OF THE FAKE DISCIPLINARY RECORDS

234.    As alleged above, the conspiracy to cover up or obfuscate the data breach is almost worse than the breach itself in the PeopleLaw Market.

235.    The fake disciplinary records online plus whatever other confidential information was released onto the internet from May 31, 2019 to the present can make the barrier to re-entry that much harder for the suspended plaintiff or Class member. For example, it

could make it harder to obtain work and increases the risk of "pile on" complaints
causing injury to the plaintiffs and class. It makes the PeopleLaw Market cost more,
reduces the efficiency in the market and also irrationally reduces consumer choice in this
Market. It also takes pressure off the Organizational Client Market in keeping their
prices lower.

236.    The fake disciplinary reacords online in any format on the internet increases the
cost to do business for the plaintiff or Class member that is actively practicing law, too.
It still creates the risk of making it much harder for the attorney to obtain new clients
(work) and increases the risk of "pile on" complaints causing injury to the plaintiffs and
the class. A study was done showing if an officer followed someone driving down the
road for any length of time, the driver would have committed several driving infractions.
This is called the broken tail-light scenario. The more "pile on" complaints the State Bar
receives about an attorney, the more likely the State Bar will eventually find a way to
discipline that attorney. (the broken tail-light scenario). The data breach makes this
scenario that much more likely thus taking more PeopleLaw Market attorneys and
putting them in the State Bar disciplinary wheelhouse. Consumers have no way of
knowing what is legitimate or what is fake. Most cannot even understand what is being
conveyed in Orders, opinions or Disciplinary Charges.

237.    Unpacking this economic model and overlaying with a rational behavior model,
the data breach with the conspiracy to cover up the data breach in a monopoly that has
members paying the costs of a disciplinary system that creates a barrier to re-entry only
further reduces the choice a consumer in the PeopleLaw Market will make, thus leading
to increased risk that inaccurate consumer choices will be made. This will lead to
increasing the risk of harm to the consumer and harming the plaintiff attorneys with the
fake disciplinary records online who may lose that potential client or become disciplined
based on the "pile on" complaints where the State Bar eventually finds a broken tail-

light.

238.   Another anticompetitive injury shown by anecdotal evidence, is that some members of the Organizational Clients Market will use those fake disciplinary records as an advantage to "pile on" more State Bar complaints or harass, vex, annoy to gain other advantage. Some former clients in the PeopleLaw Market may use the fake records to "pile on" and file State Bar complaints that otherwise would not have been filed or as a way to obtain a payout by the Client Security Fund which includes payment based on an allegation of "unearned fees."

239.   As a proximate result, the plaintiffs and class have been harmed and the defendants caused that harm warranting injunctive relief for both the conspiracy and the illegal price fixing.

240.   Under the Clayton Act, as a further proximate result, actual damages, if any, attorney fees, costs and treble damages are warranted.

**FIFTH CAUSE OF ACTION**
**Antitrust Violation Under the Sherman Act § ~~3~~2**
**(~~All~~ Attorney Member Plaintiffs ~~against~~Against Defendants the State Bar of California, ~~Tyler Technologies,~~and Does ~~4-10~~4 to 10)**

~~106~~241.    Plaintiffs incorporate herein by reference paragraphs 1 through ~~105~~240 above in this pleading as though fully set forth herein.

~~107~~242.    This cause of action is being brought on behalf of the Attorney Member Plaintiffs and all members of the Attorney Member Class.

~~108.   Alternatively, to the Fourth Cause of Action, Defendants, the State Bar of California, Kevan Schwitzer (JudyRecords.com) and Does 5 to 10 have violated Section 3 of the Sherman Act.~~

~~109.   Defendant, the State Bar of California and Does 5 to 10 unlawfully restrained competition of lawyers by unduly hindering the lawyers whose confidential information was breached from employing his or her talents, industry or capital in a~~

~~lawful undertaking or attempted to do so, thus keeping the public from receiving legal services as freely as it would without such restraints.~~

243.   The allegations of the State Bar's Monopoly, Market definition, Market Power, interstate commerce, and lack of Parker Immunity alleged in Cause of Action Number Four above is explicitly incorporated as though such allegations were laid out herein.

**DISCIPLINARY COSTS AS A REFUSAL TO DEAL**

244.   Incorporating the above Section 1 claim, focused on the State Bar disciplinary costs, if said claim is not a §1 Sherman Antitrust violation, then it is a violation under §2 of the Sherman Antitrust Act because here, we have the unreasonable terms and conditions predicated on payment of money when the OCTC decides it will file disciplinary charges. The price fixed by a Board consisting of market participants is too high in this monopoly environment. By the State Bar demanding the member in the PeopleLaw Market pay a cost that the Bar has reason to know the member cannot afford to pay in order to have a hearing on the matter or to appeal a decision on the merits, the offer with such unreasonable terms and conditions are a refusal to deal.

245.   Additionally, or alternatively, if the cost is demanded as a term or condition to reentry into the PeopleLaw Market while the plaintiff's license is suspended; the plaintiff cannot earn the money to pay the cost making it such an unreasonable term and condition which also amounts to a practical refusal to deal.

246.   Third, the State Bar costs deter the right to go trial. The Costs amount to a practical refusal to deal when the attorney is charged with multiple offenses and all of the most egregious offenses are dismissed at trial, leaving one or two technical violations akin to a broken taillight. The Costs are fixed where the attorney must pay the entire cost bill, it is not offset in a pro rata manner based on the fact that most charges were dismissed. The OCTC does not have to prove probable cause before filing the charges, either. The OCTC should know at the beginning the attorney who cannot afford

to go to trial will still go to trial to defend against the egregious allegations, thus setting up a way to permanently disbar an attorney by erecting the Disciplinary Cost barrier to reenter the PeopleLaw Market based on the costs.

247.    As a proximate result, the plaintiffs and class have been harmed and the defendants caused that harm warranting injunctive relief because the State Bar Board's cost sheet has the practical effect of being a refusal to deal.

