1  Lenore L. Albert, Esq. SBN 210876
2  LAW OFFICES OF LENORE ALBERT
3  1968 S. Coast Hwy #3960
   Laguna Beach, CA 92651
4  Telephone (424)365-0741
5  Email: lenalbert@InteractiveCounsel.com
   Attorney for Plaintiffs, John Roe 1, Jane Roe 1,
6  Jane Roe 2, Jane Roe 3, and John Roe 2, *on behalf of*
7   *themselves and all others similarly situated*

8

9              **UNITED STATES DISTRICT COURT**

10         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| JOHN ROE 1, an individual; JANE ROE 1, an individual; JANE ROE 2 an individual; JANE ROE 3, an individual, JOHN ROE 2, *on behalf of themselves and all others similarly situated*, <br><br> Plaintiff, <br><br> vs. <br><br> THE STATE BAR OF CALIFORNIA; TYLER TECHNOLOGIES, INC.; KEVAN SCHWITZER; RICK RANKIN; and DOES 4 through 10, inclusive, <br> Defendants. | CASE NO. 22-cv-00983-DFM <br><br> Assigned to the Hon. Douglas F. McCormick Crtm. 6B <br> Complaint filed: 03-18-2022 <br><br> **PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS** |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

1

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

**PLEASE TAKE NOTICE THAT PLAINTIFFS** request this Court to TAKE JUDICIAL NOTICE of the State Bar news release dated today, March 10, 2023 to consider along with the oral argument and papers submitted on Defendants' Motion to dismiss the antitrust claims on the grounds that documents were not previously obtainable by the plaintiffs but now are publicly available on the internet and not reasonably in dispute as to the admissions made by a party opponent contained therein or are vicarious admissions made by their agent. The information is relevant to support the denial of the motion to dismiss on some of the antitrust claims.

Plaintiffs request this Court take judicial notice under FRE 201 as follows:

1. State Bar press release by Chair Ruben dated March 10, 2023 which contained the two reports on approximately $1 million in funds or favors given to the State Bar employees at all levels in order to deter discipline, have attorneys fired or otherwise influence the State Bar disciplinary system, a true and correct copy of which is attached hereto as Exhibit 1.

## RELEVANCE

The documents are relevant to support the plausibility of allegations in the Second Amended Complaint that in fact certain people at the State Bar can and have made decisions regarding discipline of attorney members based on their own personal advantage. It shows there is no Oversight by the Legislature or California Supreme Court to warrant any Parker Immunity. It also shows that the State Bar continues to protect its reputation to the detriment of its members. It further shows that the Does 1 through 4 may be able to be named after discovery is allowed. This is the epitome of anticompetitive conduct to show that the motions to dismiss on all grounds should be denied and let the case proceed.

2

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

Dated:  March 10, 2023

Respectfully Submitted,

LAW OFFICES OF LENORE ALBERT
/s/ Lenore Albert
LENORE L. ALBERT, ESQ.
Attorney for Plaintiffs, John Roe 1, Jane Roe 1,
Jane Roe 2, Jane Roe 3, and John Roe 2, *on
behalf of themselves and all others similarly
situated*

**3**

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE
BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS
MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

`

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE:

 I declare that I am over the age of 18 years, and not a party to the within action; that I am employed in Orange County, California; my business address is 1968 S. Coast Hwy #3960, Laguna Beach, CA 92651. On March 10, 2023, I served a copy of the following document(s) described as:

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS**

On the interested parties in this action as follows:


**[x] BY E-SERVE and EMAIL** – I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth. (Per Covid-19 Order)
**[] BY MAIL**– I caused such document(s) to be placed in pre-addressed envelope(s) with postage thereon fully prepaid and sealed, to be deposited as regular US Mail at Huntington Beach, California, to the aforementioned addressee(s).
 I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: March 10, 2023

                                        _/s/Lenore Albert_
                                        Lenore Albert

**4**

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*            22-cv-00983-DFM

1

**SERVICE LIST**

2

**For Defendants State Bar of California**

3
COOLEY LLP

MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)

4
3 Embarcadero Center

5
20th Floor

San Francisco, CA 94111

6
Telephone: (415) 693-2000

7
Facsimile: (415) 693-2222

TIANA DEMAS (*pro hac vice*) (tdemas@cooley.com)

8
110 N. Wacker Drive, Suite 4200

9
Chicago, IL 60606

10
Telephone: (312) 881-6500

Facsimile: (312) 881-6598

11
BARRETT J. ANDERSON (318539) (banderson@cooley.com)

12
WALTER WAIDELICH (300798) (cwaidelich@cooley.com)

13
4401 Eastgate Mall

San Diego, CA 92121

14
Telephone: (858) 550-6000

15
Facsimile: (858) 550-6420

16
GREGORY MERCHANT (341287) (gmerchant@cooley.com)

3175 Hanover Street

17
Palo Alto, CA 94304

18
Telephone: (650) 843-5000

Facsimile: (650) 849-7400

19

20
 VANESSA L. HOLTON (111613)

21
General Counsel

ROBERT G. RETANA (148677) Deputy General Counsel

22
SUZANNE C. GRANDT (304794)

23
Assistant General Counsel

**OFFICE OF GENERAL COUNSEL**

24
**THE STATE BAR OF CALIFORNIA**

25
180 Howard Street

26
San Francisco, CA 94105-1639 Telephone: 415-538-2388; Facsimile: 415-538-2517

27

**5**

28
**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

Email: suzanne.grandt@calbar.ca.gov

**For Defendant Rick Rankin**
JEFFER MANGELS BUTLER & MITCHELL LLP
MICHAEL A. GOLD (Bar No. 90667)
*mgold@jmbm.com*
JUSTIN ANDERSON (Bar No. 328969)
*Janderson@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567

**For Defendant Tyler Technologies, Inc.**
Christina N. Goodrich (SBN 261722) christina.goodrich@klgates.com
Zachary T. Timm (SBN 316564)
zach.timm@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard Seventh Floor Los Angeles, California 90067
Telephone: 310.552.5000 Facsimile: 310.552.5001

Beth W. Petronio, admitted *pro hac vice*
beth.petronio@klgates.com
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5815
Facsimile: (214) 939-5849

**ECF LIST:**

Barrett J. Anderson      banderson@cooley.com, efiling-notice@ecf.pacerpro.com,
efilingnotice@cooley.com, mdejesus@cooley.com

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE
BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS
MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

Beth W. Petronio      beth.petronio@klgates.com

Christina N. Goodrich      christina.goodrich@klgates.com,
klgateseservice@klgates.com

David Belcher      david.belcher@faegredrinker.com,
docketgeneral@faegredrinker.com, shanta.teekah@faegredrinker.com

Gregory John Merchant      gmerchant@cooley.com

Justin Alexander Anderson      janderson@jmbm.com, learly@jmbm.com,
mastercalendar@jmbm.com

Lenore L Albert      lenalbert@interactivecounsel.com, docket@interactivecounsel.com,
lenorealbert@msn.com

Michael Allan Gold      mgold@jmbm.com, cl7@jmbm.com,
mastercalendar@jmbm.com, MGold@jmbm.com

Michael G Rhodes      rhodesmg@cooley.com, efiling-notice@ecf.pacerpro.com,
eFilingNotice@cooley.com, john-brocales-7263@ecf.pacerpro.com,
mrhodes@cooley.com, smartinez@cooley.com

Peter William Baldwin      peter.baldwin@faegredrinker.com, peter.baldwin@usdoj.gov,
USACAC.criminal@usdoj.gov

Robert G Retana      robert.retana@calbar.ca.gov, joan.randolph@calbar.ca.gov

Suzanne Grandt      suzanne.grandt@calbar.ca.gov, joan.randolph@calbar.ca.gov

Tiana A. Demas      tdemas@cooley.com, efiling-notice@ecf.pacerpro.com,
efilingnotice@cooley.com

Vanessa L Holton      vanessa.holton@calbar.ca.gov

**7**

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE
BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS
MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*                22-cv-00983-DFM

Walter Waidelich      cwaidelich@cooley.com, kjones@cooley.com

Zachary Thomas Timm      zach.timm@klgates.com, klgateseservice@klgates.com

**8**

**PLAINTIFFS' REQUEST FOR THE COURT TO CONSIDER NEW EVIDENCE
BY WAY OF JUDICIAL NOTICE POST SUBMISSION ON DEFENDANTS
MOTION TO DISMISS THE ANTITRUST CLAIMS**

*Roe v The State Bar of California, et al.*          22-cv-00983-DFM

EXHIBIT 1



# The State Bar *of California*

## News Releases

**Media Contact**

Office of Communications | 213-765-1388 | barcomm@calbar.ca.gov

### State Bar of California Releases Reports Detailing Past Unethical Conduct in Handling Girardi Complaints

**Agency to Implement Additional Enhancements to Strengthen Oversight, Improve Discipline System, and Prevent Conflicts of Interest**

  

Friday, March 10, 2023    Categories: News Releases

The State Bar of California Board of Trustees released today two redacted reports on its past handling of complaints against disgraced and disbarred attorney Thomas V. Girardi. The Board decided to release the reports in furtherance of the agency's public protection mission and its commitment to transparency and accountability. In releasing these reports, the State Bar has redacted information that is protected under the law, including California Business and Professions Code section 6086.1, and the right to privacy.

The first report was prepared by attorney Alyse Lazar, who in 2021 was retained by the State Bar to review 115 files of past complaints against Girardi. Her review, limited to documents in investigative files, identified numerous instances in which complaints were closed without complete investigations or despite the development of facts warranting discipline. A redacted version of the report is posted here.

The second report was completed by Halpern May Ybarra Gelberg LLP, an outside law firm hired by the State Bar to conduct a wide-ranging investigation that was not limited to file review and included interviews of 74 witnesses and extensive evidence gathering. The May report details instances where Girardi's efforts to buy relationships and exercise influence at the State Bar—at all levels—likely impacted the handling of some complaints against him, causing those complaints to be closed improperly. A redacted version of the report is posted here.

Together, the two reports provide a clear and comprehensive review of how Girardi's unethical and unacceptable behavior went unchecked for so long and reveal systemic organizational dysfunction that persisted for many years and through many changes of leadership. Importantly, none of the individuals whose unethical behavior is detailed in the May report are still affiliated with or employed by the State Bar in any capacity.

"To ensure that what happened in the Girardi matter never happens again, we commissioned unflinching investigations by outside experts, are making the results public to the extent we can legally do so, and are addressing the findings comprehensively," said Ruben Duran, Chair of the State Bar Board of Trustees. "While none of the individuals named in the May report are still at the State Bar, the magnitude and duration

of the transgressions reveal persistent institutional failure and a shocking past culture of unethical and unacceptable behavior. In recent years we have put in place many safeguards that serve both to prevent unethical or corrupt behavior and—if it does occur—to catch and address it quickly. That work continues. Providing this disclosure is a necessary step to demonstrate our commitment to transparency and accountability and restore public trust."

## The findings

During a 16-month investigation, May and his team reviewed over 950,000 documents, issued 23 subpoenas, and interviewed, either voluntarily or under compulsion, 74 witnesses. The May report indicates that Girardi intentionally cultivated relationships at many levels in the State Bar to increase his influence in the agency. The report outlines several instances of past State Bar staff exercising poor judgment, ignoring or poorly handling conflicts of interest, and otherwise behaving unethically. None of the individuals identified as engaging in unethical conduct remain affiliated with or employed by the State Bar.

Examples include:

- Former State Bar employee Tom Layton, who was terminated in 2015, (and his wife) received gifts and payments estimated at over $1 million from Girardi, through his firm, while Layton was employed at the State Bar. Those payments and gifts were never properly disclosed.
- Other State Bar employees and Board members accepted and failed to report gifts and other items of value from Girardi.
- Relatives of staff members were employed by Girardi's firm.
- Staff in the Office of Chief Trial Counsel (OCTC) were improperly involved in matters assigned to outside conflict counsel.
- Eight Girardi cases were closed by individuals who May determined had conflicts of interest at the time they worked on the cases. The report found that their conflicts tainted their decisions to close the cases.
- Interim Executive Director Bob Hawley ghostwrote decisions in matters assigned to outside conflict counsel without disclosing that fact, including a decision to recommend closure of a complaint against Girardi.
- Between 2013 and 2015, both the Executive Director's Office and Office of General Counsel received reports about Girardi's influence at the State Bar and connection to Layton and others but failed to investigate.
- Former Executive Director Joe Dunn, who was terminated in 2014, and Hawley made questionable terminations of two OCTC attorneys who were advocating for disciplinary actions against Girardi.
- On at least one occasion, Girardi successfully deployed his connections at the State Bar to discourage people from making complaints against him.

The May report found that—while the State Bar has since done much to remedy these problems—in the past, conflict policies were weak, record-keeping on conflicts was incomplete, and awareness of conflict rules, which should have influenced case assignments and handling, was low.

The 2021 Lazar report revealed errors made in case closures over the four decades of Girardi's career. In particular, the report identified significant issues regarding the investigation and evaluation of high-dollar, high-volume trust accounts. The 2021 Lazar report prompted the Board to undertake the May investigation and to take several actions by the Board to strengthen the discipline system.

## Actions already taken

Current Board and staff leadership have already taken **many steps to reform the agency**. Many of the failures outlined in the May report occurred before 2018, when the State Bar shed its professional association functions and focused more sharply on its public protection mission. Examples of these reforms include:

- More robust policies and procedures regarding conflicts-of-interest and gifts that recognize the importance of avoiding the appearance of impropriety and mandate frequent reporting.
- New OCTC policies that limit the ability to close cases when a complaining party withdraws a complaint.
- Improvements in how OCTC reviews patterns of complaints.
- Numerous steps to strengthen the Special Deputy Trial Counsel (SDTC) Program, which handles cases when internal staff have conflicts.
- Elimination of Board elections. All Trustees are now appointed, and elections for Board officer positions have also been eliminated.
- Greater oversight by the Board of the CTC and SDTC.

## Looking ahead

Before the May report was submitted, the Board created an Ad Hoc Committee on Oversight and Accountability Reforms to review the findings and recommendations from the May report and recommend additional changes in State Bar governance and operations. Committee members are Trustees Arnie Sowell, Jr., Hailyn J. Chen, and Melanie M. Shelby.

After its members fully consider the May report's findings in conjunction with the Lazar report, the committee will make recommendations that will be posted for public comment before being acted on by the Board of Trustees.

"The commissioning and release of the May and Lazar reports represent important steps in the State Bar's efforts to better fulfill its public protection mission by fostering a culture grounded in integrity, accountability, and transparency," Duran said. "While much has already been achieved, these investigations equip us to further strengthen governance, ethical culture, policies, and procedures."

Frequently asked questions about the release of these reports and past actions on the Girardi matter are posted here.

###

Follow the State Bar online
LinkedIn, Twitter, Facebook, and Instagram

*The State Bar of California's mission is to protect the public and includes the primary functions of licensing, regulation and discipline of attorneys; the advancement of the ethical and competent practice of law; and support of efforts for greater access to, and inclusion in, the legal system.*

**Previous Article**

Copyright © 2023 The State Bar of California

*This document is confidential work product, protected from disclosure by attorney-client privilege which may be waived by the client.*

## REPORT AND ANALYSIS OF AUDITED GIRARDI FILES

EXECUTIVE SUMMARY:

In March 2021, the State Bar's General Counsel employed outside counsel to audit all closed disciplinary files pertaining to State Bar complaints filed against California attorney Thomas Vincent Girardi ("Girardi"), State Bar Number 36603. The primary purpose of the audit is to determine whether or not there is any information in any of the files showing that the handling of the case to the benefit of Girardi resulted from some type of personal or financial relationship with or benefit to any of the individuals who were involved in the case disposition, including outside special deputy trial counsel as well as State Bar employees. There were 130 complaints filed against Girardi with the State Bar from 1982 to January 2021. One hundred fifteen of them were reviewed. Fifteen older files could not be located in off-site storage. The auditor found no documentation in any files to support a finding of improper influence by Girardi on either State Bar employees or outside examiners in the resolution of these cases.

The complaints involve a myriad of alleged violations. Forty-four raised possible client trust account issues violative of Rule of Professional Conduct (RPC) 1.15. Thirty-eight alleged failures to competently or diligently perform legal services (RPC 1.1; 1.3), to communicate with the client (RPC 1.4) and/or to take appropriate actions when withdrawing from employment (RPC 1.16). The remainder complained about other ethics violations including dishonesty (RPC 8.4), failing to comply with conflicts rules (RPC 1.7, 1.8.1), violating reporting requirements of Business and Professions Code §6068(o), and interfering with other attorneys' representation of their clients (RPC 3.10; 4.2).

The auditor did find numerous errors in the handling of some of these files both by the Office of the Chief Trial Counsel (OCTC) staff and by some of the outside examiners appointed pursuant to State Bar Rules of Procedure, Rule 2201. Many of these errors appear to be the result of strict compliance with office practices which, in this case, required flexibility in order to properly address patterns of misconduct. For example, in ten cases where the complaint focused on Girardi delaying in paying settlement funds to the client and Girardi made the payment out of his trust account once contacted by the State Bar (OCTC staff and outside examiners), the complaints were closed. There was no investigation as to whether Girardi had actually received settlement funds for that particular client before the payment was made or he was simply advancing his own money or other clients' trust funds to get the State Bar complaint closed. There was no determination that the funds had been maintained in one of Girardi's many client trust accounts until paid and whether or not there was an unjustified delay in disbursing the funds, which is in itself a violation of the State Bar Rules of Professional Conduct.

A case resolved in 2002 evidenced a ██████ misappropriation ███████████████████████████████████████████████████████████. There was no filing of disciplinary charges with the State Bar Court and therefore no discipline for the misconduct due to the false statement by the deputy trial counsel that ███████████████

████████████████████████████████████ Girardi's fame and fortune may have impacted the decision to erroneously close this case. There is no evidence in the file of any improper interactions between staff and Girardi prompting the closure.

Between 1992 and 1994, another deputy trial counsel who was responsible for the closure of 11 cases without any discipline, also appeared to be impressed with Girardi's celebrity status and ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ the millions of dollars in Girardi's trust accounts. Two of the cases involved distribution of funds from Girardi's trust account in excess of the amounts held in trust for the clients, which facts would have been sufficient to prove violations of the trust account rules.  Three other cases all assigned to different staff with the same violation were closed between 1998-2000. Although there is no documentation in the files to show improper influence by Girardi on OCTC staff, these errors in judgment resulted in no public discipline being imposed on Girardi for decades when there was sufficient evidence to support findings of professional misconduct by the State Bar Court's standard of clear and convincing evidence.

In 2010, an outside examiner incorrectly closed a complaint referred by the Ninth Circuit Court of Appeal which had disciplined Girardi for misleading the court.  This matter would have resulted in public discipline for Girardi.  There was no evidence in the file that the closure was due to any improper motive, but instead due to the attorney's lack of knowledge and training on the mandatory nature of the reciprocal discipline provisions of Business and Professions Code §6049.1. Twenty-one other files were assigned to other Special Deputy Trial Counsel between 2007 and 2019 due to various conflicts including Girardi's representation of individuals in actions against the State Bar and a partner's service as President of the Board of Governors. The closures of these files were appropriate based on the evidence or the exercise of prosecutorial discretion such as discussed above regarding delayed payments to clients.

Even though there was no definitive evidence of disparate handling of any of the cases due to some ulterior motive, the auditor has provided recommendations to reduce or prevent similar errors in the handling of future cases by OCTC staff and outside examiners which are contained at the end of this report.

I.    INTRODUCTION

In early March 2021, the General Counsel of the State Bar of California, Vanessa Holton, requested the assistance of attorney Alyse M. Lazar to audit all closed disciplinary files pertaining to State Bar complaints filed against California attorney Thomas Vincent Girardi ("Girardi"), State Bar Number 36603. Ms. Lazar was selected to perform this work as an independent outside consultant based on her background and experience.

Ms. Lazar has practiced law in the State of California for over 40 years. She was employed by the State Bar of California in the Office of Trial Counsel from 1980 to 1998 as a litigator and an Assistant Chief Trial Counsel. She represented the office in all types of disciplinary cases at the trial and appellate levels, oversaw the work of attorneys and investigative staff, had responsibilities for drafting and interpreting regulatory rules and statutes, and served as a liaison to various government agencies. Since that time, she has worked in private practice in Ventura County, California and has served on numerous boards, committees and commissions for various government and non-profit entities. From 2012 to the present, Ms. Lazar has conducted independent random audits of closed State Bar files in conformance with the Office of the Chief Trial Counsel Policy Directives 2006-02 and 2010-01. These audits are performed under the auspices of the Mission Advancement and Accountability Division of the State Bar.

Both at the inception and throughout the audit, conflicts checks were performed to ensure that Ms. Lazar's work would not be influenced by any information contained in any of the files reviewed. Had a conflict arisen, any such files identified would have been removed from the audit and reviewed by a separate outside counsel. No such conflicts were identified including any of the files that were reviewed between 1984 and 1998 when Ms. Lazar was employed at the State Bar. Ms. Lazar did not work on any of those files directly or indirectly nor did she supervise any employees who worked on such files.

In total, 115 files which were received by the State Bar between February 1984 through January 8, 2021 and thereafter closed involving complaints about Girardi's conduct were audited. Fifteen additional files could not be located in off-site storage due to their age and a less detailed tracking systems than the one in place today.  The vast majority of files were deemed to not warrant any disciplinary action and were closed at either the intake or investigation levels. In 1992, six files that had been considered for disciplinary action were consolidated and resolved with ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ In October 1999, the State Bar Court approved a stipulation to a private reproval against Girardi where he acknowledged misconduct in three separate matters. By its terms, this discipline which was agreed upon prior to the filing of charges with the State Bar Court, is confidential. ████████████████████████████████████████████

Consequently, from his admission in 1965 through February 2021, no information was available to the public regarding any of the disciplinary matters pertaining to Girardi that were investigated by the State Bar. Most of these cases were investigated by employees of the Office of the Chief Trial Counsel (OCTC).  Whenever a conflict was identified with any personnel of the State Bar,

such files were assigned to independent outside examiners pursuant to the special deputy trial counsel provisions of State Bar Rules of Procedure, Rule 2201. Twenty-four of the 115 files were handled by these trained outside counsel between 2007 and 2019 due to various conflicts including Girardi's representation of individuals in actions against the State Bar and a partner's service as President of the Board of Governors. In some of these files assigned to outside counsel, the Office of General Counsel performed some administrative oversight.

The purpose of the audit is to determine if all files reviewed were properly handled whether the work was performed by employees of the State Bar or by special deputy trial counsel. In particular, the auditor was tasked with determining whether or not there is any information contained in any of the files showing that the handling of the case was influenced by some type of personal or financial relationship with Girardi benefitting any of the individuals who were involved in the case disposition, including outside special deputy trial counsel as well as State Bar employees.

This report provides a full and fair evaluation of all the cases audited. It critically evaluates and explains errors that were identified. Differences of opinion regarding the handling of a case have been evaluated using the prosecutorial discretion standard. So long as no abuse of discretion is evident, the handling of such files is not deemed to be erroneous. Nonetheless, comments regarding such differences of opinion are set forth in this report for informational purposes.

To the extent possible, depending upon when various files were located and provided to the auditor, the files were reviewed in chronological order. The reason for doing so was to understand what information was available to OCTC staff at the time they made the decision on how to handle each file. Contained in each file is a printout of all prior cases involving that particular attorney, the first listed allegation code, and the status of the case (open or closed.) OCTC has maintained electronic records for files received by the office for most of the years in which complaints were received regarding Girardi. The prior mechanism was known as AS400 and in or about 2018, it was converted to a system known as Odyssey. All OCTC staff have access to this system which contains more detailed information regarding all closed and open files in the system including identifying all possible areas of misconduct based on an analysis of the complaint and the disposition of each allegation. More limited information has been made available to special deputy trial counsel.

As the files were reviewed, the auditor prepared written comments on each file along with information as to staff assigned, open and closure dates and whether or not Girardi was contacted for a response to the allegations. This document, Audit of Closed OCTC Files re Thomas Vincent Girardi ("Audit"), contains the State Bar's file number for each case. These numbers changed whenever a file was transferred from the intake unit to the investigation department. To avoid confusion regarding the case numbers, this report references the files from numbers 1 to 115. The cross-reference to the actual State Bar case numbers is contained in the Audit.

## II.   TRUST ACCOUNT VIOLATIONS

Of the cases audited, forty-four of them raised issues pertaining to possible client trust account violations (files 3, 4, 8, 9,10, 14, 18, 19, 20, 23, 24, 25, 26, 28, 29, 30, 31, 34, 36, 42, 45, 47, 48, 49, 51, 53, 55, 59, 70, 75, 80, 81, 83, 91, 92, 95, 96, 99, 101, 102, 104, 105,107, 112).

The most serious allegations involved the possible misappropriation of funds which occurred in a variety of ways. The failure to retain funds in an identified trust account was raised in five cases (files 34, 51, 81, 83, 96). Issuing trust account checks before the funds cleared the account resulted in two actions reported by a bank (file 59). Five of the complaints (files 8, 14, 28, 47, 48) raised issues regarding Girardi advancing payments to clients from his client trust account when the settlement funds for their cases had allegedly not yet been received. Finally, there were two instances (files 24, 51) where Girardi paid the client more money than he had received on behalf of the client from trust account funds to compensate them for expenses incurred or for interest that would have been earned had Girardi taken the appropriate steps to earn interest for the client on their funds.

Other identified violations of the trust account rules that may or may not have also revealed a misappropriation of trust funds were identified in the following cases. Seventeen cases (files 8, 20, 29, 30, 53, 55, 70, 80, 91, 92, 95, 96, 101, 102, 105, 107, 112) include a complaint that Girardi had delayed in paying the clients their portion of settlement funds or paid insufficient funds to the client. Nine cases (files 3, 8, 9, 10, 23, 26, 51, 91, 104) involved Girardi's failure to promptly resolve medical liens on client cases for which the court had designated a specific sum of money to be maintained in a trust account to make the payment with the remainder to be paid to the client. Another area of concern raised in fifteen complaints (files 4, 18, 19, 24, 25, 30, 34, 36, 42, 45, 48, 49, 51, 75, 99) was Girardi's alleged failure to promptly provide accountings to clients after numerous requests for a complete itemization of all funds received on their behalf and how the funds were disbursed. Files 31 and 34 involved allegations of failing to obtain court approval of the settlement and the legal fees paid to Girardi ████████ ████████ The evidence of such misconduct in these two cases did not rise to the clear and convincing standard required for State Bar Court proceedings.

Based on the volume and content of these complaints, there were indicia that Girardi may have been repeatedly violating provisions of the State Bar's trust accounting rules by delaying the payment of settlement funds to clients and lienholders and not providing accountings for the funds. To determine whether or not Girardi had maintained all funds to be held on behalf of his clients including for the payment of medical liens in the account until paid and paying out all the moneys due, OCTC would have had to review bank records and Girardi's client trust account ledgers; however OCTC did not do so in most of these cases. It failed to look at this bigger picture due in part to the fact that these files were handled by many different investigators and attorneys throughout the 37 years covered by this audit. On a case-by-case basis, these closures appeared to be appropriate, however, except as otherwise noted, they did not involve a sufficient investigation to be certain.

It is disturbing to note that on several occasions when an investigator contacted a trial attorney regarding the possibility of pursuing formal disciplinary action, some possible trust account violations were minimized and not pursued.



In 1990, ████████████████████████████ file 12 ████████████
██████ ████ ████████████████████████████
████████████████ In file 7, resolved in 1993, ████████████
─────────────────
█
████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

In 1989, (file 3) ██████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ This was not a one-time instance, but repeated over the decades.

In May 1989, the State Bar's Rules of Professional Conduct were amended and Rule 8-101 pertaining to "Preserving Identity of Funds and Property of a Client" was renumbered to Rule 4-101 but with the same language.  This rule was expanded in January 1993 to include specific record keeping standards. The current Rule 1.15, adopted in November 2018 contains substantially the same language with some additional provisions.  The principle behind all of these permutations of the rule is that client funds require protection from an attorney's creditors' claims and segregating them completely from an attorney's own funds is the only way to safeguard them.  When attorneys commingle their funds in the trust account, no matter how they are designated on office ledgers, ██████████████████████ it destroys the identity of the account as a true trust account.

This Rule specifically required and requires:

> No funds belonging to the licensee or the law firm shall be deposited therein or otherwise commingled therewith except as follows: (1) Funds reasonably sufficient to pay bank charges. (2) In the case of funds belonging in part to a client and in part presently or potentially to the licensee or the law firm, the portion belonging to the licensee or law firm must be withdrawn at the earliest reasonable time after the licensee's interest in that portion becomes fixed. However, when the right of the licensee or law firm to receive a portion of trust funds is disputed by the client, the disputed portion shall not be withdrawn until the dispute is finally resolved.


████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████ In August 1992, the State Bar and Girardi
████████████████████████████████████████████████████████████
████████████████████████████████ (files 4, 8, 9,10, 11, 22). █████████████████████
████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████ Some of these violations were serious breaches of Girardi's ethical obligations and yet no actual discipline was imposed by staff exercising prosecutorial discretion.

Case 22 ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████ This same determination should have been included in ████████████████████████
███████.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ Nonetheless, this first-time disposition was within the range for matters resolved with a cooperative attorney ████████████ rather than requiring OCTC to expend the resources and take the risks to prove up all allegations in a State Bar Court trial. No evidence of Girardi improperly influencing the OCTC attorney to agree to this resolution appeared in the files, however, as discussed above, the attorney had expressed some bias in favor of Girardi.

Even after this case was resolved ███████████████████████████ four subsequent files (24, 28, 47, 48) show that Girardi continued to advance sums of money to some of his clients while awaiting resolution of their cases and before receiving money on their behalf. These checks were written from the trust account, resulting in violations of the trust account rules as well as Rule of Professional Conduct 4-210(A)(2) which requires the client's written consent and promise to repay such a loan ████████████████████████████████████████
████████████████████. While Girardi was disciplined in part for a Rule 4-210 violation regarding file number 28, (discussed in more detail below), OCTC erred by not pursuing discipline in any of these four cases for trust account violations.

One of these cases, (file 47) 

At the very least, the conduct would have constituted commingling and, at the high end, misappropriation of other clients' funds. The fact that Girardi had been put on notice that this was disciplinable conduct ███████████ ████████████████████████ six years earlier makes it even more egregious.

Misappropriation is not the same as theft. It does not require the attorney to use money received on behalf of a client for an improper purpose. It occurs whenever an attorney fails to deposit or fails to maintain funds received on behalf of any client, excluding attorney fees, in a clearly marked trust account. As stated in Rule of Professional Conduct 4-100 "All funds received or held for the benefit of clients by a licensee or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labeled "Trust Account," "Client's Funds Account" or words of similar import."

Therefore, every time Girardi issued an advance on a case with a trust account check, he was either using other client money being maintained in that account or using his own commingled funds. Even if he claimed that the money came from attorney fees that were in dispute, he had no right to remove any of these funds from the account including paying it to other clients until the dispute was resolved. This constitutes misappropriation which, according to the disciplinary standards, warrants suspension or disbarment in most instances.

To ensure compliance with proper trust account practices, the State Bar adopted Standards on January 1, 1993 regarding the records that every attorney must maintain for client funds, which includes funds received to be paid to lienholders of the client if agreed upon by the client. They state:

> A licensee shall, from the date of receipt of client funds through the period ending five years from the date of appropriate disbursement of such funds, maintain: (a) a written ledger for each client on whose behalf funds are held that sets forth: (i) the name of such client, (ii) the date, amount and source of all funds received on behalf of such client, (iii) the date, amount, payee and purpose of each disbursement made on behalf of such client, and (iv) the current balance for such client; (b) a written journal for each bank account that sets forth: (i) the name of such account, (ii) the date, amount and client affected by each debit and credit, and (iii) the current balance in such account; (c) all bank statements and canceled checks for each bank account; and (d) each monthly reconciliation (balancing) of (a), (b), and (c).

In 1993, Girardi was informed about a complaint (file 30) 

OCTC should have issued a warning or directional letter to explain the long-standing Rules regarding record keeping and the requirements of these new standards.

In December 1994, the State Bar ████████████████████████████ in file 24. ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ This handling of the matter provided no assurance that Girardi would change future conduct or even be advised about it from his counsel. More significantly, OCTC did not resolve other issues raised in the complaint that are far more serious.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

This case was not appropriately investigated before it was closed and potentially serious violations were disregarded ██████████████████████████████████████████████████████

████████████████████████ The deputy trial counsel ██████████████████████

████████████████████████████████████ opinion about Girardi's fame and fortune may have influenced the handling of this case. The file contains no information regarding a possible personal or monetary benefit to the attorney for ███ actions.

In October 1999, the State Bar Court approved a stipulation to a private reproval that was agreed to prior to the filing of a Notice of Disciplinary Charges and therefore it was not publicly disclosed. Three cases were consolidated for this disposition regarding misconduct that occurred between 1988 and 1995. One complaint involved advancing money to a client (file 28). Girardi was only disciplined for the Rule 4-210 violation for not preparing a loan agreement. ██████████████████

████████████████████████████████████████ no client trust account (Rule 4-100) violations were contained in the stipulation for this count. In the second matter (file 34), Girardi admitted that he transferred one million dollars belonging to a client into two certificates of deposit in the firms' name with no identification that the money belonged to the client. This was deemed to violate RPC 4-100(A), but was downplayed by Girardi's statement that these actions were taken to avoid tax liability to the client. This ignores the fact that had OCTC not gotten involved resulting in the funds being delivered to the client, there was the real possibility that the client could have lost this million dollars to Girardi's creditors had his fortunes been reversed as they are today. The third matter consolidated into the private reproval (file 39) involved Girardi's failure to inform a client of significant development on her case including its dismissal. Because the misconduct was minimized, including the exclusion of misappropriation charges, and Girardi's mitigation involving his public service to the legal profession was heavily weighted, the court approved the stipulated disposition. It relied on 1991-1992 State Bar case law establishing precedent for a private reproval for technical trust account violations.