248.    Plaintiffs and the class are also entitled to damages if any, costs, attorney fees and treble damages.

### ATTEMPT TO MONOPOLIZE THE FEDERAL BAR/COURTS

249.    Defendant State Bar of California had a specific intent to monopolize using predatory or anticompetitive conduct directed at accomplishing the unlawful purpose of attempting to control who could practice in federal court; and had/has a dangerous probability of achieving this monopoly power by threatening plaintiffs and class members in the PeopleLaw Market with allegations of committing a felony if they practiced in the federal court market (even when the federal court allowed it) as more particularly described below.

250.    The State Bar of California has a legally acquired monopoly power over who can be admitted to and practice in the state courts in California.

251.    The federal courts have legally acquired monopoly power over who can be admitted to and practice in the federal courts.

252.    The separation of the two systems is important from the perspective of the PeopleLaw Market lawyers because lawyers who represent the People at times are not favored in the state system. For example, a PeopleLaw Market lawyer may represent clients seeking legal redress for civil rights violations against state and local agencies. In order to quell those lawsuits and deter filing those lawsuits all a State Bar has to do is begin disciplining those attorneys and taking their licenses away to practice in state

court or make the barrier of re-entry to costly giving the same effect as a disbarment. As
such, the federal courts do not have attorneys leave out of the same door the attorney
may have entered into their Federal Bar under *Theard, Selling,* and *in re Poole.*

253.    Neither the California Supreme Court acting legislatively nor the state legislature
has articulated a clear policy to allow the State Bar to attempt to regulate who can
practice in federal court, and even if it did, the state is not actively supervising this
anticompetitive conduct of the State Bar in investigating and disciplining plaintiff
members for unauthorized practice of law against suspended attorneys who *have not had*
their membership suspended in the federal court(s).

254.    The State Bar of California has attempted a monopoly over who can practice in
federal court by threatening to charge or charging the plaintiffs and class members of
unauthorized practice of law (UPL) in federal courts during a suspension in state court.

255.    The plaintiffs and Class members that are inactive or suspended have been
thwarted from seeking to maintain their membership in the federal court(s) based on the
State Bar's attempt to monopolize who can practice in federal court as further alleged in
this cause of action.

256.    By threatening, investigating and/or disciplining suspended attorneys who have
practiced law in federal court when their membership *was not suspended in federal
court* is an attempt by the California State Bar to increase its monopoly power beyond
the practice of law in the state of California and into the jurisdiction of the federal court
which is unconstitutional.

257.    Plaintiffs and the class are informed and believe based on the footnote in the May
18, 2022 Odyssey Portal email that State Bar confidential investigations of the purported
unauthorized practice of law ended up on the internet as disciplinary records in
JudyRecords.com and possibly elsewhere.

258.    This type of conduct unfairly tends to destroy competition itself. For example, the

unauthorized practice of law is a felony which can result in the attorney's incarceration (loss of liberty) in addition to their license to practice law in the state of California. Unlike the state court, the federal court has no legitimate reason to continue a suspension after the set term based on the attorney's failure or inability to pay the State Bar disciplinary costs which can keep the attorney suspended infinitum. The federal court is simply not a debt collector for the State Bar.

259.    A second type of anticompetitive behavior arises from the Organizational Client Market who may "pile on" by reporting the alleged unauthorized practice of law to harass, vex, annoy or obtain some other benefit in its self-interest.

260.    A third type of anticompetitive behavior arises from the State Bar initiated investigations and discipline —some of whom on the Board have offered litigations services—using their position to act in their own self-interest by threatening to charge the suspended attorneys with unauthorized practice of law which is a felony and thereby expel the attorney from the PeopleLaw Market in federal court, too.

261.    Rational behavior of most plaintiffs and Class members that have felt the heavy knee on their neck by the State Bar of California is to cease and desist such practice even if the federal court has authorized it due to the risk of being charged with a felony and possibly incarcerated.

262.    This will create a barrier to reenter the profession for the plaintiff attorneys who are suspended; a barrier to make a living while suspended; and a barrier to practice in the PeopleLaw Market in federal court in those cases where the federal court has so consented. It will deter and has deterred suspended attorneys from even trying which makes it harder to reenter because there is no way for a substantial portion of the attorneys in the PeopleLaw Market to pay the reentry Disciplinary Costs or makes it that much harder to do so to the plaintiff members injury.

263.    This will decrease the suppliers of PeopleLaw Market lawyers in federal court. It

will also decrease the pool of PeopleLaw Market lawyers who can provide pro bono
services leaving the pro bono work for people in the PeopleLaw Market to rely on pro
bono assistance from lawyers in the Organizational Clients Market.

264.    The economic market inefficiencies will also have an effect in the courtroom
because it will increase the cost of access to the federal courts in the PeopleLaw Market
for consumers and those seeking redress based on their civil rights. It will harm the
consumer because some will no longer be able to afford an attorney and will either
forego pursuing or defending their rights in the PeopleLaw Market or try to do it
themselves.

265.    It will also lessen the pressure on the higher cost for legal services in the
Organizational Clients Market; increasing costs for legal services in the Organizational
Clients Market.

266.    This will lead to inefficiencies in the market, reduce the supply of legal services to
the PeopleLaw Market and create more administrative inefficiencies in the judicial
system as more people go unrepresented.

267.    The data breach has only compounded this problem as repeatedly alleged above.

268.    As such there is antitrust injury as a result of the threat or actual investigations
which has caused a barrier to re-enter the PeoplesLaw Market.

269.    A confidential unauthorized practice of law record on the internet may have the
added negative injury of enticing more grifters to use the breached State Bar members
records for identity theft purposes as the behavior tends to match a perceived copycat
model, especially when so much legal work is now accomplished online and remotely.

270.    The same injuries alleged in the other claims of antitrust violations above exist
here, too.

271.    As a direct and proximate result, plaintiffs and the Class have been harmed by the
confidential investigations for unauthorized practice of law released onto the internet by

the Defendants.