It is noted that stipulated dispositions involve compromise and, under all of the circumstances present at the time, this outcome was not inappropriate based on the included violations. It is

curious that standard conditions of probation required in almost every other disciplinary matter at that time, namely attending the State Bar Ethics School and taking and passing the multistate professional responsibility exam were replaced by a provision to take twelve hours of continuing legal education classes on law office management or legal ethics.  There were no requirements regarding his firm's handling of trust funds nor even requiring education on the subject. Had the case been litigated in State Bar Court and the misconduct established by clear and convincing evidence, a greater level of discipline would have been mandated. █████████████████████

Ultimately, based on the facts and circumstances presented to ████ the Chief Trial Counsel at the time approved having OCTC stipulate to a private reproval.

In October 1997, when Girardi, through counsel, was communicating with OCTC regarding the private reproval matter, ████████████████████████████████████████ (file 51).
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
should have resulted in substantial discipline ████████████████████
████████████████████████████████████████████████████

OCTC did not handle this file appropriately. It disregarded ████████████████
misappropriation ██████████████████████████████████████ The seasoned State Bar attorneys who handled this case and closed it with ██████████████████████
████████ clearly were aware that they did not need proof that Girardi ████████████
████████████ to proceed with discipline for ████████████ misappropriation. Nonetheless, there is no evidence in the file that Girardi improperly influenced the closure of this case through a personal, financial or business relationship with any of the staff involved.

File 59, involved ████████████████████████████████████████████████
████████████████████████████████████████████████████ no clients' funds were jeopardized and closure of the file was appropriate although a directional letter would have put Girardi on notice of the proper handling of trust accounts. File 83 involved ████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ While it may have been difficult to establish any culpability for ████████████████████████████████ these issues were never even investigated by asking Girardi to explain the allegations before the file was closed.

File 81 was properly closed when ██████████████████████████████████ Nonetheless, by 2012 after there had been numerous other cases raising questions about Girardi maintaining funds received for the benefit of clients, it would have been appropriate to at least investigate ██████████████████████████████████████████████████████████████ ███████████████████████████████████ No such investigation was performed prior to closure.

File 96 with the complaint filed in 2016 and resolved by an outside examiner in 2020, was properly closed ████████████████████████████████████████████████████ due to the fact that the misconduct, if any, had occurred fifteen years earlier and could not be prosecuted under the doctrine of laches. Closure was also appropriate for file 104 involving and unpaid medical lien, as it could not be investigated because █████████████████████ barring OCTC from obtaining attorney-client privileged documents without a good cause waiver.

In the seventeen cases where the clients complained about delays in receiving all of their settlement funds, it was Girardi's practice in many of these cases to pay out the money if the case had settled upon receiving notice of the State Bar complaint. ████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████ In accordance with OCTC practice, these cases were all closed without any investigation of possible trust account violations. ████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ file 51 that ███████████ ██████████████████████████████████████████

 In file 92, an outside examiner attempted to investigate whether or not Girardi maintained the funds ████████████████ in a trust account until paid out. ████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ This attorney intended to pursue further investigation ███████████████ Before this occurred, ████ obtained new employment requiring ████ to have the case transferred to a different outside examiner who then closed the file without any additional investigation and without determining if any trust account violations had in fact occurred. A review of the file reveals no evidence that the subsequent outside examiner received any benefit from Girardi for closing the file without this additional investigation which may have resulted in proof of significant trust account violations.

 Had the Bar fully investigated these matters involving delayed payments by requesting the ledger for each of these clients, it may have revealed either a technical non-compliance with the State Bar

Page 11 of 21

requirements or possibly additional misappropriations. Without these records, it could not be determined whether or not Girardi at the very least violated Rule of Professional Conduct 4-100(B)(4) by failing to "Promptly pay or deliver, as requested by the client, any funds… in the possession of the licensee which the client is entitled to receive". The ledgers, if Girardi had maintained them in accordance with the State Bar Standards, would have disclosed the dates of receipt of funds and the dates of disbursal for each client. On a case-by-case basis, Girardi would have been required to explain in detail any substantial delays, ███████████████████████████

██████████████████████████████████ For example, in file 101, there was a ██████ delay in paying the client ██████████████████████████

██████████████████. This issue was not pursued after Girardi paid this money to the client even though OCTC may exercise its discretion to pursue investigations even if the CW requests closure of a file.

During the investigation of several of the files, OCTC requested Girardi's bank records. ████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

Where information is revealed during a valid investigation that could amount to additional misconduct, it is normal practice for OCTC to open its own State Bar Investigation (SBI) file. There were two instances, ██████████████████████████████████

████████████ that should have led to further investigation.  File 34 ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ █████████████████████

██████████████████████████████████████████

Similarly in 2002, ████████████████████████████ for file 51, ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ This should have resulted in additional investigation as it did not comport with the trust account Standards.

As noted at the beginning of this section, there were fifteen cases which included an allegation for failing to promptly provide written accountings to clients regarding all funds received by Girardi on their cases.  Compared to misappropriation, this is a less serious violation, but it should not have been ignored.  In a 1999 matter (file 48), ████████████████████████████████

███████████████████████████████ In a 2000 case (file 49), OCTC closed the case without

recognizing that 
in file 45 ▮ the case was closed with no action ▮
By OCTC
continually closing these cases without at the very least putting Girardi on notice of the wrongdoing, it resulted in his treating other clients in a similar fashion with apparent immunity.

## III.    UNTRUTHFUL/MISLEADING CONDUCT

Files 62, 67 and 68 all pertain to the same matter but were given different case numbers due to the manner in which they were reported to the State Bar. They were all assigned to one outside examiner pursuant to Rule of Procedure 2201. In the underlying case, Girardi and other attorneys were disciplined by the Ninth Circuit Court of Appeal.  The examiner erroneously closed the file with no State Bar discipline even though he was required to at least pursue possible discipline pursuant to Business and Professions Code §6049.1, designated as a "J" case. This statute provides that whenever an attorney is disciplined by another jurisdiction, such as the federal court, the case will warrant reciprocal discipline by the State Bar of California so long as the provisions of this statute are satisfied.

In such proceedings, the State Bar Court would be obligated to deem the factual determinations and conclusions of the federal court as correct and the only issues would have been the degree of discipline to impose if the culpability determination in this other jurisdiction would constitute conduct disciplinable by the California State Bar, which it was. In fact, the court cited to State Bar Rule of Professional Conduct 5-200 (requiring truthfulness in dealing with a court) and Business and Professions Code §6068(d) (prohibition against misleading a judge) as two of the grounds for discipline.  The only other issue would have been whether or not "the proceedings of the other jurisdiction lacked fundamental constitutional protections", which it did not, as both discovery and a four-day court trial occurred where Girardi was represented by counsel prior to the imposition of discipline by the federal court.

The Ninth Circuit formally reprimanded Girardi for his participation in bringing and pursuing a case before the court against the wrong defendant (The Dole Company) to enforce a foreign judgment from Nicaragua obtained by default after the foreign court barred Dole from participating in the case and explicitly holding that the judgment was not against The Dole Company. Girardi's conduct was aggravated in that after he found out the true facts, he wilfully failed to take any action to dismiss the appeal and instead pursued further inappropriate actions by opposing defendant's efforts to provide the court with the accurate documents to show a lack of jurisdiction.

The outside examiner incorrectly concluded that the federal reprimand was sufficient.  In fact, had similar discipline in the form of a public reproval been imposed on Girardi, it would have necessarily contained additional standard conditions including but not limited to reporting

requirements to the State Bar's probation department, taking and passing the multistate professional responsibility exam, and possibly tailored provisions to address the misconduct. A public reproval would have been the lowest level of discipline that could have been imposed due to Girardi's prior private reproval. The State Bar Court may have ordered suspension or at least stayed suspension especially in light of the fact that Girardi's conduct in this matter negatively impacted hundreds of his clients involved in the litigation as well as being a significant burden on the court and opposing parties. Instead, Girardi's record with the State Bar continued to be sheltered from public disclosure. A review of these files produced no evidence that Girardi improperly influenced the outside examiner in his decision. In fact, the attorney never contacted Girardi about the matter.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Several other files audited also contained information regarding misleading or dishonest conduct. A note contained in case 3, ████████████████████████████████████████████████████ however, no action was pursued. Similarly, in Case 54, ███████ Case 104 involved the failure to honor a medical lien which was closed ████████████████████████████ ████████

Three complaints contained allegations that Girardi had made misrepresentations to clients regarding their cases. In file 55, ███████████████████████████████████████████ ████████████████████████████ Other clients (file 105) complained that, ████ ████████████████ In File 112, Girardi ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████

## IV. PERFORMANCE AND COMMUNICATION ISSUES

Complaints were filed against Girardi alleging performance and/or communication issues in thirty-eight cases. Former Rule of Professional Conduct 3-110 (current Rule 1.1) requires attorneys to diligently and competently perform legal services on behalf of clients and eleven cases raised this issue (files 6,11, 16, 21, 39, 40, 51, 65, 71, 84, 103). Business and Professions Code §6068(m) and former Rule of Professional Conduct 3-500 (current Rule 1.4) mandate that clients are kept reasonably informed of significant developments on their cases, including responding to reasonable requests for information. This violation was alleged in twenty-six of the cases audited (files 2, 4, 5, 6, 11, 14, 15, 17, 19, 22, 36, 39, 40, 51, 53, 55, 56, 57, 71, 77, 103, 105, 111, 113, 114, 115). Failure to take appropriate actions when withdrawing from the representation of a client

in violation of Rule of Professional Conduct 3-700 (current Rule 1.16) was alleged in twelve matters (files14, 18, 40, 43, 49, 52, 54, 55, 56, 82, 89, 97.)

According to the State Bar's Standards for Attorney Sanctions for Professional Conduct the presumed discipline for performance, communication, or withdrawal violations of multiple clients is actual suspension or disbarment and yet no public discipline was imposed on Girardi for the misconduct apparent in many of these files. The reason for the closures of most of these files which were meritorious was the result of an OCTC practice to resolve these matters between attorneys and clients rather than pursue discipline. While some cases warranting disciplinary action were erroneously closed by deputy trial counsel possibly enamored with Girardi's persona, there was no evidence that any of these cases were closed due to some benefit personally obtained by State Bar staff from Girardi.

Starting in 1988, ███████████████████████████████ his reaction was to express anger and inform the client to obtain new counsel as he felt the complaint had created a situation where he would need to withdraw from the case. ██████████

██████████████████████ (file 21). ████████████████ (files 5, 6, 17), ██████████ ███████████████████████████████████████████████████ Due to the nature of the cases he handled for which few other attorneys could provide similar representation, withdrawing from representation often resulted in the clients losing their cases as they were unable to obtain new counsel. Such action was not unethical on the part of Girardi however, it could be construed as vindictive "pay back" to these clients for appropriately complaining to the State Bar especially when calls to his office by the client rendered no response. ██████████

██████ Many of the cases that Girardi handled involved people who all lived in the same neighborhood or worked in the same place of employment. If the word spread that filing a complaint with the State Bar would result in Girardi terminating representation of an individual, this would have had a chilling effect on the ability of clients to inform the State Bar of possible wrongdoing. This is simply noted as an issue which the State Bar might want to address for the future and not as any error on the part of OCTC staff.

In the ███████████████████████ entered in 1992, ████████████ included ██ ████████████████████████████ (file 11). This case was included ████████

████████████ Such handling of the matter is generally inconsistent with the purpose of ██

Regarding file 51 closed in 2002, the deputy trial counsel ████████████████████ ████████ the failure to perform and communicate ██████████████████████

███████████████████ Girardi had been disciplined in 1999 with a private reproval in part for a failure to communicate and more serious misconduct. Based on this prior record, ████████████████

████████████████ was a false statement contrary to the Standards for attorney discipline. Staff erred in closing the file and not making a public record of clear violations of Girardi's duty to ████████████████████████ The motivation for this decision is unknown.

In 2011, file 71 contained █████████████████████████████ that he had failed to communicate with ████ and failed to diligently performance. █████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ the closure was appropriate, however, this misconduct was again disregarded to ██████████████████ to the potential detriment of other clients.

In 2017, in case 97, handled by a special deputy trial counsel, ████████████████ Girardi had abandoned the client's case █████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████

Nearly one-quarter of the complaints reviewed for the audit contained an allegation of a failure to communicate. ████████████████████████████████████████████ in one instance in 1987 (file 2), ████████████████████████████████████

████████████████ the file was closed consistent with OCTC policy. Similar conduct was repeated in 2005 (file 57) ████████████████████████████████████████████████
█████████████████

More often these failures to communicate occurred when there were long delays in the litigation and Girardi only sent form letters to entire groups of clients rather than responding to their individual concerns. It is normal practice for OCTC to encourage an attorney in a pending case to re-establish communications with the client by simply sending a letter to the attorney and informing the client that they could contact the State Bar again if the attorney did not contact them within 10 days. Unless the complainant recontacted OCTC, the file would remain closed. While this restraint in most cases avoids unnecessary interference by the State Bar in the attorney-client relationship, ████████████████████ (files 5, 6, 17 and 55), OCTC should have considered disciplinary action or at least a warning letter for violating Business and Professions Code §6068(m). A note in file 17 states that ████████████████████████████████████████████████████
████████████████████████████ The auditor found no information in any files establishing that any staff member was doing this.

In a 2002 case (file 53), a memo in the file from the deputy chief trial counsel states ███████████

████████████████████████████████████████████████████████████████████████████████████

███████████████ A resource letter is not discipline, nor would it have put Girardi on notice of his wrongful conduct in the same manner that a warning letter is intended to do.  Nonetheless, OCTC staff should have at least taken this action on a clear and repeated violation.

In 2003 in file 56, Girardi failed to communicate with the client or his new counsel ███████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████ Instead of advising Girardi of his ethical responsibilities, OCTC again simply closed the file with a form closing letter which had the effect of leading him to believe that his conduct was appropriate when it was not. This same misconduct of failing to communicate with the client and failing to turn over the client's file ████ ███████████████████ had also been evidenced in file 18 from 1990 that was closed with no action.

The other cases in which Girardi failed to take the appropriate actions when withdrawing from representation of a client involved varying misconduct. Files 14, 54 and 89 ███████████████

███████████████████████████████████████████████████████████████████████████████████████

███████ The closures upon confirmation of Girardi's compliance were in accordance with OCTC practice.

In File 40, ████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ Similarly, in file 82 ████████

███████████████ OCTC staff failed to sufficiently investigate this matter to determine if Girardi improperly continued ██████████████
███████ It would have been appropriate to issue warning letters on these cases to put Girardi on notice that his conduct was inconsistent with the requirements of ███████████████████████████ █████ especially after being required to ██████████████████████████████████ ████████ in his 1992 ████████████████████████.

File 43 involved a situation where █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ A note in the State Bar file directs staff to ██████████████████████████ This was not done. The file was closed █████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ This case was improperly closed without

pursuing either issue presumably due to the backlog of investigation files resulting from the State Bar's work slowdown in mid-1998 and an erroneous note in the file ████████████ when in fact ██████████.

In file 49, the client had requested that OCTC reopen ██ complaint ████████████ ████████████ A similar request for reopening was made in file 55 ████ ████████████████████████ OCTC staff erred and did not follow office policy by not informing Girardi that ████████████████████ in these two matters.

## V.   OTHER AREAS OF ALLEGED MISCONDUCT AND STAFF ERRORS

The vast majority of the complaints filed against Girardi alleged either violations of the State Bar's trust account rules and/or performance and communication issues.  In these areas, patterns of repeated conduct emerged over time, but appear to have been ignored by staff as well as some of the special deputy trial counsel. There was even a reticence to issue warning letters which would have put Girardi on notice that his conduct was violative of the Rules of Professional Conduct and/or State Bar Act. The reasons for doing so are not disclosed in the files.

In cases raising other types of violations, OCTC did ████████████████ in file 106 for threatening the complainant and a ████████████ for Girardi's misleading advertisement in file 100. Such actions do not protect the public, but at least put staff on notice that OCTC has made a definitive determination of misconduct when ████████████████ and identified problematic activity when a ████████████ is contained on the attorney's internal records in OCTC's Odyssey system. Absent these warning flags, staff who had not handled prior cases on Girardi might assume all the closed complaints had no merit rather than considering that Girardi was engaging in patterns of misconduct.

The evidence in file 7, ████████████████████████ ████████████████████████ The decision to close the file was made in January 1992 when there were six other open cases pending at the pre-filing level which were resolved by ████████████ in August 1992. This case should have been included in order to put Girardi on notice that he had violated the conflicts rules. The deputy trial counsel, ████████████ ████████████ declined to take the case without a sufficient basis for doing so.  There is no evidence that the attorney received any benefit from Girardi for directing closure of the file.

Case 12 was referred by the Los Angeles Superior Court because Girardi had five lawsuits filed against him between May 1987 and March 1988 which he failed to report to the State Bar as required by Business & Professions Code 6068(o)(1). ████████████████ ████████████████████████ ████████████████████ Even if these were technical

Page 18 of 21

violations, some type of action possibly including them in another disciplinary matter would have been appropriate.

File 20 wherein Girardi was found civilly liable for taking twice the fee than he had verbally agreed to charge was properly closed due to differences in the burden of proof in civil litigation versus State Bar Court proceedings. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

At the time, thirty-two State Bar complaints against Girardi had been closed and ten were still open. Under these circumstances, even though the closure was appropriate, this should not have been factored into the decision. There is no information in the file to show that this false statement which was the impetus for closure was motivated by any relationship between Girardi and the investigator.

Case 27 involved referral fees and was properly closed because ████████████████████████ ████████████████████████████████████████ Nonetheless, evidence in the file shows that Girardi and his law firm may have been routinely ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ An SBI should have been opened to look into this conduct and the related ████████████████████████ ██████ based on the information contained in the file instead of simply closing the case.

The complaint in File 90 alleged that Girardi had threatened CW ████████████████████ to gain an advantage in civil litigation (RPC 5-100) and being untruthful in a deposition ████████ ████████████████████████████████████████████████████████████████████ The outside examiner closed the matter believing that there was not clear and convincing evidence of any violations. ████████████████████████████████████████████████████ ████████████████████████████ the matter should have been investigated by informing him about the complaint and, if the facts did not change, a warning letter should have been issued to put Girardi on notice that future such conduct would subject him to discipline.

A ████████████████████████████████████████████████████████ in file 111 for ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ While this is generally an appropriate disposition for such conduct, the ████████████████ should have disclosed the full extent of Girardi's misconduct.

The investigator failed to comply with the investigation plan in file 82 ████████████████████ ████████████████████████ Without ████████████████ additional investigation, the case was prematurely closed. Similarly, there was an incomplete investigation of the facts in file 44 prior to closing the file. There is no evidence that these actions were motivated by any improper relationship between OCTC staff and Girardi.

The audit revealed other performance issues beyond the purpose of this audit. These included incorrect language in a letter sent to Girardi possibly prompting him to withdraw from representation of the client (55), inconsistencies in handling closures (file 115), and misfiled documents (58).  Two items noted on cases handled by outside examiners were failing to send closing letters to CWs (files 86, 87, 88) and delays in reassignment of a case resulting in the running of the rule of limitations (File 95).

Twenty-two of the files audited (files 1, 13, 32, 35, 37, 38, 41, 46, 50, 63, 64, 66, 72, 73, 74, 79, 84, 85, 98, 108,109, 110)  were appropriately closed with little if any investigation due to such factors as the nature of the complaint was incomprehensible from the information provided and the complainant did not provide additional information in response to OCTC's request; the running of the rule of limitation with no exceptions enabling tolling of the five-year period; the case was a duplicate of another case; or the facts alleged did not constitute professional misconduct. Other cases that were either not identified in this report or simply listed in various classification but not critically discussed were appropriately closed by OCTC after a complete investigation.

## VI.   CONCLUSIONS AND RECOMMENDATIONS



There was very little evidence in the files containing opinions of staff regarding Thomas Girardi. Written notes showed that two of the deputy trial counsel responsible for making decisions on whether or not cases were closed or prosecuted did appear to have some bias either against the complainants and/or in favor of a belief that Girardi was not engaging in any misconduct warranting discipline. The investigators who worked on these files appear to have simply been following the directives of these attorneys to close the files. Even if there was no improper motive for the closures, the evidence supported findings of commingling and possibly misappropriation in cases 24, 28, 47, 48 and ▓▓▓ misappropriation ▓▓▓▓▓▓▓▓▓ in file 51 all of which should have been prosecuted.

The audit concluded that nineteen cases (files 7, 11, 12, 22, 24, 28, 30, 40, 43, 47, 48, 49, 51, 53, 55, 56, 59, 62, 90) were improperly closed when they warranted at the very least a warning letter and in some cases pursuit of actual discipline in the State Bar Court.  Nine other cases (files 44, 45, 81, 82, 83, 92, 101, 102 and 112) were not sufficiently investigated.

The files do not provide sufficient information to determine if any OCTC staff or outside examiner was improperly influenced by Girardi into closing valid cases or not thoroughly investigating matters because of his celebrity status in the legal community or due to the provision of financial or other benefits.

With regard to the errors identified, it is recommended that additional staff training and possibly modification of OCTC practices occur regarding the various issues contained in this report, if not already implemented.  Specific attention should be focused on using tools available based on the trust account standards to obtain Respondents' client ledgers as well as bank statements when investigating the possible mishandling of trust funds whenever an attorney maintains substantial funds in a trust account making it difficult to trace funds. The revision of OCTC practices should be considered pertaining to the investigation of files involving an attorney with a large volume of similar State Bar complaints to identify patterns of possible misconduct rather than simply closing them on a case-by-case basis.  Specific training of outside examiners is recommended regarding Business and Professions Code §6049.1and similar statutes requiring the filing of disciplinary actions if the provisions are satisfied. Also, additional training is encouraged for these attorneys as to why resolutions of matters with the clients should not necessarily result in closure of the files. Finally, when top level managers of OCTC are involved in decisions pertaining to the resolution of cases involving high-profile Respondents, they are encouraged to independently review the entire file rather than relying upon staff memos that may not fully and fairly disclose all the information and evidence contained in the file.

The auditor is available to assist in any follow-up requested by the General Counsel or the Chief Trial Counsel.

Submitted by Alyse M. Lazar                    Date: May 7, 2021

*This document is confidential work product, protected from disclosure by attorney-client privilege which may be waived by the client. This Audit was prepared by independent counsel Alyse M. Lazar at the request of the General Counsel of the State Bar of California. It provides information and analysis of all 115 files reviewed by the auditor. The information contained herein and in the original files was relied upon by the auditor in preparing the Report and Analysis of Audited Girardi Files submitted to the General Counsel on May 7, 2021.*

### AUDIT OF CLOSED OCTC FILES RE THOMAS VINCENT GIRARDI (SBN 36603)

| # | Case No. | Staff Assigned | Supervisor | Open/Close Dates | R notified |
|---|----------|----------------|------------|------------------|-----------|
| 1. | 84-O-11185 | ▮ | ▮ | 2/3/84-1/24/86 | n |

This case involved Respondent's handling of funds ▮▮▮▮ ▮▮▮▮ The matter was appropriately closed based on the documents in the file.

| 2. | 87-O-11697 | ▮ | ▮ | 4/8/87-4/28/87 | y |

▮▮▮ Respondent failed to communicate with CW ▮▮▮▮. Even though there was a significant delay, the case was appropriately closed in line with OCTC policy ▮▮▮ ▮▮▮

| 3. | 87-O-16137 | ▮ | ▮ | 9/10/87-9/1/89 | y |

▮▮▮▮▮▮▮▮▮ This issue was addressed in a ▮▮ contained in file no. 89-O-10983 ▮▮ ▮▮

Nonetheless, it is serious misconduct that likely warranted at least some public discipline.

| 4. | 87-O-18399 | | ▮ | 12/20/87-8/18/92 | y |

This case involved a failure to communicate and failure to promptly provide an accounting and was the lead case in ▮▮▮ contained in file no. 89-O-10983 ▮▮
▮▮▮▮

1

████████████████████████████████████████ files 89-O-12014, 89-O-12946, 89-O-15098, 89-O-10983, 91-O-07791, and 87-O-18399 were all closed. ████████████████████████████████████

████████████████████████████████████████████████████████████ Nonetheless, the trust account violations in this case and file no. 89-O-10983 would normally warrant public discipline. There was no information in the file that this disposition was reached due to any personal or financial relationship between Respondent and the trial counsel motivating this non-disciplinary resolution.

5. 88-00464          ████████                    12/24/87-2/9/88          y
CW complained about Respondent's failure to inform ████ of the status of the case. ████████████
████████ The case was properly closed in line with OCTC policy.

6. 88-O-11569          ████████            ████████        4/5/88-5/5/89          y
Respondent withdrew from representing the CW who complained about delays in performance and failures to communicate. ████████████████████████████████████████, there were insufficient facts to support proceeding with discipline in this case on the failure to perform. Closure on failing to communicate was consistent with OCTC policy.

7. 88-O-11756          ████████████        ████████        5/27/88-7/19/93          y
This case was closed and reopened upon reconsideration by the Complainants' Grievance Panel recommending the file be forwarded to the Office of Trials ████████████████████████████
████████████████████████████████████████████████████████ OCTC closed the case due to ██████████████████████████████████████████████████████
█████████████████████████████████████ Nonetheless, the documentation in the file ███████████████████████████████ is sufficient to establish ████ the conflict of interest. The other violations would be difficult to prove, ████████████████████
████████████████████████████████████████ While the conflicts violation did not definitively result in damage to the clients, it should not have been dismissed. The decision to close the file was made in January 1992 when there were six other open cases pending at the pre-filing level which were resolved ████████████████
████████ in August, 1992 (see file no. 87-O-18399). This case could have been included in order to put Respondent on notice that he had violated the conflicts rules. ████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ Having this opinion of Respondent may have impacted the deputy trial counsel's objectivity in handling complaints against him.

2

8. 89-O-10983          ▮▮▮          ▮▮▮          4/6/89-8/18/92          y
This case was resolved as part of ▮▮▮▮▮▮▮▮▮▮▮▮ which is contained in
this file but has file no. 87-O-18399 as the lead case. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9. 89-O-12014          ▮▮▮          ▮▮▮          7/12/89-8/18/92          y
This was part of ▮▮▮▮▮▮▮▮▮▮ contained in File 89-O-10983. ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10. 89-O-12946          ▮▮▮          ▮▮▮          6/26/89-10/16/92          y
This case involves the same matter as File No. 89-O-12014 and was brought ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ regarding Respondent's failure to promptly satisfy the lien
from the settlement funds. It appears that ▮▮▮▮ misstated the file number and referenced this
case as 89-O-12949. Some papers from this case were included in a file with miscellaneous
documents. Also, in that file were papers from File No. 90-O-17655.  In that matter, ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ In an unusual action, the deputy trial counsel ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮This
issue was not pursued further due to some confusion in correspondence sent ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

11. 89-O-15098          ▮▮▮          ▮▮▮          8/18/89-10/14/92          y
This was part of the ▮▮▮▮▮▮▮▮▮▮▮ contained in File 89-O-10983. Respondent
failed to communicate with the client and to timely file the case before the running of the statute
of limitations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12. 89-O-15641          ▮▮▮          ▮▮▮          8/9/89/10/1/90          y
This case was referred by the Los Angeles Superior Court because Respondent had five lawsuits
filed against him between May 1987 and March 1988, which he failed to report to the State Bar
as required by Business & Professions Code 6068(o)(1). ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████ Even if these were technical violations, some type of action possibly including them in another disciplinary matter would have been appropriate. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ There is no evidence in the file that there was some improper impetus from Girardi motivating closure of this file even though it was wrong to do so.

13. 89-O-17526 ███████████████ ████████ 12/21/89-3/22/91 y
This case was a duplicate of 89-O-10983 which was included in ████████
████████ involving an unpaid medical lien ████████. Even though Respondent did not admit to any misconduct, it was properly closed as part of the compromise for ████████████████.

14. 90-07797 ██████████████ 1/11/80-1/22/90 y
██████████████████████████████████████ complained about not receiving the client's file ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ OCTC did not investigate ████████████████████

████████ Because the client did not initiate or join in the complaint, closure was appropriate once Respondent ████████████████████████.

15. 90-14117 ████████ 6/25/90-6/27/90 y
Respondent failed to respond to phone calls and letters from the CW █████
████████████████████ The closure by intake was in line with OCTC policy.

16. 90-27634 ████████ 11/20/90-12/7/90 y
████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████. The closure by intake was appropriate.

17. 90-O-12614 ████████████ ██████████ 4/26/90-9/18/90 y
CW complained about Respondent's failure to communicate ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Respondent has the right to withdraw from cases so long as there is no prejudice to the client and filing a State Bar complaint could certainly create a situation where Respondent did not feel he could effectively represent the client. Because Respondent's

representation was sought after due to his celebrity status, he could afford to pick and choose his clients. Because OCTC could not discipline Respondent for withdrawing from such cases, these complaints resulted in harm to the clients that could not be rectified by the Bar.

18. 90-O-17655 ███████ ███████    12/05/90-10/10/91    y
This is an SBI case stemming from ████████████████ Respondent's failure to turn over ███ file to new counsel and to provide a complete accounting of settlement funds. ████████████ ████████████████████████████████ While Respondent had a duty to return the file and provide an accounting upon being relieved as counsel, it does not appear there was any harm to the client as a result of minor delays and the closure of the file was an appropriate exercise of discretion at the time. Had OCTC been aware of other cases revealing a pattern of engaging in this conduct, closure would not have been correct.

19. 91-O-03923 ███████ ███████    6/10/91-4/23/92    y
This case alleging a failure to communicate and account for settlement funds was properly closed upon receipt of sufficient documentation from Respondent to show that there was no misconduct.

20. 91-O-04209 ████████████ 6/20/91-8/26/91    y
This case was appropriately closed due to a difference in the burden of proof in a civil case versus a State Bar matter. Respondent was found civilly liable for taking twice the fee that he had verbally agreed to charge.  The closing memo ████████████████████████ ████████████████████████ states ████████████████████████████████████████████████████ At the time, 32 State Bar complaints against Respondent had been closed and 10 were still open.  Under these circumstances, even though the closure was appropriate, this false statement should not have been factored into the decision. There is no evidence that the investigator was unduly influenced by Respondent in any manner in falsely stating this reason for closing the file.

21. 91-O-05449 ███████ ███████    6/25/91-3/2/92    y
This file ███████████████ was properly closed. ████████████████

22. 91-O-07791 ███████ ███████    11/13/91-6/28/94    y
This case was incorporated in ███████████████ contained in file 89-O-10983





23. 91-O-07877 ████ ██ 11/18/91-1/30/92 y
This case was appropriately closed █████████████████

24. 92-O-15406 ████ ██ 7/02/92-12/5/94 y

This handling of the matter provides no assurance that Respondent would change future conduct or even be advised about it from his counsel. More significantly, OCTC did not resolve other issues raised in the complaint that are far more serious. ████████████████

This case was not appropriately investigated before it was closed and potentially serious violations were disregarded ████████ The deputy trial counsel had ██████ which may have resulted in the improper handling of this file, however, there is no evidence in the file that ██ was motivated by some actions taken by Respondent to close the file.

25. 93-O-11598 ████ ██ 3/05/93-4/20/93 y
This case involving Respondent's alleged failure to account for and return unearned advanced costs to new counsel was properly closed at CW's request after resolving the matter.

26. 93-O-12104 ████ ██ 3/23/93-6/29/93 y
This case █████████ was properly closed after a thorough investigation.

27. 93-O-13654 ████ ██ 5/6/93-7/14/93 y
The case involved referral fees and was properly closed ████████

██████████████████████████████████████████████████████ An SBI should have been opened to look into this conduct and the related ██████████████████ ████████ but the case was simply closed.

28. 93-O-14209   ████████████████████████   3/30/93-10/18/99   y
The case was consolidated with files 95-O-11864 and 96-O-01837 for disciplinary action, resulting in a stipulation to a private reproval. The only violation in this case for which Respondent admitted culpability was his failure to obtain the client's written consent to repay a loan made to ███ by Respondent as an advanced payment, a RPC 4-210(A)(2) violation.
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████ This trust account violation was not recognized and addressed in the stipulation and therefore was not considered by the State Bar Court judge in approving the stipulation to this minimal discipline. ██████████████████████████████████
██████████████████████████████████████████████████████
██████████████████ There is no information in the file disclosing any improper dealings between the deputy trial counsel and Girardi which would explain the failure to include this misconduct in the stipulation or even in the memo to the Chief Trial Counsel.

29. 93-O-15913   ████████   ████   7/08/93-9/2/93   y
The case involving a delay in Respondent paying CW the remainder of ███ settlement funds was properly closed per office policy ██████████████████████████.

30. 93-O-16928   ████████   ████   8/23/93-11/8/94   y
This case involved a possible mishandling of funds ██████████ however, due to the age of the underlying case ████████████████████████████████████ the Respondent could have claimed laches if the matter had proceeded to trial before the State Bar Court.
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████ at the very least, Respondent ████████ ██████████████████████████ and should have been advised of this fact in a directional or warning letter to at least document the misconduct.

31. 94-O-18874   ████████   ████   12/5/94-7/25/95   y
This case was referred by a trial judge based on findings that Respondent did not obtain court

approval of the minor's compromise and for his legal fees in a post-trial settlement of a minor's case and that Respondent improperly retained the client's money in Respondent's non-interest-bearing trust account. Respondent eventually turned over all of his fees and additional sums of money as interest that should have been earned to the client's new counsel. A stipulation between Respondent and new counsel set forth facts absolving Respondent of any wrongdoing which stipulation was accepted by the court of appeal and was the basis for closing the State Bar file. ██████████████████████████████ The evidence does not support a finding that Respondent misused the client's funds and therefore closure was appropriate. It appears unusual that the appellate court through Justice Croskey decided to delay remitting the case back to the trial court until the judge who had determined that Respondent engaged in misconduct and had submitted the complaint to the State Bar retired from the bench even though this resulted in delays in finalizing the case. Nonetheless, OCTC handled the file correctly under all of the circumstances.

32. 95-23932          ██████          ██████          5/25/95-4/16/96      y
This case involving an unpaid expert witness bill was properly closed as a civil matter ██
███████████████████████████████████████

33. 95-O-10852       ██████       ████████             unknown      y
This case was considered for consolidation with the disciplinary matters resulting in a private reproval including case number 93-O-14209. The allegation involved a conflict of interest
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████ Under the circumstances, closure of this file was appropriate due to conflicting evidence.