272.    Plaintiffs and the Class members have a risk of loss to reputation, risk of identity theft, harassment, "pile on" complaints, and increased risk of loss of income or barrier to reenter the profession that the plaintiff chose not due to the plaintiff's own incompetence.

273.    As a further proximate result, by the State Bar attempting to monopolize the practice of law in federal court, the plaintiffs and the class lose income only exasperating the problem.

274.    This also undermines the legitimacy, independence and integrity of the federal courts.

275.    For example, a State Bar investigative report drafted by the Office of Chief Trial Counsel shows Office of General Counsel told a lawyer in the Organizational Client Market that the opposing lawyer in the PeopleLaw Market was unlawfully practicing law in the Ninth Circuit although the Ninth Circuit issued an Order expressly consenting to the practice of law knowing the State Bar had suspended the lawyer's license. Based on this knowledge, plaintiffs are informed and believe more internal communications like this exist and during discovery more will come out.

276.    In another case, putative class member DG has an email from the State Bar to a District Attorney informing the District Attorney that the State Bar will file public charges, but were debating whether to send the complaint to the public intake unit to read it coming from the District Attorney or as an Internal State Bar investigation.

277.    The State Bar has overreached unlawfully restraining the plaintiffs' and class members ability to provide services in the federal court without threat of possible incarceration, causing harm to the plaintiffs and class members including loss of rights, fear of loss of liberty, financial damage and mental harm.

278.    Because there is no oversight, there is a dangerous probability that the State Bar

of California will succeed without giving the federal court a chance to weigh in on who can practice before them in their court without injunctive relief.

~~110~~279.    As a proximate result, injunctive relief is warranted.

~~111.    As a further proximate result~~280.    Plaintiffs and the Class members are entitled to, actual damages, if any, attorney fees, costs and treble damages are warranted.

## SIXTH CAUSE OF ACTION
### Negligence
### (All Plaintiffs against Defendants Tyler Technologies, State Bar of California, and Rick Rankin)

~~112~~281.    Plaintiffs incorporate herein by reference paragraphs 1 through ~~80~~280 above in this pleading as though fully set forth herein.

~~113~~282.    This cause of action is being brought on behalf of all Plaintiffs and all members of all Classes.

~~114~~283.    Plaintiffs and all class members personal and/or confidential information was disclosed to one or more third parties.

~~115~~284.    Defendant State Bar of California and Rick Rankin were under a mandatory duty and owed a duty of due care to plaintiffs and all class members to (1) provide reasonable notice of the breach; (2) provide the plaintiffs and members steps to take to protect themselves; (3) institute proper security measures to keep the information confidential; and/or (4) maintain proper security measures to ensure the information remained confidential.

~~116~~285.    Defendant Tyler Technologies voluntarily undertook to take responsibility for one or more of their Co-defendant's duties and/or owed the Plaintiffs and all members of all Classes a general duty of care when securing the confidential disciplinary records so it could not be accessed through the portal.

~~117~~286.    Defendant State Bar of California, Rick Rankin and Tyler Technologies breached that duty by failing to (1) provide reasonable notice of the breach; (2) provide

the plaintiffs and members steps to take to protect themselves; (3) institute proper

security measures to keep the information confidential;

 (4) secure the portal and/or (5) maintain proper security measures to ensure the

information remained confidential.

118287.    Plaintiffs and all class members stood in a special relationship with the

Defendant State Bar of California as members of the State Bar or complainants and as

such were damaged by the Defendant's breach of its duty of care.

119288.    Defendant Tyler Technologies, State Bar of California, and Rick Rankin

were a substantial factor in causing the plaintiffs and all class members emotional

distress due to the delay and failure to notify, including but not limited to, fear, anxiety,

paranoia, shame, loss of sleep, depression, and spending time and expense trying to

figure out what they could do to protect themselves, their reputation and/or their health

wellbeing.

120289.    Plaintiffs and all class members are entitled to actual damages and general

damages.

## SEVENTH CAUSE OF ACTION
### Negligence per Se
### (All Plaintiffs against All Defendants)

121290.    Plaintiffs incorporate herein by reference paragraphs 1 through 80 and 112

through 120289 above in this pleading as though fully set forth herein.

122291.    This cause of action is being brought on behalf of all Plaintiffs and all

members of all Classes.

123292.    Plaintiffs and all class members personal and/or confidential information

was disclosed to one or more third parties.

124293.    Plaintiffs and all class members stood in a special relationship with the

Defendant State Bar of California as members of the State Bar or complainants and as

such were damaged by the Defendant's breach of its duty of care or its agents or

employees such as Tyler Technologies, Rick Rankin and Does 4 through 10.

~~125~~294.    Defendant Kevan Schwitzer owed a duty to all plaintiffs and all class members not to violate their right to privacy under Cal. Const. Art 1 § 1 and/or not to violate Cal. Civ. Code § 1798.53.

~~126~~295.    Plaintiffs and all class members were protected members of the class in Cal. Civ. Code §§ 1798.21, 1798.24, 1798.29, 1798.53 and/or Cal Const Art. 1 § 1.

~~127~~296.    Defendants violated one more Code or Constitutional Article as referred to above.

~~128~~297.    As a direct and proximate cause of Defendants' violation(s) of law, the plaintiffs and all class members suffered emotional distress, including but not limited to, fear, anxiety, paranoia, shame, loss of sleep, depression, and spending time and expense trying to figure out what they could do to protect themselves, their reputation and/or their health wellbeing.

~~129~~298.    Plaintiffs and all class members are entitled to actual damages and general damages.