34. 95-O-11864       ████████████             1995-10/18/99     y
This case was included in a stipulation to a private reproval with file 93-O-14209 as the lead case. Respondent withdrew one million dollars of the client's settlement and purchased two certificates of deposit in Respondent name without any indication that they were in trust for the client even though the funds were for the benefit of the client and to satisfy any excess medical bills. Respondent acknowledged that this violated RPC 4-100(A), but claimed that he did this to avoid negative tax consequences to the client. ██████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████ This misconduct would most likely warrant public discipline today, but at the time, the deputy trial counsel referenced similar cases where private or public reprovals were approved by the State Bar Court. Thus, the private reproval approved by State Bar Court in 1999 was within the range of existing case law based on

8

the facts presented to the court.



There is no explanation in the file regarding these discrepancies which were tagged on the bank records, but never pursued.

35. 95-O-13372                                    5/18/95-11/4/95        y
Closure was appropriate as the allegations ████████████████ involving possible solicitation of clients were not substantiated by the evidence produced.

36. 95-O-16942                                    10/11/95-3/26/96       y
Closure was appropriate as CW did not substantiate █ claim that Respondent failed to communicate with ██ or provide an accounting of the settlement funds ██████████

37. 96-10040                                      1/23/96-3/29/96        n
This file was closed due to insufficient evidence however the CW was not interviewed and the nature of the complaint is uncertain. Nonetheless, the misconduct, if any, occurred many years ago and ████████████████████████████ Therefore, closure would have been appropriate based on the rule of limitations as well as laches.

38. 96-O-01060                                    2/21/96-7/17/96        y
The case involves fee sharing and was properly closed due to CW's failure to provide any documentation substantiating the complaint.

39. 96-O-01837                                    86-10/18/99            y
This case was included in the stipulation to a private reproval with file 93-O-14209 as the lead case. The ████████████████ was dismissed, and while there were allegations of Respondent's failure to competently perform, Respondent was disciplined for failing to inform the clients of the dismissal in violation of B&P§6068(m). The RPC 3-110 violation would have been difficult to prove based on a review of all the facts and therefore dropping this allegation and agreeing to the stipulation was appropriate.

40. 96-O-06526                                    10/7/96-3/30/99        y
Allegations of failure to diligently perform and to communicate were investigated and determined that there were insufficient facts to establish such misconduct. An issue that was not identified was ████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ While this was a minor violation as no
apparent harm was suffered by CW, █████████████████████████████████████

████████████████████████████████████████████

████████████████████ By closing this file without a warning letter,
Respondent was not put on notice of this continuing problem with his law practice.

41. 97-33282          Intake staff not identified          9/15/97-9/30/97          n
The complaint form in this case failed to provide any information regarding the nature of the
complaint and █████████████████████████████████████████
████████████████████████████████ .

42. 97-O-16122       ████       ████              9/9/97-3/19/99          y
CW had requested an accounting ██████████████████████████████████
████ . It was closed at CW's request indicting the matter had been resolved in conformance
with OCTC practice.

43. 97-O-16688          █████████              9/24/97-3/18/99          y
██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████ A note in the State Bar file directs staff to
███████████████████ This was not done. The
file was closed ███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ This case was closed
without pursuing all these issues presumably due to the backlog of investigation files resulting
from the Bar's work slowdown in mid-1998 and an erroneous note in the file ██████████
████████████ when in fact ████████████████████

44. 97-O-16781       ████              ████       10/3/97-3/30/99          y
The file in this case is incomplete. ████████████████████████████████
██████████████████████████████████████ This
case was nonetheless closed after a cursory review following the mid-1998 work slowdown

based on a determination that there was no evidence in the file to substantiate the allegations.
Without a full investigation, this determination was premature.

45. 97-O-18393 ██████████      ██████████      12/23/97-10/2/98      y
This complaint involved ████████████████████████ had not
received a full accounting ███████████████████████████████
███████████████████████████████████ Staff agreed
referencing case number 93-O-14209 and closing it as a duplicative matter, however, that case
did not focus on a failure to account. ████████████████████████████
██████████████████████████████████ OCTC never determined
whether or not ███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
While this violation may be technical in nature, ████████████████████
███████████████ would have exposed any possible discrepancies regarding where the
money went and if it was appropriately maintained in Respondent's trust account.

46. 98-23887      ██████████      9/3/98-7/14/99      n
This case was properly closed as it was brought by a non-client ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████ While there was significant public outcry about ████████, there
was no evidence of any misconduct that the State Bar should have pursued at the time.

47. 98-O-02011 ██████████      ██████████      4/13/98-5/4/98      y
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████ Until these questions were answered,
the file should not have been closed. If not handled appropriately, this conduct constitutes a
violation of a RPC 4-210(A)(2) and possibly a commingling or misappropriation charge and is
similar to some of the conduct for which Respondent ████████████. Staff erred in closing
the file although there is no evidence to show any improper motivation for doing so.

48. 99-O-11880 ███████        ██████        8/20/99-3/28/00        y
This case was closed after Respondent finally met with the CW and provided an accounting ██
█████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████ Staff erred in not fully investigating this apparent violation
of Respondent's handling of trust funds. ████████████████████████████████████
█████████████████████████████████████ the facts of this case
exhibit an ongoing pattern of conduct with Respondent wherein he ignores his ethical duties to
account for money received on behalf of his clients until they complain to the State Bar.

49. 00-05826 █████             4/11/00-11/2/00        y
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████ OCTC closed the file without recognizing that what Respondent provided to CW was not
a full and proper accounting. ███████████████████████████████████
████████████████████████████████ CW requested the matter be
reopened and ██████████████████████████████████████████████████
█████████████████████████████████ Respondent should have been contacted and informed of his duty ██
███████████████████████████████████████████████████████████
█████ Instead, OCTC failed to take any action and informed the CW that the case would remain
closed.

50. 00-O-13160 ██████        █████        7/28/00-6/26/01        y
This case was properly closed as a civil dispute.

51. 01-O-03204 ████████████ Platell  8/6/01-4/23/02        y
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████ OCTC █████
██████████████████████████████ but did not obtain sufficient records to
completely trace the funds. ████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████ OCTC failed to obtain bank records for the period ███████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████████



This case should have been prosecuted for the trust account violation. It was inappropriately resolved with ▮▮▮▮▮▮▮▮

These issues were not fully investigated and/or raised in the closing letters to CW and the ▮▮▮▮▮▮ to Respondent. Had this matter been prosecuted 20 years ago, it would have resulted in suspension or disbarment based on the disciplinary standards applicable at the time and, at the very least, put future clients as well as OCTC staff on notice of Respondent's mishandling of trust funds. There is no information in the file explaining the motivation behind the deputy trial counsel's inaccurate assessment of this case and failure to pursue the matter in State Bar Court.

52. 02-09927                    ▮▮▮▮▮                                   6/28/02-9/9/02            y
This case, involving a mix-up in returning the client's file to new counsel, was properly handled by OCTC.



53. 02-10958          ███████          ██████          2/20/02-3/25/02          y

CW was ███████████████████ complaining about Respondent's failure to return any of ███ phone calls ████████████████████ and wondering why ███ had still not received ███ money. After the complaint was filed, CW █████████████████████ requested that the matter be closed ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ the issuance of a warning letter should have been taken rather than the straight closing letter that was provided █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

54. 02-11859          ███████          5/30/02-6/25/02          y

Between August 2000 and May 2002, CW contacted Respondent numerous times requesting Respondent turn over the client file to an attorney authorized to receive the file. ███████

████████████████████████████████████████████████████████

████████████████████ The file was properly closed in accordance with OCTC policy █████████ The possible █████████ was not identified or pursued, however, due to the low level of the primary misconduct, closure was warranted.

55. 02-14699          ██████          ██████          8/12/02-2/24/03          y

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

the investigator's letter should have specified the issues raised and requested Respondent communicate with CW about them. ████████████████████████████████

████████████████████████████████████████ at the very least, Respondent should have

14

been advised to keep accurate records regarding ███████████████. When the CW requested reconsideration of the Bar's decision raising a new issue ████████████████████████████████████
███ OCTC erroneously refused to contact Respondent regarding this issue. ██████████████████
████████████████████ Respondent should have been instructed to ████████████████
████████████████████████████████████████████████████
███████

56. 03-07921            ██████         ██████         5/13/03-7/10/03             y
This case is related to file number 02-14699 and involved Respondent's failure to communicate ██████████████████████ and to provide requested documents to the client's new attorney ██████████████████████████████████████████████████████ Instead of advising Respondent of his ethical responsibilities ████████████, OCTC again simply closed the file with a form closing letter which had the effect of leading Respondent to believe that his conduct was appropriate when it was not.

57. 05-01525            ██████                      1/28/05-3/15/05             n
████████████████████████████████████████ Respondent failed to communicate with CW for several months ████████████████████████████████████
███ After the complaint was filed, the matter was resolved and the case was closed through the State Bar's mediation program with no letters sent out by OCTC.

58. 06-20052            ██████            Greenberg     6/23/06-6/8/07             y
████████████████████████ complained about Respondent threatening to report him ██████████████████████████. The facts do not support an RPC 5-100 violation and the file was properly closed.  Contained within the file is information regarding litigation in another client matter ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████ The document was obviously misfiled and a case involving these facts was not provided to the auditor.

59. 06-29601/06-29602        ██████                   12/6/06-1/5/07             y
This case involves two reportable actions regarding overdrafts of Respondent's trust account.
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████ After receiving a private reproval in 1999 in part for trust account violations, at

minimum a directional letter should have been sent to Respondent regarding the risks involved in issuing checks from his client trust account before the deposited checks had cleared the bank.

60. 07-12185　　　　██████　　　　　　　2/5/07-4/13/07　　　　y
This file was appropriately handled and closed by OCTC ███████████████████████████
████████████████████████████████████████████████████████

61. 07-21717　　　　█████████　　　　　　7/11/07-4/23/08　　　　y
The case involved alleged ex parte communications by Respondent with the trial and settlement judges ███████████████████████████████████████████████████████
████████ Once the documentation was obtained, there was sufficient evidence to warrant closure of the file. █████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

62. 08-O-12613　　　Falk (OEX)　　　　　　6/25/08-12/15/10　　　　n
The outside examiner, appointed by Jim Towery, was assigned this case in April 2010 and closed it in December 2010. No disciplinary action was taken even though the Ninth Circuit Court of Appeals formally reprimanded Respondent for his participation in bringing and pursuing a case before the court against the wrong defendant (The Dole Company) to enforce a foreign judgment from Nicaragua obtained by default after the foreign court barred the defendant from participating in the case and explicitly holding that the judgment was not against the Dole Company but a different named entity that did not exist. Respondent's law partner, Howard Miller, was the president of the State Bar Board of Directors at the time, requiring the assignment to an outside examiner even though he was not disciplined by the federal court for his conduct. Other Respondents from a different law firm were disciplined by the court, ████ ████████████████████████████████████ The outside examiner applied the wrong standards to this case. █████████████
███████████████████. The Bar has specific rules and statutes pertaining to imposing its own discipline on attorneys who have been disciplined by another court in another jurisdiction and does not take the position that such other discipline is sufficient to not pursue independent discipline by the Bar. ████████████████████████████
████████████████████████████████████████████████
██████████████████████████
████████████████████████████. Discipline can be imposed on attorneys for wilful, not intentional violations of any of the Rules of Professional Conduct. Wilfulness does not require knowing and purposefully engaging in the conduct, but simply having the capability of doing so (See *Durbin v. State Bar*.) Rule 5-200(A), applicable at the time, required all attorneys presenting matters to a tribunal to be truthful to the court.  Rule 5-200(B) prohibited attorneys from seeking to mislead the judge "by an artifice of false statement of fact or law."  Similarly, pursuant to B&P Code §6103 suspension or disbarment is appropriate for "wilful" violations of the oaths and duties set forth in B&P Code §6068 including subsection (c), only maintaining actions that appear to be "legal or just", and subsection (d), "never to seek to mislead the judge…

by an artifice or false statement of fact or law". Moreover, B&P Code §6068(o) requires attorneys to report to the Bar sanctions such as those imposed against Respondent in this matter. The reason that this statute contains this provision is not simply to file the information away, but rather for the State Bar to investigate and take disciplinary action, if appropriate, regarding the conduct for which the attorney was punished in a different forum.

It is acknowledged that in State Bar proceedings the misconduct must be established by clear and convincing evidence rather than the preponderance standard applied in most civil cases. In this case, both discovery and a four-day trial were held on the sanction and disciplinary issues wherein Respondent was represented by counsel. The court's decision states that the judge's findings regarding the states of mind of the attorneys "are accurate and provable by clear and convincing evidence." Also, the Order issued by the Ninth Circuit is supported by documentary evidence and deposition testimony which could have been utilized in the State Bar's disciplinary case especially because Respondent had the opportunity to take part in these depositions through counsel. If the matter proceeded as an original "O" matter, the Circuit Court's conclusions could not be accepted as true for purposes of a State Bar trial, however, using the evidence considered by the court, could have formed the basis for similar determinations by the State Bar Court. This would include the facts that Respondent was provided information that the documents relied upon to establish jurisdiction over defendant Dole were inaccurate and the Nicaraguan court never found any liability against Dole Company. Thereafter, Respondent wilfully failed to take any action to dismiss the appeal and instead pursued further inappropriate actions by opposing Defendant's efforts to provide the court with the accurate documents. Because Respondent had a previous State Bar disciplinary record, public discipline in the range referenced in B&P§6103 would have presumably been the correct outcome of this matter.



In case number 10-J-06845, ███████████████████████████████████████████████████████████████ In such proceedings, the State Bar Court would be obligated to deem the factual determinations and conclusions of the federal court as correct and the only issues would have been the degree of discipline to impose if the culpability determination in this other jurisdiction would constitute conduct disciplinable by the California State Bar, which it was. The only other issue would have been whether or not "the proceedings of the other jurisdiction lacked fundamental constitutional protections", which it did not. Because the matter had been referred to an outside examiner, ███████████████████ OCTC could not handle the matter ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ Because there is no flexibility in proceeding on a J case if the criteria of B&P Code §6049.1 are met, it appears that these cases were closed in error. Finally, it is noted that the outside examiner apparently never contacted Respondent about this matter, ████████████████████████████████ ███████

63. 10-09589          ███████               4/20/10-7/27/10          n
This case was closed as a duplicate of case file 08-O-12613. Even though it contained additional information not provided to the special deputy trial counsel, it was properly closed.



64. 10-18253          ███████          7/30/10-8/6/10          n
This case was properly closed as a duplicate of case number 08-O-12613.

65. 10-26141          ██████          Greenberg     10/29/10-11/19/10     n
This case alleging failure to competently perform was appropriately reviewed and closed at the intake level.

66. 10-27314          ██████          ███████     11/12/10-12/15/10     n
This case regarding Respondent's conduct as opposing counsel was appropriately reviewed and closed at the intake level.

67. 10-J-06845          █████████          unknown          n
See the auditor's remarks in 08-O-12613 which is part of this same matter.

68. 10-J-08337          █████          unknown          n
See the auditor's remarks in 08-O-12613 which is part of this same matter. The file contains very little information and therefore it cannot be determined what happened with this file ███████ ███████████████████████████████████████████████, but it is assumed that it was closed with no work being performed.

69. 11-16918          ██████ (OEX)/Hawley          4/7/11-8/10/11          n
This case alleging a conflict of interest in Respondent's representation of an opposing party was appropriately handled by the outside examiner in coordination with State Bar staff.

70. 11-18676          ██████          6/14/11-7/5/11          n
This file refers to a lawsuit filed by some of Respondent's clients against him for allegedly misusing/misappropriating some ████████████ settlement funds ██████████████████ While OCTC could have independently investigated this matter, it was within OCTC policies to close this specific file pending the outcome of the Superior Court case.

71. 11-26130          ██████          8/8/11-10/26/11          n
██████████████████████████████████ failed to communicate with ████ and ████ ████████ that there was a failure of diligent performance. The CW requested that the case be closed ██████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ the closure was appropriate.

72. 11-26135          ███████          8/9/11-8/15/11          n
This case was appropriately closed when CW did not provide the information needed to determine the basis for ████ complaint.

73. 11-35398          Intake staff not identified          11/29/11-12/27/11          n
This case was appropriately closed when CW did not provide the information needed to

determine the basis for ▮ complaint.

74. 12-03261          Greenberg                          2/14/12-3/2/12          n
This case involving Respondent misplacing CW's papers was appropriately closed due to a
resolution of the matter with Respondent.

75. 12-08523          ▮▮                                4/19/12-5/2/12          n
Once it was confirmed that CWs had received all of their settlement funds in an individual case
handled by an associate in Respondent's firm, the case was properly closed.

76. 12-08796          ▮▮              ▮▮                4/23/12-12/7/15         n
This case regarding fee sharing was appropriately closed due to pending civil litigation.

77. 12-11225          ▮▮              ▮▮                5/25/12-1/2/13          n
This case alleged a failure to perform and was appropriately reviewed and closed.

78. 12-14555          ▮▮              ▮▮                7/13/12-1/14/13         y
This case involving the terms of a settlement was appropriately reviewed and closed.

79. 12-22361          ▮▮                                11/5/12-11/8/12         n
This case, alleging ex parte communications with a judge, was properly closed without referral to
an outside examiner as there were insufficient facts presented by CW to warrant an investigation.

80. 12-24077          ▮▮      Greenberg                  12/3/12-1/9/13          n
The case was appropriately reviewed and closed upon the determination that ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but Respondent's handling of the matter
was proper.

81. 12-O-12006        ▮▮                                5/6/11-3/26/12          n
This case raised the issue of whether or not Respondent maintained disputed fees ▮▮▮
▮▮▮▮▮▮▮▮▮▮ in his client trust account. OCTC never investigated this
matter due to the fact that CW resolved the fee issue with Respondent and requested the closure
of ▮ file.  This closure was appropriate, however, the file did raise a concern that was being
repeated by other clients regarding the maintenance of Respondent's trust account and the Bar
could have taken the opportunity to obtain bank records and determined the whereabouts of the
funds, because the decision to close a file is up to the discretion of the State Bar and not the CW.
While such extraordinary work would not normally be appropriate when a file could be closed,
due to the number of complaints brought against Respondent pertaining to Respondent's
handling of trust funds, the Bar would have had the opportunity with a client's consent to
investigate this matter.

82. 12-O-15515        Noonen          ▮▮                 7/26/12-8/8/13          y
This case was closed by intake and reopened when CW complained that Respondent had dumped
▮▮ as a client ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮            No court documents were obtained ▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████ Even though it appears
that CW ultimately suffered no harm and the misconduct, if any, by Respondent was probably *de
minimis*, insufficient documentation was obtained by the investigator to clear up the
discrepancies in the facts.

83. 12-O-16066      Noonen      ████      8/23/12-11/26/12      y
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████ Therefore, the Bar could have reviewed the
Respondent bank records ████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████ a thorough investigation should
have been conducted and it was not.

84. 13-26286      ████                      9/4/13-10/21/13      n
This case alleging failure to perform was appropriately reviewed and closed.

85. 13-33967      ████           ██████      12/19/13-9/22/14      n
This case regarding ████████████████████ was appropriately reviewed and closed.

86/7/8. 14-30049, 14-30061, 14-30269 ████████      11/15/14-12/25/16      n
All these files involved the same litigation matter where issues regarding the disbursement of the
funds were pending appeal.  As such, ████████████████████████████████████

20

██████and there was no basis for disciplinary action.  What is missing from the documents reviewed are any letters to the CWs explaining why the files are being closed and informing them of their right to contact the Bar again after the court hearings are completed if ████████ ████████████████████████████

89. 14-16046            ████            4/1/14-4/24/14          y
This case was appropriately handled ██████████████████████████████████████ ████████████████████████

90. 14-28979            ██████████            10/28/14-6/8/15          n
The complaint alleged that Respondent had threatened CW ██████████████ to gain an advantage in civil litigation (RPC 5-100) and being untruthful in a deposition ████████ ██████████████████████████████ Once the civil case was resolved, the CW requested that the complaint be closed. ██████████████ ██████████████████████████████████ The outside examiner closed the matter believing that there was not clear and convincing evidence of any violations. ████████ the matter should have been investigated by informing Respondent about the complaint and, if the facts did not change, a warning letter should have been issued to put Respondent on notice that future such conduct would subject him to discipline. It was correct to dismiss the allegations regarding Respondent's dishonesty in the deposition for lack of sufficient evidence.

91. 15-12318            unknown (OEX )            2/13/15-?      unknown
████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ There appear to be possible trust account violations regarding these matters, however, only the complaint was provided to the auditor and there is insufficient information for OCTC to track down this file which was assigned to an outside examiner.

92. 15-14329/16-O-17380      ██████████████      3/17/15-2/21/18          y
This file and files 15-30007 and 15-31489 ████████████████████████ Those matters were investigated and closed by ████████████. Due to OCTC conflicts, the cases against Respondent were assigned to outside examiner ██████████████. Prior to completing the investigation, ████obtained new employment necessitating transfer of the cases to another outside examiner ██████████ who closed all three matters. All three cases involved delays in payment of settlement funds to the clients. ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████
███████████████████████████ None of these actions were taken by ██████ prior to closing the
files. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ It is
unfortunate that this change of outside examiner resulted in an incomplete investigation. There is
no evidence that ██████ closed the file for any improper purpose or motivation provided by
Girardi.

93. 15-30007/16-O-17383 ██████████████████          11/30/15-2/21/18       y
See discussion contained in file no. 15-14329

94. 15-31489/16-O-17384 ████████████████████          12/29/15-2/21/18       y
See discussion contained in file no. 15-14329

95. 16-O-15214 ██████████████          10/5/15-7/8/20       y
This case was appropriately closed due to the running of the rule of limitation (Rule 5.21(C).  It
had been assigned to an outside examiner who recommended additional investigation regarding
██████████████████████████████████████ This case apparently sat
for several years before it was reassigned to a new outside examiner in April 2020 and by then, it
was untimely and the investigation was terminated without answers to this issue.

96. 16-O-15215 ████████████████          6/26/16-4/30/20       y
This case was appropriately closed as the alleged misconduct occurred over 15 years earlier, and
while an SBI case is exempt from the Rule of Limitations, the principle of laches would apply
because the documentation that both parties would need to resolve this matter was no longer
available. The case involved alleged misuse by Respondent of some of the settlement funds
received by Respondent ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████ It is
unfortunate that the State Bar did not open an SBI case on ████████████████████
████████████████████████████████████████████ It will never be known
whether or not the millions received were properly accounted for with regard to each and every
client.

97. 16-O-17385 ████████████████          6/20/16-6/14/17       y
Respondent abandoned CW ████████████████████████████████████
████████████████████████████████████████████████████



Under the circumstances including the amount of time and resources that would have been required to try the case before the State Bar Court, closing the case was an appropriate exercise of prosecutorial discretion.

98. 17-02400        2/10/17-2/25/17    n
Because the client did not join in the complaint, it was properly closed as a civil matter.

99. 17-08854        5/30/17-7/9/17    y
This case was originally investigated by OCTC who erroneously sent a letter to When the correct Respondent was contacted, After the Bar received this additional information, the case was transferred to an outside examiner who appropriately closed the matter based in the documentation provided.

100. 17-O-02388        4/3/17-11/15/17    y
A was issued to Respondent regarding his advertisement This outcome of the case was appropriate.

101. 18-29529        12/18-3/9/19    y
This case involved Respondent's delay in disbursing settlement funds to the CW Having received no further response from the CW, the case was closed. Respondent was not asked to provide bank records

██████████████████████████ This outside examiner was not privy to all of the prior matters on Respondent which could have prompted ████ to conduct this additional investigation ████ ██████████████.

102. 19-O-10151          ██████████████          11/20/18- 4/17/19       y
This complaint, filed in November 2018, involved a delay by Respondent in paying CW a portion of ████ settlement funds ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████ The CW agreed and the file was closed even though other State Bar files showed a pattern of Respondent delaying payments of settlement funds until he was notified by the State Bar.  Because there is no indication that CW would not have cooperated with the Bar if it had further pursued the matter, investigation into this specific delay should have been completed as RPC 4-100(B)(4) required the prompt payment of funds to clients. Unfortunately, with different files assigned to different outside examiners, they may not have been provided with information regarding other investigations pertaining to Respondent to which OCTC staff would have been provided access. This may have impacted why cases such as this were closed without a thorough investigation.

103. 19-O-10247          ██████████████          12/12/18-4/9/19          y
This case involves allegations of failing to perform and failing to communicate. ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████ The case was appropriately closed.

104. 19-O-10248          ██████████████          12/14/18-3/12/19         y
This case involves the failure to honor a medical lien which was closed when Respondent paid CW. ████████████████████████████████████████
Because the CW was not the client, The State Bar could not require Respondent to breach attorney-client privilege regarding the handling of client funds. ████████████████
████████████████████████████████████████████████████
████████████████████ closure was appropriate. ████████████████████████
████████████████

105. 19-O-10279          ██████████████          10/24/18-3/22/19         y
This case involves a failure to communicate with clients regarding a delay in payment of settlement funds ████████████████ and possible misrepresentations to the clients regarding

the reason for the delay. Respondent was notified of the complaint ████████████
███████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████ the case was appropriately closed.

106. 19-O-10695          ███████████          1/2219-3/7/19        y
This SBI case was resolved with ██████████ and is related to case no. 19-O-10248
████████████████████████████████████████████████████████████████████████
██████████████████████████████. Under the circumstances, the ████████████ is
warranted █████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ It
appears that having been required to take ethics courses for past discipline did not have the
intended impact on Respondent's conduct.

107. 19-O-16483          ███████████          1/22/19-3/13/19      y
This case which involved a delay in CW receiving ██ settlement funds ████████████
██████████ was appropriately closed after contacting Respondent as a result of CW desiring to
withdraw the complaint, ███████████████████████████████████████████████
██████████████████████. The allegations regarding Respondent's failure to communicate with the
client were also not pursued at ███ request.

108.19-O-25820          ███████████          10/23/19-2/24/20     n
This case was properly closed at the intake level due to CW's failure to cooperate with the State
Bar. █████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████

109. 19-O-29284          ███████████          12/26/19-6/4/20      n
This complaint involves Respondent's refusal to represent CW ████████████████
██████████ The complaint was filed in December 2019 and therefore was beyond the 5-year Rule of
Limitation period with no applicable tolling provisions.  Therefore, it was properly closed due to
the running of the Rule of limitation.

110. 19-10584            ███████████          1/8/19-3/1/19        n
This case involves the alleged solicitation of a client ███████████████████████. The
case was appropriately closed due to proof problems, █████████████████████████████
████████████████████████████████████

25

111. 20-O-00434 ███████████ ████ 1/8/20-5/19/20    y
A ████████████████████████████████████ was issued to
Respondent ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ While this is generally an appropriate
disposition for such conduct, the ████████████ should have disclosed the full extent of
Respondent's misconduct.

112. 20-O-04157 ███████████ ██████ 3/11/20-4/20/20    y



████████████████████████████████████████ For all these reasons, it is recommended that the file be reopened, if appropriate, to conduct additional investigation.

113. 21-O-00654          ████████          1/19/21-2/3/21          y
This case was appropriately closed by Intake with ████████████████████████████
████████████████████████████████████████

114. 21-O-00698          ████████          1/20/21-2/10/21          y
In this case, the CW wanted information regarding the status of ██ legal matter and indicated that attempts to contact Respondent were unsuccessful████████████████. The closure was handled in accordance with OCTC policies and procedures by ████████████████████████████████████████
████████████████████████████████████████

Nonetheless, if the State Bar is involved in any manner in assuming jurisdiction over Respondent's practice, staff should make sure that the information in this case is shared with the appropriate individual(s) involved in such activities.

115. 21-O-01074          ████████          1/27/21-3/8/21          n
This case appears to involve the same legal matter as files (113) 21-O-00654 and (114) 21-O-00698.  The CW clearly complained about Respondent's lack of communication regarding the status of the case. ████████████████████████████████████
████████████████ this case was closed because CW had not provided additional information even though there was sufficient information on the complaint form including the court case number and ████████████████████████ to proceed with the matter. The inconsistency in handling these files by different staff is noted. Moreover, if the same staff person had reviewed all three files, it may have prompted an inquiry into whether or not Respondent had ████████████████████████████████████████
████████████████████████████████████.

.

*ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

# Independent Investigation for the State Bar of California:

## Report of Investigation

**February 4, 2023**



www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................ 3

INVESTIGATION SUMMARY ............................................................... 7

    Scope of Investigation ...................................................................... 8

    Documents Collected and Reviewed................................................ 9

    Witness Interviews ......................................................................... 11

RELATED INVESTIGATIONS AND REPORTING ......................... 13

    The 2014 Munger, Tolles & Olson Report ................................... 13

    The Lion Air Litigation and Criminal Indictments ...................... 13

    State Bar Case 21-O-30192 Against Girardi.................................. 14

    Press Reporting on Girardi Connections with the State Bar ......... 14

STATE BAR ORGANIZATION AND RELEVANT STATE BAR
POLICIES AND PRACTICES................................................................ 15

    Prosecutorial Ethics and Conflicts-of-Interest ............................. 15

    Employee Awareness of Policies ................................................... 16

FACTUAL FINDINGS............................................................................ 18

    Thomas V. Girardi – Background .................................................. 18

    Allegations Against Thomas Girardi and Failure of the State Bar to
    Publicly Discipline Him ................................................................. 20

    Girardi's Connections with the State Bar and the Impact of Those
    Connections .................................................................................... 21

    Connections at the Executive and Board Level ............................. 25

        Joseph Dunn.............................................................................. 26

        Howard Miller .......................................................................... 30

        Sonja Oehler ............................................................................. 32

        Luis Rodriguez.......................................................................... 33

        Other Reported Board Connections........................................... 35

    Connections with OCTC and the State Bar Court ......................... 37

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Murray Greenberg ................................................................. 37

Thomas Layton ..................................................................... 44

Donald Miles ........................................................................ 58

Mike Nisperos ...................................................................... 59

John Noonen ......................................................................... 61

Dale Nowicki ........................................................................ 63

Richard Platel........................................................................ 64

State Bar's Decision to Not Discipline Girardi After Ninth Circuit
Sanctions ............................................................................... 68

Prior Representation of Girardi Keese..................................... 70

Greenberg's Involvement and Closure ..................................... 71

Efforts to Reopen the Case ..................................................... 73

Acting Executive Director's Clandestine Involvement in Closing Rule
2201 Cases............................................................................ 73

Office of General Counsel and Executive Director's Office Failure to
Investigate Reported Girardi Connections at State Bar ................. 78

2011 Termination of OCTC Management ................................... 80

APPENDIX A - OVERVIEW OF THE STATE BAR AND ITS
ORGANIZATION ................................................................... 83

APPENDIX B - RELEVANT STATE BAR POLICIES AND PRACTICES...... 86

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## EXECUTIVE SUMMARY

Halpern May Ybarra Gelberg LLP ("Halpern May") was retained by the Board of Trustees (the "Board") of the State Bar of California (the "State Bar" or the "Bar") to conduct an independent, attorney-client privileged and confidential investigation into whether the State Bar's handling of past discipline complaints against Thomas V. Girardi ("Girardi") was affected by Girardi's connections to or influence at the State Bar and identifying actions by anyone with ties to the State Bar that may constitute malfeasance in how discipline complaints against Girardi were handled.   Based upon our investigation, we find that the State Bar's handling of past discipline complaints against Girardi was more likely than not affected by Girardi's connections to and influence at the State Bar, and that there were multiple State Bar insiders who did not properly disclose their connections to Girardi, including employees who handled Girardi discipline cases.

As set forth in detail in the following report, we found that Girardi maintained an extensive network of connections at all levels of the State Bar.  As one witness told us, "[i]t's almost like Girardi became part of the fabric at the State Bar."  Our investigation determined that Girardi cultivated contacts on the Board, in the Executive Director's Office, and in the Office of Chief Trial Counsel ("OCTC"), both at the managerial and line prosecutor and investigator level.  Girardi's ties to the State Bar spanned decades and appear to have been intentional.  We found evidence indicating that Girardi was involved in the appointment of at least one State Bar Court judge and the attempted appointment of a Chief Trial Counsel ("CTC").  And we also found evidence that Girardi made offers of career assistance to people in State Bar leadership, apparently seeking to make additional connections when and where he could.   We have evidence—both documentary and testimonial—showing that at least nine former State Bar employees or Board members had connections to or accepted items of value, travel, or meals from Girardi while they were working at the State Bar or State Bar Court or were on the Board, although not all of these individuals were involved in the handling of cases against Girardi.  We did not find any connections between Girardi and any current State Bar employees, jurists, or Board members.

As detailed below, Girardi's relationship with former OCTC employee Thomas Layton was particularly remarkable.  Girardi is the godfather to Layton's daughter and the two were close friends and had what was described by one witness as a "father-son" type relationship.  According to records from Girardi's law firm, Girardi Keese, Layton, his wife, and a business entity they ran together received over $600,000 in payments from Girardi Keese while Layton was employed at the

PRIVILEGED / WORK PRODUCT                                    **3** | P a g e

State Bar.  Girardi Keese also leased Layton multiple cars over the years and gave Layton a firm credit card, which he used to pay for routine expenses.  Layton also received a large bank loan that Girardi guaranteed and for which Girardi Keese made repayments.  Girardi Keese also employed two of Layton's children while Layton was employed at the State Bar.  Multiple people we interviewed reported that Girardi and Layton appeared to be together often, during meetings at Girardi Keese or over lunch at Morton's and other restaurants.  Layton also appears to have facilitated Girardi's relationships with others at the State Bar, ranging from line investigators to the CTC to Board members.  Even though we did not find evidence that Layton was assigned to or made discretionary decisions in any Girardi case, there is evidence suggesting that he assisted Girardi in disciplinary matters in other ways.

As it relates to case handling, we find that two former OCTC employees— Murray Greenberg and John Noonen—had conflicts-of-interest at the time they worked on Girardi cases as a result of their connections to Girardi.  The Girardi cases they worked on were closed without public discipline, some under questionable circumstances.  We conclude that these employees' conflicts tainted the discretionary decisions they made on behalf of the State Bar and that the Girardi cases they worked on were improperly handled.