## **PRAYER FOR RELIEF**

### **First Cause of Action – Cal. IPA 1977**

    1. Injunctive relief;

    2. Actual damages;

    3. General damages;

    4. Costs;

    5. Attorney fees; and

    6. Any further relief the court would deem appropriate and just.

### **Second Cause of Action – Invasion of Privacy**

    1. Injunctive relief;

    2. Costs;

   3. Attorney fees; and

   4. Any further relief the court would deem appropriate and just.

**Third Cause of Action – Invasion of Privacy**

   1. Actual Damages;

   2. General Damages;

   3. Costs;

   4. Exemplary Damages of at least $2,500.00 per Plaintiff and class member;

   5. Attorney fees; and

   6. Any further relief the court would deem appropriate and just.

**Fourth Cause of Action - Antitrust**

   1. Actual Damages;

   2. General Damages;

   3. Costs;

   4. Attorney fees;

   5. Treble Damages; and

   6. Any further relief the court would deem appropriate and just.

**Fifth Cause of Action - Antitrust**

   1. Injunctive relief;

   2. Actual Damages;

   3. General Damages;

   4. Costs;

   5. Attorney fees;

   6. Treble Damages; and

   7. Any further relief the court would deem appropriate and just.

**Sixth Cause of Action - Negligence**

   1. Actual Damages;

2. General Damages;

3. Costs; and

4. Any further relief the court would deem appropriate and just.

**Seventh Cause of Action – Negligence per se**

1. Actual Damages;

2. General Damages;

3. Costs; and

4. Any further relief the court would deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all legal claims.

Dated: ~~April 13~~October 8, 2022      Respectfully

Submitted,

> LAW OFFICES OF LENORE ALBERT
> /s/ Lenore Albert_____ LENORE
> Attorney for Plaintiffs, John Roe 1, Jane Roe
> 1, Jane Roe 2, Jane Roe 3, and John Roe 2,
> *on behalf of themselves and all others*
> *similarly situated*

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE:
 I declare that I am over the age of 18 years, and not a party to the within action; that
I am employed in Orange County, California; my business address is ~~31872 Joshua
Dr #22C, Trabuco Canyon~~1968 S. Coast Hwy #3960, Laguna Beach, CA
~~92679~~92651. On ~~May 19~~October 7, ~~2021~~2022, I served a copy of the following
document(s) described as:
~~FIRST~~SECOND AMENDED CLASS ACTION COMPLAINT AS CORRECTED
On the interested parties in this action as follows:

**For Defendants State Bar of California**
Leah Wilson, Executive Director
845 S. Figueroa St.
Los Angeles, CA 90017
213-765-1000

**For Defendant Rick Rankin**
Rick Rankin
845 S. Figueroa St.
Los Angeles, CA 90017
213-765-1000

**For Defendant Tyler Technologies, Inc.**
Lynn Moore, Jr. President & CEO
5101 Tennyson Parkway
Plano, TX 75024
(800) 966-6999

**For Defendant Kevan Schwitzer**
Kevan Schwitzer
6909 State Hwy 161, Apt #320
Irving, TX 75039
Email: Judyrecordssite@gmail.com

**[x] BY E-SERVE and EMAIL –** I caused such document(s) to be transmitted to the
office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es)
set forth. (Per Covid-19 Order)

**[x] BY MAIL–** I caused such document(s) to be placed in pre-addressed envelope(s) with postage thereon fully prepaid and sealed, to be deposited as regular US Mail at Huntington Beach, California, to the aforementioned addressee(s).

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: ~~April 13~~October 10, 2022

–/s/Lenore Albert_____
                    Lenore Albert

## SERVICE LIST

**For Defendants State Bar of California**
COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
TIANA DEMAS (*pro hac vice*) (tdemas@cooley.com)
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Telephone: (312) 881-6500
Facsimile: (312) 881-6598
BARRETT J. ANDERSON (318539) (banderson@cooley.com)
WALTER WAIDELICH (300798) (cwaidelich@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420
GREGORY MERCHANT (341287) (gmerchant@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

VANESSA L. HOLTON (111613)
General Counsel
ROBERT G. RETANA (148677) Deputy General Counsel
SUZANNE C. GRANDT (304794)
Assistant General Counsel
**OFFICE OF GENERAL COUNSEL**
**THE STATE BAR OF CALIFORNIA**
180 Howard Street
San Francisco, CA 94105-1639 Telephone: 415-538-2388; Facsimile: 415-538-2517
Email: suzanne.grandt@calbar.ca.gov

Second Amended Class Action Complaint
*Roe v The State Bar of California, et al.*                    22-cv-00983-DFM

**For Defendant Rick Rankin**
JEFFER MANGELS BUTLER & MITCHELL LLP
MICHAEL A. GOLD (Bar No. 90667)
*mgold@jmbm.com*
JUSTIN ANDERSON (Bar No. 328969)
*Janderson@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567


**For Defendant Tyler Technologies, Inc.**
Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Zachary T. Timm (SBN 316564)
zach.timm@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard Seventh Floor Los Angeles, California 90067
Telephone: 310.552.5000 Facsimile: 310.552.5001

Beth W. Petronio, admitted *pro hac vice*
beth.petronio@klgates.com
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5815
Facsimile: (214) 939-5849

**ECF LIST:**

Barrett J. Anderson        banderson@cooley.com, efiling-notice@ecf.pacerpro.com,
efilingnotice@cooley.com, mdejesus@cooley.com

Beth W. Petronio        beth.petronio@klgates.com

Christina N. Goodrich        christina.goodrich@klgates.com,
klgateservice@klgates.com

David Belcher        david.belcher@faegredrinker.com,
docketgeneral@faegredrinker.com, shanta.teekah@faegredrinker.com


Gregory John Merchant        gmerchant@cooley.com

Justin Alexander Anderson        janderson@jmbm.com, learly@jmbm.com,
mastercalendar@jmbm.com

Lenore L Albert        lenalbert@interactivecounsel.com,
docket@interactivecounsel.com, lenorealbert@msn.com

Michael Allan Gold        mgold@jmbm.com, cl7@jmbm.com,
mastercalendar@jmbm.com, MGold@jmbm.com

Michael G Rhodes        rhodesmg@cooley.com, efiling-notice@ecf.pacerpro.com,
eFilingNotice@cooley.com, john-brocales-7263@ecf.pacerpro.com,
mrhodes@cooley.com, smartinez@cooley.com

Peter William Baldwin        peter.baldwin@faegredrinker.com,
peter.baldwin@usdoj.gov, USACAC.criminal@usdoj.gov

Robert G Retana        robert.retana@calbar.ca.gov, joan.randolph@calbar.ca.gov

Suzanne Grandt        suzanne.grandt@calbar.ca.gov, joan.randolph@calbar.ca.gov

Tiana A. Demas        tdemas@cooley.com, efiling-notice@ecf.pacerpro.com,
efilingnotice@cooley.com

Vanessa L Holtonvanessa.holton@calbar.ca.gov

Walter Waidelich        cwaidelich@cooley.com, kjones@cooley.com

Zachary Thomas Timm        zach.timm@klgates.com, klgateseservice@klgates.com

EX A

# Discipline Costs

## Effective January 1, 2022

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the year-on-year percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2022, the adjustment is an increase of 3.81%.