Unlike with Layton, OCTC attorney Greenberg's relationship with Girardi was not well known.  Greenberg spent three decades at the State Bar and was personally involved in the State Bar's handling of multiple Girardi cases that were closed without any public discipline to Girardi, both directly and by providing training and supervision to other attorneys who worked on Girardi cases.  In addition to his involvement with Girardi cases, Greenberg intervened in and closed a case against ███████████████████ and used his personal email account to have apparent backchannel communications with a ████████████ attorney in another pending case.  Our investigation revealed that while he was in OCTC, Greenberg met with Girardi at Girardi Keese's offices and attended parties and other social events hosted by Girardi, and he appears to have received concert tickets from Girardi.  There is no evidence that he disclosed these connections or benefits to the State Bar even as he was involved in the closure of cases against Girardi and ████████████ ████████.  In April 2019, just two months after Greenberg retired from the State Bar, he submitted a declaration on behalf of Girardi Keese related to the use of client funds, which included the statement, "[a]ll of their [Girardi Keese's] conduct were [sic] in accord with the Rules of Professional Conduct of the State Bar and was totally appropriate."  When we deposed Greenberg, he invoked his Fifth

Amendment right against self-incrimination and refused to answer any questions about his relationship with Girardi or work at the State Bar.

Similarly, OCTC investigator Noonen handled and made discretionary decisions in two Girardi cases that benefited Girardi, while Noonen had conflicts-of-interest. Among other things, Noonen's daughter had worked at Girardi Keese, and Girardi Keese had already handled a personal legal matter for him. Both of the Girardi cases Noonen investigated were closed for insufficient evidence. An auditor's review of those cases found that neither was properly investigated.

We found that over the years, many of Girardi's relationships with State Bar insiders (and the gifts and other things of value exchanged inside of these relationships) were not appropriately disclosed by the State Bar insiders, as part of their conflicts-of-interest disclosures or otherwise. Part of the reason for this failure is the State Bar's historical lack of robust conflicts-of-interest policies and related policies regulating, for example, the receiving of gifts from attorneys. Additionally, there appears to have been little to no formal training on conflicts issues for State Bar staff until recently, and many State Bar employees we interviewed expressed very little familiarity with conflicts-of-interest concepts.

In addition to finding that cases against Girardi were closed by conflicted individuals, we also found that both the Executive Director's Office and the Office of General Counsel received multiple reports of Girardi's inappropriate connections at the State Bar that were not investigated. We also found that former Executive Director, Joseph Dunn, terminated two senior attorneys in OCTC during the same time period when those attorneys were advocating for serious charges to be brought against Girardi in pending State Bar cases. This was an unprecedented move, as the Executive Director's Office is not supposed to interfere in the management or operations of OCTC.

While investigating the handling of Girardi cases, we also discovered a troubling practice by the State Bar's then leader, Deputy and Acting Executive Director Robert Hawley. Pursuant to State Bar Rule 2201, whenever OCTC had a conflict-of-interest it was supposed to refer out any discipline cases to an independent outside attorney to handle. We discovered that Hawley had been ghostwriting case analysis memorandums for conflict cases and passing them off as the work product of the independent conflict counsel, including on a Girardi case. Although we did not find any evidence that Hawley recommended closure of the Girardi case based upon any connection he had to Girardi, Hawley's actions completely undermined

the State Bar's conflict-of-interest procedures and call into question the handling of other conflict cases during Hawley's tenure.

Additionally, we found evidence that on at least one occasion Girardi successfully deployed his connections to the State Bar to discourage people from making State Bar complaints against him in the first instance, with Girardi indicating that any complaint made against him would go nowhere and be pointless. Indeed, Girardi was already prominent in the profession and well-connected politically by the 1990s. His stature in the community likely contributed to the perception that bringing any disciplinary charges against him would be an uphill battle that involved taking on one of the titans of the legal profession. One case file in particular contains a notation regarding ████████████████, and the rationale for closing another case included the unsupported idea ████████████████████████████████████████████████████████████████.

We also heard of rumors that Girardi could have executive leaders at the State Bar removed at his request, and reports that Girardi could facilitate or prevent judicial appointments. Whether or not true, these rumors are illustrative of the perceived extent of Girardi's enmeshment with State Bar matters or other matters important in the legal profession.

The investigation and findings summarized here are set forth in detail in the accompanying report, which proceeds as follows. First, we provide a summary of our investigation, including the steps we took and the evidence we examined. Next, we provide information about recent events involving Girardi that provide context for our investigation and its findings. Third, we discuss conflict-of-interest policies applicable to the State Bar, which are discussed in more detail in Appendix B. Fourth, we discuss Girardi's connections to individuals at the State Bar, including at the Executive and Board level and in OCTC and the State Bar Court, and to the extent it could be determined, the impacts of those connections on the handling of State Bar cases. We also note the involvement of people with connections to Girardi in the handling of State Bar cases against attorney respondents other than Girardi himself, where those respondents themselves had connections to Girardi. Finally, we identify additional issues with the handling of cases against Girardi that we discovered during the course of our investigation, and to the extent it could be determined, discuss the possible impacts of Girardi's influence on those occurrences.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

# INVESTIGATION SUMMARY

The State Bar Board engaged Aaron May and the law firm of Halpern May to conduct an independent, attorney-client privileged and confidential investigation into whether the State Bar's handling of past discipline complaints against Girardi was affected by Girardi's connections to or influence at the State Bar. Halpern May was empowered under the Business & Professions Code to issue subpoenas, take testimony of witnesses, and compel the production of documents. As part of its investigation, we issued 23 subpoenas and interviewed, either voluntarily or under compulsion, 74 witnesses. We also collected over 950,000 documents from a variety of sources. We commend the State Bar and the Board for allowing us to conduct an independent investigation. In particular, the State Bar has been cooperative in providing the materials we requested (where available), giving us access to employees, and supporting our efforts to compel recalcitrant witnesses to testify.

The biggest challenge with the investigation was the passage of time and the corresponding unavailability of records and fading memories of witnesses. The disciplinary complaints against Girardi span a 40-year time period and date back to at least 1984, before the advent of email. Further, due to the State Bar's document retention policies and IT constraints, there were significant limitations on what State Bar emails were preserved and available to our investigation. While we were able to get access to some Girardi Keese emails, we understand that Girardi himself did not use email to communicate and instead relied upon in-person meetings and phone calls. In addition, many witnesses could not recall events or details from decades back, which limited our ability to investigate the handling of older Girardi cases. Further, several witnesses to events relevant to our investigation are deceased.

The other significant challenge to the investigation was the nature of the misconduct we were investigating—potential corruption and other illegal activities. Often, those who engage in criminal activity do not memorialize their wrongdoing in writing or, if they do, they do not preserve it or provide it to investigators. Further, experience shows that many perpetrators do not admit to their wrongdoing when questioned and will lie and/or minimize their involvement. And, as was the case here with two individuals, when criminal conduct is involved, witnesses may refuse to answer questions about their conduct on Fifth Amendment grounds.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Despite these significant challenges, we investigated Girardi's influence and connections to the State Bar and assessed his ability to corrupt the disciplinary process, as detailed below.

## Scope of Investigation

We were tasked by the State Bar with investigating whether the State Bar's handling of past discipline complaints against former licensee Girardi was affected by Girardi's connections to or influence at the State Bar and identifying actions by anyone with ties to the State Bar that may constitute malfeasance in how discipline complaints against Girardi were handled.

At the outset, it is important to understand what our investigation did and did not include.  As the State Bar previously reported, the State Bar opened 205 disciplinary matters about Girardi over a 40-year period involving allegations of trust accounting violations, theft, perjury, and other serious infractions.  It was only in 2021, after Girardi failed to contest a disciplinary complaint, that the State Bar meted out any public discipline against Girardi.

In March 2021, the State Bar engaged Alyse Lazar as outside counsel to independently review the Girardi case files to "determine whether or not there is any information in any of the files showing that the handling of the case to the benefit of Girardi resulted from some type of personal or financial relationship with or benefit to any of the individuals who were involved in the case disposition, including outside special deputy trial counsel as well as State Bar employees."[1]  As

---

[1] During Halpern May's review of the case files, we discovered documents indicating that Lazar, while employed as an attorney for the State Bar, was briefly assigned to work on a Girardi case in 1995.  We found no indication she was involved with any decision-making regarding discipline for Girardi in that case.  In late 2011 and early 2012, Lazar served as an outside independent auditor for the State Bar and performed a review of a closed Girardi case as part of a random audit; she concluded the case had been incorrectly closed and advocated for it to be reopened.  In another case against Girardi, the State Bar provided Lazar's contact information to the outside SDTC assigned to the case as a resource to answer procedural questions; during Halpern May's interview with Lazar, she stated that the SDTC never contacted her to discuss the case. Based on documentary evidence, it appears that Lazar had a brief conversation with someone on the SDTC's team on an issue that did not involve Girardi specifically.  Lazar informed us that she did not recall having been involved with any Girardi cases.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

of January 2021, there were 130 Girardi cases.[2] Lazar's review was limited to the four corners of the case files she was given. Lazar reported that she "found no documentation in any files to support a finding of improper influence by Girardi on either State Bar employees or outside examiners in the resolution of these cases." Our task was to pick up where Lazar left off to see if there was evidence *outside* the case files of Girardi's improper influence in the handling of his disciplinary cases. In Lazar's report, she went through case-by-case and provided analysis of the resolution. We reviewed that report and requested case files where Lazar indicated questions or concerns about the resolution of a case, where the underlying complaint related to client trust account concerns, and where Lazar flagged that Girardi may have made misrepresentations to the State Bar.

To be clear, our investigation did not include an assessment into whether Girardi actually misappropriated funds from his clients or committed any other ethical violations or criminal acts. We also did not analyze whether State Bar disciplinary cases were correctly closed, but instead relied on Lazar's analysis for those determinations. Additionally, this investigation did not revisit the foci of the 2014 Munger, Tolles & Olson LLP ("MTO") investigation, described in further detail below, except to the extent that investigation revealed information concerning Girardi's connections to the State Bar. Finally, we were not asked to conduct a general root cause analysis to determine why the State Bar allowed Girardi to practice for so long without publicly disciplining him. While our task of looking at Girardi's influence at the State Bar gave us some insight into this issue, that was not the question we set out to answer.

### Documents Collected and Reviewed

Through our investigation, we collected and reviewed the following materials:

- **State Bar Case Files.** As described above, we identified the case files to review based on Lazar's audit report. We also requested other case files where evidence was developed suggesting issues with a case's handling. Based upon witness interviews, it is our understanding that under State Bar policy, all critical documents relating to the handling of a case are supposed to be maintained in the case file.

---

[2] Fifteen of the Girardi case files could not be located, so Lazar only reviewed 115 Girardi case files.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

▪ **State Bar Internal Policies.**  We requested and received several documents detailing internal policies and practices from the State Bar, including various manuals and administrative memoranda regarding conflict-of-interest policies, ethical screens, and outside employment.

▪ **Forms 700.**  We collected and reviewed the available Forms 700 for relevant individuals.  During the time-period at issue, the State Bar required certain designated employees to complete Forms 700.  The requirements for which employees were required to complete Form 700 and the required disclosures varied from year to year.  Although we requested the State Bar provide us the completed Forms 700 for individuals relevant to our investigation, the State Bar was unable to locate all requested forms.  Further, many of the Forms 700 that were in the State Bar's files were incomplete and sometimes not even signed.[3]

▪ **Emails from Relevant State Bar Employees.**  We requested emails for former State Bar employees who were believed to have information relevant to the investigation.  Because emails for former employees are archived, and the available archives are almost certainly incomplete, the State Bar had limitations on the availability of relevant emails to our investigation.  We were, however, able to obtain additional emails and documents that were previously collected by the State Bar's former outside counsel relating to a different investigation and to suits brought by four former State Bar employees.  Using this email set, we applied search terms and limiters to identify and review relevant emails to our investigation.

▪ **Documents from Girardi Keese.**  In 2021, Girardi Keese was placed in involuntary bankruptcy, and a trustee was appointed to oversee its affairs.  We subpoenaed the Girardi Keese trustee for documents relevant to our investigation, including emails with State Bar employees and officers and financial documents.  Initially the Girardi Keese trustee objected, due to the cost of complying with the subpoena.  After negotiations, we entered into a court-approved stipulation with the trustee, and the trustee produced both emails and financial records to us with the State Bar covering the expense of compliance.  The Girardi Keese documents were some of the most insightful

---

[3] We discuss the disclosures made on those Forms 700 by certain State Bar employees in further detail below, but note here that by not insisting on its employees completing these forms completely, the State Bar faces increased difficulty in identifying conflicts and holding individuals accountable for not handling conflicts appropriately.

materials we received in the investigation, as they documented cash and gifts flowing from Girardi Keese to State Bar employees and officers.

- **Documents from Outside Law Firm.**  As part of our review of the work done by OUTSIDE ATTORNEY C, an SDTC on a Girardi case, we requested any documents related to that case from the successor to the law firm where he worked.

- **Subpoenaed Documents.**  Although we subpoenaed documents from many witnesses relating to their relationships with Girardi and/or their handling of Girardi cases, nearly all of them claimed they did not possess any such documents.   A few witnesses voluntarily provided us with relevant documents they maintained, including a former State Bar contractor who worked on a Girardi case.

- **Miscellaneous Other Documents.**  As our investigation progressed, we requested documents from the State Bar.  The State Bar always responded to our request, either by providing us with the required documents or by informing us that the documents were not available.

## Witness Interviews

As part of our investigation, we interviewed 74 people.  Our general approach was to first reach out to witnesses to see if they would meet with us voluntarily. Most witnesses agreed to voluntary interviews.  For those who did not respond to our outreach or refused to speak to us voluntarily, we subpoenaed the witness to compel their testimony.  Once subpoenaed, most witnesses complied, except two former State Bar employees: Layton and Sonja Oehler.  For Layton and Oehler, we had to seek enforcement of their subpoenas in Los Angeles County Superior Court ("Superior Court").  One witness whom we subpoenaed for testimony, former State Bar employee Greenberg, asserted his Fifth Amendment privilege to refuse to answer any questions about his activities and work at the State Bar or his connections to Girardi.  Girardi, through his counsel, informed us that medical professionals and the Superior Court have determined Girardi was not mentally competent and was thus unable to testify.  Girardi's counsel further explained that regardless of his competency issues, he or his conservator on his behalf, would assert his Fifth Amendment privilege in response to all questions asked of him.  As a result, we determined there was no benefit to taking Girardi's testimony.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

The witnesses we spoke to broke down into the following categories:

▪ Current State Bar employees, officers, or Board members;

▪ Former State Bar employees, officers, or Board members;

▪ Former and current SDTCs;

▪ Former attorneys or employees at Girardi Keese (or predecessor firm); and

▪ Miscellaneous others including individuals who contacted us regarding Girardi, an attorney who was involved in the 2014 MTO report, and a spouse of a State Bar employee who received money from Girardi Keese.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## RELATED INVESTIGATIONS AND REPORTING

Below, we provide details on investigations, cases, or reporting that preceded or has paralleled our investigation.  These items informed our investigation, but where relevant, we have taken steps to independently verify details relevant to the scope of our investigation.

### The 2014 Munger, Tolles & Olson Report

On July 31, 2014, the then-Chief Trial Counsel, CTC 2, made a whistleblower complaint about then-Executive Director Dunn and others to then-Deputy Executive Director Hawley.  Her report raised several issues, including the Mongolia trip taken by Dunn, Layton, and Miller; and other matters.  In response to CTC 2's report, the State Bar retained outside counsel Munger, Tolles & Olson LLP ("MTO") to investigate CTC 2's complaints.  MTO's investigation was not focused on OCTC or its resolution of Girardi cases.

MTO produced a report, in which it provided a number of conclusions related to the concerns raised by CTC 2.  As part of its report, MTO flagged that "[t]he frequency with which Girardi's firm has surfaced in matters . . . investigated is striking," and it noted that "the closeness of the relationship between some senior managers and [Girardi Keese] does raise potentially troubling perceptions."  MTO made the following recommendation in its report: "The Board should instruct senior management how important it is to cultivate and maintain a public perception that the Bar represents all attorneys, and that no one law firm or segment of the bar has a special position.  It should further instruct management that its conduct to date may have created an unhealthy perception that Girardi and his firm have special influence or receive special treatment – and that management should take steps to dispel and avoid contributing further to this perception in the future."  MTO also found that Layton approached CTC 2 when she entered a managerial role "to offer assistance from Girardi in helping her to become a judge or achieve some other professional goal," and that Dunn made similar offers to State Bar Board Presidents without mentioning Girardi.

### The Lion Air Litigation and Criminal Indictments

Girardi Keese and Edelson PC served as plaintiffs' counsel in the litigation arising from the crash of Lion Air Flight 610 in October 2018.  The case, which was proceeding in federal court in the Northern District of Illinois, was settled in early 2020.  In December 2020, Edelson sued Girardi, Girardi Keese, and others, alleging

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

that Girardi and Girardi Keese were "on the verge of financial collapse and locked in a downward spiral of mounting debts and dwindling funds." Edelson further alleged that Girardi "has resorted to embezzling the proceeds of settlements that should have been directed to his clients." In mid-December 2020, an Illinois federal judge found Girardi and Girardi Keese in civil contempt, froze their assets, and referred the matter to the U.S. Attorney's Office for the Northern District of Illinois.

On February 1, 2023, the U.S. Attorney's Offices for the Northern District of Illinois and the Central District of California announced that Girardi had been indicted by grand juries for wire fraud (in both actions) and civil contempt (in the Illinois action).

**State Bar Case 21-O-30192 Against Girardi**

In March 2021, the State Bar initiated disciplinary proceedings against Girardi in State Bar Court Case No. SBC-21-O-30192, alleging several violations of the Rules of Professional Conduct stemming from three State Bar cases, including a case arising from the Lion Air litigation. In April 2021, the State Bar moved for an entry of default against Girardi after he failed to file a response to the notice of disciplinary charges, and in November 2021, the State Bar petitioned the State Bar Court for an order recommending Girardi's disbarment. In June 2022, the Supreme Court of California ordered Girardi disbarred. This was the first instance of any public discipline against Girardi.

**Press Reporting on Girardi Connections with the State Bar**

There have been multiple reports from investigative journalists concerning Girardi's connections with State Bar employees. Of note, the *Los Angeles Times* released investigative reports in March and July 2021 regarding connections between Girardi and various State Bar employees, including Layton and Dunn. Then, in July 2021, *Law360* released additional reporting on Girardi's connections with Layton. These and other news outlets have followed up on that reporting. We have reviewed the media reports to identify leads and evidence to pursue as part of our investigation and independently verified any facts we relied upon.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## STATE BAR ORGANIZATION AND RELEVANT STATE BAR POLICIES AND PRACTICES

In order to put our investigation and findings into context, it is important to understand the organization and structure of the State Bar as well as the conflict-of-interest and other policies that govern the State Bar, especially State Bar Rule 2201 and Forms 700.

To the extent the reader is not familiar with the State Bar's structure and organization, including the function of OCTC, we have prepared an appendix summarizing that information. (Appendix A.)

Below, we outline the conflict-of-intertest concepts that informed our investigation and conclusions, and make findings regarding State Bar employees' overall awareness of these concepts based on our interviews. We have also prepared an appendix summarizing in greater detail the relevant conflicts-of-interest concepts and policies, and how applicable policies have changed over the years, including the important changes that went into effect last year. (Appendix B.)

### Prosecutorial Ethics and Conflicts-of-Interest

All lawyers are subject to ethics rules that prohibit conflicts-of-interest, such as those contained in California's Rules of Professional Conduct. Prosecutors—government attorneys charged with enforcing the law against others on behalf of the public—are subject to even greater ethical considerations regarding conflicts-of-interest that require them to avoid even the appearance of impropriety. The existence of the appearance of impropriety is related, to but separate, from the existence of an actual conflict-of-interest, and the appearance of impropriety alone may render a government official's involvement in a case inappropriate even where there is no actual conflict-of-interest under the applicable rules. This concept is embodied in the case law, ethics opinions, and industry ethical standards that are discussed in Appendix B.

The OCTC's own conflicts-of-interest policies have historically been quite weak, and did not explicitly prohibit, for example, State Bar employees from receiving gifts from the lawyers they are regulating. As set forth in more detail in Appendix B, the State Bar's principal rule for handling conflicts-of-interest, Rule of Procedure 2201, was until 2016 focused on recusal of the CTC, rather than of line employees in OCTC, and made recusal discretionary in many instances. Although the State Bar's policies have been recently augmented to account for these

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

issues, as discussed in the section below, many State Bar employees we interviewed were unfamiliar with or could not easily articulate a more robust understanding of conflicts rules that includes the requirement to avoid the appearance of impropriety, even though this requirement—which is imposed by the common law—applies to State Bar decisionmakers.

The additional ethical considerations imposed by California common law to govern government attorneys and the appearance of impropriety are intended not only to provide for fairness in the actual administration of justice, but to protect and facilitate the public's confidence in the administration of justice and in the government's ability to prosecute cases fairly and objectively. Indeed, disinterested decisionmakers are one of the bedrocks our or legal system and are a fundamental component of the concept of due process. The involvement of a conflicted government official (or apparently conflicted official) in a discretionary decision made on behalf of the public is impermissible and improper because it undermines public confidence in our government and our institutions. Accordingly, where we have found that a conflicted individual made discretionary decisions on behalf of the State Bar in a case involving Girardi, we have concluded that the case was improperly handled.

In the sections that follow, we discuss whether certain individuals had conflicts-of-interest. In those discussions, we are referring to all of the concepts discussed above and in Appendix B.

### Employee Awareness of Policies

During interviews, numerous OCTC employees identified the California Rules of Professional Conduct as the sole source of ethical considerations that governed their work, and did not identify any additional ethics rules or guidelines that applied to their work enforcing the law against other attorneys on behalf of the public. Indeed, as described in detail below, even the State Bar's then-Deputy Executive Director Hawley analyzed conflict issues involving an SDTC counsel who was appointed to investigate Girardi solely under the California Rules of Professional Conduct, without addressing the conflict rules applicable to government attorneys or the appearance of impropriety.

In interviews conducted before the State Bar's most recent conflicts rules were implemented, numerous OCTC employees stated that they had not received any training on applicable conflicts-of-interest rules and guidelines, and some employees had a poor recollection of, and/or could not meaningfully articulate, the

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

applicable conflicts-of-interest rules after formal training was provided. Multiple employees also reported handling conflicts on an informal, ad hoc basis, for example by asking a supervisor to reassign a case because they knew someone involved.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## **FACTUAL FINDINGS**

### **Thomas V. Girardi – Background**

Much has been said, written, and reported about Girardi, and we only summarize some key points here.  Girardi was a member of the California Bar between 1965 and 2022.

| Date | License Status 🛈 | Discipline 🛈 | Administrative Action 🛈 |
|---|---|---|---|
| Present | Disbarred | | |
| 7/1/2022 | Disbarred | Disbarment 21-O-30192 🛈 | |
| 1/13/2022 | Not eligible to practice law in CA | Ordered inactive 21-O-30192 🛈 | |
| 8/9/2021 | Not eligible to practice law in CA | Ordered inactive 21-O-30192 🛈 | |
| 7/1/2021 | Not eligible to practice law in CA | | Suspended, failed to pay fees |
| 3/30/2021 | | Disciplinary charges filed in State Bar Court 21-O-30192 🛈 | |
| 3/9/2021 | Not eligible to practice law in CA | | Ordered inactive |
| 1/13/1965 | Admitted to the State Bar of California | | |

Over time, he became a preeminent plaintiff's lawyer who recovered hundreds of millions of dollars in settlements and judgments.  A character based on Girardi was featured in the film *Erin Brockovich*.  More recently, Girardi became famous for his appearances on the reality TV show, *The Real Housewives of Beverly Hills*, which featured his then-wife, Erika Jayne.

For a long period of time, Girardi was a powerbroker in the California political sphere.  He raised and donated large sums of money for those running at all levels of office, which helped him develop relationships with elected officials.  Girardi reportedly advised multiple California governors on judicial appointments and helped numerous lawyers become judges.  Girardi also hosted fundraisers, like he

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

did for Dunn during Dunn's campaigns for the California State Senate.  Indeed, the reach of Girardi's political connections was extraordinary.  For example, Miller reported to us that if Girardi made a telephone call to California Governor Jerry Brown or to President Clinton, the call would be returned within hours, and the *Los Angeles Times* reported a similar sentiment in March 2021.



The broad reach of Girardi's influence among politicians has been widely reported for years, including a *Los Angeles Times* article about Girardi's connections to President Biden, California Governors Jerry Brown and Gavin Newsom, and former Attorney General Bill Lockyer, not to mention U.S. Senators.

As the press reporting indicates, Girardi's political connections played a significant role in his ability to influence judicial appointments, both state and federal.  Miller reported that he believed that at least for certain periods of time, Girardi had the power to prevent someone from becoming a judge if he wanted to.  Girardi also made financial donations to judicial election campaigns.

Girardi was not shy about spending money on his well-connected friends or to make new ones.  Every year, he hosted multiple lavish parties that were attended by politicians, judges, prominent attorneys, prosecutors, and State Bar employees and officials.  He also hosted regular lunches and other meals at Morton's, The Palm, and the Jonathan Club that were attended by politicians, local officials, and State Bar employees.  Girardi provided generous gifts and benefits to those he knew or was trying to meet.  For example, he had a private jet which he used to fly friends and colleagues for work or pleasure, including several State Bar employees and officials.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

As described above, we understand that Girardi has recently been diagnosed with Alzheimer's Disease, which has greatly affected his memory and competency. Girardi was not interviewed as part of the investigation because of his competency issues and because Girardi, through his attorney, informed us he would invoke his Fifth Amendment right against self-incrimination to all our questions.

**Allegations Against Thomas Girardi and Failure of the State Bar to Publicly Discipline Him**

While Girardi has recently been publicly accused of stealing client funds and cheating his co-counsel out of fees, these allegations are not new to the State Bar. The State Bar was aware of over 200 misconduct complaints against Girardi dating back to at least 1984. In total, between 1982 and January 2021, 130 complaints were made to the State Bar about Girardi, none of which resulted in any public discipline, and the vast majority of which were closed without any discipline. Some cases were resolved with private discipline, such as ▮▮▮▮▮▮▮▮ private reprovals, ▮▮▮▮▮▮▮▮▮▮▮▮ Others were resolved with no discipline at all. And until last year, no cases resulted in public discipline.

Dozens of those State Bar complaints against Girardi involved allegations that he stole from his clients or committed some other trust account violation (*e.g.*, he did not properly keep track of client funds, provide accountings when requested by clients, or segregate client funds from firm funds). In several of the cases where Girardi was accused of misappropriating client funds, the facts followed a familiar pattern: Girardi settled a case and received settlement funds but, even after multiple requests from the client, did not pay the client her share of the proceeds. The client would then, out of desperation, file a complaint with the State Bar against Girardi. Shortly after the complaint was filed, Girardi would pay the client what was owed and, as part of the arrangement, the client would drop the complaint. At that point, the State Bar would close the case, even though in many instances the evidence of violations were clear cut. A similar type of complaint was from Girardi's co-counsel, who would allege that Girardi failed to pay them their fair share of settlements. Those complaints were also resolved in a similar manner— after a complaint was filed, Girardi would pay off his co-counsel, co-counsel would withdraw their complaint, and the State Bar would close the case.

On February 1, 2023, the Department of Justice announced two indictments against Girardi charging him with wire fraud, based upon allegations that he stole millions of dollars from his clients as part of a lengthy fraud scheme.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## Girardi's Connections with the State Bar and the Impact of Those Connections

Girardi maintained connections to the State Bar at nearly every level. One witness told us, "[i]t's like Girardi became part of the fabric of the State Bar." Our investigation determined that Girardi had connections to the Board, the Executive Director's Office, and OCTC, both at the managerial and line prosecutor and investigator level, and that spanned decades. He appears to have been involved in identifying candidates for the Board, and there is evidence he was involved in the appointment of at least one State Bar Court judge and attempted to influence the appointment of a CTC. Girardi, sometimes acting through a conduit, appears to have invited State Bar employees to meals, parties, concerts, ball games and other events, many of which he seems to have paid for.

In all, we have discovered evidence connecting at least nine State Bar employees or Board members who had connections to or accepted items of value, travel, or meals from Girardi at the time they were at the State Bar, State Bar Court, or the Board. Three of those individuals were involved in the closure of State Bar cases against Girardi, and we conclude that two of these individuals had conflicts-of-interest at the time they handled the cases.

Many of the individuals who appear to have had connections to Girardi presented on panels together at the annual Consumer Attorneys Association of Los Angeles ("CAALA") convention in Las Vegas, which CTC 2 referred to as a "boondoggle." Here are excerpts from a few CAALA flyers advertising the State Bar employees who were speaking at the annual event.



Avoiding Trouble with the State Bar
and
What to Do When an Investigation Opens
*Hon. Richard Platel, State Bar Judge*
*Thomas Layton, State Bar Investigator*
*Murray Greenberg, Supervising Trial*
*Counsel for the State Bar*

2008 CAALA

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

> Avoiding Trouble with the State Bar
> *Hon. Richard Platel, State Bar Judge*
> *Murray Greenberg, State Bar*
> *Supervising Trial Counsel*
> *Thomas Layton,*
> *State Bar Investigator*

2010 CAALA

**SPECIALTY CREDITS**
**Moderator: Shawn McCann**

Legal Ethics (1 hour)

Avoiding Trouble with the State Bar
*Joe Dunn, Murray Greenberg,*
*Thomas Layton, Hon. Donald Miles,*
*Hon. Richard Platel*

2013 CAALA

> Avoiding Trouble with the State Bar
> *Senator Joseph Dunn (Ret.), CEO,*
> *California State Bar*
> *Richard Platel, Supervising Hearing Judge,*
> *California State Bar Court*
> *Donald Miles, Hearing Judge,*
> *California State Bar Court*
> *Murray Greenberg, Senior Attorney,*
> *Office of the Chief Trial Counsel*
> *Thomas Layton, Judicial Liaison,*
> *Office of Public Protection*

2014 CAALA

We understand that Girardi was well connected with CAALA, and that his firm threw a party at the CAALA convention each year that multiple State Bar employees attended.

In addition to Girardi's connections to specific individuals affiliated with the State Bar, witnesses reported that Girardi often threw parties attended by OCTC personnel above and beyond the individuals that we detail below as well as by many federal and state judges and other prominent lawyers from leading law firms. Multiple witnesses spoke about how judges and other prominent lawyers or politicians at these events would rave about how highly they thought of Girardi.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

One witness reported that Girardi had always valued his connections with people, and that Girardi would cultivate relationships through his hosting large events with many invitees. As the witness described it, to Girardi, "relationships were the key to everything." Based on Girardi's pattern of conduct, and the details outlined below in this report, it appears that Girardi's cultivation of relationships at the State Bar and with related individuals and institutions was intentionally designed to increase his influence at the State Bar.

As an example, a witness who served for several years on the State Bar's Board, eventually serving as its President, reported to us that during his time at the State Bar, there was background chatter about Girardi and how well connected he was, politically and otherwise. For example, Girardi was at many prominent sponsorship events relating to the legal community. Another former Board member and President of the Board recounted an encounter that he had with Girardi (first to MTO during their investigation in 2014 and then to us). The former Board member said that after he decided to run for president of the Board, the outgoing President, Luis Rodriguez, told him that he should meet with Layton because (as MTO recounted) "Layton was not yet sure if he would throw his support to [the former Board member]." The former Board member reported that he found the suggestion strange, because Layton was just a State Bar employee, but nonetheless agreed. He reported that when he arrived at the meeting, Girardi came to the table to speak with him and Layton. The former Board member reported that the conversation was limited to small talk, and that Girardi did not ask for or offer anything of value related to the witness's possible election as President.

Another witness also reported to us that there were rumors that Girardi had certain Bar employees or executives removed from their positions. Whether or not this is actually true (and we were unable to corroborate this particular witness's account), the mere fact that people affiliated with the State Bar believed that Girardi had such power and influence is illustrative of his perceived influence and power.

Keeping with Girardi's reported focus on building relationships, multiple witnesses reported that Layton offered Girardi's assistance in the development of their careers, particularly if they were seeking judicial seats in the future. One witness reported to us that because of Girardi's perceived connections at all levels of the State Bar, he believed that there was no place within the State Bar to report concerns about Girardi.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

Additionally, State Bar employees and officers accepted gifts, including meals at Girardi's regular table at Morton's, knowing that Girardi was paying. Other State Bar employees and officers accepted meals and other gifts for which they claimed not to know the source. These individuals reported to us that they were not completely sure who paid for their free meals and thus could not be sure it had been Girardi, though they were sure they themselves did not pay and they did not name anyone else as having possibly paid.

As discussed above, Girardi was already prominent in the profession by the 1990s. His stature in the community may have contributed to the perception that bringing any disciplinary charges against him would be an uphill battle that involved taking on one of the leaders of the legal profession. Indeed, at least one case file contains a notation regarding ▮▮▮▮▮▮▮▮▮▮▮▮ and the rationale for closing another case included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

We also found evidence showing that Girardi exploited his connections with the State Bar to deter someone from even filing complaints with the State Bar in the first place. As described below, a witness reported that, after ▮▮ threatened to report Girardi to the State Bar, Girardi invited ▮▮ to a dinner that Layton also attended. ▮▮ understood this to be an attempt to intimidate ▮▮ with Layton's State Bar connections in an effort to deter ▮▮ from filing a State Bar complaint. Girardi also name-dropped Layton on at least one occasion to an attorney who complained about his conduct in what appears to be an attempt to get the upper hand in litigation (also described in further detail below).