Effective January 1, 2022, the costs assessed for disciplinary matters will be as follows[3]:

| Original Proceedings | 2021 | 2022 |
|---|---|---|
| Matters that go in Default | 5,165 | 5,362 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | 3,558 | 3,693 |
| Matters that Settle during first 120 days of proceeding | 4,159 | 4,317 |
| Matters that Settle before Pretrial Statement is filed | 6,592 | 6,843 |
| Matters that Settle before trial but after Pretrial Statement is filed | 8,624 | 8,952 |
| Matters that proceed to a One-day trial | 8,624 | 8,952 |
| Matters that proceed to a Multi-day trial | 19,448 | 20,188 |
| Matters that proceed to the Review Department | 23,789 | 24,695 |

| Conviction Referrals | 2021 | 2022 |
|---|---|---|
| Matters that go into Default | 3,485 | 3,617 |
| Matters that Settle during the first 120 days of proceeding | 2,910 | 3,020 |
| Matters that Settle before Pretrial Statement is filed | 6,242 | 6,479 |
| Matters that Settle before trial but after Pretrial Statement is filed | 8,193 | 8,504 |
| Matters that proceed to a One-day trial | 8,193 | 8,504 |
| Matters that proceed into a Multi-day trial | 14,917 | 15,485 |
| Matters that proceed to the Review Department | 21,324 | 22,136 |

| Other Matters | 2021 | 2022 |
|---|---|---|
| Probation Revocation Proceedings | 2,787 | 2,893 |
| Rule 9.20 Proceedings | 2,932 | 3,043 |

| Additional Costs | 2021 | 2022 |
|---|---|---|
| Each investigation matter over one | 1,135 | 1,178 |
| Each resignation | 159 | 165 |

In addition, the following costs will be assessed as appropriate:
1. Consolidation costs equal to the minimum cost for the consolidated case type
2. Transcript costs[4] incurred by the Office of Chief Trial Counsel
3. Taxable costs[5] incurred by the Office of Chief Trial Counsel

---

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURS49BSA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.
[3] Cost assessments for 2021 are shown for comparison only.
[4] Per Business and Professions Code § 6086.10(b)(1)
[5] Per Business and Professions Code § 6086.10(b)(2)

# Discipline Costs – 2021

*Effective January 1, 2021*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the year-on-year percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2021, the adjustment is an increase of 1.98%.

For matters filed on or after January 1, 2021, the costs assessed are as follows:

| Original Proceedings | 2021 |
|---|---|
| Matters that go in Default | $5,165 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,558 |
| Matters that Settle during first 120 days of proceeding | $4,159 |
| Matters that Settle before Pretrial Statement is filed | $6,592 |
| Matters that Settle before trial but after Pretrial Statement is filed | $8,624 |
| Matters that proceed to a One-day trial | $8,624 |
| Matters that proceed to a Multi-day trial | $19,448 |
| Matters that proceed to the Review Department | $23,789 |

| Conviction Referrals | 2021 |
|---|---|
| Matters that go into Default | $3,485 |
| Matters that Settle during the first 120 days of proceeding | $2,910 |
| Matters that Settle before Pretrial Statement is filed | $6,242 |
| Matters that Settle before trial but after Pretrial Statement is filed | $8,193 |
| Matters that proceed to a One-day trial | $8,193 |
| Matters that proceed into a Multi-day trial | $14,917 |
| Matters that proceed to the Review Department | $21,324 |

| Other Matters | 2021 |
|---|---|
| Probation Revocation Proceedings | $2,787 |
| Rule 9.20 Proceedings | $2,932 |

| Additional Costs | 2021 |
|---|---|
| Each investigation matter over one | $1,135 |
| Each resignation | $159 |
| Consolidation costs equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(2)) | |

---

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURS49BSA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

1

# Discipline Costs – 2020

*Effective January 1, 2020.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the year-on-year percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2020, the adjustment is an increase of 2.33%.

For matters filed on or after January 1, 2020, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $5,064 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,489 |
| Matters that Settle during first 120 days of proceeding | $4,078 |
| Matters that Settle before Pretrial Statement is filed | $6,464 |
| Matters that Settle before trial but after Pretrial Statement is filed | $8,456 |
| Matters that proceed to a One-day trial | $8,456 |
| Matters that proceed to a Multi-day trial | $19,069 |
| Matters that proceed to the Review Department | $23,327 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,417 |
| Matters that Settle during the first 120 days of proceeding | $2,853 |
| Matters that Settle before Pretrial Statement is filed | $6,120 |
| Matters that Settle before trial but after Pretrial Statement is filed | $8,033 |
| Matters that proceed to a One-day trial | $8,033 |
| Matters that proceed into a Multi-day trial | $14,627 |
| Matters that proceed to the Review Department | $20,909 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,733 |
| Rule 9.20 Proceedings | $2,875 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,113 |
| Each resignation | $156 |
| Consolidation costs equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(2)) | |

---

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURS49BSA0.

[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2019

*Effective January 1, 2019.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2019, the adjustment is an increase of 3.32%.