Further, Girardi referenced his connections inside the State Bar to State Bar employees or SDTCs who were working on investigations against him as part of his advocacy. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Due to Girard's mental state and assertion of his Fifth Amendment rights, we were not able to ask him who he was referring to in ▮▮▮▮ and during his deposition, Layton denied knowing who Girardi was referencing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

OCTC, made up of individual attorneys and investigators handling each case, is afforded great discretion in determining whether to close complaints against attorneys. *See* Rule 2601, Rules of Procedure of the State Bar of California ("The Office of Chief Trial Counsel may, in its discretion, close an inquiry, complaint or investigation. The inquiry, complaint or investigation may also be closed with the issuance of a warning letter or a directional letter or by any other appropriate manner not constituting discipline."). Personal connections to Girardi by State Bar employees exercising this discretion create conflicts-of-interest and the appearance of impropriety, and thus taint the handling of the cases and the discretionary decision to close the cases without public discipline. In total, our investigation revealed that at least nine Girardi cases were handled by OCTC employees who had a connection to, or appear to have received benefits from, Girardi and/or his law firm at some point in time. All of these cases were closed without public discipline. Eight of those nine cases were closed by individuals whom we determined had conflicts-of-interest at the time they worked on the cases. We conclude that the involvement of conflicted individuals in these cases taints the discretionary decisions made in those cases and means that they were improperly handled.

In the sections that follow, we detail, *inter alia*, the connections that were reported to us by State Bar employees, past and present, and other witnesses, but note that not all reported allegations regarding Girardi were corroborated. Nevertheless, we have included the reports we discuss below in our confidential and attorney-client privileged report because they are relevant to the Board's understanding of Girardi's influence at the State Bar, which appears to have perpetuated itself in part through rumors regarding Girardi's connections to State Bar leaders.

**Connections at the Executive and Board Level**

Over the years, Girardi had connections to multiple people on the State Bar's Board and in its Executive Director's Office.[4] Our investigation did not reveal any

---

[4] Because Layton began his employment at the State Bar in OCTC and spent the majority of his time inside OCTC before being reassigned to the Executive Director's Office, his connections to Girardi are detailed in the section regarding OCTC employees, below.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

material connections between Girardi and any current Board executive or Board member.

### *Joseph Dunn*

Joseph Dunn served as the Executive Director of the State Bar from November 2010 to November 2014, when he was terminated for misconduct and false representations he made to the Board. Together with Layton, Oehler, and Noonen, Dunn sued the State Bar after his termination, alleging, *inter alia*, wrongful termination and retaliation. Dunn's suit went to arbitration, and the arbitrator ultimately found in favor of the State Bar. In July 2022, the State Bar, by and through an SDTC appointed under State Bar Rule 2201, initiated disciplinary proceedings against Dunn, alleging acts of moral turpitude in connection with his role at the State Bar. Those disciplinary proceedings are currently ongoing.

Dunn has personal and professional connections to Girardi and others in Girardi's orbit, including Miller and Layton. Dunn told us that he first met Girardi sometime in the 1990s, when both were members of the plaintiff's counsel bar. According to Dunn, Girardi held fundraisers for and donated to both of Dunn's California State Senate campaigns, in 1998 and 2002. Dunn knew both Miller and Layton before Dunn joined the State Bar in 2010. In 2013, Dunn moved Layton from his longstanding position as an investigator in OCTC into a newly created position in the Executive Director's Office, where Layton reported directly to Dunn. CTC 2 suggested that this transfer occurred because she was planning to give Layton a negative performance review.

Dunn and Girardi maintained a personal and professional relationship after Dunn left the State Bar; for example, Dunn and Girardi explored working together as attorneys in private practice around 2018. According to Dunn, he and Girardi last spoke sometime in the fall of 2020.

During his tenure at the State Bar, Dunn was invited to and attended lunches with Girardi, including at Morton's and the Jonathan Club, and parties hosted by Girardi, like Girardi's Superbowl and Christmas parties, as well as other events hosted and paid for by Girardi. Dunn's office, by and through his secretary Oehler, was even involved in assisting a third-party who wanted to attend one of Girardi's parties. When asked which State Bar employees he recalled seeing at Girardi's parties, Dunn identified only Layton. When asked if he had seen Greenberg or Richard Platel at Girardi's parties, Dunn stated that he had a vague recollection of seeing them at parties, but could not place them at specific parties on specific

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

dates.  In 2012, an email shows that Dunn planned to attend the dedication of the "Thomas V. Girardi Chair" at Loyola Law School.

> **Subject:** FYI...Sen. Joe Dunn will be attending the May 2nd dedication of the Thomas V. Girardi Chair.

And in 2013, Dunn—along with Layton—was included on Girardi Keese's guest list for an ASCDC (likely the Association of Southern California Defense Counsel) event.

Dunn flew on Girardi's private plane before, during, and after his tenure at the State Bar.  During his sworn deposition, Dunn admitted to the flights before and after his time at the State Bar, but stated that he had only taken one trip on the plane during his time at the State Bar—the trip he took together with Luis Rodriguez.  However, this appears to be inconsistent with documentary evidence indicating that Dunn flew on Girardi's plane <u>at least five times</u> while he was the Executive Director of the State Bar.

> **Subject:** Departure for tomorrow will be 4:30 pm for Sacramento; 4 passengers: Tom, █████ Tom Layton, Joe Dunn going to a 6:30 dinner at Cafeterial 15L, 1116 15th St., Sacramento - question below

According to records from Girardi Keese, it appears that Girardi Keese donated $25,000 to Dunn's campaign for the California State Senate in 2000.

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: A  Operating - CBB #0045/0312

| Check Number | Check Date | Vendor Number | Name | | Check Amount | Check Type |
|---|---|---|---|---|---|---|
| 090218 | 12/29/2000 | 1DUNN | JOE DUNN FOR STATE SENATE | | 25,000.00 | Manual |
| | | | | Bank A Total: | 25,000.00 | |
| | | | | Report Total: | 25,000.00 | |

Girardi Keese apparently paid $240,000 to the Law Offices of Joseph Dunn over 2009 and 2010, before Dunn joined the State Bar.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: A Operating - CBB #0045/0312

| Check Number | Check Date | Vendor Number | Name | Check Amount | Check Type |
|---|---|---|---|---|---|
| 147255 | 9/11/2009 | 1DUNJOE | LAW OFFICES OF JOSEPH DUNN | 40,000.00 | Manual |
| 147659 | 10/5/2009 | 1DUNJOE | LAW OFFICES OF JOSEPH DUNN | 40,000.00 | Manual |
| 148845 | 12/1/2009 | 1DUNJOE | LAW OFFICES OF JOSEPH L. DUNN | 40,000.00 | Manual |
| 149013 | 12/4/2009 | 1DUNJOE | LAW OFFICES OF JOSEPH L. DUNN | 40,000.00 | Manual |
| 150169 | 2/3/2010 | 1DUNJOE | LAW OFFICES OF JOSEPH L. DUNN | 40,000.00 | Manual |
| 150369 | 2/10/2010 | 1DUNJOE | LAW OFFICES OF JOSEPH L. DUNN | 40,000.00 | Manual |
| | | | **Bank A Total:** | 240,000.00 | |
| | | | **Report Total:** | 240,000.00 | |

During his sworn deposition, Dunn was asked about, but did not disclose, any payments or gifts from Girardi Keese.

Dunn also appears to have received gifts from Girardi in the form of hotels and entertainment in Las Vegas. Based on an email sent by a Girardi Keese employee to Dunn's assistant, it appears that Girardi paid for hotel expenses and concert tickets for Dunn in 2012, while Dunn was still working for the State Bar.

> **Subject: RE: Tom & Erika Girardi Holiday Party**
>
> Hi Sonja,
>
> Rooms have been booked at The Wynn Tower Suites: 1 room for Joe Dunn for arrival 12/14 & out on 12/16; 1 room for you and your daughter for same dates.
>
> I have reserved 3 tickets to the Faith Hill/Tim McGraw 8 pm show at the Venetian. We'll probably have a reception Friday before the concert at maybe 5 pm.
>
> Anyone golfing on Saturday?

Dunn also corresponded with a Girardi Keese employee in 2010 about another Las Vegas trip. Dunn asked the Girardi Keese employee about tickets to a show and the Girardi Keese employee confirmed that the tickets had been procured and provided Dunn with check-in details for a suite at the Wynn, suggesting that Girardi had arranged for the trip.

> We got the 3 tickets for the 7:30 p.m. show for "O" at the Bellagio. You will have your tickets upon check in at The Tower Suites registration in the Wynn.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Dunn attended annual CAALA conventions in Las Vegas in at least 2013 and 2014, and Dunn reportedly clashed with CTC 2 over OCTC attorney Greenberg's attendance.  Dunn also attended the State Bar trip to Mongolia, together with Miller and Layton.  This trip was a subject of the 2014 MTO investigation and was detailed in their results.  MTO concluded that Dunn misled the Board about whether State Bar funds would be used to pay for the trip, and found that after the use of State Bar funds had come to light, Girardi Keese made a payment and/or donation to the State Bar as a potential reimbursement.[5]  Miller and another Girardi Keese attorney donated to Dunn's congressional campaign after Dunn left the State Bar.

Approximately nineteen Girardi cases were closed during Dunn's tenure as Executive Director.  Although, as Executive Director, Dunn was not supposed to have a role in the State Bar's disciplinary function—something he admitted—we found evidence that Dunn nevertheless inserted himself into OCTC management in a way that inured to Girardi's benefit.  As discussed in detail below, Dunn was involved in the termination of four senior OCTC attorneys, including two who were advocating for discipline against Girardi.  During his deposition, Dunn admitted he was involved in the termination but described his involvement as at most ministerial.

By reviewing emails, we learned that in 2013—after Dunn moved Layton to the Executive Director's Office—Dunn's office received a letter flagging that Layton may have some inappropriate involvement in State Bar cases against Girardi.  Dunn was shown the letter during his sworn deposition, but he stated he had no recollection and thus could not comment.  This letter was later forwarded to Deputy Executive Director Hawley, and Hawley's handling of the allegations is discussed in further detail below.  Dunn denied that he even heard anything about Layton interceding in cases on behalf of Girardi during Dunn's time with the State Bar.

Dunn submitted Forms 700 for the years 2010, 2011, and 2013.  The State Bar does not have a Form 700 for Dunn for the years 2012 or 2014, and there are other irregularities with the records.  For example, Dunn's form for 2013 is incomplete and unsigned, and the form for 2010 is dated as having been completed in 2013.  Dunn did not disclose any gifts or things of value from Girardi or Girardi Keese in any of the Forms 700 we were provided.  When asked whether he disclosed things of value he received from Girardi during his time at the State Bar, Dunn stated that

---

[5] Dunn's representations to the Board regarding the Mongolia trip form part of the basis for the current disciplinary charges pending against Dunn.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

he did not recall, because he considered the disclosures an administrative issue and left them to his assistant Oehler to handle, even though he was required to sign them himself under penalty of perjury.  During her sworn deposition, Oehler testified that she did not complete any Forms 700 for Dunn, that she did not keep track of items that Dunn was to disclose on his Form 700, and that she did not recall her job responsibilities as having included tracking items of value for Dunn to disclose.

### *Howard Miller*

Howard Miller served on the State Bar Board of Trustees (formerly known as the Board of Governors) from 2006 to 2010, serving as its President from 2009 to 2010.  Concurrent with his tenure on the Board, Miller was also an attorney at Girardi Keese with the title "partner."  While Miller had the title of "partner" at Girardi Keese, he was not a true partner of the firm.  Based upon what Miller told us, Girardi was the sole owner of the firm, and Miller and other attorneys were essentially employees of Girardi Keese.  Miller and Girardi worked together to varying extents on Girardi Keese cases during Miller's sixteen years at Girardi's law firm (2002 to 2018).

Miller and Girardi also interacted socially during these years.  Miller flew on Girardi's private jet.  Additionally, they attended many lunches together at Morton's and elsewhere.  Girardi always paid for everything at the lunches.  Miller reported that Layton was frequently at these lunches, and that Dunn was sometimes in attendance as well, though less frequently than Layton.  Miller reported that although Layton was often present, Miller did not know any substantive details about Layton's relationship with Girardi.  Miller heard rumors that Layton was acting as the "gatekeeper" to Girardi but did not believe that to be true.  It appears that Miller and Layton may have an interpersonal relationship.  A witness reported hearing Miller and Layton frequently speak by phone while Miller was State Bar President, which he viewed as unusual, and the two also exchanged multiple emails.

At least one large event was thrown by Girardi in Miller's honor, a formal lunch to celebrate Miller's election as State Bar Board President, with approximately 200 people attending, including many people affiliated with the State Bar.  The State Bar's official agenda for Board of Governors Meetings and Events at the 82nd State Bar Annual Meeting in September 2009 prominently features a notation indicating that the luncheon was "hosted by Girardi Keese."

PRIVILEGED / WORK PRODUCT

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## Saturday, September 12, 2009

11:30 AM - 1:30 PM   **California Judges Association (CJA)/State Bar Board of Governors**
Swearing-in Ceremony and Installation Luncheon
Lunch hosted by Girardi Keese.  RSVP required.  *Use the Annual
Meeting Pre-registration Form to reserve your tickets.*

Miller joined the State Bar's Board in 2006 after being elected according to the election structure that existed then.  At that time, Miller reported that Girardi was a member of a group of prominent attorneys who would make endorsements for Board member elections, and Miller discussed his intention to run for a Board seat with Girardi before announcing his candidacy and seeking an endorsement from the group.  Miller stated that although Girardi was supportive of Miller's decision to run for President in 2009, Girardi did not campaign on Miller's behalf.  Miller told us that he never had any discussions or communications with Girardi about State Bar issues while Miller was on the Board.

Miller understood that he had disclosure obligations during the time he served on the Board, but told us that he did not report his attendance at Girardi events because Miller's association with Girardi Keese was open and apparent.

In 2012, as discussed above, after Miller left the State Bar and during a time period when Miller worked at Girardi Keese but had no formal relationship with the State Bar, Miller was part of a State Bar delegation on a trip to Mongolia with Layton and Dunn.

We understand that all State Bar Board members were required to complete Forms 700.  However, the State Bar has no record of any Forms 700 completed by Miller.

There were approximately 11 Girardi cases opened while Miller was on the Board.  We understand based on review of case files and documents that OCTC referred Girardi cases to SDTCs pursuant to Rule 2201 while Miller was President of the Board from 2009-2010.  We do not have any evidence that Miller had any involvement in the handling or resolution of Girardi cases during his time on the Board.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

### *Sonja Oehler*

Sonja Oehler served as Dunn's executive assistant while Dunn was Executive Director of the State Bar, from 2010 to 2014. Oehler had been Dunn's assistant at the organization at which he was employed before moving to the State Bar, and Dunn negotiated for Oehler to continue serving as his assistant when he joined the State Bar. After the State Bar terminated Oehler's employment in November 2014, she filed a lawsuit against the State Bar. Oehler was represented by Girardi Keese in the litigation. Oehler asked Girardi personally to assist her in her dispute with the State Bar, and considers Girardi to have been her personal attorney.

In her role as Dunn's assistant, Oehler facilitated communications between Girardi and his office, and Dunn and his office. Oehler also communicated regularly with Layton, and sometimes with others with connections to Dunn and Girardi, including Rodriguez. In her role as Dunn's assistant, Oehler received a complaint made to Dunn that Layton was inappropriately interceding in a State Bar case against Girardi. Oehler claimed to have no memory of this.

During her sworn deposition, Oehler was asked about Layton's role in the Executive Director's Office, where the two of them worked. Oehler did not provide any details about Layton's activities, stating that she did not recall anything about what Layton did other than "attend meetings." When pressed for details about the meetings, she was unable to provide any. Despite repeated questioning, Oehler did not provide any further details about what Layton did while the two of them worked together for Dunn in the Executive Director's Office. Oehler stated that she has maintained a relationship with Layton since they left the State Bar and they speak occasionally.

In 2014, before Dunn was terminated, Oehler emailed the Foundation for Democracy and Justice to inform it that Girardi would be making a $25,000 donation, and telling the Foundation that Dunn requested that correspondence related to Girardi's donation be routed through Oehler, so that Oehler could "ensure it gets to the right person at the law firm."

We found that while employed at the State Bar, Oehler received gifts and things of value from Girardi and Girardi Keese. For example, in 2012, Oehler admitted to attending Girardi's holiday party in Las Vegas with her daughter and Dunn. In addition to the party itself, Oehler told us that her accommodation costs at the Wynn as well as tickets for a concert at the Venetian were covered by Girardi Keese.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

During her sworn deposition, Oehler was asked if she received gifts and other items of value from Girardi and Girardi Keese, and she answered no. After reviewing emails that we showed her, Oehler admitted that she had attended a conference in Las Vegas, and a couple of lunches at Morton's and the Jonathan Club, and holiday parties, and that Girardi likely paid for these. When specifically asked if she had received concert tickets from Girardi, she said that she had not, until she was shown an email from her personal email account indicating otherwise. Later in the deposition, Oehler admitted that she had also flown on Girardi's private plane and stayed at the St. Regis Hotel in Washington, D.C. at Girardi's expense. Oehler then disclosed that in addition to the concert tickets, she also received tickets to a basketball game from Girardi, though she could not recall the time frame for when she received the basketball game tickets and it may have been after she left the State Bar. Oehler admitted that she did not disclose any of this on any Form 700 she submitted to the State Bar.

Oehler did submit Forms 700 for the years 2012 and 2013. The State Bar has no record of Forms 700 for Oehler for the years 2010 or 2011; the form for 2013 appears to also cover 2014, but seems to be incomplete. All of Oehler's Forms 700 are dated as having been completed in 2014, and the 2013 form is not signed. During her sworn deposition, Oehler admitted that she knew that "gifts and travel" were required to be disclosed on Forms 700. Nevertheless, Oehler did not disclose any gifts, travel, or other things of value from Girardi or Girardi Keese in any of the Forms 700 on file at the State Bar.

We are unaware of Oehler having any involvement in the handling of any discipline cases involving Girardi.

### *Luis Rodriguez*

Luis Rodriguez served on the State Bar Board from 2010 through 2014 and as its President from 2013 to 2014.[6] Rodriguez initially resisted participating in an interview for purposes of this investigation, and it took multiple attempts to effectuate service on him. After we informed Rodriguez, through his attorney, that the State Bar would seek to compel his compliance with the subpoena issued for his

---

[6] After leaving the State Bar, Rodriguez made a demand for $100,000 to the State Bar for alleged defamation. Unlike Layton, Dunn, Oehler, and Noonen, however, Rodriguez did not actually file suit against the State Bar.

testimony, Rodriguez agreed to a limited interview in which he disclosed that he met and socialized with Girardi multiple times during his time with the State Bar.

When asked about the nature of his interactions with Girardi during his time with the State Bar, Rodriguez stated that they were limited to social interactions at events like county bar dinners or political fundraisers, which he recalled happened a couple of times a year. Rodriguez stated that he was not aware of any disciplinary case against Girardi pending at any time during which he was involved with the State Bar. During the course of the interview, Rodriguez added that he had attended two holiday luncheons thrown by Girardi. Another witness reported seeing Rodriguez at Girardi's table at Morton's, during which time Rodriguez and Girardi discussed Rodriguez possibly serving as the Public Defender. In 2013, Rodriguez was interviewed by Girardi on his AM radio show (Champions of Justice) about Rodriguez serving as State Bar President. Email correspondence suggests Rodriguez and Girardi may have been involved in jointly advocating for certain political candidates, but Rodriguez had no recollection of the discussions.

When asked if he had flown on Girardi's private jet during his time with the State Bar, Rodriguez confirmed that he took two trips on Girardi's private plane while with State Bar—one within California and one to Washington, D.C. Girardi was on the plane on both occasions, and Dunn was also on the plane on one occasion. When asked if the plane rides were disclosed to the State Bar, Rodriguez stated that they were reported to the Executive Director's Office, which did not express any concern. The Executive Director at the time was Dunn, who, as noted above, was also on Girardi's plane with Rodriguez. During his sworn deposition, Dunn stated that as Executive Director, he reported to the State Bar's Board, of which Rodriguez was a member and then President.

Rodriguez knows Layton, Greenberg, Noonen, Dunn, Oehler, and Miller, but the full extent of Rodriguez's relationships with these individuals is unknown. One witness reported that Rodriguez had a close relationship with Layton, Dunn, and Miller. It is unclear whether Rodriguez interacted with Girardi indirectly, for example through Layton. For instance, Rodriguez denied having spoken to Girardi about the State Bar President position during his campaign for President, but acknowledged that he likely spoke to Layton about it. Rodriguez could not recall the contents or context of his discussion with Layton about his campaign. A former Board member and President of the Board recounted to MTO in 2014 and then to us that Rodriguez told him he should meet with Layton to discuss the role of State Bar President, and when the witness arrived at the meeting, Girardi was present. Rodriguez told us that he did not know the nature of Layton's relationship

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

with Girardi, but that he recalled that Layton and Girardi were together at almost every social occasion. Rodriguez knew Layton before Rodriguez joined the State Bar.

According to records we received from Girardi Keese, Rodriguez appears to have received three payments totaling $3,000 from Girardi Keese while with the State Bar, in the form of yearly $1,000 checks in 2011, 2012, and 2013 (in December each time).

| Check History Report<br>Sorted By Check Number<br>Activity From: 1/1/2000 to 12/31/2020 | | | | | Girardi & Keese (GIR) |
|---|---|---|---|---|---|
| Bank Code: G  Torrey General Account | | | | | |
| Check<br>Number | Check<br>Date | Vendor<br>Number | Name | Check Amount | Check Type |
| 202638 | 12/21/2011 | 1RODLUI | LUIS RODRIGUEZ | 1,000.00 | Manual |
| 209638 | 12/28/2012 | 1RODLUI | LUIS RODRIGUEZ | 1,000.00 | Auto |
| 216391 | 12/23/2013 | 1RODLUI | LUIS RODRIGUEZ | 1,000.00 | Manual |
| | | | Bank G Total: | 3,000.00 | |
| | | | Report Total: | 3,000.00 | |

Rodriguez did not disclose these payments to us during his interview and we were not aware of them at the time of his interview. Rodriguez was asked whether he witnessed Girardi, Girardi Keese, or any affiliate of Girardi offer anything of value to anyone affiliated with the State Bar, and answered no. After discovering the payments, we provided Rodriguez the opportunity to reinterview to explain the newly found evidence, but Rodriguez, through his attorney, declined to do so.

We understand that all Board members were required to complete Forms 700. However, the State Bar has no record of any Forms 700 completed by Rodriguez.

We do not have any evidence that Rodriguez had any involvement in the handling or resolution of Girardi cases during his time on the Board.

### *Other Reported Board Connections*

As discussed in Appendix A, prior to 2018, State Bar Board members were not appointed but instead were elected by licensed lawyers in California. We were informed that local committees of prominent lawyers would meet to consider candidates and make endorsements for these elections, and Girardi was a member

PRIVILEGED / WORK PRODUCT                                                      35 | P a g e

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

of the local committee in Los Angeles. We understand that many candidates would meet with the local committee to seek its endorsement for the election, like Miller did when he sought and obtained a Board seat in 2006. Emails from Dunn's time as Executive Director appear to indicate that Girardi remained involved in suggesting possible candidates for the State Bar's Board years later.

It is unclear what, if any, influence Girardi was able to exert on State Bar cases against him through the relationships he built by participating the selection process for State Bar Board members, but one former OCTC investigator informed us that a Board member may have intervened in a case against Girardi in the 1990s. This allegation, however, could not be corroborated.



According to the witness, an OCTC investigator employed by the State Bar in the 1990s, ▮ recalled working on a case against Girardi that ▮ believed warranted discipline. The investigator ▮▮▮▮▮▮▮▮▮▮▮ later learned that the prosecution would not result in any public discipline. According to the witness, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Girardi was accompanied by a sitting member of the State Bar's Board of Governors (as the Board of Trustees was formerly known). The witness could not recall which member of the Board it had been, but believed it was a male. According to the investigator, ▮▮▮▮▮▮▮▮ ▮▮ which was unusual. According to the witness, although it was not said expressly, the witness got the impression that because of interest in the case from the Board and the CTC, the case would not result in public discipline to Girardi.

The OCTC attorney and ▮ supervisor were interviewed about this allegation, but neither recalled having happened, and neither recalled ever having been approached by a CTC or member of the Board about a specific case against Girardi. The CTC denied knowing that there were any cases against Girardi pending during his time as CTC and stated that he could not have interceded in a case he was not aware existed. We are not aware of any connections between the CTC at that time and Girardi. Acknowledging that the passage of time can affect people's memories and the availability of documentary evidence, we reviewed the case file and other available evidence, and asked interviewees about the allegation, but were not able to corroborate the OCTC investigator's allegation.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

## Connections with OCTC and the State Bar Court

Over the years, Girardi appears to have had a number of connections to OCTC attorneys and investigators, as well as State Bar Court judges. We did not find evidence of any material connections between Girardi and any current OCTC employees or State Bar Court judges.

### *Murray Greenberg*

Murray Greenberg worked in OCTC from 1989 to February 2019.[7]  Greenberg started as an investigator in 1989, then moved into an attorney position after passing the bar in 1989. He worked in several sections of OCTC during his tenure, including a managerial role in the Intake Unit. We deposed Greenberg in January 2023, but he asserted his Fifth Amendment right and refused to answer any questions about his work at the State Bar and his connections to Girardi and Layton and largely limited his testimony to his post-Bar work. As such, the following discussion of Greenberg's connections to Girardi is based on documentary evidence and statements from other interviewees.

Greenberg appears to have had a many-year relationship with Girardi, although we do not know how or exactly when they met. According to documentary evidence, Greenberg knew Girardi by at least June 2008, as Greenberg presented a gift to Girardi that Girardi described in June 2008 as "extraordinary" in a thank you note.

> Dear Murray:
>
> I have never received such an extraordinary gift. It's massively appreciated.
>
> The nice thing about a gift like this is you think of the guy who gave it to you every time you look at it.
>
> With kind personal regards,
>
>
> THOMAS V. GIRARDI
> TVG/kc

---

[7] Due to funding issues, the State Bar terminated the majority of its staff from 1998-1999. To the extent individuals we discuss in this section were part of the 1998 termination and then were rehired in 1999, our discussion of time spent at the Bar will not reflect that brief termination.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Based on what we learned from a former Girardi Keese employee, it appears that Greenberg's gift giving was not a single occurrence. The former Girardi Keese employee told us that Greenberg gave her and Girardi bottles of wine maybe twice a year over many years.

According to the sworn testimony of a witness who worked at Girardi Keese, Greenberg met with Girardi at the Girardi Keese offices while he was employed by the State Bar with some frequency. The witness's recollection was that Greenberg requested meetings with Girardi, then met with him for about 30 minutes per session. The witness did not know what Girardi and Greenberg discussed during these closed-door meetings. We also reviewed emails corroborating that Greenberg went to the Girardi Keese office while at the State Bar. Additionally, we heard from a witness that Greenberg went to lunches with Girardi at Morton's, and our understanding based on witness interviews is that Girardi paid for those lunches, although we do not have any evidence of that apart from witness testimony.

While employed by the State Bar, Greenberg was invited to parties thrown by Girardi and Girardi Keese, such as Superbowl, Christmas, and Thanksgiving parties. He was also included on Girardi Keese's guest lists for events such as the Jack Webb Award dinner and the National Italian American Foundation West Coast Gala. Emails also show that Greenberg accepted two tickets to an Adele concert in 2016, and an unknown quantity of Santana tickets in January 2019 from Girardi Keese.

We also have documentary evidence showing that Greenberg spoke on panels related to professional ethics and discipline at the annual CAALA convention in Las Vegas in 2007, 2009-2012 and 2018, and a former Girardi Keese employee told us that Greenberg attended the parties thrown by Girardi during the event. Greenberg's attendance of the 2014 CAALA convention was a source of conflict between Dunn and CTC 2, as discussed above.

Additionally, emails collected from Girardi Keese suggest that Greenberg referred a legal malpractice case to Girardi Keese while he was still employed by the State Bar. We do not know how he became aware of the case or if he received a referral fee from Girardi Keese.

Greenberg submitted Forms 700 for several years. He submitted a Form 700 on March 11, 2014 upon assuming the position of Senior Trial Counsel on January 11, 2014 and additional Forms 700 as follows: March 2, 2015 (for the period January 1-December 31, 2014); March 14, 2016 (for the period January 1-December 31,

2015); March 21, 2017 (for the period January 1-December 31, 2016); and March 5, 2018 (for the period January 1-December 31, 2017).  On February 13, 2019, Greenberg submitted a Form 700 upon his departure from the State Bar.  For all applicable years, we understand that Greenberg was required to disclose all "gifts, loans, and other payments received" from sources subject to the regulatory, permit, or licensing authority of the State Bar.  On all of these Forms 700, Greenberg signed under penalty of perjury that he had no reportable interests.  However, based on the documentary and testimonial evidence summarized above, it does not appear that this was accurate for all years.  As described above, emails that we collected indicate that, at the very least, Greenberg accepted concert tickets from Girardi Keese in 2016 and January 2019.

After he retired, Greenberg appears to have performed work that supported Girardi.  In April 2019, two months after his retirement, Greenberg signed a sworn declaration on behalf of Girardi Keese related to the use of client funds, which included the statement, "[a]ll of their [Girardi Keese's] conduct were [sic] in accord with the Rules of Professional Conduct of the State Bar and was totally appropriate."

> **DECLARATION OF MURRAY GREENBERG**
>
> 3     I have spent 30-1/2  years with the State Bar with extensive background in
> 4  analyzing appropriate conduct of lawyers and evaluation of moral character, violations of
> 5  honesty and integrity and violation of trust account rules and regulations.
> 6        My experience includes instructing State Bar trial counsel on a wide variety of
> 7  topics involving client trust funds. There are several issues the Court should consider in
> 8  this case:

> 12      4.     The law firm of Girardi|Keese followed the law by holding these funds in a
> 13  trust account in which the small amounts of interest went to the State Bar pursuant to the
> 14  Business and Professions Code section 6211.
> 15      5.     All of their conduct were in accord with the Rules of Professional Conduct
> 16  of the State Bar and was totally appropriate.
> 17      6.     The law firm itself received no benefit from any interest under fees or costs
> 18  advanced.
> 19      7.     Every penny went directly to the State Bar according to the rules of the State
> 20  Bar regarding interest on lawyers trust accounts.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

In 2020, Greenberg's name also appears in connection with advocacy on Girardi's behalf in an active State Bar case. ███████████████████████████████████████████████████████████ Greenberg did not invoke his Fifth Amendment rights with regards to this topic during his deposition. He testified that he was paid to consult with Girardi's lawyer to assist "in providing some information with respect to the particular rule or procedure that was involved" in the State Bar proceeding.

We have evidence that Greenberg was involved in closing six Girardi cases without public discipline, as well as cases opened against ████████████ and ████████████████████. Given his connections to Girardi, Greenberg had a conflict-of-interest, or, at the very least there were substantial doubts about his impartiality, and thus he should have recused himself from any involvement in the cases. We conclude that Greenberg's connections to Girardi taint the handling of these cases and the discretionary decisions to close them without public discipline.

In addition, we located evidence appearing to show that Greenberg, while employed by the State Bar, had an off-the-record conversation with an attorney who represented Girardi in relation to Girardi's disciplinary matters. Based on the evidence, it appears that Girardi's attorney discussed what appears to be a Girardi disciplinary case with Greenberg, and Greenberg reportedly told Girardi's attorney that the case should be dismissed. Girardi's attorney asked Greenberg to submit a declaration in support of Girardi, but Greenberg was unwilling to do so. The exact case that they were discussing is unknown, and based on our evidence, it does not appear that Greenberg was assigned to it.

Below, we discuss a selection of cases related to Girardi that Greenberg was involved in resolving. The following is based on materials from the State Bar's confidential case files unless otherwise noted.

**Case 11-18676.** In May 2011, the State Bar opened Case 11-18676 against Girardi based on ongoing litigation against Girardi by former clients alleging misappropriation of client funds. On June 7, 2011, OCTC ATTORNEY 1, ████████████████████████████████████████████████████ also flagged the case as a 2201 case, which we understand to indicate the presence of a conflict within OCTC. ███████████████████████████████████████████



www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

The case was not sent out to an SDTC.  According to a terse memorandum in the file authored by Greenberg and dated July 5, 2011, he stated that 

Based on the information available to us, it does not appear that a new State Bar case was ever opened regarding the facts underlying this case.



When interviewed, OCTC ATTORNEY 1 did not recall working on this case and was unable to answer any of our questions about it.  Greenberg refused to answer any questions about State Bar cases, asserting his Fifth Amendment right.  Lazar opined that the case could have moved forward despite the ongoing court proceedings but that it was within the discretion of State Bar policies to close the case pending the outcome of a Superior Court action.

The memorandum and closure are suspicious for multiple reasons.

*First*, it is concerning to us that, even after the case was flagged as a 2201 conflict case, OCTC staff was involved in deciding to close the case. When we asked OCTC ATTORNEY 1 about this, ▆ said that the practice was to only send a case to an SDTC if OCTC staff thought there was something to prosecute.  This may have been permissible under OCTC policy at the time, but even if permissible, to afford this level of discretion to a conflicted OCTC seems to violate the common law prohibition regarding government attorneys' conflicts-of-interest.  The State Bar has since rectified this obvious policy flaw by revising Rule 2201 to prohibit OCTC staff from disposing of conflict cases.

PRIVILEGED / WORK PRODUCT                                    41 | P a g e

*Second*, putting aside the general OCTC conflict, given Greenberg's connections to Girardi, he should have been recused from working on the case in any capacity, and he should not have been authoring the ▮▮▮▮▮▮▮ for the case.

*Third*, it is hard to understand why Greenberg intervened in this case ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is unclear why Greenberg intervened in this case in the first instance and why he drafted the ▮▮▮▮▮ ▮▮▮▮▮ for the case.

**Cases** ▮▮▮▮▮▮▮▮▮▮ In 2012 and 2013, three complaints were made to the State Bar about ▮▮▮ RESPONDENT, all related to the same litigation. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, we discovered that Greenberg was communicating from his personal email address with ▮▮ RESPONDENT about these cases. According to the case files, Greenberg was assigned to one of these cases ▮▮▮▮▮, one of the cases was assigned to an attorney whom he supervised ▮▮▮▮▮, and the other case was assigned to different OCTC personnel, although Greenberg still appears to have been involved in it in some capacity.