For matters filed on or after January 1, 2019, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,949 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,409 |
| Matters that Settle during first 120 days of proceeding | $3,985 |
| Matters that Settle before Pretrial Statement is filed | $6,317 |
| Matters that Settle before trial but after Pretrial Statement is filed | $8,264 |
| Matters that proceed to a One-day trial | $8,264 |
| Matters that proceed to a Multi-day trial | $18,636 |
| Matters that proceed to the Review Department | $22,796 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,339 |
| Matters that Settle during the first 120 days of proceeding | $2,788 |
| Matters that Settle before Pretrial Statement is filed | $5,981 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,851 |
| Matters that proceed to a One-day trial | $7,851 |
| Matters that proceed into a Multi-day trial | $14,295 |
| Matters that proceed to the Review Department | $20,434 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,670 |
| Rule 9.20 Proceedings | $2,809 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,088 |
| Each resignation | $152 |
| Consolidation costs equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(2)) | |

---

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0, CUUSA422SA0.
Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2018

*Effective January 1, 2018.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2018, the adjustment is an increase of 2.64%.

For matters filed on or after January 1, 2018, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,790 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,300 |
| Matters that Settle during first 120 days of proceeding | $3,857 |
| Matters that Settle before Pretrial Statement is filed | $6,114 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,998 |
| Matters that proceed to a One-day trial | $7,998 |
| Matters that proceed to a Multi-day trial | $18,037 |
| Matters that proceed to the Review Department | $22,064 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,232 |
| Matters that Settle during the first 120 days of proceeding | $2,699 |
| Matters that Settle before Pretrial Statement is filed | $5,789 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,598 |
| Matters that proceed to a One-day trial | $7,598 |
| Matters that proceed into a Multi-day trial | $13,835 |
| Matters that proceed to the Review Department | $19,777 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,585 |
| Rule 9.20 Proceedings | $2,744 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,053 |
| Each resignation | $147 |
| Consolidation costs equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(2)) | |

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0, CUUSA422SA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2017

*Effective January 1, 2017.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs.  The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2].  For 2017, the adjustment is an increase of 2.42%.

For matters filed on or after January 1, 2017, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,667 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,215 |
| Matters that Settle during first 120 days of proceeding | $3,758 |
| Matters that Settle before Pretrial Statement is filed | $5,957 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,793 |
| Matters that proceed to a One-day trial | $7,793 |
| Matters that proceed to a Multi-day trial | $17,574 |
| Matters that proceed to the Review Department | $21,497 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,149 |
| Matters that Settle during the first 120 days of proceeding | $2,629 |
| Matters that Settle before Pretrial Statement is filed | $5,640 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,403 |
| Matters that proceed to a One-day trial | $7,403 |
| Matters that proceed into a Multi-day trial | $13,480 |
| Matters that proceed to the Review Department | $19,269 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,518 |
| Rule 9.20 Proceedings | $2,673 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,026 |
| Each resignation | $144 |
| Consolidation costs equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (Business and Professions Code 6086.10(b)(2)) | |

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0, CUUSA422SA0.

[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2016

*Effective January 1, 2016.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012. the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2016, the adjustment is an increase of 2.39%.

For matters filed on or after January 1, 2016, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,557 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,139 |
| Matters that Settle during first 120 days of proceeding | $3,669 |
| Matters that Settle before Pretrial Statement is filed | $5,816 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,609 |
| Matters that proceed to a One-day trial | $7,609 |
| Matters that proceed to a Multi-day trial | $17,159 |
| Matters that proceed to the Review Department | $20,989 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,075 |
| Matters that Settle during the first 120 days of proceeding | $2,567 |
| Matters that Settle before Pretrial Statement is filed | $5,507 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,228 |
| Matters that proceed to a One-day trial | $7,228 |
| Matters that proceed into a Multi-day trial | $13,162 |
| Matters that proceed to the Review Department | $18,814 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,459 |
| Rule 9.20 Proceedings | $2,610 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,001 |
| Each resignation | $140 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs − 2016

*Effective January 1, 2016.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012. the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2016, the adjustment is an increase of 2.39%.

For matters filed on or after January 1, 2016, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,557 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,139 |
| Matters that Settle during first 120 days of proceeding | $3,669 |
| Matters that Settle before Pretrial Statement is filed | $5,816 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,609 |
| Matters that proceed to a One-day trial | $7,609 |
| Matters that proceed to a Multi-day trial | $17,159 |
| Matters that proceed to the Review Department | $20,989 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,075 |
| Matters that Settle during the first 120 days of proceeding | $2,567 |
| Matters that Settle before Pretrial Statement is filed | $5,507 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,228 |
| Matters that proceed to a One-day trial | $7,228 |
| Matters that proceed into a Multi-day trial | $13,162 |
| Matters that proceed to the Review Department | $18,814 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,459 |
| Rule 9.20 Proceedings | $2,610 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $1,001 |
| Each resignation | $140 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2016

*Effective January 1, 2016.*

Pursuant to action by the State Bar's governing board in January 2011 and May 2012. the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2016, the adjustment is an increase of 2.39%.

For matters filed on or after January 1, 2016, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,451 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $3,066 |
| Matters that Settle during first 120 days of proceeding | $3,584 |
| Matters that Settle before Pretrial Statement is filed | $5,680 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,431 |
| Matters that proceed to a One-day trial | $7,431 |
| Matters that proceed to a Multi-day trial | $16,758 |
| Matters that proceed to the Review Department | $20,499 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $3,003 |
| Matters that Settle during the first 120 days of proceeding | $2,507 |
| Matters that Settle before Pretrial Statement is filed | $5,378 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,059 |
| Matters that proceed to a One-day trial | $7,059 |
| Matters that proceed into a Multi-day trial | $12,854 |
| Matters that proceed to the Review Department | $18,375 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,401 |
| Rule 9.20 Proceedings | $2,549 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $978 |
| Each resignation | $137 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0.
[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2014

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[1] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[2]. For 2014, the adjustment is an increase of 2.31%.