In April 2013, ▮▮ RESPONDENT emailed correspondence related to the cases to Greenberg's personal email address. Greenberg—using his personal email—and ▮▮ RESPONDENT exchanged several emails about the State Bar matters. In one exchange, Greenberg forwarded materials from the complaining witness from his State Bar email account to his personal email account. He then sent those materials from his personal email account to ▮▮ RESPONDENT. We could not locate the correspondence between ▮▮ RESPONDENT and Greenberg's personal email in the case files for these cases; we only had access to them from another source.

We asked ▮▮ RESPONDENT about ▮▮ off-the-record communications with Greenberg. ▮ admitted to knowing Greenberg and said that ▮ believed ▮ met Greenberg at a CAALA convention in Las Vegas. ▮ told us that ▮ did not recall how ▮ got Greenberg's personal email or why ▮ reached out to Greenberg personally. ▮▮ RESPONDENT also denied that ▮ interactions with Greenberg were anything but standard responses to requests from Greenberg. Greenberg refused to answer any questions about cases he worked on at the State Bar, instead asserting his Fifth Amendment right against self-incrimination.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Regardless of the propriety of the closure of these cases (and Lazar opined that closure without disciplinary action was appropriate), Greenberg should not have been emailing ▇ RESPONDENT about the State Bar cases using his personal email account. We asked Lazar to review these case files and the correspondence between Greenberg's personal email and ▇ RESPONDENT, and she explained as follows:

It is not normal practice for OCTC employees to provide any persons involved in a State Bar matter personal contact information for a State Bar employee. Not only does this create a risk of inadvertent disclosure of confidential State Bar information, but also could create a risk to the safety of a State Bar employee through actions taken by a disgruntled Respondent or complainant. OCTC cannot require all staff attorneys to limit the information on the State Bar's website in the attorney's personal profile to a State Bar email address, but disclosure of such information on a professional website would certainly be ill-advised.

How and why Respondent was provided with Greenberg's private email is not disclosed in the file. By engaging in these communications, it could have resulted in confidential information being accidently accessed by a hack to Greenberg's private server or some other individual not employed by the State Bar having access to this email account. More troubling is the fact that there is no way of knowing whether or not there were additional emails between Respondent and Greenberg that were not copied and put into the State Bar file.

An additional area of concern is the appearance of bias in favor of the Respondent due to the fact that only Respondent was provided with Greenberg's personal email information whereas none of the complainants involved in the matter were treated similarly.

**Case** ▇▇▇▇ During the investigation, we received information about a State Bar case against a ▇▇▇▇▇▇ MEMBER that was closed without any public discipline under questionable circumstances. ▇▇▇▇▇ MEMBER is still a licensed attorney in California.

In 2014, a witness ("Reporting Witness") reported ▇▇▇▇▇ MEMBER ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The Reporting Witness told us that ▇ then received a telephone call from the OCTC attorney prosecuting the case, who said that even though the ▇▇▇▇▇ MEMBER had clearly lied to the State Bar during the investigation, the OCTC attorney was closing the case without any public discipline because ▇ felt pressured to do so by ▇ supervisor. The case was then closed.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT



We interviewed the OCTC attorney who investigated the case. ████ told us that ██████████████████████████████████████████████████████████ ██████████ The OCTC attorney told us that Greenberg directed ████ to "settle" the case or "make it go away."  The OCTC attorney said this was the only case ████ ever worked on where a supervisor directed ████ to close a case in this manner.

Greenberg's involvement in the case is confirmed in the case file, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As noted, we were not able to ask Greenberg about this case because he invoked his Fifth Amendment right against self-incrimination.

The ██████████████ MEMBER was interviewed but disclaimed any memory of the case, which ████ attributed to a medical issue affecting memory. ████ stated that ████ has not been close with Girardi for twenty years and had no knowledge of Girardi's connections to the State Bar or of any use of those connections to help in resolving ████ case.

### *Thomas Layton*

Thomas Layton started working at the State Bar in 1999 as an investigator in OCTC.  As discussed above, CTC 2 told us that Executive Director Dunn moved Layton into the Executive Director's Office in 2013 after she planned to give Layton a negative performance review.  Layton worked there until he was placed on leave in November 2014 and terminated in 2015.  He reported to Dunn, and while his official title was Public Information Officer, Layton told us that was not his position. Instead, he considered himself to be the "law enforcement and judicial liaison." Layton reportedly had frequent lunches with Girardi during the work week at Girardi's favorite restaurants.  He was also reportedly spotted with regularity at Girardi Keese's offices, where he was known by many people who worked there.

Girardi's connections to Layton run deep and wide.  One witness described them as having a "father-son relationship," although Layton disputed that characterization.  Girardi is the godfather to one of Layton's children and employed

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

another two of them while Layton worked at the State Bar. Layton admitted to us in a sworn deposition that Girardi was his "very good friend." Layton told us that he has known Girardi for about 20 years and that he met him while he was doing law enforcement endorsements for judicial and political positions.[9] Layton stated that he last spoke to Girardi just a few days before we deposed him in December 2022.

In addition to the personal connections, we found evidence indicating that Girardi, through his law firm, gave Layton and his family cash and things of value that we estimate total over a million dollars. This includes cash as well as payment for Layton's expenses, car payments, travel, legal representation, and meals. Many of these benefits were provided to Layton while he worked at the State Bar. Below is a summary of notable things of value that Girardi provided Layton during his State Bar employment.

- **Payments to Layton and His Wife.** Based upon Girardi Keese financial records, the firm paid Layton and his wife over $600,000 while he was employed by the State Bar. Some of these payments were made out to Layton directly, some to his wife, and the bulk to an entity named "Layton & Layton," which Layton stated was a business he and his wife had.

  o *Payments to Layton.* Girardi Keese records show the firm paying Layton over $153,000 from 2005-2011, while he was employed by the State Bar and working in OCTC. Layton also appears to have received a 1099 tax form from Girardi Keese in 2009 for $50,000 paid to him during the year. When asked about these payments and the 1099 from Girardi Keese, Layton had no explanation. For example, when asked why he received a check for $25,000 from Girardi in 2006, Layton said that he did not know why.

---

[9] Before working at the State Bar, Layton was a Sheriff's Deputy for Los Angeles County.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: A  Operating - CBB #0045/0312

| Check Number | Check Date | Vendor Number | Name | | Check Amount | Check Type |
|---|---|---|---|---|---|---|
| 122513 | 10/4/2005 | 1LAYTON | THOMAS LAYTON | | 1,100.00 | Manual |
| 125499 | 4/7/2006 | 1LAYTON | THOMAS LAYTON | | 968.80 | Manual |
| 129177 | 11/16/2006 | 1LAYTON | THOMAS LAYTON | | 50,000.00 | Manual |
| 133669 | 8/30/2007 | 1LAYTON | THOMAS LAYTON | | 1,800.06 | Manual |
| 137368 | 4/15/2008 | 1LAYTON | THOMAS LAYTON | | 25,000.00 | Manual |
| 138065 | 5/19/2008 | 1LAYTON | THOMAS LAYTON | | 777.00 | Manual |
| 138065 | 5/19/2008 | 1LAYTON | THOMAS LAYTON | | 777.00- | Reversal |
| 141657 | 12/8/2008 | 1LAYTON | THOMAS LAYTON | | 5,000.00 | Manual |
| 144238 | 4/23/2009 | 1LAYTON | THOMAS LAYTON | | 50,000.00 | Manual |
| 149785 | 1/7/2010 | 1LAYTON | THOMAS LAYTON | | 1,352.28 | Manual |
| 154819 | 9/10/2010 | 1LAYTON | THOMAS LAYTON | | 3,373.07 | Manual |
| 159240 | 4/18/2011 | 1LAYTON | THOMAS LAYTON | | 10,000.00 | Manual |
| 159303 | 4/21/2011 | 1LAYTON | THOMAS LAYTON | | 5,000.00 | Manual |
| | | | | **Bank A Total:** | 153,286.21 | |

o _Payments to Rose Layton._  Girardi Keese records show Layton's wife, Rose Layton, a professor of clinical accounting, being paid $2,500 by Girardi Keese in 2002 (while Layton was working in OCTC) and $4,800 in 2013 (while Layton was working in the Executive Director's Office).  We asked Rose Layton about these payments, and she could not provide any details regarding them, other than saying that she performed services for Girardi Keese that may have included research.

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: A  Operating - CBB #0045/0312

| Check Number | Check Date | Vendor Number | Name | | Check Amount | Check Type |
|---|---|---|---|---|---|---|
| 100431 | 5/28/2002 | 3LAYTON | PROF. ROSE LAYTON | | 2,500.00 | Manual |
| | | | | **Bank A Total:** | 2,500.00 | |

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: G  Torrey General Account

| Check Number | Check Date | Vendor Number | Name | Check Amount | Check Type |
|---|---|---|---|---|---|
| 213810 | 8/1/2013 | 3LAYTON | ROSE LAYTON | 4,800.00 | Manual |

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

o   _Payments to Layton & Layton._   According to Girardi Keese financial records, the firm paid "Layton & Layton"[10] $461,000 from 2006 to 2014 (all while Layton was working for the State Bar, with most of that money being paid while Layton was working in OCTC).  During his deposition, Layton admitted that he was associated with "Layton & Layton."  He told us that "Layton & Layton" provided services to Girardi Keese, mainly consulting services provided by his wife.  However, he did not provide details of the type of services provided by Layton & Layton to Girardi Keese, and told us that he did not know what the services were.

We also asked Rose Layton in a sworn deposition about the payments, and she claimed they were for unspecified services "related to the financial aspects of a case" that she provided to Girardi Keese, but told us that she could not give any examples of what this meant.  When asked further, she said that the general type of work she did was "[p]robably defining things like – maybe like what potential income would be."  She said she had no documentary evidence of the services she provided —no checks, no contracts, no tax forms, no correspondence, and no work product. She told us that she communicated orally with Girardi and hand-delivered her work product to him.

---

[10] We have not found any public record of a business called "Layton & Layton."  Rose Layton told us that Layton & Layton was a fictitious business name registered in Los Angeles County, and that there was no official entity with that name.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: A  Operating - CBB #0045/0312

| Check Number | Check Date | Vendor Number | Name | Check Amount | Check Type |
|---|---|---|---|---|---|
| 126357 | 5/26/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 126357 | 5/26/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00- | Reversal |
| 126358 | 5/26/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 126358 | 5/26/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00- | Reversal |
| 126434 | 6/1/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 126435 | 6/1/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 126509 | 8/5/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 126510 | 8/5/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 127675 | 8/4/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 128066 | 9/5/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 128502 | 10/2/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 129069 | 11/6/2006 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 131604 | 4/18/2007 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 132075 | 5/22/2007 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 132312 | 6/7/2007 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 138821 | 7/8/2008 | 3LAYLAY | LAYTON & LAYTON | 11,000.00 | Manual |
| 139676 | 8/22/2008 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 139677 | 8/22/2008 | 3LAYLAY | LAYTON & LAYTON | 25,000.00 | Manual |
| 140571 | 10/9/2008 | 3LAYLAY | LAYTON & LAYTON | 15,000.00 | Manual |
| 150030 | 1/25/2010 | 3LAYLAY | LAYTON & LAYTON | 30,000.00 | Manual |
| | | | **Bank A Total:** | 381,000.00 | |

**Check History Report**
**Sorted By Check Number**
**Activity From: 1/1/2000 to 12/31/2020**

Girardi & Keese (GIR)

Bank Code: G  Torrey General Account

| Check Number | Check Date | Vendor Number | Name | Check Amount | Check Type |
|---|---|---|---|---|---|
| 204738 | 4/9/2012 | 3LAYLAY | LAYTON & LAYTON | 50,000.00 | Manual |
| 211842 | 4/12/2013 | 3LAYLAY | LAYTON & LAYTON | 10,000.00 | Manual |
| 216829 | 1/17/2014 | 3LAYLAY | LAYTON & LAYTON | 5,000.00 | Manual |
| 300643 | 4/11/2014 | 3LAYLAY | LAYTON & LAYTON | 15,000.00 | Manual |
| | | | **Bank G Total:** | 80,000.00 | |
| | | | **Report Total:** | 461,000.00 | |

- **Girardi Keese Credit Card.** In 2011, it appears that Girardi provided Layton with a Girardi Keese American Express card. An internal Girardi Keese email suggests that, when Layton first received the card, he reportedly asked to have the name "Girardi Keese" removed from the face of the card.

**Sent**: Tue May 10 18:07:19 2011
**Subject**: I got Tom Layton's Gold Card. He just told me it cannot have GK on the card. Has to have only his name. Can you take care of it and I'll give you the card we received.

Layton admitted to us that he did not disclose that he had a Girardi Keese credit card to the State Bar. His wife claimed that she did not recall Layton having a Girardi Keese credit card. During the first day of his deposition,

PRIVILEGED / WORK PRODUCT

**48** | P a g e

Layton admitted to receiving a Girardi Keese credit card and using it for personal expenses. He further admitted that he did not pay the bills for the card, as the statements went directly to Girardi Keese. When asked to explain why Girardi Keese was paying for his personal expenses, he initially refused to answer, claiming "attorney-client privilege." Layton also said Girardi gave him the card as part of a confidential oral agreement with Girardi to resolve a dispute they had.

After we threatened to seek court intervention to compel answers to these questions, Layton agreed to come back for a second day of testimony. During this second day of testimony, Layton told us that he used the credit card for expenses related to driving Girardi, such as gas and meals. Layton vacillated between telling us that the reason he had the card was to cover Girardi-related expenses, and that Girardi gave him the card to compensate him for the mishandling of several personal legal matters. Layton's testimony on this point was difficult to understand.

We were unable to determine how much Layton charged to his Girardi Keese credit card while he was employed by the State Bar. In the Girardi Keese Chapter 7 Trustee's lawsuit against Layton, the Trustee alleges that Layton charged $315,114 on his Girardi Keese American Express card between December 18, 2013 and December 18, 2020, which is approximately $45,000 a year.

- **Car Payments.** Layton testified that Girardi paid for Layton's leased cars (a BMW X5, a BMW 5 Series, and a Cadillac Escalade), during a time period including when Layton was employed by the State Bar and after he was terminated. While Layton was unable to pinpoint the year Girardi started making his car payments, we have documentary evidence suggesting Girardi Keese was making payments in 2011. In his first day of testimony, Layton said Girardi paid for his cars pursuant to his confidential, oral agreement with Girardi. In his second day of testimony, Layton said Girardi paid for his cars because Layton was driving him around. Layton admitted Girardi had a personal driver during this time, and that he was employed at the State Bar for some of this time. When asked, Layton's wife said that she did not know Girardi paid for Layton's cars.

- **Loan Guarantee and Payments.** Girardi guaranteed a bank loan of $150,000 to Layton and, through his law firm, made payments on the loan. Based on documents we obtained, Girardi appears to have guaranteed

the loan for Layton in 2006, and Girardi Keese seems to have made payments on the loan in at least 2007, 2011, 2012, and 2013. Layton admitted that Girardi guaranteed the loan and made payments on the loan, and he told us that the loan was for home renovations. Layton alternated between asserting that Girardi cosigned the loan as part of the confidential agreement that he could not discuss, and that Girardi made payments on the loan because the bank did "something wrong." Either way, Layton admitted that Girardi made payments on the loan.

- **Meals**. Layton ate with Girardi at restaurants such as Morton's, The Palm, and the Jonathan Club, and Layton admitted that Girardi paid for most of these meals. We have emails showing that on a couple of occasions Layton paid for meals and then was reimbursed from Girardi and/or Girardi Keese, although Layton told us that he did not remember that occurring. Further, one witness reported to us that Layton had "signing authority" for Girardi at Morton's, so he could sign the bill, which would be added to Girardi's tab. We were not able to corroborate this account.

- **Private Jet Flights.** Layton flew on Girardi's private jet while he worked at the State Bar. We have documentary evidence suggesting that Layton flew on Girardi's private jet in at least 2012, 2013, and 2014. For at least one of these flights, it appears Layton intended to or did actually bring family members. During his deposition, Layton admitted to flying on Girardi's jet, and he admitted that it was "possible" that he flew on Girardi's private jet to and from the CAALA conventions in Las Vegas. Layton also admitted that he did not pay for any portion of his flights on Girardi's private jet.

- **Other Travel Expenses.** Girardi also appears to have paid for some of Layton's personal travel. For example, in 2011 (while Layton was working for OCTC), it appears that Girardi paid for four rooms for Layton at the Orleans hotel in Las Vegas, and a witness reported to us that this was a trip that Layton took with his parents. The witness informed us that Girardi was not involved in this trip, other than by paying for the accommodations. This witness also informed us that Girardi paid for other personal trips for Layton, and Layton admitted to this in his deposition.

- **Tickets.** Layton accepted tickets from Girardi Keese for box seats at the Staples Center for events such as concerts and sports games. During his interview, Layton admitted to accepting tickets to a "few" Lakers and Clippers games. A witness reported seeing Layton and his son in the Girardi

Keese box during an NBA game in 2001.  In 2013, Layton emailed Girardi's assistant to request ten Rose Parade bleacher seats for his entire family.  We do not have evidence of whether Girardi agreed to this request.

---

**From:** Thomas Layton <​​​​​​​​​​​​​​​​​​​>
**Sent:** Wed, 27 Nov 2013 11:44:22 -0800
**To:** <​​​​​​​​​​@girardikeese.com>
**Subject:** Rose parade

My son is marching in the Rose Parade. Can we get 10 bleacher seats. Oort whole family would like to watch

---

- **Charitable Contributions.**  Additionally, Layton appears to have asked Girardi Keese for money to support his participation in charity golf tournaments or attendance at charity dinners.  In 2012, Layton forwarded Girardi's assistant an email regarding information concerning a charity dinner and wrote, "Can I get some $$."

---

**From:** "Layton, Thomas" <Thomas.Layton@calbar.ca.gov>
**Sent:** Wed, 10 Oct 2012 18:42:42 +0000
**To:** <​​​​​​​​​@girardikeese.com>
**Subject:** FW: Reserve Forces Bureau Annual Recognition Dinner - October 25, 2012 - California Commerce Casino
**Attachments:**
· RFB Sponsor Brochure 2012.pdf *(745 kb)*

Can I get some $$

---

Similarly, in 2013, Layton forwarded a flyer for a golf tournament to Girardi's assistant, writing "For abused kids. Can I get $1,500."

---

**From:** "Layton, Thomas" <Thomas.Layton@calbar.ca.gov>
**Sent:** Thu, 25 Apr 2013 00:13:18 +0000
**To:** <​​​​​​​​​@girardikeese.com>
**Subject:** FW: gold flyer
**Attachments:**
· 2013 SVB Golf Flyer.pdf *(331 kb)*

For abused kids.  Can I get $1,500

---

- **Parties.**  Layton was invited to and attended many Girardi Keese parties, as well as parties that were thrown by Girardi.  These parties included Christmas, Thanksgiving, and Fourth of July parties, as well as Superbowl parties.  Some of these parties were "destination events," and Layton admitted to attending at least one such party in Mexico that Girardi paid for.  Layton was also asked by Girardi Keese to review a Christmas party guest list for "additions or subtractions" to the list, which included State Bar employees Greenberg, Platel, and Dunn.

- **Gifts.**  Layton admitted to receiving birthday and Christmas presents from Girardi but denied recalling any specific presents.  According to another witness, Layton received a gift basket from Girardi for one Christmas that included a first edition book.

- **Legal Representation.**  Girardi Keese represented Layton in four legal matters while he worked at the State Bar.  We were aware of two of these matters, as they were publicly filed, but the other two matters do not appear to have become public, and Layton refused to disclose any further details about them.  Layton informed us that Girardi Keese handled the four matters on contingency.

On top of the financial ties, Layton had additional connections to Girardi and Girardi Keese.

- **Girardi Keese's Employment of Layton's Children.**  Girardi Keese employed two of Layton's children while he worked at the State Bar.

- **Layton's Involvement with Girardi Keese.**  Layton spent time at the Girardi Keese office while he was working at the State Bar.

  Evidence shows that Layton referred cases to Girardi Keese while he was working at the State Bar, and he may have learned about at least some of these cases from information obtained on the job.  During his deposition, Layton admitted to referring one case to Girardi Keese, but documentary evidence suggests that he referred at least three.  Layton denied receiving any referral fees from Girardi Keese.

  Layton also appears to have assisted Girardi Keese attorneys with litigation while he was working at the State Bar.  Girardi Keese emails show that

Layton helped Girardi Keese attorneys procure law enforcement reports for their cases on more than one occasion.

Layton also appears to have helped Girardi Keese attorneys or employees with personal issues. As an example, in 2010, a Girardi Keese employee asked Layton for help with a traffic ticket "for no license plate and no proof of insurance," as well as a ticket for being on his cell phone. Layton said in response, "I will take care of it." Another Girardi Keese employee told us that she got a traffic ticket, and Girardi told her to "tell Layton, he can fix it for you."

▪ **Introduction of Girardi to State Bar Employees.** As part of our investigation, we heard from witnesses that Layton introduced Girardi to State Bar employees and invited people to events or meals with Girardi. For example, former CTC Mike Nisperos, discussed in further detail below, reported to us that he met Girardi through Layton. Former State Bar investigator Noonen told us that he met Girardi through Layton, although Layton denied ever seeing Noonen and Girardi together.

In addition, certain former State Bar employees reported to us that Layton approached them with offers of career help. CTC 2 reported to us that after she was appointed to a higher-profile position, Layton came into her office and stated that Girardi was asking about her and wanted to know what her career aspirations were, implying that he could help her. Layton denied that this occurred during his deposition. Former CTC Nisperos also reported that Layton offered Girardi's assistance to advance his career, and Girardi in fact made a donation to Nisperos' judicial campaign thereafter. Layton denied offering Girardi's assistance with a judicial campaign to Nisperos.

In 2014, Layton was required to submit a Form 700. Specifically, Layton was required to disclose all "gifts, loans, and other payments received" from sources subject to the regulatory, permit, or licensing authority of the State Bar.[11] On April 11, 2014, Layton signed, under penalty of perjury, a Form 700 for the period of January 1-December 31, 2013, stating that he did not have anything to report. However, it appears that this was not accurate, as we have evidence that, in 2013, Layton received at least the following items from Girardi and/or Girardi Keese:

---

[11] Layton was required to report "the name and address of each source of income aggregating five hundred dollars ($500) or more in value, or fifty ($50) or more in value if the income was a gift."

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

payments of $10,400; car payments of approximately $12,000; payment of credit card expenses; at least three flights on Girardi's private jet; at least four concert tickets; and many meals.[12]

When he started at the State Bar in 1999, Layton also signed a "Conflict of Interest Disclosure" form, which provided as follows:

> **CONFLICT OF INTEREST DISCLOSURE**
>
> While working for the State Bar, I am also working (with or without compensation) for the following individuals or entities:
>
> _____
>
> _____.
>
> I agree that, as a condition of my employment, I will update this disclosure and provide the name of any other entities or individuals I begin to work for while I am working for the State Bar.
>
> I understand that, due to potential or actual conflicts of interest, as determined by the State Bar, my work for the State Bar may be terminated or limited in the discretion of the State Bar.
>
> Signed: _____

We did not find any evidence that Layton ever amended this disclosure to disclose any work he performed for Girardi or Girardi Keese while employed by the State Bar.

Though Layton was an OCTC investigator from 1999 to 2013, we did not find any evidence that he was assigned to any Girardi cases. There was nothing in case files or other documents indicating Layton worked on any Girardi cases, and interviewees did not recall Layton officially handling any Girardi cases. During his deposition, Layton testified he did not work on any Girardi cases. Layton also testified that he did not take any actions to influence the resolution of a Girardi case or any State Bar case against other Girardi Keese attorneys. He further testified that he did not recall doing anything to influence resolution of a State Bar case against

---

[12] During his deposition, Layton acknowledged that the signature on this Form 700 appeared to be his, but he denied having any memory of completing the form.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

an attorney at Girardi's request. As such, we cannot establish that Layton's connections to Girardi directly influenced the outcome of any Girardi case.

Although we could not find any direct evidence of Layton's involvement on a particular Girardi case, there is evidence suggesting that he assisted Girardi in other ways with disciplinary matters.

▪ **Communications Regarding Complaints About ██████████ Attorneys.** A former OCTC employee told us that one of Girardi's attorneys for State Bar cases faxed Girardi's responses to State Bar correspondence to Layton, even though Layton was not assigned to the matters. We did not find direct evidence corroborating this statement, but we did find evidence of a ██████████ attorney sending information about ██ pending State Bar case to Layton's personal email address, which does somewhat corroborate the witness's statement. At the time this email was sent, Layton was working in the Executive Director's Office, not in OCTC, so he was not assigned to the case. In other words, it does not appear that there was any legitimate reason for the ██████████ attorney to forward the correspondence to him. We asked Layton about this incident, and he stated that he did not recall receiving this information, and he did not know why the ██████████ attorney sent him the case information. He further asserted that he did not help the ████ ██ attorney "in any way" and that there was "nothing [he] could do."

Given the evidence that Layton was communicating with attorneys about pending Girardi and ██████████ cases while employed at the State Bar, we cannot rule out the possibility that Layton was providing some sort of assistance to Girardi and ██████████ in the handling of disciplinary matters. That said, we were unable to establish what that assistance may have actually been.

▪ **Girardi's Use of Layton to Dissuade Complaints and Resolve Disputes.** We received a report suggesting that Layton helped Girardi to deter people from even filing complaints with the State Bar in the first place. We were contacted by an attorney witness regarding ██ interaction with Girardi, and the witness's account of this interaction follows. The witness was co-account with Girardi and believed that he was inflating his costs to skim money from settlements. The witness demanded an accounting and informed Girardi that ██ would make a complaint to the State Bar if he did not provide such an accounting. After ██ made this demand, Girardi invited the witness to lunch at Morton's in Downtown Los Angeles. After the witness arrived at the

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

restaurant, Layton joined ██ The witness had never met Layton before and did not know he would be attending the lunch. Girardi then arrived and introduced Layton as his good friend who was the head of ethics investigations at the State Bar. Layton told the witness that Girardi was godfather to one of his children.[13] Girardi further—and falsely—told the witness that all State Bar complaints went through Layton.

The witness felt intimidated and threatened by this encounter, and ██ believed that it was intended to deter ██ from filing a State Bar complaint against Girardi. The witness did not ultimately receive the accounting from Girardi, and ██ did not file a State Bar complaint against him. During his sworn deposition, we asked Layton whether he ever spoke to an attorney who was threatening to file a complaint against Girardi before ██ filed it, and Layton responded that he did not believe so.

We also found evidence that Girardi referenced his connections with Layton to try to gain credibility in litigation. In 2014, ██████████████
████████████████████████████
████████████████████████████
████████████████████ While being deposed in the underlying litigation, Girardi stated that he thought the State Bar would agree with his opinion regarding the ethicality of certain actions, and when questioned further as to the basis for that belief, Girardi stated that he had given a hypothetical set of facts to Layton after "bump[ing] into him at some bar event." When asked if he had any other "dealings" with Layton, Girardi stated "no," which was clearly false.[14]

---

[13] Layton confirmed at his deposition that Girardi was the godfather to his child. The fact that this witness knew this intimate detail regarding Layton's and Girardi's relationship helps to corroborate the witness's account of events.

[14] ████████████████████████████████████
████████████████████████████████████
██████████████████

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

> Q   Have you had other dealings with Mr. Layton?
>
> A   No.
>
> Q   Why did you call Mr. Layton?
>
> A   Oh, I just bumped into him at some bar event.
>
> Q   You knew him from before?
>
> A   Oh, I knew who he is, sure.

- **Layton Reportedly Met with Attorney About State Bar Investigation at Girardi's Request.**   Further, Girardi also appears to have used his connection to Layton to give the impression to attorneys outside of Girardi Keese that he had the ability to influence the resolution of State Bar cases.  An attorney ("ATTORNEY A") who did not work at Girardi Keese but knew Girardi from previously acting as co-counsel, was the subject of client complaints ███████████████████████ made to the State Bar in ███████████.  According to ATTORNEY A, ███ had the impression that the State Bar was taking the complaints against ███ very seriously and intended to pursue disciplinary charges against ███████.

ATTORNEY A told us that ███ was concerned about how this would affect ███ career, so ███ discussed the State Bar cases with another attorney, who recommended that ███ contact Girardi, as he was known to have a good relationship with the State Bar.  ATTORNEY A reported that ███ then met in-person with Girardi and Layton to discuss the State Bar cases.  Girardi reportedly asked ATTORNEY A to describe the State Bar cases against ███ and to identify the State Bar personnel assigned to them.  Although Layton was in the room, he reportedly did not speak during the meeting and Girardi did not identify him a State Bar employee.

After the Girardi/Layton meeting, ATTORNEY A reported that the State Bar seemingly changed its position and offered to stipulate with ATTORNEY A to resolve the cases on more favorable terms, to which ATTORNEY A agreed. █████████████████████████████████████████████████ We have not found any evidence, however, that either Girardi or Layton was involved in the ███████████████ or took any other steps to help ATTORNEY A get a favorable resolution of the cases.  We interviewed several of the OCTC attorneys who

handled the case, but all denied that Girardi or Layton had any involvement or influence.

### *Donald Miles*

Donald Miles was a State Bar Court judge from 2006 to 2018. He was appointed to that position by Governor Arnold Schwarzenegger for a six-year term, and he was then reappointed in 2012 by Governor Jerry Brown. Miles served as a judge in the hearing department of the State Bar Court.

A witness reported that Layton may have been involved in Miles's reappointment. In a sworn deposition, Miles stated that he did not remember speaking to Layton about his appointment or reappointment. Miles also disclaimed any knowledge of involvement by Girardi in his reappointment as a State Bar Court judge. We were unable to corroborate the report.

Miles does appear to have had ties to Layton and Girardi while he was on the State Bar Court bench. Miles admitted to having conversations with Layton while on the bench, and he explained that they did a number of "programs together" and that their sons went to college together. He further stated that he was "sure" that some of the conversations he had with Layton involved Girardi as a topic. Miles also admitted that he knew Girardi, and he interacted with him at Bar events.

Miles told us that he was a panelist at the CAALA convention several times, and that he attended the Girardi Keese party during the conventions. After further questioning about Girardi's parties, Miles stated that he remembered attending one additional party, a Girardi Keese Superbowl party. He said that he did not recall attending any other Girardi or Girardi Keese parties. Documentary evidence confirms that Miles was a panelist at the CAALA convention in at least 2009 and 2011-2014. There is no evidence that Miles flew on Girardi's private jet to the CAALA convention, and Miles denied doing so during his deposition. Additionally, a Girardi Keese guest list indicates that "Judge Don Miles" RSVPed "yes" to the Girardi Keese Christmas Eve luncheon in 2013 (which Layton, Dunn, and Rodriguez also apparently RSVPed "yes" for). "Don Miles," who we presume to be the Miles we are discussing, was included on Girardi Keese's guest lists for the 2013 Jack Webb Award dinner and the 2016 Inner City Law Center luncheon.

Miles completed Forms 700 in at least 2012 (for the period January 1-December 31, 2011), 2014 (for the period January 1-December 31, 2013), 2015 (for the period

January 1-December 31, 2014), 2017 (for the period January 1-December 31, 2016), and 2018 (for the period January 1, 2017-October 31, 2017). Miles disclosed that CAALA reimbursed him for travel expenses for the convention in Las Vegas in 2014 ($532) and 2013 ($500), but otherwise did not disclose any gifts, travel payments, advances, or reimbursements. We do not have any evidence suggesting that Miles omitted any gifts or things of value received from Girardi or Girardi Keese on his Forms 700.

Miles did not work on any filed Girardi cases as a State Bar Court judge because the State Bar never filed any cases against Girardi while Miles was on the bench. However, Miles did handle a pre-filing Girardi matter  iles told us that Layton did not have any *ex parte* communications about the case with Girardi, and that Layton did not communicate with him about the case.

When asked whether he had a conflict-of-interest that should have precluded him from handling ███████, Miles stated that he did not, because "[his] relationship with Girardi was not such that within the purview of being a conflict of interest that would require [him] to disclose a relationship or that would disqualify [him] from handling it; so [he] had no sense of any conflict." ███████ ███████████████████████████████ We thus did not find any evidence that Miles used his position to benefit Girardi. We also note that, in further discussion, he explained that there was no formal process or policy if a State Bar Court judge knew the complainant or respondent in a particular case.

### *Mike Nisperos*

Mike Nisperos joined the State Bar as CTC in March 2001 and left the office in 2005. In May 2001, Nisperos and his son attended an NBA semifinals playoff game with free tickets provided to them by Layton. Nisperos told us that when he and his son arrived at the basketball game, Girardi and other guests, including Layton and his son, were in attendance. Nisperos told us that at that point, he learned that the tickets had been provided by Girardi, and he socialized with Girardi at the game. Nisperos told us that he did not report his receipt of the tickets, on a Form

700 or otherwise, and did not include Girardi in his conflicts-of-interest information provided to the State Bar thereafter.

When asked about the decision not to identify Girardi on his personal conflicts-of-interest list, Nisperos stated that he was not included because he met Girardi after the list was created, and the list was not updated.  Nisperos explained that he would have considered Girardi a conflict "in his head" because of the basketball tickets, and would have referred cases against Girardi to a different prosecutor such as his deputy if any crossed his desk.  Nisperos said he was not familiar with any formal process regarding how to handle cases when a conflict-of-interest existed, but would have left the decision regarding how to proceed to his deputy.

Nisperos reported meeting with Girardi personally for a second time in 2005, shortly before Nisperos left the State Bar.  Nisperos said that he and Girardi met over breakfast so that Nisperos could thank Girardi for Girardi's offer of assistance to Nisperos, which Nisperos said had been previously communicated to him by Layton.  Layton denied communicating to Nisperos an offer from Girardi to assist with becoming a judge.  Two witnesses reported that Nisperos and Layton had a close relationship while they were working at the State Bar.  One of these witnesses reported that Layton used to act as a chauffeur for Nisperos, and another witness reported that the two would attend social gatherings like barbeques and that Nisperos would supposedly refer to Layton as his "political guy."  During his deposition, Layton said that he drove Nisperos "on occasion."  One witness reported that Layton may have played a role in the State Bar's decision to promote Platel in August 2001 by advocating for Platel's promotion to Nisperos.  During his interview with us, Nisperos stated he recalled Platel trying to curry favor with him, and that he only discovered after leaving the State Bar that Platel had a close relationship with Girardi.