For matters filed on or after January 1, 2014, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,343 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $2,992 |
| Matters that Settle during first 120 days of proceeding | $3,497 |
| Matters that Settle before Pretrial Statement is filed | $5,543 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,252 |
| Matters that proceed to a One-day trial | $7,252 |
| Matters that proceed to a Multi-day trial | $16,354 |
| Matters that proceed to the Review Department | $20,005 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $2,930 |
| Matters that Settle during the first 120 days of proceeding | $2,447 |
| Matters that Settle before Pretrial Statement is filed | $5,249 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,890 |
| Matters that proceed to a One-day trial | $6,890 |
| Matters that proceed into a Multi-day trial | $12,545 |
| Matters that proceed to the Review Department | $17,932 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,344 |
| Rule 9.20 Proceedings | $2,488 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $955 |
| Each resignation | $134 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

---

[1] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0.

[2] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2013

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the year-on-year percentage change in the Consumer Price Index[3] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[4]. For 2013, the adjustment is an increase of 2.08%.

For matters filed on or after January 1, 2013, the costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,246 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $2,925 |
| Matters that Settle during first 120 days of proceeding | $3,419 |
| Matters that Settle before Pretrial Statement is filed | $5,418 |
| Matters that Settle before trial but after Pretrial Statement is filed | $7,088 |
| Matters that proceed to a One-day trial | $7,088 |
| Matters that proceed to a Multi-day trial | $15,986 |
| Matters that proceed to the Review Department | $19,554 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $2,864 |
| Matters that Settle during the first 120 days of proceeding | $2,392 |
| Matters that Settle before Pretrial Statement is filed | $5,131 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,734 |
| Matters that proceed to a One-day trial | $6,734 |
| Matters that proceed into a Multi-day trial | $12,262 |
| Matters that proceed to the Review Department | $17,528 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,291 |
| Rule 9.20 Proceedings | $2,432 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $933 |
| Each resignation | $131 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

[3] Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series CUURA422SA0.

[4] Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series CIU2010000100000I.

# Discipline Costs – 2012

Pursuant to action by the State Bar's governing board in January 2011 and May 2012, the costs assessed for disciplinary matters are adjusted annually to account for changes in labor and other resource costs. The adjustment is calculated by combining 40% of the annual percentage change in the Consumer Price Index[5] with 60% of the annual percentage change in the Employment Cost Index for Management, Professional and Related Occupations[6]. Disciplinary costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) – eff. 1/1/2012 | Cost Assessment |
|---|---|
| Matters that go in Default | $4,159 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $2,865 |
| Matters that Settle during first 120 days of proceeding | $3,349 |
| Matters that Settle before Pretrial Statement is filed | $5,308 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,944 |
| Matters that proceed to a One-day trial | $6,944 |
| Matters that proceed to a Multi-day trial | $15,660 |
| Matters that proceed to the Review Department | $19,156 |

| Conviction Referrals (Stage at which the matter settles) – eff. 5/11/2012 | Cost Assessment |
|---|---|
| Matters that go into Default | $2,806 |
| Matters that Settle during the first 120 days of proceeding | $2,343 |
| Matters that Settle before Pretrial Statement is filed | $5,026 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,597 |
| Matters that proceed to a One-day trial | $6,597 |
| Matters that proceed into a Multi-day trial | $12,012 |
| Matters that proceed to the Review Department | $17,171 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,244 |
| Rule 9.20 Proceedings | $2,382 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $914 |
| Each resignation | $128 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

---

[5]  Specifically, the December-to-December change in U.S. Bureau of Labor Statistics series  CUURA422SA0.
[6]  Specifically, the Q4-to-Q4 change in U.S. Bureau of Labor Statistics series  CIU2010000100000I.

# Discipline Costs

*Effective January 10, 2011*

Pursuant to action by the State Bar Board of Governors in January 2011, the costs associated with disciplinary actions have been increased to account for the increasing labor costs at the State Bar.  For matters filed on or after January 10, 2011, the disciplinary costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $4,060 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $2,797 |
| Matters that Settle during first 120 days of proceeding | $3,269 |
| Matters that Settle before Pretrial Statement is filed | $5,182 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,779 |
| Matters that proceed to a One-day trial | $6,779 |
| Matters that proceed to a Multi-day trial | $15,287 |
| Matters that proceed to the Review Department | $18,700 |

| Conviction Referral (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $2,739 |
| Matters that Settle during the first 120 days of proceeding | $2,287 |
| Matters that Settle before Pretrial Statement is filed | $4,906 |
| Matters that Settle before trial but after Pretrial Statement is filed | $6,440 |
| Matters that proceed to a One-day trial | $6,440 |
| Matters that proceed into a Multi-day trial | $11,726 |
| Matters that proceed to the Review Department | $16,762 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $2,191 |
| Rule 9.20 Proceedings | $2,325 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $892 |
| Each resignation | $125 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

# Discipline Costs

*Effective January 1, 2003 – January 9, 2011*

Pursuant to action by the State Bar Board of Governors in June 2002, the costs associated with disciplinary actions have been increased to account for the increasing labor costs at the State Bar.  For matters filed on or after January 1, 2003 – January 9, 2011, the disciplinary costs assessed are as follows:

| Original Proceedings (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go in Default | $2,918 |
| Matters that Settle Prior to Filing of a Notice of Disciplinary Charges | $1,983 |
| Matters that Settle during first 120 days of proceeding | $2,296 |
| Matters that Settle before Pretrial Statement is filed | $3,654 |
| Matters that Settle before trial but after Pretrial Statement is filed or a one-day trial | $4,920 |
| Matters that proceed to a Multi-day trial | $11,107 |
| Matters that proceed to the Review Department | $13,463 |

| Conviction Referrals (Stage at which the matter settles) | Cost Assessment |
|---|---|
| Matters that go into Default | $1,987 |
| Matters that Settle during the first 120 days of proceeding | $1,636 |
| Matters that Settle before Pretrial Statement is filed | $3,530 |
| Matters that Settle before trial but after Pretrial Statement is filed or a one-day trial | $4,569 |
| Matters that proceed into a Multi-day trial | $8,479 |
| Matters that proceed to the Review Department | $12,398 |

| Other Matters | Cost Assessment |
|---|---|
| Probation Revocation Proceedings | $1,564 |
| Rule 9.20 Proceedings | $1,641 |

| Additional Costs (as appropriate) | Cost Assessment |
|---|---|
| Each investigation matter over one | $619 |
| Each resignation | $89 |
| Consolidation cost equal to the minimum cost for the consolidated case type | |
| Transcript costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(1)) | |
| Taxable costs incurred by the Office of the Chief Trial Counsel (BPC § 6086.10(b)(2)) | |