During Nisperos's time as CTC, there were approximately seven Girardi cases closed by his office.  Nisperos denied knowing that his office handled multiple cases against Girardi during his tenure as CTC.  None of those cases were sent out to conflicts counsel under Rule 2201, but instead were closed by State Bar staff.  This includes Case 01-O-03204, a case closed under suspicious circumstances that is discussed in detail below, which was closed by State Bar staff including Platel, in April 2002.

In 2006, after Nisperos had left the State Bar, Girardi endorsed Nisperos's campaign for superior court judge.  Girardi Keese donated $1,000 to Nisperos's 2006 judicial campaign.  In 2009, a Girardi Keese attorney wrote an email to

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Nisperos to ask for two attorney referrals.  Nisperos recalled providing the requested referrals to the Girardi Keese attorney but stated that they had no further interactions on that case and that he never worked with anyone at Girardi Keese on any cases.

As a CTC, Nisperos should have completed a Form 700 during each year of his tenure as CTC.  However, the State Bar was unable to locate any Forms 700 for Nisperos.  As noted above, during his interview, Nisperos told us that he did not disclose the basketball tickets that he received from Girardi on a Form 700.

### *John Noonen*

John Noonen was an investigator at the State Bar from 1987 until his termination in 2015.  From 2012 to 2015, Noonen served as the Managing Director of Investigations.[15]  Noonen and Layton worked together as investigators for many years at the State Bar, and they appear to have had a close relationship.  Layton reportedly introduced Noonen to Girardi around 2001 or 2002.

Noonen had multiple connections to Girardi Keese.  A resume sent to the State Bar shows that Noonen's daughter worked at Girardi Keese from 2010-2011, while Noonen was at the State Bar.  Additionally, Girardi Keese represented Noonen in a legal matter around 2002.  According to a former Girardi Keese attorney, Girardi Keese also represented Noonen's sister in a matter in the 2004 to 2007 timeframe.

A former Girardi Keese employee told us that Noonen visited the Girardi Keese office, although he did so with less frequency than Greenberg.  Noonen attended lunches at Morton's with Layton, and he admitted that Girardi was sometimes also present.  During his interview with us, Noonen stated that he did not know who paid for his lunches at Morton's, but he conceded that he did not pay for them himself.  In September 2014, while serving as the Managing Director of Investigations for the State Bar, Noonen accepted eight tickets to a UCLA sports game from Girardi Keese.  Noonen told us that he learned of the tickets through Layton, and it appears that Noonen went to the Girardi Keese office to pick up the tickets.

---

[15] After his termination, Noonen sued the State Bar for retaliation and defamation.  Before his termination, Noonen took photographs of documents.  We did not investigate this occurrence, except to review certain of the documents to determine whether they related to Girardi.  We also asked Noonen during his interview whether his actions related to Girardi.  Our review did not reveal that the documents related to Girardi, and Noonen denied that his actions had anything to do with Girardi.

PRIVILEGED / WORK PRODUCT                                      **61** | P a g e

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Noonen also appears to have attended several Girardi and/or Girardi Keese parties, such as a 2010 Christmas party. During our interview with Noonen, he denied going to any of Girardi's Superbowl parties, but documentary evidence shows that he RSVPed "yes" for the 2013 Superbowl party (along with Greenberg). Documentary evidence also shows that Noonen RSVPed "yes" to the 2012 Girardi Keese Thanksgiving luncheon (along with Greenberg and Dunn). Noonen was included on Girardi Keese's guest list for a 2016 Inner City Law Center luncheon.

Noonen told us he received an invitation by mail in 2013 to go to the Bahamas for a Girardi or Girardi Keese party. Noonen reported that Layton knew about the invitation, because Layton asked Noonen if he had received anything in the mail around the time of the invitation. Noonen told us that he did not accept the invitation to the party.

Noonen submitted Forms 700 in at least 2014 (for the period January 1-December 31, 2013) and 2015 (for the period January 1-December 31, 2014). On all his Forms 700, Noonen stated under penalty of perjury that he had no reportable interests. However, it does not appear that this was accurate for at least the 2015 Form 700, as Noonen accepted eight UCLA tickets from Girardi Keese in September 2014.

Noonen was assigned as an investigator to two Girardi cases while at the State Bar, both of which were closed without discipline. Case 12-O-16066, involved allegations of misappropriation, misrepresentations to the court, trust account issues and the commission of a crime, and was closed in 2012 for insufficient evidence.[16] Case 12-O-15515 involved allegations of failure to perform, delay, abandonment of client, lack of/failure to communicate, and withdrawal from employment and was closed in 2013 also for lack of evidence. Lazar reviewed these cases and found that neither was properly investigated, thus calling into question their closures.

We discussed the cases with both Noonen and a State Bar attorney who worked on the cases with him. Noonen disclaimed any memory of the cases and could not answer any questions about the investigative decisions he made. When asked whether he should have recused himself from the cases due to his relationship with

---

[16] Interestingly, Greenberg was also involved in the handling of Case 12-O-16066, ███████████████████████████████████████████████. Based on the case file, this is the only involvement that Greenberg had the in the case.

Girardi and Girardi Keese, Noonen said that he did not believe he had a conflict-of-interest because all of his interactions with Girardi were through Layton.

The OCTC attorney who worked on both cases with Noonen did not specifically recall the cases and was not aware that Noonen had been represented by Girardi Keese before working on this case, and ███ was also not aware that Noonen's daughter had worked for Girardi Keese.  The attorney disclaimed having any connection to Girardi, other than taking a class from him in the 1980s.  After being informed of Noonen's possible connections to Girardi Keese, the OCTC attorney said that Noonen should have recused himself rather than working the Girardi cases.  If the OCTC attorney had known about Noonen's connections at the time, ███ would not have allowed Noonen to work on the cases.  Although, with hindsight, the attorney raised questions about some of the investigative steps taken by Noonen and indicated that ███ may expect different handling of the cases today, the attorney said that ultimately, ███ as the attorney assigned to the cases, was responsible for the decision to close the cases.

As Noonen had familial and personal connections to Girardi at the time that he worked on these two cases, he had a conflict-of-interest and should not have handled the investigations.  We conclude that Noonen's connections to Girardi taint the handling of these cases and the discretionary decisions to close them without public discipline.

### *Dale Nowicki*

Dale Nowicki was hired by the State Bar in June 2020, and he worked as an OCTC attorney until October 2021.[17]  After a media inquiry in October 2021, the State Bar became aware that Nowicki had an ongoing private practice in which he co-counseled with David Lira, a former Girardi Keese attorney and Girardi's son-in-law.  We understand that Nowicki did not disclose his work in private practice to the State Bar or get approval to continue working on outside cases while employed at the State Bar.  He also did not disclose any outside income to the State Bar on a Form 700 that he submitted in 2021.

After leaving the State Bar, Noonen worked with Nowicki at the Metropolitan Transportation Authority.  We understand from Noonen that he introduced Nowicki to Layton when Nowicki was looking for an attorney referral to handle a wrongful

---

[17] We did not interview Nowicki, as he had already resigned from the Bar by the time we learned about his Girardi connections and because he did not work on any Girardi cases.

death case.  Noonen told us he believed that Layton referred Nowicki to someone at Girardi Keese.  Noonen denied having any involvement in getting Nowicki a job at the State Bar.  By the time Nowicki was hired by the State Bar, Noonen had not worked there in years.

We have no evidence that Nowicki was involved in any Girardi cases while he worked at the State Bar.

### _Richard Platel_

Richard Platel joined the State Bar as an attorney in June 1999.  In August 2001, Nisperos, then the CTC, promoted Platel to an Assistant Chief Trial Counsel (ACTC) position.  Several people whom we interviewed commented on how quickly Platel was promoted.  One witness told us that he understood that Layton, who had reportedly ingratiated himself with Nisperos, advocated for Platel's promotion to Nisperos.

In 2004, Platel was appointed to the State Bar Court by California State Assembly Speaker Fabian Nuñez.  Many witnesses told us that Layton was involved in or directly responsible for Platel's appointment.  One witness reported being privy to a conversation with Platel and Layton before Platel's appointment was finalized, during which Layton reportedly said that Girardi was close with Nuñez and was pushing for Platel to be appointed.  One witness said it was an "open secret" that Layton helped Platel to get the State Bar Court position.  During our interview of Platel, he denied discussing his interest in the State Bar Court appointment with Girardi, and he said that he had no knowledge of what Girardi did or did not do on his behalf.  He admitted to discussing the appointment with Layton, but said that he did not recall what they discussed.  During Layton's sworn deposition he stated that he couldn't remember having discussions with Platel or otherwise discussing Platel's appointment to the State Bar Court and that his only involvement in Platel's appointment was telling "everybody he applied."  Layton further denied contacting anyone involved in the appointment process on Platel's behalf.

Additionally, after his appointment to the State Bar Court in 2004, a reception was held in Platel's honor at the Walt Disney Concert Hall.  We heard from multiple witnesses that Girardi sponsored this reception.  Platel vehemently denied that Girardi sponsored the reception, saying he paid for it himself.  Platel claimed that he did not have any receipts for the reception.  Platel did admit that he invited Girardi to the celebration because Girardi called to congratulate him.  On December

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

20, 2004, a Girardi Keese receptionist invited all Girardi Keese attorneys to Platel's reception.

---

**Sent:** Mon, 20 Dec 2004 17:19:29 +0000
**To:** Attorneys <Atty@girardikeese.com>
**Subject:** Judge Richard Platel

You are all cordially invited to a reception for Judge Richard Platel at the Disney Concert Hall from 4:00 to 5:30 PM. It will be in the BP Hall (Founders Room).

---

Although we have not found documentary evidence showing that Girardi ultimately paid for the reception, we find it unusual that all Girardi Keese attorneys would be invited to the reception absent Girardi's involvement in sponsoring the event. One witness told us that he heard from Layton that Girardi sponsored the reception. Additionally, we learned from a former Girardi Keese employee, who asserted that she attended the reception, that she understood that Girardi or Girardi Keese paid for the event.

Platel told us that he met Girardi around 2004 when he was introduced to him at a restaurant. He described the relationship as cordial acquaintances. However, Nisperos identified Platel as Girardi's other connection (besides Layton) in OCTC. Platel denied ever having lunch with Girardi, although he admitted that he saw Girardi at lunch at Morton's a few times, when both happened to be there. He denied that Girardi paid for his meals. One witness reported that Platel had a close relationship with Layton, Greenberg, and Noonen and that they would have lunch together.[18]

Platel also denied attending Girardi's Christmas parties, and he admitted to attending only one Girardi Superbowl party. Documentary evidence shows that Platel appears to have been invited to the Christmas party thrown by Girardi and/or Girardi Keese in at least 2010, 2011, 2013-2014, and 2018-2019. He also appears to have been invited to the Girardi Superbowl party in at least 2009, 2011-2012, 2014, and 2018-2019. Additionally, Platel and his wife (another State Bar employee)[19] were included on Girardi Keese's guest list for the 2013 Jack Webb

---

[18] One former Girardi Keese attorney told us that Platel's "son's then-fiancée" worked at Girardi Keese for many years as a law clerk. Platel did not mention anything about this connection during his testimony.

[19] Platel's wife worked at the State Bar as an investigator until April 2015. We do not have any evidence that she worked on Girardi cases.

PRIVILEGED / WORK PRODUCT                                    **65** | P a g e

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Award dinner.  Like many of the individuals discussed above, Platel told us that he was a panelist at the CAALA convention in Las Vegas several times, starting around 2004.  Platel also told us that he attended the Girardi Keese dinner during the conventions.

Platel served two terms on the State Bar Court, and he was not reappointed for a third.  He left the State Bar Court in October 2014, and in 2015, he moved to Hawaii to work at the Hawaii State Bar.  He then returned to California in March 2017.  We received reports that Platel tried several times to get back into OCTC.  Platel told us that he applied to be CTC in 2008 or 2009, and a witness reported to us that Layton wanted Dunn to select Platel to replace CTC 1 as CTC in 2011.  According to a May 2016 privileged email sent by a then-Board member, Girardi called the Board member and told him that Platel should be brought in as CTC (at the time, the CTC position was vacant).  Girardi reportedly said that Platel was "Chief Trial Counsel in Hawaii" and "would like to come back to California." He also reportedly said that bringing Platel back as the State Bar's CTC "could avoid pressure to disband the Bar."  Shortly before this call occurred, emails show that Layton sent what appears to be Platel's then-current resume to Girardi (via a Girardi Keese employee).  We asked Platel about whether he talked to Girardi about applying for the CTC position in 2016.  Platel admitted that he applied for the CTC position in 2016, but he denied talking to Girardi about it.  He stated that he did not recall whether he spoke to Layton about his application.  However, as noted above, Layton had a copy of his resume.

Platel told us he was approached by Girardi in 2017 and asked to help with a case that Girardi Keese was litigating.  Platel admitted to flying on Girardi's private jet to and from a hearing, along with his wife.  Platel told us that he was not compensated by Girardi for his involvement in the matter.  Platel denied taking any other flights on Girardi's jet, and we do not have any evidence that he flew with Girardi during his time at the State Bar or State Bar Court.

Platel completed Forms 700 in at least 2012 (for January 1-December 31, 2011), and 2014 (for January 1-December 31, 2013).  In 2012, Platel did not report anything on his Form 700, and in 2013 and 2014, Platel reported that he was reimbursed for travel expenses by CAALA.

Platel was involved in at least one Girardi case while working in OCTC.  He was not involved in any Girardi cases while on the State Bar Court bench because there were no Girardi cases filed by OCTC during that time.  While in OCTC, Platel appears to have intervened and closed a Girardi case (Case 01-O-03204) in 2002

involving allegations of trust accounting violations. Multiple witnesses commented that the handling of the case was suspicious. Lazar concluded the case was improperly resolved and that Girardi should have been disbarred or suspended if it were properly handled.

Initially, the case was assigned to an OCTC investigator, who ███████████ ███████████. While ███████████ ███████████ ███████████ ███████████ ███████████ ███████████. Platel, who was the investigator's supervisor, reportedly took the case away from the investigator without any explanation. In ███ interview, the investigator recalled this case specifically before any prompting as it was very unusual to ████. In ████ 10 plus years at the State Bar, only twice had a case ever been taken away from ████.

The Investigator was not aware of this at the time, but after Platel reportedly took the case from ████ another OCTC attorney reviewed the case (along with another active Girardi case). ███████████ ███████████ ███████████ ███████████ ███████████ ███████████ ███████████ ███████████ ███████████ This statement is both legally and factually incorrect. ███████████ ███████████ ███████████ ███████████ ███████████ ███████████ ███████████.

Platel then closed the case ███████████. We heard that this in and of itself was very unusual, as he was not the attorney assigned to the case and he was a high-level manager. Usually, the investigator on a case—not the ACTC—was responsible for ███████████.

After the case was reportedly taken away from ████, the investigator received ███████████ ███████████ told us that Platel came into her office and took those ████ from ████.

When asked about these cases, Platel said ███████████ ███████████ ███████████. He added that the OCTC attorney told him that Girardi was a powerful man, and his impression was that the State Bar was afraid of Girardi. Platel also told us that he did not know Girardi at this time. The OCTC attorney told us that ████ did not recall the case or how ████ came to ███████████.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Given the passage of time, we had minimal access to documents and other evidence from the time period when this case was closed (2002) and we did not find evidence that Platel had any connections to Girardi at the time. We do know, however, that within a few years of the case closure Platel did have a relationship to Girardi, as discussed above. Given the strangeness around how Platel interacted with this case and the benefits that he received from Girardi later in time, we cannot rule out that Platel had a conflict-of-interest that tainted the handling of this case.

### State Bar's Decision to Not Discipline Girardi After Ninth Circuit Sanctions

In December 2010, OUTSIDE ATTORNEY C, acting as SDTC, determined that the State Bar would not pursue any additional discipline against Girardi for misconduct that resulted in Girardi (and other attorneys) being disciplined by the Ninth Circuit (*In Re Girardi*, 611 F.3d 1027 (9th Cir. 2010)). The decision to not impose discipline on Girardi came under fire both inside and outside the State Bar. Similarly, Lazar concluded that OUTSIDE ATTORNEY C misapplied the law and closed the case in error. As this was such a contested result, we looked into this case specifically to determine whether Girardi's influence at the State Bar was a factor. As discussed in further detail below, there are many concerning aspects about the way the case was handled, but we did not find any evidence that the ultimate decision to impose no further discipline on Girardi was made as a result of Girardi's influence.

In June 2008—and after an investigation led by Ninth Circuit Judge Wallace Tashima found that Girardi and other attorneys misled the Court—the Ninth Circuit appointed an independent prosecutor, Professor Rory Little, to conduct further disciplinary proceedings. At the same time, the State Bar opened an investigation (Case 08-O-12613) into the matter, but after discussions that, according to the case file, appear to have involved Greenberg,

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

In July 2010, after Little completed his investigation, the Ninth Circuit concluded as follows:

> **4. Conclusion**
>
> Respondents in this case have been respected members of the bar, and each has presented significant mitigating evidence. Their conduct in this case, however, cannot be excused on that basis, given their culpability and the substantial injury their conduct caused the opposing parties and this court. We have carefully considered the *1040 recommendations of Judge Tashima and Professor Little, who have made our task substantially easier and whose assistance we gratefully acknowledge. We impose discipline as follows:
>
> THOMAS V. GIRARDI is formally reprimanded.

*In Re Girardi*, 611 F.3d 1027, 1039-40 (9th Cir. 2010)

The State Bar then proceeded with its ███ investigation. At the time, Miller,[20] a Girardi Keese attorney, was President of the State Bar Board, and accordingly, CTC 1 recused himself and his office under Rule 2201.

CTC 1 appointed OUTSIDE ATTORNEY C, a respected appellate litigator and appellate specialist at OUTSIDE LAW FIRM, as the SDTC to investigate the case. OUTSIDE ATTORNEY C had never served as an SDTC before and was not on the pre-approved Rule 2201 counsel list. Although a titan of the appellate bar, by his own admission OUTSIDE ATTORNEY C had very limited experience in State Bar matters.[21] OUTSIDE ATTORNEY C worked on the case with his partner, OUTSIDE ATTORNEY D,[22] as well as other OUTSIDE LAW FIRM attorneys. OUTSIDE ATTORNEY C provided his services on a *pro bono* basis, but the other OUTSIDE LAW FIRM attorneys billed for their time, pursuant to the terms of a written engagement agreement. ████████████████

████████████████████ We understand that upon being informed of OUTSIDE ATTORNEY C's conclusion, Girardi and/or the other attorneys made the outcome public.

---

[20] Miller was initially included in the Ninth Circuit's proceedings, but in 2006, he was exonerated and discharged. The Ninth Circuit did not impose any discipline against him.

[21] ████████████████████████████████████████

[22] OUTSIDE ATTORNEY D later became a member of the Board.

PRIVILEGED / WORK PRODUCT

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

By all accounts, OUTSIDE ATTORNEY C mishandled the case and improperly determined that no discipline should be imposed.  Among other issues, OUTSIDE ATTORNEY C stated in his memorandum that ███████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████  However, that statement is not supported by any relevant law, and the version of California Business and Professions Code section 6049.1 that was in effect at the time contradicts OUTSIDE ATTORNEY C's reasoning, providing, "In any disciplinary proceeding under this chapter, a certified copy of a final order made by any court of record or any body authorized by law or by rule of court to conduct disciplinary proceedings against attorneys, of the United States or of any state or territory of the United States or of the District of Columbia, determining that a member of the State Bar committed professional misconduct in such other jurisdiction shall be conclusive evidence that the member is culpable of professional misconduct in this state . . . ."'  During our interview of OUTSIDE ATTORNEY C, he stated ███████████████████ █████████████████████ that he was horrified by what the attorneys did, but he also thought that justice had been done and the attorneys had been "humiliated" enough by the Ninth Circuit's imposition of discipline.

Beyond the legal incorrectness of OUTSIDE ATTORNEY C's conclusion, there are a series of issues that arose as a result of OUTSIDE ATTORNEY C's work on the Girardi case, and we discuss each in turn below.

### *Prior Representation of Girardi Keese*

In 2006 (before OUTSIDE ATTORNEY C accepted the Girardi case as an SDTC), an OUTSIDE LAW FIRM partner represented Girardi Keese in a case brought by a former Girardi Keese client ("GIRARDI CLIENT LITIGATION"). OUTSIDE LAW FIRM's prior representation of Girardi Keese would *at best* make it a bad choice to be the firm appointed to investigate whether Girardi committed misconduct, given the obvious appearance of impropriety issues in having a client's former counsel investigate the client; at worst, it was a serious conflict-of-interest that should have been disclosed to the State Bar before the firm was engaged.

We did not find any evidence suggesting that OUTSIDE ATTORNEY C or OUTSIDE ATTORNEY D were involved in GIRARDI CLIENT LITIGATION or

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

even knew the case existed. OUTSIDE ATTORNEY C told us that a conflicts check would have been run before he agreed to accept the SDTC position, but he did not specifically recall it or whether it picked up the GIRARDI CLIENT LITIGATION matter. OUTSIDE ATTORNEY D disclaimed any involvement in the conflicts check for the matter, but stated that if a check was run, it should have identified the GIRARDI CLIENT LITIGATION case.

OUTSIDE ATTORNEY C also did not recall if he made any certification to the State Bar regarding conflicts-of-interest before being appointed SDTC for the Girardi case, and we did not locate any such certification in the State Bar's case file. We obtained documents and communications from OUTSIDE LAW FIRM's successor firm related to OUTSIDE ATTORNEY C's work as SDTC, and we did not find any documentary evidence showing the conflicts check or a discussion of potential conflicts or of GIRARDI CLIENT LITIGATION.

When asked if the GIRARDI CLIENT LITIGATION case was a conflict that should have disqualified him from serving as SDTC on a Girardi case, OUTSIDE ATTORNEY C stated that it did not look good, but he did not believe it was a conflict because the matter was unrelated to the State Bar Girardi case. OUTSIDE ATTORNEY D stated that it may be a conflict. In 2011, the State Bar was informed of OUTSIDE LAW FIRM's prior representation of Girardi Keese in GIRARDI CLIENT LITIGATION, and Hawley (then Deputy Executive Director) ███████████ ███████████████████████████████████████████████ Hawley told us that he did not recall why this project was assigned to him. ██████████████████ ███████████████████████████████████████████████████████████████

Based on the evidence available to us, we conclude that given OUTSIDE LAW FIRM's prior representation of Girardi Keese, OUTSIDE ATTORNEY C should not have been selected as the SDTC as it casts substantial doubt on his impartiality. That being said, given that we found no evidence that OUTSIDE ATTORNEY C knew of his firm's prior representation, we conclude that the prior representation did not influence the outcome of OUTSIDE ATTORNEY C's handling of the case.

### *Greenberg's Involvement and Closure*

Even though this was a case referred out to an SDTC, Greenberg had a role in its handling. We understand that, at the time, Greenberg provided administrative support for Rule 2201 cases. Even though he had a pre-existing relationship with

Girardi, described in detail above, he did not recuse himself from that role on this case. As explained below, a witness claimed that in his opinion, Greenberg actually took credit for making the case go away.

As a primary matter, Greenberg appears to have been involved in 2008 discussions about ███████████████████████████. Given Greenberg's relationship with Girardi, he probably should not have had any role in the process. In fact, that same year Girardi wrote Greenberg a thank you note for the most "extraordinary gift" he had ever received.

After the Ninth Circuit concluded its disciplinary proceedings, the State Bar's investigation resumed, and Greenberg signed the letter confirming OUTSIDE ATTORNEY C's appointment. He also trained OUTSIDE ATTORNEY C and his team on rules and procedures for handling State Bar cases before they began their investigation. Witnesses did not recall the substance of the training, and Greenberg refused to testify, so it is unknown whether Greenberg gave instructions to OUTSIDE ATTORNEY C that influenced the case's outcome. Greenberg also stayed in contact with OUTSIDE ATTORNEY C and his team as they conducted the investigation, as he was their point of contact with the State Bar.

A former OCTC employee reported to us that ██ overheard Greenberg discussing the closure of this case with attorneys at the 2010 Girardi Christmas party, and the witness got the impression that the attorneys were "patting" Greenberg on the back related to the closure of the case. We do not have any corroborating evidence for this, and indeed, the witness reported that ██ recollection was more like a "feeling," rather than any clear statements. However, the timing (OUTSIDE ATTORNEY C closed the case on December 15, and the witness reported hearing Greenberg discuss it at a Christmas party) does align with the witness's recollection.

Greenberg's relationship with Girardi, his involvement with the controversial case, and its improper outcome raise serious doubts about whether the case was properly handled. It is certainly suspicious that Greenberg was involved in the ██████████ of the case and was the one who provided the training to the SDTC team, and the SDTC thereafter failed to properly apply the State Bar's rules and procedures and improperly failed to impose any discipline on Girardi. On the other hand, OUTSIDE ATTORNEY C denied that Greenberg had any role in his decision to close the case and told us that the decision not to impose discipline on Girardi was entirely his. While we cannot rule out that Greenberg may have improperly

influenced the outcome of the case, given OUTSIDE ATTORNEY C's acceptance for the decision-making in the case, we cannot conclude that it is more likely than not that he did.  That said, given Greenberg's relationship with Girardi, he had a conflict-of-interest and should not have been involved in the handling of the case in any manner.

### *Efforts to Reopen the Case*

Several OCTC attorneys vehemently disagreed with OUTSIDE ATTORNEY C's decision to close the case.

In June 2011, OCTC ATTORNEY 2 contacted the State Bar's Board to As described in further detail below, OCTC ATTORNEY 2 was fired on July 6, 2011, and the case was not reopened.

### Acting Executive Director's Clandestine Involvement in Closing Rule 2201 Cases

In the course of our investigation, we became aware of a shocking issue involving former Deputy and Acting Executive Director Hawley's handling of a Rule 2201 case involving Girardi ▮▮▮▮ (Case 14-28979).  As we lay out in detail below, CTC 2 recused OCTC from handling the State Bar complaint because the complaint involved allegations concerning ▮▮▮▮▮▮.  Even though Hawley knew of this conflict, he hand-selected an SDTC whom he knew and then ghostwrote a memorandum for the SDTC, ▮▮▮▮▮▮ which the SDTC presented as ▮ own.  Hawley then recommended to the Board that they accept the "SDTC's" recommendation, without informing the Board he was the one who prepared it.  That this would happen for any case is troubling, but it is especially concerning because the complaint implicated ▮▮▮▮▮▮, and Hawley's actions (whether or not this was the intention) helped protect the State Bar and ▮▮▮▮▮▮ ▮▮▮▮.

In October 2014, an attorney made a complaint to the State Bar, alleging that Girardi threatened to report someone to the State Bar if they did not acquiesce to his

demands and that Girardi made misrepresentations to the court by giving false testimony in a deposition ███████████████████████████████████. Because the complaint involved ██████████████████████████████████, CTC 2 recused OCTC from the matter and requested appointment of a SDTC to handle the complaint pursuant to Rule 2201. CTC 2 gave the following explanation as to why she was recusing herself:

> Pursuant to rule 2201(i), I recuse myself with respect to a complaint alleging professional misconduct by Thomas Girardi. I am aware of facts that might reasonably entertain a doubt that I could be able to be impartial. More specifically, I have reported professional concerns about Thomas Girardi's relationship with State Bar employee Thomas Layton and former Executive Director Joseph Dunn, which may give the appearance of partiality.

As described in additional detail in the section below, CTC 2 had herself made a report to Hawley regarding inappropriate connections between Girardi and Layton she was aware of and had requested an internal investigation of the issue. CTC 2 then requested an investigation into the facts alleged in the State Bar complaint that had been made by the outside attorney.

In February 2015, Deputy and Acting Executive Director Hawley emailed an attorney he previously worked with in private practice ("OUTSIDE ATTORNEY B"), and asked if ██ would be willing to "take a pro bono assignment" as an SDTC. Hawley stated that the "assignment should only take a few hours and should be limited to file review." Hawley further said that he could and would "assist [with] authorities and guidance." OUTSIDE ATTORNEY B told us that ██ did not have any experience with professional responsibility or State Bar disciplinary cases, and that Hawley told ██ that he would answer any questions that ██ had.

Hawley then emailed the Board to recommend that OUTSIDE ATTORNEY B be appointed the SDTC for the case. In his email to the Board, Hawley mischaracterized CTC 2's rationale for recusing herself from the case as follows:

> The other files are from individuals represented by Girardi & Keese. These complaints pertain to Thomas Girardi's representation of parties in litigation totally unrelated to the State Bar. Girardi & Keese is the firm that former State Bar President Howard Miller is with. This, and the fact that Miller has represented former ED Joseph Dunn regarding Dunn's separation from the State Bar resulted in the CTC's recusal from these cases.

Regardless of his intention, this mischaracterization had the effect of hiding CTC 2's complaints about Girardi's connections at the State Bar from the Board.

A Board member questioned Hawley's proposal of OUTSIDE ATTORNEY B as an SDTC, asking if █ had the right expertise and noting that █ "doesn't seem to have any ethics, prosecutorial or other related experience." The Board member added, "[i]f these claims [complaints] are simple ones then that's fine, but if they have any sensitivity or complexity (which I imagine they might) then we might be better off with someone who has more expertise." Hawley pushed for the appointment of OUTSIDE ATTORNEY B, arguing back to the Board member, among other things, that it was difficult to find SDTCs as the appointment is *pro bono*; that Los Angeles-based attorneys did not wish to take on a case involving Girardi; that the case files were "rudimentary"; and that OUTSIDE ATTORNEY B's task would be to determine if the file should be closed. Ultimately, OUTSIDE ATTORNEY B was appointed in March 2015 to handle four Girardi cases[23] and one additional, unrelated case.

Even though the case had been assigned to OUTSIDE ATTORNEY B to conduct an independent investigation and assessment of the Girardi complaint, Hawley was the one who actually handled it and made the recommendation to close it. █████████████████████████████████████

█████████████████████████████████████

---

[23] OUTSIDE ATTORNEY B was also appointed SDTC to review three complaints against Girardi, all related to each other, that did not have to do with allegations of connections between Girardi and █████ (Cases 14-30049, 14-30061, and 14-30269). █ ultimately recommended closure of all three cases. Based on documentary evidence, it appears that OUTSIDE ATTORNEY B wrote █████████████ recommending closure of these cases █████ Lazar concluded the closures were appropriate and we have no evidence to the contrary. We also do not have any evidence that OUTSIDE ATTORNEY B had any connections to Girardi, and █ disclaimed any such connections.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Hawley's analysis follows:

Ultimately, Hawley wrote

  OUTSIDE ATTORNEY B
made a sarcastic remark about the fact that Hawley was doing the actual work on the case in OUTSIDE ATTORNEY B's name.

In May 2015, and without telling the Board that he ghostwrote it, Hawley sent the memorandum to the Board, along with a memorandum in his own name recommending the Board approve the closure of the case, and the Board accepted the recommendation.

We only discovered Hawley's involvement in the case after conducting a review of his emails. The official case file did not contain materials showing how heavily Hawley was involved in the case or that he essentially made the decision to close the case himself.

When Hawley was interviewed, he provided confusing and inconsistent information about his involvement in the Girardi case. When we asked Hawley about his role in SDTC matters generally, he referred to himself as a "resource" to

the SDTCs and said that he would provide his thoughts to SDTCs only if asked. He added that he always made it clear to an SDTC that the result should be the SDTC's independent decision. He did not mention writing the reports on behalf of SDTCs. However, once we showed Hawley the emails and documents we found in his emails showing he ghostwrote materials for OUTSIDE ATTORNEY B, Hawley admitted to writing the materials, and said he wrote reports for *all* SDTC cases he was involved with, not just the Girardi case. When asked whether he told anyone about his ghostwriting of SDTC memoranda, Hawley said that the Board knew about it, but we have not found any evidence to support that. Because our investigation was focused on Girardi-related cases, we did not vet Hawley's statement that he routinely wrote SDTC reports in all cases. We found evidence that Hawley appears to have ghostwritten one other report for OUTSIDE ATTORNEY B (for an unrelated complaint against a different attorney), but we did not find evidence that he ghostwrote any other reports, and it does not appear that he wrote the materials for the other cases against Girardi handled by OUTSIDE ATTORNEY B.

When we interviewed OUTSIDE ATTORNEY B, ██ initially said that Hawley provided ██ with a "skeleton" report, and that no one at the State Bar attempted to influence ██ decision regarding whether to impose discipline on Girardi. Additionally, when first shown the report ████████████████████ OUTSIDE ATTORNEY B stated unequivocally that ██ drafted the report and that no one assisted ██ in drafting its contents. However, after we showed ██ the documentary evidence showing otherwise, ██ apologized and told us that ██ did not recall that Hawley drafted the report, and admitted that Hawley in fact had done so. ██ also told us that ██ probably did not review the materials cited in the report supporting the recommendation ████████████, as ██ would have just accepted what Hawley sent ██ ██ admitted that the decision to close the case was not an independent one, and that ██ had deferred to Hawley's assessment of how to handle the allegations.

While Hawley's intervention in the Girardi ██ case is troubling on many levels, we did not find any evidence indicating that Hawley's actions were motivated by connections to Girardi or a desire to protect him. As far as we could determine, Hawley did not have any relationship to Girardi and did not receive anything of value from him or anyone connected to him. When asked about his relationship to Girardi, Hawley stated that he had never met him.

Hawley's intervention into this Girardi case is a clear breach of Rule 2201, as well as of the separation between the Executive Director's Office and OCTC. The

case was referred out to independent counsel because it directly implicated the State Bar ███████████████████████████████████████████████. CTC 2 determined that independence was needed in the handling of the case, and that someone outside the State Bar should handle it. The fact that someone inside the State Bar handled this case is alone troubling; that it was the Acting Executive Director of the State Bar is frankly shocking. The Executive Director is not supposed to make recommendations in discipline cases, and especially not Rule 2201 cases. The effect of Hawley's intervention in the case—especially when considered in conjunction with the decision to close without investigating CTC 2's requests for an internal investigation into overlapping issues—had the effect of protecting Girardi and keeping hidden his ████████████████████████████████ ███████████████. It is especially striking that one of the allegations that was covered up by Hawley's actions was that ███████████████████████████████████ ██████████████████████████████████████████████████████████████

## Office of General Counsel and Executive Director's Office Failure to Investigate Reported Girardi Connections at State Bar

Both the Executive Director's Office and the Office of General Counsel received reports from both internal and external sources of Girardi's influence at the State Bar and connections to Layton and others, but failed to investigate the complaints in good faith.