[EX B](EX B)

(Added graphics)





## Odyssey – An Open Platform

At Tyler Technologies, we understand and embrace the benefits of open systems to allow courts to work most efficiently. Odyssey® leverages hundreds of APIs to connect and securely share data across multiple systems. It adheres to national open data standards, is Springboard certified for third-party integration, and enables clients to analyze data gathered from disparate systems via Socrata®.

Our open data strategy represents Tyler's commitment to creating systems that make courts efficient, and our understanding that courts share information with a variety of partners. With an open platform, courts can develop agile, flexible, and comprehensive electronic processes.

*Open Platform. Many Ways to Connect.*

Odyssey provides a variety of ways for courts and other agencies to share data across applications, agencies, and jurisdictions. Here are a few of the ways Tyler helps clients connect our applications in an open fashion:

*Integrate Systems With Tyler Alliance*

Tyler Alliance is a multi-agency, distributed platform that integrates public safety and criminal justice systems by connecting departments, agencies, and jurisdictions. It helps organizations break down barriers to make information sharing across public safety and justice agencies easy and secure. Tyler Alliance establishes connection points across multiple applications, securely enabling data sharing across jurisdictions, resulting in improved search capabilities, increased automation, and reduced data entry.

Tyler products share a consistent technology foundation via a Universal Service Bus (USB) that seamlessly connects Tyler products, enabling them to operate more collaboratively and efficiently. Third parties can also share information with other applications from dispatch to disposition via APIs and other mechanisms.

*Adhering to Open Industry Standards*

We are committed to following national open data standards, including the Court Component Model (CCM) and the Electronic Court Filing Standard (ECF). In fact, our e-filing platform was the first to be certified by Springboard as adhering to OASIS ECF v 4.01. This makes the Odyssey Open Platform easy to integrate with EFSPs, other EFMs, and third-party systems.

### Odyssey is:

- **Comprehensive,** with broad capabilities for all aspects of the criminal justice enterprise, from dispatch to disposition

- **Connected out-of-the-box** across all Tyler systems through Tyler Alliance integrations

- **Open,** with third-party access to Tyler Alliance integrations and hundreds of APIs

- **Reliable** through integration certification and support programs that offer peace-of-mind

- **Secure** to meet CJIS security and data compliance standards

- **Transparent,** to provide both key stakeholders and the public easy access to data via data analytics

For more information, visit

www.tylertech.com

or email info@tylertech.com

*... Continued on reverse*

**Empowering people who serve the public®**



For more information, visit tylertech.com

© 2018 Tyler Technologies, Inc. All Rights Reserved

(Added graphics)

## Odyssey — An Open Platform (cont.)

### Access to Hundreds of Published APIs

We have hundreds of APIs available today, and many of our clients take advantage of them to link Odyssey with other systems to make connections and the sharing of data easier. These APIs help facilitate communication scenarios like simultaneously publishing warrant statuses across court, law enforcement, and jail systems. They also allow third-party developers to innovate and connect with Odyssey to build new solutions, such as public-facing web portals.

### Sharing Data With Configurable Integration Publishing (CIP)

With Configurable Integration Publishing, Tyler makes it easy for Odyssey clients to share data with other applications where an API is not enough. With CIP, Odyssey clients publish data in a configurable XML format and share it however they need. Odyssey can be configured to send that information automatically, so subscribers can leverage it within existing partner systems or new, innovative applications.

### Connecting and Analyzing Data Across Disparate Systems

Tyler's Socrata solution analyzes data sets to give managers the insights needed to streamline workflows, alleviate procedural bottlenecks, and reduce backlogs. Socrata can connect data from both in and beyond courts to perform tasks like providing performance insights on city-wide, county-wide, and statewide KPIs, measuring e-filing performance within a jurisdiction, and examining a county-wide integrated criminal justice system to show supervisors system performance insights based on predetermined KPIs. All the information gathered across these disparate systems leads to better, more informed decision making.

### A Marketplace for Extensibility

While open systems allow for faster innovation, they can create environments that are difficult to manage and govern. They also pose procurement challenges, as compatibility between applications is often unclear. Tyler is committed to an open marketplace for innovation and information sharing, and maintains teams and programs dedicated to third-party integrators. Moving forward, information on certified-compatible systems, sample solutions, and support tools will be freely available online.

### Dedication to Continuous Improvement

Tyler continues to invest a significant part of its annual $40M+ R&D budget into connecting our applications so they work well together by sharing information and creating business processes across departments. At the same time, we remain committed to maintaining an open platform that allows other vendors to connect with Odyssey.

Courts, jails, and prosecutors, as well as probation, civil service, and police departments, can choose one of Tyler's apps designed to share information seamlessly with each other out of the box. Or, if they have sophisticated IT organizations and larger budgets, Odyssey provides a variety of ways to share data with third-party applications via Tyler Alliance, APIs, CIP, or Socrata.

Either way, Odyssey is backed by the Tyler evergreen philosophy for continuous improvement, which means when you purchase software solutions from Tyler, you aren't just getting the latest software as of the date you sign your contract. You are also getting the benefit of perpetual upgrades, and a way to keep your applications connected far into the future. We deliver this without additional license fees. It's all part of our commitment to empowering people who serve the public.

Open. Reliable. Secure. Comprehensive. Odyssey provides the best of both worlds — a broad array of best-in-class applications and best-in-class practices for open systems.

Empowering people who serve the public®

tyler technologies

89