In December 2013, an outside attorney wrote a letter to Executive Director Dunn that raised concerns about Layton's connections with Girardi and his involvement in Girardi disciplinary matters. From what we can determine, Dunn did nothing with the letter. In January 2014, the outside attorney forwarded the letter to Deputy Director Hawley after being referred to him by Oehler.

We were not able to find any documentary evidence showing that Dunn or Hawley did anything to follow up on the letter. When we spoke to Hawley, he said that he did not recall the letter, but he would not have done anything after receiving the letter other than talk to CTC 2.

Later in 2014, CTC 2 received a voicemail from a woman claiming to be a licensed attorney in Washington who wanted to speak to someone about Executive Director Dunn and Girardi. The caller claimed to have first-hand knowledge of financial dealings involving Dunn and Girardi. CTC 2 forwarded the voicemail to Hawley for handling, stating that she was not going to return the call unless Hawley

instructed her otherwise. Hawley informed us that he did not recall receiving this email from CTC 2 or taking any action after receiving it.

In November 2014, as discussed in further detail in the section above, OCTC received a complaint against Girardi alleging that Girardi threatened to report someone to the State Bar if they did not acquiesce to his demands and that Girardi gave false testimony in a deposition ██████████████████████████ ████ CTC 2 recused OCTC from the matter pursuant to Rule 2201 and asked Hawley, who was then the Deputy and Acting Executive Director of the State Bar, to appoint an SDTC to investigate. Hawley's improper handling of the case sent to the SDTC is discussed in detail in the section above. Concurrently with her recusal, CTC 2 also requested the State Bar's human resources office conduct an internal investigation into the allegations regarding Layton.

Hawley sent CTC 2's request for an internal investigation to the State Bar's Office of General Counsel, where it was assigned to the ███████████ general counsel. The ██████████ general counsel reviewed the materials and determined that there were not "sufficient facts at this time to go forward with an internal investigation." ██ noted, however, that "if there are additional facts linking Girardi and Layton that might implicate an inappropriate relationship, or if there are other complaints or allegations against Layton that suggest a pattern of using his position as an OCTC investigator to benefit third parties, further inquiry may be appropriate."

Also in November 2014, CTC 2 separately reported her own concerns to Hawley that Layton was receiving meals, plane rides on Girardi's private jet, legal representation, and other things of value from Girardi, while Layton was employed at the State Bar and in violation of the State Bar's policies. CTC 2 requested an internal investigation into these issues, ███████████████████████████ █████████████████████████████████████ stating that it should be easy to verify allegations such as one that Girardi represented Layton in litigation while Layton was employed at the State Bar. CTC 2 also identified Dunn, Platel, Miles, and Noonen as potentially also having received inappropriate gifts from Girardi. CTC 2 also made this report to Hawley.

Hawley sent CTC 2's second investigation request to the same ███████████ general counsel who had reviewed CTC 2's first complaint, asking ███ to review and to determine whether the new information changed ███ conclusion about whether any kind of internal investigation into the allegations was warranted. Despite the fact that ██ had earlier concluded that additional allegations

linking Girardi and Layton would warrant an investigation, the ███████████ general counsel did not conduct any investigation into CTC 2's allegations, and did not take any steps to verify or disprove any information provided by CTC 2. Instead, the ███████████ general counsel determined that an investigation was not warranted because CTC 2 had not substantiated her allegations with evidence. The ███████ general counsel advised that several of CTC 2's allegations, if true, could raise serious concerns, but because the allegations were only allegations, no action needed to be taken. Stated differently, the ██████████ general counsel determined that because the allegations were only allegations, no internal investigation should be conducted to determine whether the allegations were true.

We interviewed the ██████████ general counsel who prepared these analyses, and █ did not recall ever having worked on anything involving Girardi. ██ stated that ██ had no recollection of preparing any analysis regarding a possible internal investigation into Girardi's gifts to Layton and other State Bar employees, even after being shown the analysis ██ wrote. ██ also stated that ███ had no personal knowledge of any State Bar employee receiving anything of value from Girardi.

The █████████ general counsel's advice that no investigation was warranted because the allegations were only allegations was provided to the Executive Director's Office by written memorandum in May 2015, and no further action was taken to investigate Girardi's gifts and other connections to Layton and others. During this same time period (April to June 2015), and as described in the section above, Deputy and Acting Executive Director Hawley ghostwrote and submitted to the Board for approval a report purportedly from the SDTC assigned to investigate the outside complaint about Girardi ████████, which similarly recommended closing without investigation a complaint alleging inappropriate connections between Girardi ██████████.

## 2011 Termination of OCTC Management

We were told by many witnesses, including former Executive Director Dunn, that the Executive Director's Office is not supposed to interfere or have any involvement in the affairs of OCTC. There is supposed to be a wall between the two offices of the State Bar, which is why Dunn's termination of four senior OCTC attorneys, two of whom were advocating for cases against Girardi around the time of their termination, raises questions about whether the firings were motivated in part or in whole to assist Girardi.

Dunn started as Executive Director in November 2010, and CTC 1 started as CTC in July 2010.  According to CTC 1, Dunn approached him during the first half of 2011 and told him that he needed to fire some of his staff.  CTC 1 told Dunn that OCTC staffing was "none of his business" and CTC 1 refused to fire anyone.

At the same time, Dunn also made it known to Hawley, his Deputy Executive Director, that he wanted OCTC ATTORNEY 2 gone.  OCTC ATTORNEY 2 recounted to us that Hawley told ███ in April or May 2011 that Dunn wanted to terminate ███, adding that there were no complaints about ███ performance and that he (Hawley) believed that OCTC ATTORNEY 2 was doing a great job.  As described in further detail above, OCTC ATTORNEY 2 at the time was a vocal critic of the decision made by OUTSIDE ATTORNEY C not to discipline Girardi and had been advocating to upper management and the Board to reopen the case.

CTC 1 was only in his position as CTC for one year, as the California Senate never confirmed him.  His last day in the office was Friday, July 1, 2011.  On July 6, 2011, Dunn and Hawley terminated OCTC ATTORNEY 2 along with three other ████████████ in OCTC including OCTC ATTORNEY 1.  A month earlier, OCTC ATTORNEY 1 ████████████████████ against Girardi based on allegations he had stolen funds from his client.  Nearly simultaneously with ███ firing, Greenberg drafted a ████████████ dated July 5, 2011.  We did not find any evidence that the other two fired OCTC attorneys had been working on any Girardi matters.

When interviewed, Dunn said that he approved the terminations, but he was simply rubber-stamping the decision that his deputy, Hawley, recommended.  He could not recall why the four were terminated but believed it was performance related.  A review of the four attorneys' personnel files revealed nothing explaining why they were terminated.  The employees' separation agreements that were recovered all indicate that the employees were involuntarily separated, without any explanation as to why.  In the press at the time, it was reported that according to a spokesperson for the State Bar, the termination decisions were "vested in Executive Director Joseph Dunn" and were part of an effort to "improve the State Bar's operations."

Hawley was also interviewed, but his memory was poor.  He did not remember details about the terminations and made inconsistent statements about the impetus for them.  It is clear, however, that Hawley was the one who communicated the firings to the employees and handled the attendant paperwork.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT



The evidence shows that Dunn signed off on the firings and Hawley implemented them, including by signing the separation agreements. Everyone with whom we spoke about this issue also agreed that only Dunn could have approved the actual terminations. However, there are disagreements about the details beyond this. In his deposition, Dunn claimed that the recommendation to fire the four OCTC attorneys came from Hawley, but Hawley does not remember details about the terminations and made inconsistent statements about the impetus for them.

Considering all of the evidence, we believe that it is more likely than not that Dunn was the driving force behind the terminations. Further, there is reason to believe the firing may have been motivated by Dunn's connections to Girardi. We understand that this was the first time the Executive Director's Office directed the termination of OCTC employees, and that this has not happened again. If you credit CTC 1's and OCTC ATTORNEY 2's statements, Dunn was seeking to fire OCTC attorneys, but CTC 1 was a roadblock to do so. Within days of CTC 1's leaving office, the Executive Director's Office fired the OCTC employees. This was a significant break in protocol that, as far as we can discern, did not happen before and has not happened since Dunn's tenure. When you combine these facts with Dunn's connections to Girardi and the fact that two of the fired attorneys had recently advocated for discipline against Girardi, there is reason to believe the terminations were based, at least in part, on Girardi's influence at the State Bar.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

# APPENDIX A
# OVERVIEW OF THE STATE BAR AND ITS ORGANIZATION

The State Bar of California is the regulatory arm of the California Supreme Court. Its mission is to protect the public and includes the primary functions of licensing, regulation, and discipline of attorneys; the advancement of the ethical and competent practice of law; and support of efforts for greater access to, and inclusion in, the legal system. The State Bar of California is the largest state bar in the United States, and it licenses more than 250,000 attorneys, investigates approximately 16,000 complaints of attorney misconduct annually, and distributes over $78 million in grants to legal aid organizations.

The organization and structure of the State Bar has changed several times since the State Bar was founded in 1927. The following is a brief overview of its operations.[24]

The State Bar is governed by a Board of Trustees (formerly called the Board of Governors) (the "Board") composed of thirteen members. Currently, five of these members are attorneys appointed by the California Supreme Court, and two are attorneys appointed by the California Legislature, one each by the Senate Committee on Rules and the Speaker of the Assembly. The other six members are non-attorney "public" members, four of whom are appointed by the Governor, one of whom is appointed by the Senate Committee on Rules, and one of whom is appointed by the Speaker of the Assembly. The Board has standing committees composed only of Board members, two of which are statutorily mandated: the Board Executive Committee and the Regulation and Discipline ("RAD") Committee. Currently, the entire Board sits as the RAD Committee.

Prior to 2018, attorney Board members were not appointed but instead were elected. The State Bar divided California into several districts, and Board members were elected by the licensed lawyers in each district. At least in Los Angeles, there was an informal committee of prominent lawyers, colloquially referred to as the "Breakfast Club," that would review the candidates from the district, identify the individuals they would back, and make endorsements. Girardi played a prominent role in this committee, including when fellow Girardi Keese attorney Miller ran for and was elected to the Board.

The Board oversees the two main branches of the State Bar: OCTC, which handles the disciplinary function, and the Executive Director's Office, which is responsible for the State Bar's other functions including attorney admissions, finances, and administrative issues. OCTC and the Executive Director's Office are separate, each reporting directly to the

---

[24] This information is based on information provided by interviewees and information publicly available on the State Bar's website, and is not intended to be a fulsome description of the nuances of the State Bar's organization or activities, past or present.

www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Board, and the Executive Director is not supposed to interfere with OCTC's administration of the discipline system.  The Office of General Counsel also reports directly to the Board.

OCTC's discipline process proceeds in stages.  Although the process has changed over time, in general and at a high level, Intake is the starting point for those seeking to file a complaint against an attorney.  Complaints are initially evaluated at Intake to determine if they involve a violation of California's professional standards.  If a formal investigation is warranted by the alleged misconduct in the complaint, the file moves to the Investigations stage.  If the matter is not resolved at the Investigation stage, for example through private discipline negotiated between the State Bar and the attorney, a State Bar attorney prepares a formal Notice of Disciplinary Charges and files it with the State Bar's court system.  The matter then proceeds to trial on the disciplinary charges.  If at any point in the process OCTC determines a conflict-of-interest exists, the State Bar utilizes the procedures in State Bar Rule of Procedure 2201, discussed in detail below, for the appointment of an outside attorney to handle the complaint.



Figure 1.1 – General Discipline Case Flow

The State Bar's court system, the State Bar Court, hears all disciplinary cases brought by OCTC and SDTCs against licensed attorneys.  California is the only state with an independent professional Court dedicated to ruling on attorney discipline cases.  The State Bar Court has the authority to recommend that the California Supreme Court suspend or disbar attorneys found to have committed acts of professional misconduct or to have been convicted of serious

crimes.  For lesser offenses, the State Bar Court can issue public or private reprovals.  The State Bar Court also can temporarily remove lawyers from practice when they are deemed to pose a substantial threat of harm to clients or the public.  Lawyers may seek review of State Bar Court decisions in the California Supreme Court.

Since 1989, the State Bar Court has used fulltime judges appointed by the California Supreme Court, the Legislature, and the Governor.  The Court is divided into two departments: a Hearing Department and a Review Department, headed by a presiding judge.  The Hearing Department is the trial level of the State Bar Court.  Five fulltime judicial positions are split between Los Angeles and San Francisco.  The Supreme Court appoints two of the hearing judges, while the Governor, the Speaker of the Assembly, and the Senate Committee on Rules appoint one hearing judge each.  The Review Department is the appellate level of the State Bar Court, consisting of the presiding judge and two other review judges.  All review judges are appointed by the Supreme Court.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## APPENDIX B
## RELEVANT STATE BAR POLICIES AND PRACTICES

### Conflicts-of-Interest/Gifts and Rule 2201

Until 2019, the State Bar of California did not have a robust policy relating to conflicts-of-interest, gifts from outside sources, or outside employment.  Thus, for most of the time during which State Bar employees were receiving, investigating, and closing complaints against Girardi, the State Bar did not have formal policies that clearly restricted many of the activities through which Girardi built relationships and influence, including providing free meals and event tickets to State Bar employees.  Although the State Bar has long had a formal policy on conflicts-of-interest, past iterations of the policy were limited in scope and focused on an employee's individual financial ties, rather than on issues of the appearance of impropriety for the State Bar as an organization.

Starting in November 2019, the State Bar began issuing various policy directives with the aim of improving and clarifying rules and procedures.  In June 2022, after the issues with Girardi and the State Bar had been widely reported on, the State Bar implemented a new, robust policy that supplements previous policies and procedures applicable to OCTC employees.  As discussed below, the new policy added for the first time significant restrictions on receiving gifts from attorneys, and clarified the expectations for how employees are to handle conflicts-of-interest.

Below we provide an overview of current policies and practices with regard to conflicts-of-interest, with a particular focus on State Bar Rule of Procedure 2201, which governs the use of outside attorneys as "Special Deputy Trial Counsel" in cases where OCTC is recused because of a conflict-of-interest.  We also identify some material differences in the current policies and practices as compared with historical policies and practices as they existed during relevant time periods.

This information is intended to provide background, and to underscore the significance of the recent rule changes implemented by the State Bar.  It is not intended to explain all of the nuances in all of the State Bar's conflicts policies and practices.

PRIVILEGED / WORK PRODUCT                                    86 | P a g e

www.halpernmay.com

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## Rule 2201

Rule 2201 sets forth the requirements for when and how to assign disciplinary complaints or inquiries to outside counsel when OCTC recuses itself from the matter.  The State Bar's internal procedures for referring matters to an SDTC or implementing an ethical screen once a conflict-of-interest has been identified are set out in detail in the State Bar's Policy Directive 2016-01, Ethical Screens (June 27, 2016, revised Sept. 2, 2021).  As of June 2022, the State Bar's procedures for identifying, tracking, and addressing conflicts-of-interest in OCTC go significantly beyond what is required by Rule 2201.

The current version of Rule 2201 outlines two categories of OCTC recusals: mandatory and discretionary.  The circumstances under which OCTC's recusal is mandatory are laid out in Rule 2201(a).  This includes inquiries, complaints, or matters that are about the CTC, an attorney employed by the State Bar, an attorney member of the Board, or an attorney that has had any personal, financial, or professional relationship with the CTC within the past 12 months.  Also included are matters the CTC believes will create the appearance that OCTC may not exercise its discretionary functions in an evenhanded manner, thus rendering it unlikely that an attorney will receive fair treatment or that the public will not be protected.

The second prong of Rule 2201 grants the CTC discretion to recuse OCTC where the inquiry, complaint, or matter is about an attorney who, within the past 12 months, has had a personal, financial, or professional relationship to the State Bar, its employees (other than the CTC), a member of the Board, or an attorney member of a State Bar committee or commission.  The CTC may also recuse OCTC to avoid the appearance of impropriety.

## Procedures for Determining Conflicts

The State Bar relies on its employees to identify potential conflicts-of-interest at all stages.  On an annual basis, the State Bar requires its employees to complete a questionnaire in which they disclose personal, financial, and professional relationships they have with licensed California attorneys.  As of June 2022, all supervising attorneys, Assistant CTCs, Deputy CTCs, Special Assistants to the CTC, and the CTC are required to update their conflict-of-interest forms more frequently, on a quarterly basis.  The State Bar then adds all identified attorneys to a list ("conflicts list") in its electronic case management system.

PRIVILEGED / WORK PRODUCT                                 87 | P a g e

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Upon receipt of a State Bar matter, the employee processing the complaint is required to check whether the complainant or respondent is listed in the conflicts list. If so, action is taken in accordance with Policy Directive 2016-1, Ethical Screens. The completion of the conflict check is noted in the database for each complaint.

Next, according to recent revisions to the process, intake attorneys are required to review the matter and determine whether a potential conflict exists. OCTC investigators or attorneys receiving cases from intake are required to review the matter for any potential conflict before they do any work on the matter. This includes checking the current conflict-of-interest database, answering a series of prompts, and checking off that an "OCTC Conflict Check" has been completed. If the matter moves to an appeal, the appeals attorney assigned must also complete a conflict check and record it in the database.

The obligation to check for conflicts now continues throughout the duration of the matter. State Bar policy requires that employees notify their supervisors as soon as possible if a potential conflict arises or becomes known at any stage after a case has been opened. Finally, prior to closing or otherwise resolving the matter, any OCTC investigator or attorney assigned to the matter must again review the matter for conflicts, and again record the conflicts check in the database.

### Appointment of Outside Attorneys under Rule 2201

As indicated above, when the State Bar identifies a conflict, OCTC can follow the process laid out in Rule 2201 to assign the case to outside examiners ("OEX") (attorneys contracted by the State Bar, also called SDTCs) or, in certain situations, recuse only those employees who have a connection to the case.

When the CTC determines that recusal is appropriate, the matter is referred to the SDTC Administrator ("Administrator"). The Administrator conducts a preliminary review of the inquiry, complaint, or matter. If the Administrator determines that no violation occurred, or that one cannot be proven, the Administrator closes the matter. Otherwise, the Administrator assigns the matter to an SDTC to further investigate. This preliminary review of inquiries and complaints must be completed within sixty days. A complainant may request a review of the

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Administrator's decision to close a complaint or inquiry; such a request for review is referred to an SDTC.

Once the Administrator refers the matter to an SDTC, the SDTC conducts the investigation.  The Administrator and SDTC act in place of OCTC regarding any inquiry, complaint, or other matter and any resulting investigation or prosecution.  Upon being contacted about the potential case, the SDTC is provided the name of the respondent, the complaining witness, and any potential witnesses by the Administrator.  The SDTC is then required to confirm, in writing, whether they have any conflicts.  If none, the SDTC is then provided the case materials to begin working on the assignment.  If the SDTC notes a conflict, he or she is recused from the matter and another SDTC who is conflict-free is appointed to handle the complaint.

Should the SDTC decide to close the matter, a complainant can request a review of the SDTC's decision.  That request is handled by the Administrator, who refers it to a different SDTC than was originally assigned to the matter.  This (different) SDTC then determines whether to recommend to the Administrator that the matter be reopened for investigation or stay closed.

### Historical Practices and Prior Iterations of Rule 2201

The State Bar's current policies and practices regarding conflicts-of-interest represent a significant improvement on prior iterations of those policies.  Regarding Rule of Procedure 2201 in particular, the current iteration of the rule, issued in December 2021, differs significantly from the prior iterations from 2006, 2016, January 2019 and November 2019.  These material differences include:

- *Mandatory recusal*.  Before 2019, Rule 2201 did not provide for the mandatory recusal of the entire OCTC when there was a conflict.  Additionally, prior iterations provided the CTC with the discretion to recuse herself in certain situations that would be considered mandatory recusal situations under the current version of the rule.  For example, in the 2006 version of Rule 2201, the CTC had the discretion (but was not required) to appoint an SDTC in investigations involving any member who had "a current or recent personal, financial, or professional relationship" to the State Bar, its employees, or a member of the Board.  In the current version, a relationship with the CTC makes recusal mandatory.

www.halpernmay.com

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

- *Administrator*. The role of Administrator was created in 2016. Prior to the creation of the Administrator role, the CTC or their designee conducted the preliminary review to determine whether an SDTC should be appointed to investigate the complaint or whether the case should be closed. The creation of the Administrator role represents a significant change from prior practice because OCTC employees are no longer performing preliminary reviews of cases that have been identified as conflicts cases. Formal procedures allowing a complainant to request review of a closed complaint were also added in 2016.

- *Oversight*. Beginning in 2016, the Chairperson of the Board's RAD Committee was empowered to designate the State Bar's Office of General Counsel to monitor all referrals to the Administrator and SDTC to maintain impartiality and confidentiality. Currently, the Administrator and/or Office of General Counsel periodically reports to the Board the number, nature, and disposition of inquiries, complaints, and investigations for which an SDTC has been appointed. Prior iterations of the Rule required the CTC to make these reports, but only upon the Board's request.

### Additional Policies

As indicated above, the State Bar's new policies and procedures regarding conflicts-of-interest, implemented in June 2022, after our investigation began, go significantly beyond what is required by Rule 2201 and include prohibitions focused on the appearance of impropriety. As of June 2022, under Policy Directive 2022-05, no OCTC employee may participate (either directly or indirectly) in the review, investigation, or prosecution of any matter falling within the below categories:

A matter involving the CTC; a state bar employee; a member of the Board; or a person with a personal, financial, or professional relationship to the CTC.

- A matter involving any individual with whom the employee has (or has had in the past 12 months) a personal or professional relationship.

- A matter involving a person whom the employee is aware has (or has had in the past 12 months), a personal or professional relationship with the State Bar or any other State bar employee, committee- or commission-member.[25]

- The employee holds (or has held in the past 12 months) a financial interest that could be affected by the resolution of the matter.

- The employee is aware that any other Bar employee holds, or within the last 12 months held, a financial interest that could be affected by the resolution of the matter.

- The matter could create the appearance that OCTC may not exercise its discretionary functions in an evenhanded manner or apply fair treatment.

Moreover, the new policies now go further in defining certain key terms (*i.e.*, what constitutes a "professional relationship") and provide helpful examples of scenarios that would present a conflict.  For example, an individual would be deemed to have a "professional relationship" with a person if both the individual and the person share the same employer.

The rules regarding the acceptance of gifts have also been significantly widened. Prior to 2022, gifts from persons or organizations seeking to do business with the State Bar or whose activities are regulated or controlled by the State Bar were prohibited only where it could be ascertained that the gift was intended to influence the employee in their official duties.  Now, no OCTC employee can receive any gift from any person or organization doing or seeking to do any business with the State Bar or whose activities are regulated or controlled by the State Bar.  No OCTC attorney or investigator is allowed to accept any gift from any licensed California attorney unless there is a pre-existing personal or professional relationship between them that would have required the imposition of an ethical screen, regardless of the gift.  Acceptance of any such gift will require that licensed California attorney to be listed on the OCTC employee's conflicts form.

---

[25] An exception exists where the employee has reported the potential conflict to their supervisor and a determination is made that either no conflict exists or that the employee with the conflict has been screened from the matter.  Policy Directive 2022-05; *see also* Policy Directive 2016-01, Ethical Screening.

PRIVILEGED / WORK PRODUCT                                      91 | P a g e

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

There have also been additional clarifications about permissible outside employment and business or volunteer relationships by OCTC attorneys. OCTC attorneys are generally not permitted to engage in the outside practice of law, with two limited exceptions: (1) providing non-criminal legal services to certain family members (assuming no interference with OCTC duties); and (2) assisting a pro bono legal services program with non-criminal pro bono legal services. Any OCTC attorney working with a legal services program is required to list each attorney employed by the established program—not just the attorneys on the matter in which they are assisting—on their conflicts form.

## Form 700

In California, a public employee who "makes or influences governmental decisions" is required to complete and sign a Form 700 (Statement of Economic Interest). According to the California Fair Political Practices Commission, the Form 700 "provides necessary information to the public about an official's personal financial interests to ensure that officials are making decisions in the best interest of the public and not enhancing their personal finances." The form further "serves as a reminder to the public official of potential conflicts of interest so the official can abstain from making or participating in governmental decisions that are deemed conflicts of interest." The Forms 700 are required to be signed under penalty of perjury.

## Prosecutorial Ethics

In addition to Rule 2201, internal procedures, and California's Rules of Professional Conduct that apply to all lawyers, government attorneys have additional conflict-of-interest rules and ethical obligations they must abide by. Prosecutors—government attorneys charged with enforcing the law against others on behalf of the public—are subject to even greater ethical considerations regarding conflicts-of-interest that require them to avoid even the appearance of impropriety. The existence of the appearance of impropriety is related to but separate from the existence of an actual conflict-of-interest, and the appearance of impropriety alone may render a government attorney's involvement in a case inappropriate even where there is no actual conflict-of-interest under the applicable rules. This is because the additional ethical considerations governing government attorneys' conflicts-of-interest are intended not only to provide for fairness in the actual administration of justice, but to protect and facilitate the public's confidence

www.halpernmay.com

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

in the administration of justice and in the government's ability to prosecute cases fairly and objectively. This concept is embodied in case law, ethics opinions, and industry ethical standards.

California common law prohibits conflicts-of-interest in government actors that go beyond actual conflicts to relationships that create the appearance of impropriety. Under the common law, "[a] public officer is impliedly bound to exercise the powers conferred on him with disinterested skill, zeal, and diligence and primarily for the benefit of the public …. Actual injury is not the principle the law proceeds on. Fidelity in the agent is what is aimed at, and as a means of securing it the law will not permit him to place himself in a position in which he may be tempted by his own private interests to disregard those of his principal. This doctrine is generally applicable to private agents and trustees, but to public officers it applies with greater force, and sound policy requires that there be no relaxation of its stringency in any case that comes within its reason …." *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1170–71 (1996) (quoting *Noble v. City of Palo Alto*, 89 Cal. App. 47, 51 (1928)).

Numerous decisions, including the State Bar's own ethics opinions, confirm that with respect to government attorneys, the appearance of impropriety in the handling of their duties can in and of itself be unethical and must be avoided. *See, e.g.*, State Bar Opinion 1981-63; California Attorney General's Office Opinion No. 07-807; *see also* California Attorney General's Office, Conflicts of Interest, *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/coi.pdf. As discussed above, in recognition of the importance of avoiding the appearance of impropriety, the State Bar in 2022 implemented new policies that focus on the appearance of impropriety and restrict things like State Bar employees accepting outside employment or receiving gifts and other things of value from California attorneys.

Prosecutorial ethical standards can also be found in published guidance documents such as those from the American Bar Association and the United States Department of Justice.

The American Bar Association's Criminal Justice Standards for the Prosecution Function (Fourth Edition, 2017) provides model guidance that seeks to address these concerns. Standard 3-1.7, Conflicts of Interest, provides several applicable model rules. Subsection (a), for instance, requires that the "prosecutor [] know and abide by the ethical rules regarding conflicts of interest that apply in the jurisdiction, and

be sensitive to facts that may raise conflict issues." *Id*. Subsection (f) provides that "[t]he prosecutor should not permit the prosecutor's professional judgment or obligations to be affected by the prosecutor's personal, political, financial, professional, business, property, or other interests or relationships. A prosecutor should not allow interests in personal advancement or aggrandizement to affect judgments regarding what is in the best interests of justice in any case." *Id*. Finally, subsection (g) provides that "[t]he prosecutor should disclose to appropriate supervisory personnel any facts or interests that could reasonably be viewed as raising a potential conflict of interest." *Id*.

Applying these and related principles, the U.S. Department of Justice prohibits its employees not just "from participating in any matter in which he has a financial interest" but also "from participating in a criminal investigation or prosecution if he has a personal or political relationship with any person or organization substantially involved in the conduct that is the subject of the investigation or prosecution, or any person or organization which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution." U.S. Department of Justice, Departmental Ethics Office, Conflicts, *available at* https://www.justice.gov/jmd/conflicts; *see also* San Francisco District Attorney's Office, Policy Directive – Conflicts of Interest, *available at* https://sfdistrictattorney.org/wp-content/uploads/2020/11/Conflicts-of-Interest.pdf.

California's Rules of Professional Conduct, Rule 1.7, establishes conflicts rules for all California lawyers including prosecutors. Subsection (b) of that Rule states that "[a] lawyer shall not, without informed written consent from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests." *Id*.; *see also* Rule 1.11, Special Conflicts of Interest for Former and Current Government Officials and Employees.

*ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL*
*ATTORNEY WORK PRODUCT*

**Independent Investigation for the State Bar of California:**

**Addendum**
**to**
**Report of Investigation**

**February 23, 2023**



www.halpernmay.com
550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

# **<u>INTRODUCTION</u>**

Halpern May Ybarra Gelberg LLP ("Halpern May") was retained by the Board of Trustees (the "Board") of the State Bar of California (the "State Bar" or the "Bar") to conduct an independent, attorney-client privileged and confidential investigation into whether the State Bar's handling of past discipline complaints against Thomas V. Girardi ("Girardi") was affected by Girardi's connections to or influence at the State Bar and to identify actions by anyone with ties to the State Bar that may constitute malfeasance in how discipline complaints against Girardi were handled.  We delivered the Report of Investigation to the State Bar on February 4, 2023.  We now submit this addendum to our Report of Investigation, through which we correct typographical and other errors in our original Report of Investigation and add additional information regarding certain State Bar policies.  None of the changes or additions contained herein affect the substantive findings of our investigation or the conclusions that we reached based on factual findings.

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## <u>TYPOGRAPHICAL AND OTHER CORRECTIONS</u>

Halpern May identifies the following errors, typographical or otherwise, in the Report of Investigation, and the corrections to those errors:

- Page 5: the sentence stating, "We discovered that Hawley had been ghostwriting case analysis **memorandums** for conflict cases and passing them off as the work product of the independent conflict counsel, including on a Girardi case" is amended to state, "We discovered that Hawley had been ghostwriting case analysis **memoranda** for conflict cases and passing them off as the work product of the independent conflict counsel, including on a Girardi case."

- Page 24: the sentence stating, "Due to **Girard's** mental state and assertion of his Fifth Amendment rights . . . ." is amended to state, "Due to **Girardi's** mental state and assertion of his Fifth Amendment rights . . . ."

- Page 36: the sentence stating, "It is unclear what, if any, influence Girardi was able to exert on State Bar cases against him through the relationships he built by **participating** the selection process for State Bar Board members, but one former OCTC investigator informed us that a Board member may have intervened in a case against Girardi in the 1990s" is amended to state, "It is unclear what, if any, influence Girardi was able to exert on State Bar cases against him through the relationships he built by **participating in** the selection process for State Bar Board members, but one former OCTC investigator informed us that a Board member may have intervened in a case against Girardi in the 1990s."

- Page 35 and Appendix A (page 83) state that attorney members of the State Bar's Board of Trustees were elected until 2018, after which time they were appointed. These assertions are amended to state that the State Bar's Board of Trustees transitioned from an elected board to an appointed board over a period of time. Pursuant to SB 36, which was signed into law in 2017, all board members are appointed (though some members had been appointed, rather than elected, prior to SB 36 going into full effect).

www.halpernmay.com

550 South Hope Street | Suite 2330 | Los Angeles, California 90071

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

## ADDITIONAL INFORMATION REGARDING STATE BAR CONFLICTS-OF-INTEREST POLICIES APPLICABLE OUTSIDE THE OFFICE OF CHIEF TRIAL COUNSEL

In Appendix B to our report, we detailed information regarding the State Bar's conflicts-of-interest policies and how those policies have changed over time, focusing on those policies that would have applied to employees in the Office of Chief Trial Counsel ("OCTC"), who were responsible for the handling of Girardi cases. Below, we provide additional information regarding conflicts-of-interest policies that apply to State Bar employees, officers, and affiliates outside OCTC. As with the information provided in our Report of Investigation, the information below is intended to provide background and to underscore the significance of the recent rule changes implemented by the State Bar. It is not intended to explain all of the nuances in all of the State Bar's conflicts policies and practices.

In 2021, the State Bar put into place an Incompatible Activities policy that applies to all State Bar employees and clarifies that State Bar employees are subject to the requirements of Section 19990 of the Government Code, which provides in part that "a state officer or employee shall not engage in any employment, activity, or enterprise which is clearly inconsistent, incompatible, in conflict with, or inimical to his or her duties as a state officer or employee." This policy prohibits, *inter alia*, the misuse of the employee's State Bar position, outside employment, and the receiving of gifts, particularly from lawyers or others with business before the State Bar.

Additionally, the State Bar has maintained a Conflict-of-Interest Code that applies to all designated employees. The Code has been revised over the years and currently includes decisionmakers from across the State Bar's offices, including in the Executive Director's Office, the Office of the General Counsel, and the Office of Chief Trial Counsel. The Code mandates that certain disclosures be made, including through the regular filing of statements of financial interest. In 2022, the State Bar launched an online portal for the filing of statements of economic interests (*i.e.*, the financial disclosures in the Forms 700). The Code also contains restrictions on the acceptance of gifts. Importantly, the Code contains standards for disqualification of a designated employee from participating in certain decision-making on behalf of the State Bar where the employee has specified connections to a person or entity affected by the decision-making.

PRIVILEGED / WORK PRODUCT                                          4 | P a g e

HALPERN MAY YBARRA GELBERG LLP
ATTORNEY-CLIENT PRIVILEGED/CONFIDENTIAL
ATTORNEY WORK PRODUCT

Board members are subject to Business and Professions Code section 6036, which requires board members to disqualify themselves from matters in which they have a financial interest or a personal nonfinancial interest.  In addition, they are subject to a Conflict-of-Interest Code and are also required to file statements of economic interest (*i.e.*, Forms 700).