1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA

2                  SOUTHERN DIVISION

3

4   JOHN ROE 1, ET AL.,      )
                      )

5            Plaintiffs,  )
                      )

6        vs.           )  Case No.  8:22-CV-00983-DFM
                      )

7   THE STATE BAR OF       )
   CALIFORNIA, ET AL.,     )

8                      )    Santa Ana, California
                      )    March 7, 2023

9         Defendants.  )    (10:03 a.m. to 10:52 a.m.)
   _____  )

10

11

12

13

14                      HEARING

15   BEFORE THE HONORABLE DOUGLAS F. MC CORMICK
         UNITED STATES MAGISTRATE JUDGE

16

17

18   APPEARANCES:            See Next Page

19   COURT REPORTER:       Recorded, CourtSmart

20   COURTROOM DEPUTY:    Nancy Boehme

21   TRANSCRIBER:          Dorothy Babykin
                      Courthouse Services

22                      1218 Valebrook Place
                      Glendora, California  91740

23                      (626) 963-0566

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

1    APPEARANCES:

2
      FOR THE PLAINTIFF JOHN ROE I, ET AL.:
3

4    LAW OFFICES OF LENORE ALBERT
     BY:  LENORE ALBERT
5          ATTORNEY AT LAW
     1968 SOUTH COAST HIGHWAY
6    SUITE 3960
     LAGUNA BEACH, CALIFORNIA 92651
7

8    FOR DEFENDANT STATE BAR OF CALIFORNIA, ET AL:

9
     COOLEY LLP
10   BY:  BARRETT ANDERSON
          ATTORNEY AT LAW
11   4401 EASTGATE MALL
     SAN DIEGO, CALIFORNIA
12
     COOLEY LLP
13   BY:  GREG MERCHANT
          ATTORNEY AT LAW
14   3175 HANOVER STREET
     PALO ALTO, CALIFORNIA  94304
15   (TELEPHONICALLY)

16   SUZANNE GRANDT
     THE STATE BAR OF CALIFORNIA
17   180 HOWARD STREET
     SAN FRANCISCO, CALIFORNIA  94105
18   (TELEPHONICALLY)

19   FOR DEFENDANT TYLER TECHNOLOGIES, INC.:

20   K&L GATES LLP
     BY:  BETH W. PETRONIO
21        ATTORNEY AT LAW
     1717 MAIN STREET
22    SUITE 2800
      DALLAS, TEXAS  75201
23

24

25

1    APPEARANCES:  (CONTINUED)

2

     FOR DEFENDANT RICK RANKIN:
3
     JEFFER MANGELS BUTLER & MITCHELL LLP
4    BY:  JUSTIN ANDERSON
          ATTORNEY AT LAW
5    1900 AVENUE OF THE STARS
     7TH FLOOR
6     LOS ANGELES, CALIFORNIA  90067
      (TELEPHONICALLY)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    I N D E X

2        8:22-CV-00983--DFM                                      MARCH 7, 2023

3        PROCEEDINGS:

4        HEARING ON SUPPLEMENTAL MOTIONS TO DISMISS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              SANTA ANA, CALIFORNIA; MARCH 7, 2023; 10:03 A.M.

2              THE CLERK:  PLEASE BE SEATED AND COME TO ORDER.

3              THIS UNITED STATES DISTRICT COURT IS NOW IN SESSION.

4              THE HONORABLE DOUGLAS F. MC CORMICK, UNITED STATES

5      MAGISTRATE JUDGE, PRESIDING.

6              WE'RE ON THE RECORD ON CASE SA CV 22-00983.

7              IT'S JOHN ROE 1, ET AL. VERSUS THE STATE BAR OF

8      CALIFORNIA, ET AL.

9              COUNSEL, YOUR APPEARANCES, PLEASE.

10             MS. ALBERT:  GOOD MORNING, YOUR HONOR

11             LENORE ALBERT ON BEHALF OF THE PLAINTIFFS.

12             MR. ANDERSON:  GOOD MORNING.

13             BARRETT ANDERSON OF COOLEY LLP ON BEHALF OF

14     DEFENDANT THE STATE BAR OF CALIFORNIA.

15             MS. PETRONIO:  GOOD MORNING, YOUR HONOR.

16             BETH PETRONIO WITH K&L GATES ON BEHALF OF DEFENDANT

17     TYLER TECHNOLOGIES.

18             THE COURT:  COUNSEL ON THE PHONE.

19             MR. ANDERSON:  GOOD MORNING, YOUR HONOR.

20             JUSTIN ANDERSON FOR DEFENDANT RICK RANKIN.

21             MR. MERCHANT:  GOOD MORNING.

22             THIS IS GREG MERCHANT WITH COOLEY ON BEHALF OF THE

23     STATE BAR.

24             (PAUSE IN PROCEEDINGS.)

25             THE COURT:   DO WE HAVE ANY ADDITIONAL COUNSEL ON THE

1    PHONE?

2              MS. GRANDT:  THIS IS SUZANNE GRANDT FROM THE STATE

3    BAR.

4              I WAS JUST AS WELL ASSOCIATING IN.  BUT I'M ALSO ON THE

5    PHONE.

6              THE COURT:  ALL RIGHT.

7              SO, COUNSEL, WE'RE HERE AS A FOLLOW-UP TO A HEARING

8    WE HAD  A FEW MONTHS AGO AFTER WHICH I DISMISSED WITH LEAVE

9    TO AMEND THE SHERMAN ACT CLAIMS.  I GAVE PLAINTIFFS LEAVE TO

10   AMEND TO ADD ADDITIONAL FACTUAL ALLEGATIONS, REPLEAD A

11   SECTION 2 SHERMAN ACT CLAIM AND ADD A SECTION 1 SHERMAN ACT

12   CLAIM.

13             I FOCUSED IN THE DISMISSAL ORDER ON THE SHERMAN ACT

14   CLAIM TO THE EXCLUSION OF THE OTHER STATE LAW CLAIMS BECAUSE

15   I WAS CONCERNED AS I TOLD THE PARTIES AT THE HEARING ABOUT

16   WHETHER IT WAS PRUDENTIAL OR APPROPRIATE FOR ME TO RULE ON

17   THE STATE LAW CLAIMS IN LIGHT OF THE STRONG LIKELIHOOD OR AT

18   LEAST THE STRONG POSSIBILITY THAT I WOULD DECIDE TO DECLINE

19   SUPPLEMENTAL JURISDICTION OVER THOSE CLAIMS AND REMAND THE

20   CASE TO STATE COURT IF THE SHERMAN ACT CLAIMS WERE IN FACT

21   DISMISSED AT THE 12(B) STAGE.

22             SO, WHAT I ENVISIONED IS WHAT IN A SENSE TRANSPIRED,

23   WHICH IS WE GET A SECOND AMENDED COMPLAINT.  WE GET

24   SUPPLEMENTAL MOTIONS TO DISMISS WITH RESPECT TO THE SHERMAN

25   ACT CLAIMS IN THOSE -- IN THAT SECOND AMENDED COMPLAINT.  AND

1    WE DETERMINE WHETHER WE ARE EITHER GOING TO GO FORWARD

2    WITH THE SHERMAN ACT CLAIMS OR NOT OR WHETHER THOSE ARE

3    GOING TO BE DISMISSED.

4         AND IF THEY ARE GOING TO BE DISMISSED, THEN, WHETHER

5    THE PARTIES WOULD LIKE TO BE HEARD.

6         AND I THINK FROM THE COMMENTS THAT WERE MADE AT THE

7    LAST HEARING IT SOUNDS LIKE THE DEFENDANTS WOULD LIKE TO BE

8    HEARD ON WHETHER THE CASE SHOULD BE REMANDED TO STATE

9    COURT.

10         SO, I MEAN, WE CAN TALK ABOUT IF THERE'S A POSSIBILITY

11    THAT THE SHERMAN ACT CLAIMS WILL BE DISMISSED.  AND AT LEAST

12    BASED ON SOME OF THE TENTATIVE COMMENTS I'M GOING TO MAKE OR

13    SOME OF THE QUESTIONS I'M GOING TO ASK MS. ALBERT, I THINK

14    THAT'S A STRONG LIKELIHOOD.

15         SO, WE SHOULD TALK ABOUT A PROCEDURE OR SOME SORT

16    OF PROCESS FOR GIVING THE PARTIES' THOUGHTS TO ME ABOUT

17    REMAND.

18         TURNING TO THE MERITS OF THE SECOND AMENDED

19    COMPLAINT, WHICH WE'VE REVIEWED.  WE'VE ALSO REVIEWED, OF

20    COURSE, THE MOTIONS TO DISMISS, THE SUPPLEMENTAL MOTIONS TO

21    DISMISS, THE ADDITIONAL OPPOSITIONS, THE ADDITIONAL REPLIES.

22         I DO THINK THAT THERE ARE TWO THEORIES OF ANTITRUST

23    LIABILITY SET FORTH IN THE SECOND AMENDED COMPLAINT.

24         THE FIRST IS WHAT I WILL CHARACTERIZE AS THE COVER-UP

25    THEORY IN WHICH THE STATE BAR AND TYLER HAVE CONSPIRED TO

1    RESTRAIN TRADE BY COVERING UP THE DATA BREACH.

2        AND THE SECOND IS THE DISCIPLINE THEORY IN WHICH THE

3    STATE BAR RESTRAINED TRADE BY ENGAGING IN PRICE FIXING VIA ITS

4    DISCIPLINARY COST SHEET.

5        SO, LET ME START WITH MY -- MY AREAS OF CONCERN FOR

6    YOU, MS. ALBERT, WHICH IS, THE FIRST IS THAT AS TO THE LATTER

7    THEORY, THE DISCIPLINE THEORY, THERE IS THE LONG LINE OF CASES

8    IN WHICH FEDERAL COURTS HAVE REJECTED ATTEMPTS TO BRING

9    ANTITRUST CLAIMS ABOUT THE DISCIPLINARY RULES OF VARIOUS

10    STATE BARS.

11        I DON'T FIND PERSUASIVE YOUR EFFORT TO DISTINGUISH

12    THOSE CASES BECAUSE YOU ARGUE THAT THE DISCIPLINARY COST

13    SHEET IS OPERATED BY THE STATE BAR WITHOUT ANY OVERSIGHT.

14        THE STATUTE INCLUDES A REQUIRED COST STRUCTURE AND

15    REQUIRES THAT THE COST BE IMPOSED ACCORDING TO SOME DEFINED

16    TERMS.

17        IT SEEMS TO ME APPARENT THAT THE COMPLAINED-OF

18    ACTIVITY THAT THE DISCIPLINARY COST SHEET IS DEFINED BY AND AT

19    THE BEHEST OF THE CALIFORNIA SUPREME COURT AND UNDER THE

20    RULES SET FORTH IN THE NORTH CAROLINA BOARD OF DENTAL

21    EXAMINERS CASE THE STATE BAR WOULD ENJOY PARKER IMMUNITY

22    FOR THAT THEORY OF ANTITRUST LIABILITY.

23        I'D LIKE YOUR THOUGHTS ON THAT, COMMENTS ON THAT.

24        AND I'LL ALSO ASK DEFENDANTS TO COMMENT ON THAT.

25        AND I'LL TURN IT OVER TO YOU.

1        MS. ALBERT:  OH, OKAY.

2        THANK YOU, YOUR HONOR.

3        FIRST – FIRST AS TO THE -- WHAT THE DEFENDANTS SHOWED

4    THIS COURT BY THEIR REQUEST FOR JUDICIAL NOTICE IS THEY

5    SHOWED THE COURT TWO THINGS.  ONE, A STATE STATUTE, WHICH

6    WAS 6086.10, WHERE IT SAID THAT THE STATE BAR CAN IMPOSE COSTS

7    AND THEN ANOTHER SUBSECTION SAID IT COULD WAIVE COSTS AND

8    THEN ANOTHER SUBSECTION SAID AND IT'S A FINE OR A PENALTY.

9        THE SECOND THING THAT THE COURT  -- THAT THE STATE BAR

10   SHOWED YOU BY WAY OF REQUEST FOR JUDICIAL NOTICE WAS THE

11   STATE BAR'S CALCULATIONS IN HOW THEY'RE CALCULATING THAT

12   COST STRUCTURE.

13       WHAT THE STATE BAR DIDN'T SHOW THIS COURT WAS THAT

14   THE CALIFORNIA SUPREME COURT OR THAT THE STATE LEGISLATURE

15   ACTUALLY REVIEWED THOSE COSTS ON AN ANNUAL BASIS.

16       THE STATE BAR ANNUAL FEE WHICH DOES HAVE PART OF A

17   DISCIPLINARY COST IN IT THAT ALL ATTORNEYS PAY FOR, THAT IS

18   REVIEWED ANNUALLY AND APPROVED BY THE LEGISLATURE.

19       BUT THE EVIDENCE THAT THEY'VE GIVEN  -- AND THIS IS AT

20   THE 12(B)(6) MOTION STAGE ON PLAUSIBILITY -- WHAT THE STATE BAR

21   HASN'T FURNISHED THIS COURT IS THEY HAVE NOT FURNISHED ANY

22   SHOWING OF OVERSIGHT.  THIS IS MORE LIKE THE *GOLDFARB* CASE.

23       THE GOLDFARB CASE, THERE THERE WAS NO STATE ACTION

24   BECAUSE IT STAYED WITHIN THE BOARD ITSELF WHAT THEY WERE

25   DOING.

1          AND HERE EVEN THE CALIFORNIA ATTORNEY GENERAL -- I

2     CITED A SECTION WHERE THE CALIFORNIA ATTORNEY GENERAL SAID IN

3     ORDER TO CONSIDER THIS TO HAVE OVERSIGHT -- YOU KNOW, THAT

4     THIS POLICY IS BEING OVER SOUGHT BY THE STATE, THEN, YOU NEED

5     TO SEE PARTICULARS.

6          AND THAT MAKES CALIFORNIA UNIQUE FROM THE OTHER

7     LONG LINE OF CASES.  LIKE, FOR EXAMPLE, IN THE ARIZONA STATE BAR

8     CASE, WE DON'T SEE WHAT THE ARIZONA ATTORNEY GENERAL SAID ON

9     WHEN YOU'RE CREATING STATUTES ON WHETHER THERE'S OVERSIGHT

10    OR NOT.

11         BUT WE DO KNOW HERE WHAT WE DON'T HAVE.  AND WE

12    DON'T HAVE ANYTHING PARTICULAR THAT THE STATE BAR BROUGHT

13    FORWARD SHOWING THAT EITHER THE ATTORNEY GENERAL, THE

14    CALIFORNIA SUPREME COURT OR THE STATE LEGISLATURE ARE

15    ACTUALLY LOOKING AT THIS PRICE STRUCTURE.

16         THE FACT THAT THEY SAID IT'S OKAY FOR THE STATE BAR TO

17    OBTAIN DISCIPLINARY COSTS IS ONE THING.  BUT WE'RE TALKING

18    ABOUT THE ACTUAL PRICE STRUCTURE, THE WAY IT'S THE REGRESSIVE

19    TAX, THE WAY IT'S ACTUALLY A BARRIER TO RE-ENTRY.

20         THAT CAN BE A  -- AN ATTEMPTED MONOPOLIZATION.  THAT

21    CAN BE A RESTRAINT ON TRADE IN ITSELF BECAUSE YOU SHOULD  --

22    UNDER ECONOMIC THEORY YOU SHOULD BE ABLE TO BUY ANYTHING,

23    RIGHT.  EVEN IF YOU GO INTO A MUSEUM YOU DON'T THINK THAT YOU

24    CAN BUY THE ART ON THE WALL.  BUT IF YOU HAD A BILLION DOLLARS, I

25    BET YOU COULD BUY THAT PIECE OF ART ON THE WALL IN SOME

1    CIRCUMSTANCES.

2         HERE  -- AND THAT IS AN ECONOMIC THEORY WHERE IF YOU

3    MAKE THE PRICE SO HIGH THAT YOU'RE CUTTING OFF EVERYONE ELSE,

4    THAT IS A TRUE BARRIER TO RE-ENTRY.

5         SO, THEY CAN'T ARGUE THAT THE ECONOMIC THEORY IS BAD

6    OR THAT THE EFFECT IS ANTICOMPETITIVE.  THEY'RE TRYING TO

7    CONVINCE THIS COURT WITH THIS PRICE CALCULATION THAT IS ONLY

8    DONE WITHIN THE BOARD ITSELF WITHOUT OVERSIGHT BY THE

9    CALIFORNIA SUPREME COURT OR BY THE LEGISLATURE THAT

10   SOMEHOW THIS MORE AMBIGUOUS STATUE  -- WHICH EVEN THE

11   CALIFORNIA ATTORNEY GENERAL OPINION SAYS IS NOT GOOD ENOUGH

12   TO BE CONSIDERED OVERSIGHT IS.

13        THEREFORE, I THINK THAT ON THE FIRST POINT ON THE NO

14   OVERSIGHT, MAYBE MY PAPER WASN'T CLEAR, BUT THAT'S ACTUALLY

15   WHAT'S HAPPENING.  BECAUSE IT NEEDS TO BE DEFINED TERMS IN

16   CALIFORNIA.

17        SECOND  --

18        THE COURT:  THE  --

19        MS. ALBERT:   OH  --

20        THE COURT:  GO AHEAD.

21        MS. ALBERT:  OKAY.

22        AND ON THE PARKER IMMUNITY, BECAUSE IT ISN'T LIKE THE

23   ANNUAL FEE BILL WHERE THE LEGISLATURE APPROVES IT, THIS  -- THIS

24   IS NOT APPROVED BY THE CALIFORNIA SUPREME COURT.

25        WHEN THERE ARE DISCIPLINARY ORDERS, THE CALIFORNIA

1     SUPREME COURT DOESN'T EVEN SEE THE MONETARY AMOUNT.  SO,

2     IT'S NEVER EVEN APPROVED ON AN INDIVIDUAL BASIS BY THE

3     CALIFORNIA SUPREME COURT.  THERE'S NO KNOWLEDGE ANYWHERE

4     OTHER THAN WITHIN THE BOARD OF THE STATE BAR ON WHAT THAT

5     COST STRUCTURE IS.

6               AND BECAUSE OF THAT THERE SHOULD BE NO PARKER

7     IMMUNITY.

8               THE COURT:  ALL RIGHT.  VERY GOOD.  THANK YOU.

9               MR. ANDERSON, DO YOU WANT TO BE HEARD ON THE PARKER

10    ARGUMENT WITH RESPECT TO THE DISCIPLINARY THEORY?

11              MR. ANDERSON:  YES, YOUR HONOR.

12              THE COURT:  YOU CAN ALSO BE HEARD WITH RESPECT TO

13    THE COVER-UP THEORY.  ALTHOUGH, I -- I'M HAVING A HARD TIME

14    SEEING HOW PARKER IMMUNITY WOULD EXTEND TO THE COVER-UP

15    THEORY.  BUT IF YOU WANT TO TAKE A SHOT AT THAT, YOU MAY.

16              MR. ANDERSON:  OKAY.  YES, YOUR HONOR.

17              I'LL START FIRST COUNSEL JUST MADE A REPRESENTATION

18    TO THE COURT THAT THE CALIFORNIA SUPREME COURT DOES NOT SEE

19    COST AWARDS AS PART OF INDIVIDUAL DISCIPLINARY ORDERS.

20              AND YOUR HONOR HAS SHOWN BY THE STATUTORY

21    STRUCTURE HERE AS SHOWN BY THE DOCUMENTS THAT THE STATE

22    BAR SUBMITTED THAT ARE SUBJECT TO JUDICIAL NOTICE IT'S CLEAR

23    THAT THE CALIFORNIA SUPREME COURT DOES REVIEW EACH OF THESE

24    ORDERS INDIVIDUALLY.  AND ATTORNEYS HAVE THE ABILITY TO

25    CHALLENGE THOSE SPECIFIC COST AWARDS.

1       THAT ALONE ANSWERS THE COURT'S INQUIRY HERE.

2       THE STATUTORY STRUCTURE FROM THE STATE LEGISLATURE

3   SAYS THAT DISCIPLINARY COSTS SHALL BE AWARDED.

4       THE CALIFORNIA SUPREME COURT THROUGH ITS AGENCY

5   THROUGH THE CONSTITUTIONAL ENTITY, THE STATE BAR, HAS

6   ESTABLISHED A DISCIPLINARY COST SHEET.  THOSE COSTS ARE

7   ASSESSED.  THEY BECOME PART OF THE ORDER WHICH IS THEN

8   REVIEWED AT THE END BY THE CALIFORNIA SUPREME COURT.

9       CLEARLY, THIS MEETS THE TWO FACTORS OF PARKER

10  IMMUNITY.

11      YOU KNOW, WITH RESPECT TO THE IDEA THAT THE

12  DISCIPLINARY COST SHEET ITSELF IS NOT APPROVED, YOUR HONOR,

13  WE DID SUBMIT THE ANTITRUST POLICY THAT THE CALIFORNIA

14  SUPREME COURT APPROVED.

15       UNDER THAT POLICY ANY ACTION THAT THE CALIFORNIA

16  SUPREME COURT TAKES THAT MIGHT HAVE AN IMPACT IN THE

17  ANTITRUST AREA MIGHT HAVE AN ANTICOMPETITIVE IMPACT.

18      CALIFORNIA SUPREME COURT HAS ABSOLUTE AUTHORITY

19  OVER THAT, CAN REVIEW THAT SUA SPONTE.

20      THE OFFICE OF GENERAL COUNSEL IS REQUIRED TO ASSESS

21  ALL OF THESE ACTIONS.  CERTAINLY, THIS COST SHEET HAS BEEN AND

22  IS UNDER THE SUPERVISION OF THE CALIFORNIA SUPREME COURT.

23      SO, THOSE ARE THE – THOSE ARE THE TWO ITEMS THAT I

24  WANTED TO NOTE ON THE SECOND THEORY, THE DISCIPLINARY

25  THEORY OF PRICE FIXING.

1          I ALSO WANTED TO JUST MAKE SURE THAT  -- THAT THE

2    COURT WAS AWARE THAT WE ALSO AGREE THAT THE GOLDFARB CASE

3    DOES NOT APPLY ON ITS FACTS HERE.  IT DOES NOT APPLY ON THE

4    THEORY OF THAT CASE.

5          IN THAT CASE AS THIS COURT RECOGNIZED IN THE DISMISSAL

6    ORDER, YOU HAD A SITUATION WHERE A COUNTY BAR WAS CREATING A

7    MINIMUM COST SHEET AND, THEN, THROUGH STATE BAR

8    PRONUNCIATIONS ENFORCING IT ON LOCAL ATTORNEYS WHO THEN

9    WOULD NOT OFFER PRICES BELOW THAT MINIMUM COST SHEET.

10          YOU'VE GOT NOTHING AT ALL RESEMBLING THAT HERE.

11          YOU HAVE A LEGISLATIVE ENACTMENT.  YOU HAVE THE

12    CALIFORNIA SUPREME COURT SUPERVISING THESE ORDERS.  YOU

13    DON'T' HAVE IN THIS CASE A BROAD MINIMUM PRICE OR ANY SORT OF

14    PRICE THAT IS ASSIGNED TO ATTORNEYS WRIT LARGE.  THEY ARE VERY

15    INDIVIDUALIZED AWARDS THAT ARE REVIEWED ON THAT BASIS.

16          SO, I WANTED TO DISTINGUISH GOLDFARB FOR YOU AS WELL.

17          SO, UNLESS THERE'S ANY FURTHER QUESTIONS ON THE

18    DISCIPLINARY THEORY, I CAN TAKE A WHACK AT THE COVER-UP

19    THEORY IF YOU'D LIKE.

20          THE COURT:  YEAH.  TAKE A  -- TAKE A WHACK AT IT IF YOU

21    WILL.

22          MR. ANDERSON:  SURE.

23          THE COURT:  I DON'T MIND THAT.

24          YOU KNOW, THE DIFFICULTY FOR ME HERE IS I WANT TO

25    SEPARATE  -- WE NEED TO SEPARATE POSSIBLE OBVIOUSLY ANTITRUST

1    LIABILITY VERSUS LIABILITY ON OTHER THEORIES WHICH WE ARE NOT

2    REALLY GOING TO TALK ABOUT NOW.

3              MR. ANDERSON:  YES, YOUR HONOR.

4              THE COURT:  SO  -- I'LL TRY TO KEEP THAT IN MIND  -- I'LL TRY

5    TO KEEP THAT IN MIND AS WE TALK ABOUT IT.

6              GO AHEAD.

7              MR. ANDERSON:  YES, YOUR HONOR.

8              YOUR HONOR, WE VIEW THE COVER-UP THEORY  -- AND

9    ADMITTEDLY, YOU KNOW, WE'VE READ THE SECOND AMENDED

10   COMPLAINT AS WELL.

11             WE MIGHT HAVE DIFFERENT IDEAS ABOUT WHAT EXACTLY

12   THIS THEORY IS GETTING AT.  BUT FROM – FROM OUR UNDERSTANDING

13   OF WHAT THE COVER-UP THEORY IS IS IT'S SIMPLY REPLEADED

14   THEORY THAT PLAINTIFFS PRESENTED IN THEIR FIRST AMENDED

15   COMPLAINT.

16             IT'S THIS IDEA THAT THE STATE BAR THROUGH ITS RULES IS

17   ATTEMPTING TO FAVOR SOLO  -- OR EXCUSE ME, LARGE FIRM

18   PRACTITIONERS OVER SOLO PRACTITIONERS.

19             IN THIS INSTANCE, YOUR HONOR, AS YOU FOUND IN THE

20   DISMISSAL ORDER AT THE BEGINNING, SUCH A THEORY STRIKES AT

21   THE DISCIPLINARY PROCESS AS A WHOLE.  AND THAT CHALLENGE --

22   THAT CHALLENGE TO THE WAY THE STATE BAR RUNS THAT

23   DISCIPLINARY PROCESS IS A CHALLENGE THAT IS IMMUNIZED BY

24   PARKER IMMUNITY.

25             AND THAT'S HOW WE VIEW THE COVER-UP THEORY.  IT'S

1    NOTHING MORE THAN AN ATTEMPT TO REARRANGE THE DECK CHAIRS,

2    SO TO SPEAK, ON A THEORY THAT THIS COURT HAS ALREADY FOUND

3    THAT THE STATE BAR IS IMMUNE FROM.

4           THE COURT:  BUT WHAT IF  -- WHAT IF YOU VIEW THE

5    COVER-UP THEORY -- AND I'M GOING TO PUT WORDS IN MS. ALBERT'S

6    MOUTH.  AND IF SHE WANTS TO DISPUTE THOSE SHE CAN IN A MOMENT.

7           WHAT IF YOU VIEW THE COVER-UP THEORY AS MORE LIMITED

8    -- WHICH WAS THAT -- AND I'M SPIT BALLING HERE SO I MAY NOT BE THE

9    MOST ARTICULATE  -- WHAT IF YOU VIEWED IT AS JUST BY  -- BY

10   COVERING UP THE DATA BREACH THAT WOULD HAVE SOME

11   PERNICIOUS EFFECTS ON PEOPLE'S WILLINGNESS  -- I THINK AS MS.

12   ALBERT WOULD ARGUE -- TO PARTICIPATE IN THE DISCIPLINARY

13   PROCESS OR MAKE THE DISCIPLINARY PROCESS WORK DIFFERENTLY.

14          AND THAT WOULD HAVE SOME ANTI-COMPETITIVE EFFECT

15   WITHOUT ACTUALLY GETTING INTO THE DETAILS OF THIS DISCIPLINARY

16   PROCEEDING OR THAT DISCIPLINARY PROCEEDING.

17          MR. ANDERSON:  WELL, YOUR HONOR, SETTING ASIDE THAT

18   WE DON'T THINK THERE'S SUFFICIENT FACTS PLED TO ACTUALLY

19   SUPPORT SUCH A THEORY.

20          THE COURT:  WE'LL GET TO THAT IN A MOMENT.

21          MR. ANDERSON:  YEAH.

22          SETTING THAT ASIDE THEN, AT THIS POINT AS YOUR HONOR

23   RECOGNIZED BY VIRTUALLY TRYING TO EXPLAIN IT, IT ALL ARISES FROM

24   THIS DISCIPLINARY PROCESS.   IT ARISES FROM THE STATE BAR'S

25   IMPLEMENTATION OF THAT PROCESS, THE USE OF THE ODYSSEY

1    PORTAL IN FURTHERANCE OF THAT PROCESS.  IT'S ALL WRAPPED UP

2    AND ARISES FROM THE STATE BAR'S RULES AND HOW THEY PROCESS

3    THESE DISCIPLINARY ACTIONS.

4           AND, SO, YOUR HONOR, WE THINK THAT VIEWING IT TOO

5    NARROWLY ISN'T THE PROPER WAY TO VIEW IT.

6           JUST AS WITH THESE OTHER EXAMPLES OF COURTS

7    IMMUNIZING THE STATE BAR  -- FOR INSTANCE, FOR ADVERTISING

8    UNDER THE <u>BATES</u> CASE IN ARIZONA.

9           YOU HAVE EXAMPLES OF CHALLENGES BROADLY TO THESE

10   DISCIPLINARY PROCESSES THAT ARE IMMUNIZED.  AND THAT'S WHAT

11   WE THINK IS HAPPENING HERE.

12           THE COURT:  OKAY.  THANK YOU.

13           LET'S TURN THEN NEXT TO ANOTHER CONCERN I HAVE.  AND

14   IT'S ANOTHER CONCERN THAT I THINK IS FOCUSED ON THE DISCIPLINE

15   THEORY AS OPPOSED TO THE COVER-UP THEORY WHICH IS THE

16   DISCIPLINARY THEORY  -- THE DISCIPLINE THEORY WOULD REQUIRE AS

17   ALL  -- ALL SECTION 1 CLAIMS DO SOME SORT OF CONCERTED ACTION.

18           AND I AM CONCERNED ABOUT WHETHER THE STATE BAR  --

19   BECAUSE I THINK THE STATE BAR IS THE ACTOR UNDER THE DISCIPLINE

20   THEORY -- IS CAPABLE OF CONCERTED ACTION.

21           SO, LET ME ASK YOU TO RESPOND TO THAT, MS. ALBERT.

22           MS. ALBERT:  SURE.

23           SO, I KNOW THAT THEY  -- I BELIEVE THE COURT IS GOING TO

24   THE SINGLE ENTITY RULE.  AND WITH THE CONCERTED ACTION WHEN

25   WE'RE TALKING ABOUT --

1       AND I BELIEVE THE COURT IS NOW – IS THE COURT FOCUSED

2    ON THE PRICE FIXING?  I WANT TO MAKE SURE I'M ON THE RIGHT ONE.

3       THE COURT:  WELL, AS I UNDERSTAND THE DISCIPLINE

4    THEORY IS THAT THE WAY I'VE CHARACTERIZED IT AS THE DISCIPLINE

5    THEORY IS THAT THE STATE BAR IS RESTRAINING TRADE BY ENGAGING

6    IN A FORM OF PRICE FIXING BY -- BY THE DISCIPLINARY COST SHEET

7    AND THAT STRUCTURE.

8       AND, SO, YEAH, I THINK IT'S A PRICE FIXING  --

9       MS. ALBERT:  OKAY.

10      THE COURT:  -- THEORY IN MY VIEW.  AND -- AND YOU COULD

11   TELL ME IF YOU THINK IT'S DIFFERENT.

12      MS. ALBERT:  OKAY.

13      YEAH.  SO  -- WELL, IT CAN BE  -- YOU CAN LOOK AT IT AS

14   PRICE FIXING WHICH THAT'S WHAT WE DESIGNATE IT AS.  OR YOU CAN

15   EVEN LOOK AT AS A GROUP BOYCOTT LIKE  -- LIKE THE SMILE DENTAL

16   CASE, RIGHT.

17      SO, THE CONCERTED ACTION HERE -- THIS IS LIKE – MORE

18   LIKE THE *SMILE DENTAL CARE* CASE AND A FEW OF THE OTHER ONES.

19      I BELIEVE THAT I ALSO TALKED ABOUT THE CALIFORNIA

20   ATTORNEY GENERAL OPINION AND THE CTA CASE.

21      SO, BECAUSE I BRIEFED THE CTA CASE FOR THE COURT, I

22   THINK WE SHOULD GO TO THAT ONE.  THAT'S THE CALIFORNIA

23   TEACHER'S ASSOCIATION.

24      AND IN THAT CASE THE BOARD THERE WAS DISCIPLINING

25   TEACHERS.  AND THEY HAD A COST SHEET.  THERE THEY WERE MAKING

1    THE TEACHERS WHO WANT TO DEFEND THEMSELVES PAY HALF OF THE

2    COSTS.  IF YOU WANTED TO DEFEND, YOU HAD TO PAY HALF THE

3    COSTS.

4         HERE IN THIS CASE IF YOU WANT TO DEFEND, AND YOU LOSE

5    ANYTHING, YOU PAY ALL THE COSTS WITH ATTORNEYS.  OKAY.

6         BUT THEY BOTH HAVE MANDATORY COSTS.

7         THE CALIFORNIA SUPREME COURT SAID THAT THAT WAS

8    UNCONSTITUTIONAL BECAUSE YOU CAN'T MAKE SOMEONE PAY TO

9    DEFEND THEMSELVES ESPECIALLY ON THEIR OWN LICENSE.

10        AND THERE WAS NO IMMUNITY OF THAT BOARD IN THE

11   CALIFORNIA TEACHER'S ASSOCIATION CASE.  OBVIOUSLY, IT WAS A

12   DIFFERENT KIND OF IMMUNITY.  BUT STILL THERE WAS NO IMMUNITY

13   BECAUSE EVEN THOUGH IT'S ONE BOARD THEY ARE PEOPLE WHO

14   PARTICIPATE -- THE BOARD IS MADE UP OF DIFFERENT INDIVIDUALS,

15   RIGHT  -- SO, IN THE CTA CASE, IT DIDN'T MATTER THAT IT WAS ONE

16   BOARD.

17        SAME WITH THE SMILE DENTAL CASE WHICH WAS -- THAT WAS

18   JUST IN THE NINTH CIRCUIT JUST A COUPLE OF MONTHS AGO.  IT CAME

19   OUT LAST YEAR.  -- SMILE DENTAL  -- SMILE DIRECT CLUB VERSUS

20   TIPPINS.

21        AND IN THERE THE NINTH CIRCUIT SAID THAT THE DENTAL

22   BOARD  -- THE DENTAL BOARD WAS REGULATING THE CONDUCT.  THEY

23   WERE TRYING TO PUSH SMILE DIRECT CLUB, YOU KNOW, OUT OF THE

24   DENTAL PRACTICE AREA.  THAT WAS THE ALLEGATIONS.

25        AND THE NINTH CIRCUIT SAID THERE'S NO PARKER IMMUNITY

1    HERE.

2            AND WE SEE THIS UNDER TWO THEORIES  --

3            THE COURT:  THIS ISN'T REALLY A PARKER IMMUNITY ISSUE.

4    IT'S A  -- IT'S A  -- IT'S A CONCERTED ACTION ISSUE.  THERE'S  -- THERE'S

5    --

6            I THINK TO SOME EXTENT I'M ASSUMING THAT YOU'VE BEEN

7    ABLE TO GET THAT PAST THE PARKER IMMUNITY NATIONAL -- I'M

8    SORRY.  I KEEP SAYING NATIONAL  -- NORTH CAROLINA BOARD OF

9    DENTAL EXAMINERS TEST.  YOU KNOW, THAT WAS ALSO A DENTAL

10    BOARD AND DEALT WITH SIMILAR ISSUES ABOUT DENTAL PRACTICE.

11           HERE THE ISSUE IS WHO ARE THE – WHO  -- WHO  -- WHO --

12    WHO ARE THE CONSPIRATORS, WHO ENGAGED IN CONCERTED ACTION.

13           I DON'T SEE ANYTHING IN THE SECOND AMENDED COMPLAINT

14    THAT DEMONSTRATES THE STATE BAR IS CAPABLE OF CONCERTED

15    ACTION.

16           EXPLAIN TO ME HOW THAT'S POSSIBLE.

17           MS. ALBERT:  WELL, BECAUSE THEY ARE INDIVIDUAL BOARD

18    MEMBERS.  IF WE LOOK AT THE ACTUAL COMPLAINT, WE HAVE A DOE 1

19    THROUGH 4 THAT'S ALSO ALLEGED IN THERE.

20           BECAUSE WE'RE AT THE PLEADING STATION  -- A PLEADING

21    STAGE, WE DIDN'T ACTUALLY NAME WHO DOE 1 THROUGH 4 IS.

22           THE COURT:  AND IS YOUR THEORY THAT THOSE ARE

23    INDIVIDUAL BOARD MEMBERS OR  --

24           MS. ALBERT:  THAT'S WHAT WE BELIEVE, THAT THEY'RE

25    INDIVIDUAL BOARD MEMBERS.

1           HOWEVER, WITH EXPERIENCE WITH THE STATE BAR,

2 SOMETIMES NOTHING CAN SURPRISE YOU.

3           SO, THE THEORY IS THAT THOSE ARE INDIVIDUAL BOARD

4 MEMBERS --

5           THE COURT:  WELL, YOUR COMMENT THERE PUSHES A

6 BUTTON THAT TROUBLES ME.

7           THIS IS A CASE ABOUT A DATA BREACH THAT OCCURRED.

8           AND IN MY MIND THAT'S THE DOG.

9           MS. ALBERT:  THAT'S TRUE.

10           THE COURT:  YOUR EFFORT TO TURN THIS INTO A WIDER

11 FIGHT ABOUT THE STATE BAR AND ITS GOVERNANCE AND ITS

12 DISCIPLINARY PROCESS AT BEST IT'S THE TAIL.

13           MS. ALBERT:  TRUE.

14           THE COURT:  WHY ARE WE DOING THAT?

15           MS. ALBERT:  WELL, IT'S BECAUSE  -- WELL, NUMBER ONE,

16 LOOKING AT THE HARMS THAT ARE CAUSED BY THE DATA BREACH, IT

17 ISN'T THAT THERE WASN'T HARM ALREADY THERE FROM THIS COST

18 SHEET.  BUT BECAUSE OF THE DATA BREACH, IT'S EXASPERATED THAT

19 HARM TO THE ATTORNEYS.

20           THE  -- THE  --

21           THE COURT:  BUT WHY  -- WHY  --

22           MS. ALBERT:  WE DON'T HAVE TO.  BUT BECAUSE IT'S HERE,

23 IT'S HERE.

24           JUST LIKE THERE WAS CHOOSING ON THIS DATA BREACH

25 BECAUSE THERE WERE ALL THESE STATE AGENCIES ALSO THAT

1    SUFFERED THE SAME DATA BREACH.  BUT WE CHOSE THIS CASE,

2    RIGHT, WITH THE ATTORNEYS AND THE STATE BAR TO THE EXCLUSION

3    OF THE OTHER GOVERNMENT AGENCIES.

4            BUT HERE THERE IS A HARM BECAUSE THERE'S ALREADY A

5    BARRIER TO REENTRY.

6            BUT NOW, FOR EXAMPLE, JUST HYPOTHETICALLY SPEAKING,

7    THERE IS AN ATTORNEY WHO HAD CONFIDENTIAL INVESTIGATIONS

8    OPPOSITE OF A TOM GIRARDI BUT SOMEONE WHO WAS JUST -- HAD

9    FRIVOLOUS ALLEGATIONS AGAINST HIM THAT WERE CONFIDENTIAL OR

10   EXPUNGED CRIMINAL RECORDS.  AND WE'RE LOOKING AT THIS COST OF

11   INVESTIGATION.

12           NOW, ALL OF THAT GOT BREACHED OUT THERE.

13           THE STATE BAR COMES KNOCKING ON THEIR DOOR AGAIN.

14   ARE THEY WILLING TO GIVE OVER THOSE RECORDS.  NO.  THAT IS THE

15   OTHER THEORY.  BUT NOW YOU COMPOUND IT BECAUSE WE HAVE TO

16   TALK ABOUT THE REAL WORLD HERE.

17           SO, THE STATE BAR MAKES IT MORE EXPENSIVE TO GO.

18   THEY'RE GOING TO INCREASE THAT COST SHEET.  THEY'RE GOING TO

19   MAKE IT EVEN MORE REGRESSIVE.

20           IF THEY COME AFTER THAT ATTORNEY ON A PUBLIC FORUM

21   WHERE THAT ATTORNEY DECIDES TO DEFEND THERE'S GOING TO BE A

22   TRUE  --

23           THE COURT:  ALL RIGHT.  SO NOW WE'RE –

24           MS. ALBERT:  -- BARRIER.

25           THE COURT:  -- JUMPING AT  -- WE'RE JUMPING AHEAD TO MY

1    NEXT CONCERN, WHICH IS YOU HAVE TO SHOW THAT THERE IS A

2    RESTRAINT ON TRADE.

3         LET'S GO BACK  -- LET'S NOW SHIFT GEARS TO THE

4    COVER-UP THEORY BECAUSE I THINK THAT'S  -- THAT'S WHERE THIS IS

5    A PROBLEM.

6         YOU HAVE TO SHOW THAT THAT RESTRAINT ON TRADE HAS A

7    SUBSTANTIAL ANTI-COMPETITIVE EFFECT THAT HARMS THE

8    CONSUMERS IN THE RELEVANT MARKET.

9         MS. ALBERT:  RIGHT.

10        THE COURT:  YOU CAN DO A NUMBER OF DIFFERENT WAYS.

11   BUT YOU HAVE TO HAVE FACTUAL ALLEGATIONS TO SUPPORT YOUR  --

12   THE COMPLAINT -- TO SUPPORT YOUR CLAIM.

13        WHAT YOU HAVE AND WHAT YOU STARTED TO DO JUST

14   THERE IS YOU STARTED TO  -- TO SPECULATE.  YOU STARTED TO MAKE

15   CONCLUSORY ALLEGATIONS.

16        MS. ALBERT:  THERE IS ONE MATERIAL FACT WHICH ALREADY

17   SHOWS HARM.  AND THAT WAS THE SURVEY THAT WAS DONE AFTER

18   THE BREACH OF ATTORNEYS.

19        IN OVER 68 PERCENT -- THAT MEANS OVER A MAJORITY OF

20   THOSE WHO WERE SURVEYED -- SAID THAT THEY WERE NOT WILLING

21   TO SHARE CONFIDENTIAL INFORMATION WITH THE STATE BAR BECAUSE

22   NOW THEY DON'T TRUST THEM.

23        THIS IS THE  -- THIS IS THE CLASSIC CASE OF THIS DOES

24   INCREASE THE COST TO INVESTIGATION.

25        IT WOULD BE THE SAME THING AS IF  --

1        THE COURT:  WHAT ARE THE FACTS THAT SHOW THAT THIS

2    DOES INCREASE THE COST OF INVESTIGATION?

3        MS. ALBERT:  WELL, THE FACTS ARE IF THE PERSON IS NOT

4    VOLUNTARILY GOING TO SUBMIT THE INFORMATION  --

5        THE COURT:  YOU DON'T KNOW  -- I'M NOT  --

6        MS. ALBERT:  -- THEN THIS  --

7        THE COURT:  AGAIN, YOU'RE  -- THAT'S A  -- IS THAT A

8    REASONABLE INFERENCE?  MAYBE.  IS IT SPECULATION?  MAYBE.

9        WHAT YOU'RE ASKING THE COURT TO DO  -- AND THIS GOES

10   BACK TO I GUESS MY SORT OF FUNDAMENTAL CONCERN WHAT I

11   EXPRESSED A MINUTE AGO  -- WHY ARE WE DOING THIS TO YOUR DATA

12   BREACH CASE?  WHY ARE WE TRYING TO MAKE YOUR DATA BREACH

13   CASE CARRY THIS WEIGHT?

14       MS. ALBERT:  YOU'RE RIGHT.  THE DATA BREACH CASE IS

15   VALID ON ITS OWN WITHOUT AN ANTITRUST CLAIM.

16       YOU ARE  -- THE COURT IS CORRECT.

17       HOWEVER, THAT DOESN'T MEAN THAT THERE ISN'T

18   ANTICOMPETITIVE HARM.

19       AM I  -- ARE THE PLAINTIFFS WORRIED THAT THE WHOLE CASE

20   GOES AWAY IF WE DON'T HAVE ANTITRUST CLAIM.  NO.

21       BUT AT THE SAME TIME THE -- UNDER TWOMBLY THE

22   STANDARD IS IS IT PLAUSIBLE, WHICH MEANS IS IT REASONABLE TO

23   BELIEVE THIS.

24       AND WE CAN USE OUR LOGIC AND COMMON SENSE WHEN IT

25   COMES TO WHAT'S REASONABLE.

1          THE COURT:  OKAY.  SO, NOW, LET'S – LET'S TALK ABOUT

2     ANOTHER INFERENCE YOU WANT ME TO MAKE.

3          YOU WANT ME TO MAKE THE INFERENCE THAT THESE

4     ANTI-COMPETITIVE EFFECTS ARE GOING TO BE BORNE BY ONLY A

5     PORTION OF STATE BAR MEMBERS WHICH YOU CALL "THE PEOPLE LAW

6     MARKET."

7          AGAIN, I DON'T SEE ENOUGH ALLEGED TO TELL ME THAT THAT

8     MARKET DEFINITION YOU'RE ASKING THE COURT TO ADOPT HAS FACTS

9     THAT WOULD ALLOW ME TO DEFINE THE MARKET FOR LEGAL SERVICES

10    IN THE WAY YOU DEFINE IT.

11         MS. ALBERT:  WELL, I DIDN'T COME UP WITH THE DEFINITION

12    OF PEOPLE LAW MARKET.  OTHER ECONOMISTS AND EVEN THE STATE

13    BAR ADOPTED IT IN A 2014 REPORT.

14         BUT THE NINTH CIRCUIT HAS SAID THAT THEY DON'T WANT

15    COURTS TO GET HUNG UP ON DEFINING WHAT THE MARKET IS WHEN

16    THERE'S A DETRIMENTAL EFFECT.

17         AND THE COURT IS CORRECT.  WE DO SEE THIS DETRIMENTAL

18    EFFECT ON THE PEOPLE LAW MARKET AS ALLEGED.

19         HOWEVER, THERE ARE TWO OTHER EFFECTS THAT ARE ALSO

20    ALLEGED  -- ATTORNEYS AS A WHOLE  -- BECAUSE IT IS ALLEGED THAT

21    STATE BAR – A PORTION OF STATE BAR DISCIPLINARY COSTS ARE

22    ADDED INTO THE ANNUAL LICENSING BILL.  EVERYBODY PAYS A

23    PORTION.  THAT'S PART OF YOUR ANNUAL LICENSE.

24         NUMBER TWO, IT'S AN EFFECT ON THE PUBLIC.

25         NOW, THESE ARE NOT ECONOMIC MODELS I MADE UP.  BUT

1    IT'S THE PLEADING STAGE.  SO, I DIDN'T BRING IN THE DECLARATIONS

2    OF TWO DIFFERENT ECONOMIC EXPERT FIRMS THAT DREW UP THESE

3    MODELS.

4         BUT THERE'S ALSO GOING TO BE AN EFFECT WHEN NOW

5    WE'RE LOOKING AT THE FORECASTING.

6         THERE ALREADY IS AN EFFECT ON THE ATTORNEYS, RIGHT.

7    THEY DON'T WANT TO GIVE THE INFORMATION FOR INVESTIGATION.

8    THEY DON'T TRUST THE STATE BAR ANYMORE.  THAT IS A HARM.

9         THAT IS A HARM THAT ACTUALLY THE CALIFORNIA

10   LEGISLATURE HAS RECOGNIZED SINCE 1977 IN THE INFORMATION

11   PRACTICES ACT.  THAT'S WHY THEY CREATED THAT, RIGHT.

12        AND THE U.S. SUPREME COURT AND THE NINTH CIRCUIT HAS

13   SAID IN ANTITRUST CASES YOU LOOK TO SEE HARMS.  YOU LOOK TO

14   SEE IF THE LEGISLATURE THINKS IT'S A HARM.

15        WELL, OBVIOUSLY THEY DO.  THEY WOULDN'T HAVE CREATED

16   THE INFORMATION PRACTICES ACT IF THEY DIDN'T.

17        NUMBER TWO, THOUGH, ALSO THE PUBLIC BECAUSE UNDER

18   THE ECONOMIC MODEL NOW WHEN WE GO TO THE FORECASTING IS IT

19   PLAUSIBLE.  IS IT PLAUSIBLE THAT THIS WILL CREATE SUCH A BARRIER

20   THAT THE LOWEST FORM OF LEGAL SERVICES WHERE THE REGULAR

21   AVERAGE EVERYDAY AMERICAN THEY CAN NO LONGER AFFORD IT

22   BECAUSE IT'S GOING TO INCREASE THE COST OF REPRESENTATION.

23   AND THAT'S WHAT THAT MODEL SHOWS.

24        AND I KNOW IT'S A COMPLEX MODEL BECAUSE WE'VE GOT  --

25   WE HAVE THREE DIFFERENT  -- IF YOU WANT TO CALL THEM DIFFERENT

1    GROUPS  -- WE HAVE ATTORNEYS AT LARGE WHO ARE GOING TO GET

2    HARMED WITH HIGHER COSTS.

3         THE STATE BAR IS GOING TO BE BURDENED BECAUSE IT'S

4    GOING TO BE HIGHER COSTS TO INVESTIGATE WHICH THEY'RE GOING

5    TO PUSH OFF ON ALL THE ATTORNEYS TO A CERTAIN EXTENT.

6         AND THEN WE HAVE THE ACTUAL SMALL MARKET, THE

7    PEOPLE'S MARKET ATTORNEYS, WHO ARE GOING TO GET AT THE

8    LOWEST END PUSHED OUT OF THE BUSINESS.

9         AND THEN IT'S GOING TO HURT AND AFFECT NOT JUST

10   COMPETITION BECAUSE IT WILL ALSO HURT THE PUBLIC BECAUSE NOW

11   THEY'RE GOING TO HAVE TO GO IN MORE OF THEM THAN ALREADY DO

12   NOW TO REPRESENT THEMSELVES.

13        THAT'S THE ECONOMIC MODEL.

14        THAT IS THE THEORY.

15        THE COURT:  AND  -- AND IS IT THE THEORY THAT WHEN THE

16   BAR AND TYLER TECHNOLOGIES AS YOU ALLEGE CONSPIRED TO

17   RESTRAIN TRADE BY COVERING UP THE DATA BREACH, THAT THAT WAS

18   -- THAT THE COVER-UP WAS DESIGNED TO HAVE THAT

19   ANTI-COMPETITIVE EFFECT?

20        OR WAS IT JUST THE COVER-UP WAS TO PROTECT THEIR

21   RESPECTIVE REPUTATIONS?

22        MS. ALBERT:  YES, YOUR HONOR.  IT'S THE LATTER.

23        IT ISN'T THAT TYLER TECHNOLOGY AND THE STATE BAR WERE

24   LIKE, OH, THIS IS THE WAY WE'RE GOING TO AFFECT THE WAY LEGAL

25   SERVICES ARE PROVIDED IN THE STATE OF CALIFORNIA.  THAT WASN'T

1    THEIR IDEA.

2            THEIR IDEA WAS THAT WE'RE GOING TO PROTECT AND

3    PRESERVE OUR REPUTATION AT ANY COST.

4            BUT BY ACTING AS ONE ECONOMIC UNITY, THE TWO OF THEM

5    TOGETHER WHEN THEY DID THAT, THEY CAUSED THE ECONOMIC HARM.

6            AND THIS IS THE ECONOMIC HARM THEY CAUSED.

7            THEY DON'T HAVE TO INTEND TO INFLICT THE HARM THAT IS

8    ACTUALLY CAUSED.  THAT ISN'T WHAT THE ANTITRUST ELEMENTS

9    REQUIRE.  THEY ONLY REQUIRE THAT THE CONDUCT THAT THEY DO DO

10    WHEN THEY CONSPIRE TOGETHER TO BE UNLAWFUL.  AND IT IS

11    UNLAWFUL TO COVER UP A DATA BREACH.

12            THE COURT:  ALL RIGHT.  WE'VE RANGED FAR AFIELD.

13            LET ME GIVE MR. ANDERSON A CHANCE TO WEIGH IN ON ANY

14    OF THESE TOPICS.

15            (PAUSE IN PROCEEDINGS.)

16            MR. ANDERSON:  THANK YOU, YOUR HONOR.

17            I THINK I'D LIKE TO START BY  -- UNLESS THERE'S A QUESTION

18    THAT YOU'D LIKE TO  --

19            THE COURT:  NO.

20            MR. ANDERSON:  -- START WITH.

21            I'D LIKE TO START WITH WHAT COUNSEL SAID, THAT THERE

22    WAS ONE MATERIAL FACT IN THE SECOND AMENDED COMPLAINT.

23            AND YOUR HONOR ASKED SEVERAL TIMES FOR ADDITIONAL

24    MATERIAL FACTS.  AND COUNSEL WAS UNABLE TO PROVIDE THEM.

25            SO, I'D LIKE TO FOCUS ON THAT ONE AND EXPLAIN WHY THAT

1    DOES NOT SHOW ANY SORT OF COVER-UP.  IT CAN'T BE PLAUSIBLY

2    USED TO  -- TO SHOW A COVER-UP.  AND THAT MATERIAL FACT IS A

3    SURVEY THAT ALLEGEDLY SHOWS THAT 68 PERCENT OF RESPONDENTS

4    ARE LESS WILLING TO SHARE INFORMATION WITH THE STATE BAR.

5              AND COUNSEL WANTS THE COURT TO TAKE THIS ONE SURVEY

6    AND USE IT TO INFER THAT THERE'S A VAST COVER-UP, AND THAT

7    TYLER TECHNOLOGIES AND THE STATE BAR HAVE REACHED SOME

8    SORT OF AGREEMENT.  AN ELEMENT OF A SECTION 1 CLAIM IS THE

9    EXISTENCE OF AN AGREEMENT, AND THAT THE AGREEMENT WAS AN

10   UNREASONABLE RESTRAINT OF TRADE.

11             AND THIS SURVEY SIMPLY CAN'T SUPPORT EITHER OF THOSE

12   ELEMENTS ON ITS OWN.

13             SO, THAT'S ONE I THINK VERY FUNDAMENTAL ISSUE WITH THE

14   COVER-UP THEORY AND FRANKLY DISPOSES OF IT RIGHT THERE.

15             YOU KNOW, I HEARD AN AWFUL LOT FROM COUNSEL.

16             I COULDN'T QUITE MAKE HEADS OR TAILS OF SOME OF THE

17   THEORIES THAT I'VE HEARD.

18              BUT ONE OF THE THINGS THAT I THINK IS IMPORTANT IS THAT

19   THE ANTITRUST HARM ALLEGED  -- AND THIS GOES FOR BOTH THE

20   SECTION 1 AND SECTION 2 CLAIMS, YOUR HONOR --  IS THAT IT MUST BE

21   A HARM TO COMPETITION.

22             WE'VE CITED SOME CASES IN OUR BRIEFING.  I THINK

23   NOVATION VENTURES IS ONE THAT'S PARTICULARLY HELPFUL ON THIS

24   POINT WHERE EVEN IF THERE'S SOME ALLEGED HARM TO OTHER

25   ENTITIES  -- CONSUMERS, THAT ITSELF WOULD NOT BE SUFFICIENT TO

1    SHOW A CAUSAL ANTITRUST INJURY, ESPECIALLY IF THE INJURY

2    ALLEGED ACTUALLY HELPS COMPETITORS IN THE MARKET.

3    SO, I'D POINT OUT THE COURT TO THAT CASE BECAUSE IN

4    THIS INSTANCE, YOU KNOW, WE DON'T HAVE A DEFINED MARKET.  WE

5    HAVE A -- SOMETHING THAT COUNSEL HAS TOLD US COMES FROM

6    ANOTHER PUBLICATION WHERE THE MARKET WAS DEFINED FOR OTHER

7    PURPOSES NOT TO SHOW AN ANTITRUST CLAIM LIKE THE ONE IN THIS

8    CASE.

9    AND THAT MARKET IS NOT IN COMPETITION WITH THE STATE

10    BAR OR WITH TYLER TECHNOLOGIES.  SO, THERE'S NO UNREASONABLE

11    RESTRAINT IN THE SENSE OF A  -- OF AN ATTEMPTED MONOPOLIZATION

12    UNDER SECTION 2.  AND THERE'S SIMPLY NO HARM TO COMPETITION IN

13    THAT SENSE EITHER FOR SECTION 1 OR SECTION 2 CLAIMS.

14    SO I  -- YOU KNOW, I'M GOING TO STOP THERE, BUT I'M HAPPY

15    TO ADDRESS ANY OTHER ISSUES THAT THE COURT HAS.

16    THE COURT:  NO.  I APPRECIATE YOUR COMMENTS.

17    MS. PETRONIO, DO YOU WANT TO GET IN ON THE ACTION?

18    MS. PETRONIO:  BRIEFLY, YOUR HONOR.

19    THE COURT:  I DIDN'T ASK YOU TO COMMENT ON THE STATE

20    BAR'S IMMUNITY ISSUE BECAUSE I DIDN'T THINK YOU -- WELL, YOU

21    MIGHT CARE.  BUT I DIDN'T THINK YOU CARED  --

22    (LAUGHTER.)

23    THE COURT:  -- THAT MUCH.

24    GO AHEAD.

25    MS. PETRONIO: YOU'RE CORRECT, YOUR HONOR.

1       THERE'S NO REASON FOR US TO STEP INTO THE IMMUNITY

2   OTHER THAN OBVIOUSLY TO SAY THAT WE HAVE ARGUED IN OUR

3   BRIEFING THAT IF THERE'S IMMUNITY FOR THOSE PORTIONS OF -- WE'LL

4   CALL IT THE COVER-UP PORTION OF THE ANTITRUST CLAIM  -- IF

5   THERE'S IMMUNITY ON THE STATE BAR'S PART FOR THAT, THEN WE

6   THINK THERE WOULDN'T BE A CLAIM AGAINST TYLER BECAUSE THERE'S

7   NO CO-CONSPIRATOR.  AND THAT'S IN THE BRIEFING.

8       BUT LET ME FOCUS ON THE COVER-UP CLAIM HERE.  AND I

9   THINK YOUR HONOR HAS HIT ON THE REAL HEART OF WHY THIS CLAIM

10  MUST BE DISMISSED.

11      IT'S ENTIRELY SPECULATIVE.  EVERY ASPECT OF WHAT HAS

12  BEEN ALLEGED FROM AN ELEMENTAL PERSPECTIVE IS SPECULATION

13  OR CONCLUSION WITHOUT ANY ACTUAL MEAT ON THE BONES.

14      SO, THERE IS NO ALLEGATION OF AN AGREEMENT.  THERE'S

15  NOT A SINGLE ALLEGATION ANYWHERE IN THE NOW VERY VAST

16  SECOND AMENDED COMPLAINT OF ANY SPECIFIC COMMUNICATION

17  BETWEEN TYLER AND THE STATE BAR.

18      THERE ARE PAGES AND PAGES OF EMAILS IN THERE WHERE

19  TYLER IS TALKING TO THE INDIVIDUAL WHO ACTUALLY HARVESTED THIS

20  DATA OFF OF TYLER'S ODYSSEY PORTAL THAT IT PROVIDES TO THE

21  STATE BAR.  AND THERE'S SOME COMMUNICATIONS BETWEEN THAT

22  INDIVIDUAL AND THE STATE BAR, BUT THERE'S NOT A SINGLE

23  COMMUNICATION ALLEGED THAT TYLER TECHNOLOGIES AND THE

24  STATE BAR DISCUSSED ANY SORT OF AGREEMENT, DISCUSSED ANY

25  ASPECT OF THE NOTICE THAT WAS PROVIDED, DISCUSSED ANY ASPECT

1    OF THE WORD OR VERBIAGES THAT WOULD BE USED IN THERE THAT

2    THE PLAINTIFFS FOUND OBJECTIONABLE.

3          SO, THERE HAS NOT BEEN AN ALLEGATION OF ANY

4    AGREEMENT OF ANY KIND MUCH LESS, YOUR HONOR, AN AGREEMENT

5    TO RESTRAIN TRADE.

6          I HEARD MS. ALBERT JUST ADMIT TO THE COURT THAT THE

7    MOTIVATION BEHIND THIS IN PLAINTIFFS' EYES WAS FOR TYLER

8    TECHNOLOGIES TO PROTECT ITS OWN REPUTATION.

9          THAT IS NOT A RESTRAINT OF TRADE NOR IS THERE

10   ANYTHING UNLAWFUL ABOUT TYLER'S ACTIONS IN THIS PARTICULAR

11   SITUATION.  THERE WAS NOT A COVER-UP IN THE SENSE THAT NO ONE

12   WAS EVER TOLD ABOUT THIS.  THERE WAS NOTICE GIVEN TO A VAST

13   NUMBER OF PEOPLE REGARDING THIS DATA BREACH.  SO, THERE'S NOT

14   AN ACTUAL ALLEGATION OF ANY UNLAWFUL CONDUCT BY TYLER MUCH

15   LESS, MUCH LESS, YOUR HONOR, SOME CONDUCT BY TYLER THAT WAS

16   INTENDED TO RESTRAIN TRADE AMONG LAWYERS PRACTICING LAW IN

17   THE STATE OF CALIFORNIA OR, TO GO ONE STEP FURTHER, LAWYERS

18   PRACTICING LAW IN THE PEOPLE MARKET IN THE STATE OF

19   CALIFORNIA.

20         I MEAN, THE CONCEPT THAT TYLER WOULD HAVE ANY

21   MOTIVATION TO IMPACT WHAT DISCIPLINARY ACTION OCCURS, WHAT

22   GETS CHARGED FOR IT, HOW THE PROCESS IS LAID OUT, ALL OF THAT,

23   THERE'S JUST NO ALLEGATION OF THAT, AND THERE CAN'T BE

24   BECAUSE TYLER WOULDN'T BE INVOLVED IN THAT TYPE OF

25   CIRCUMSTANCE.

1       THE RELEVANT MARKET AS YOU'VE POINTED OUT, THERE'S

2    NOT ANY SUPPORTING ALLEGATION WITH RESPECT TO THAT.

3       AND THE REAL SPECULATION HERE IS WHEN WE START

4    TALKING ABOUT WHAT WOULD THE ANTICOMPETITIVE HARM BE.

5       AND IT'S ONE LEAP TO ANOTHER LEAP TO ANOTHER.  SO, WE

6    START WITH THIS SURVEY, WHICH, BY THE WAY, THERE'S NO

7    ALLEGATION AS TO WHO CONDUCTED THAT SURVEY, HOW MANY

8    PEOPLE PARTICIPATED IN THAT SURVEY.  COULD HAVE BEEN 68

9    PERCENT OF 10 PEOPLE FOR ALL WE KNOW.

10       THE COURT:  WELL, 68 PEOPLE  -- PERCENT OF A HUNDRED

11    PEOPLE  --

12       (LAUGHTER.)

13        THE COURT:  -- 68 PERCENT OF 10 PEOPLE WOULD DIVIDE

14    SOMEONE IN .8 WHICH WOULDN'T WORK.

15       MS. PETRONIO:  WELL, DON'T HOLD ME TO THE MATH, BUT

16    YOUR HONOR GETS THE POINT.  THERE'S NOT ANY ACTUAL

17    ALLEGATION ABOUT THAT WAS  --

18       THE COURT:  WELL, IT'S ALSO MOST  -- THERE'S NO SHOWING

19    OF WHAT THAT SURVEY WOULD HAVE SAID A YEAR OR TWO YEARS

20    PRIOR.

21       IT'S PERHAPS A SITUATION THAT THE 68 PERCENT OF THE

22    PEOPLE WOULDN'T HAVE GIVEN THEM INFORMATION TO THE STATE

23    BAR A COUPLE YEARS EARLIER.

24       MS. PETRONIO:  EXACTLY.

25       AND THAT ONE ALLEGATION IS THEN USED TO SAY, WELL, IF

1    YOU DON'T PROVIDE CONFIDENTIAL INFORMATION, THEN, WE

2    SPECULATE THAT IT WILL INCREASE THE COST OF INVESTIGATIONS.

3        AND THEN WE SPECULATE THAT THE COST OF

4    INVESTIGATIONS WILL BE PASSED ALONG TO THE ATTORNEYS OVERALL

5    AS A WHOLE AS MS. ALBERT SAID, BUT ALSO SOMEHOW SPECIFICALLY

6    HAVE AN EXTRA BURDEN ON THE PEOPLE LAW MARKET AND THAT WILL

7    THEN CHILL THE ABILITY OF PEOPLE TO HIRE LAWYERS IN THE STATE

8    OF CALIFORNIA.

9        IT'S ALL ONE STRUNG TOGETHER CONCLUSORY SPECULATIVE

10    ALLEGATION OF SOME HARM THAT MAY HAPPEN IN THE FUTURE AND

11    NOT AN ACTUAL ALLEGATION OF ANY HARM THAT HAS OCCURRED OR IS

12    CERTAIN TO OCCUR AS A RESULT OF THIS ACTION.

13        SO, WE JUST DON'T THINK THERE IS AN ANTITRUST CLAIM IN

14    ANY RESPECT HERE.  THIS IS A CLAIM ABOUT A DATA BREACH AS YOUR

15    HONOR SAID.  AND THOSE ARE THE ISSUES WE SHOULD REALLY BE

16    TACKLING AS OPPOSED TO HAVING SPENT A SIGNIFICANT AMOUNT OF

17    TIME IN BRIEFING ON THESE ANTITRUST ISSUES THAT ARE SORT OF

18    TANGENTIALLY AS YOU SAID THE TAIL WAGGING THE DOG.

19        THE COURT:  ALL RIGHT.

20        MS. ALBERT, DO YOU WANT TO COMMENT ON OR RESPOND

21    TO EITHER MR. ANDERSON'S OR MS. PETRONIO'S COMMENTS.

22        AND THEN I'D LIKE TO ENGAGE IN A HYPOTHETICAL

23    CONVERSATION ABOUT WHAT WE'RE GOING TO DO IF I AGREE WITH

24    THEM AND DISMISS THE SHERMAN ACT CLAIMS.

25        GO AHEAD.

1          MS. ALBERT:  YES.  THANK YOU, YOUR HONOR.

2          SO, DEFENSE FIRST THEY SAID WE ONLY HAD ONE FACT.

3          I DIDN'T HEAR THE COURT ASK US FOR ALL OF THE FACTS.  I

4    MEAN, THERE'S TEN UNDISPUTABLE, YOU KNOW, FACTS.

5          LIKE THE STATE BAR AND TYLER TECH, THEY ADMIT THAT

6    THERE WAS A DATA BREACH.

7          THERE'S AN ADMISSION THAT THE DATA BREACH CONTAINED

8    CONFIDENTIAL RECORDS.

9          THE CONFIDENTIAL RECORDS WERE POSTED ON THE PUBLIC

10   INTERNET WEBSITE.  AND THEY WERE RECLASSIFIED AS PUBLIC

11   RECORDS.

12         THEY DO NOT DENY THAT BOTH TYLER TECH AND STATE BAR

13   REFERRED TO THE BREACH BY A NUMBER OF PAGE VIEWS WHICH

14   GIVES THE PLAUSIBLE INFERENCE THAT THEY HAD DIRECT

15   COMMUNICATIONS.

16         THE STATE BAR AND TYLER TECH, THEY ARGUE THAT THIS IS

17   ALL SPECULATIVE BECAUSE THE EMAILS THAT WERE IN THE PLEADING

18   CAME FROM KEVAN SCHWITZER WHO WAS TALKING EITHER TO THE

19   STATE BAR OR TO TYLER.

20         NONE OF THE EMAILS ARE BETWEEN STATE BAR AND TYLER.

21   BUT WE'RE NOT AT THE DISCOVERY STAGE YET, YOUR HONOR.

22         WE RECEIVED THOSE EMAILS BY SETTLING WITH KEVAN

23   SCHWITZER.  BUT WE CAN SEE THAT BOTH OF THEM USED THE PAGE

24   VIEWS.

25         WE DO SEE AN EMAIL WITH RICK RANKIN WHO IS AN

1    EMPLOYEE OF THE STATE BAR SPEAKING DIRECTLY IN ONE OF THOSE

2    EMAILS.

3          AND THE FACT THAT THEY BOTH HAVE THE CONCERTED AND

4    JOINT MOTIVE OF SAVING THEIR OWN REPUTATION BY DELUDING THE

5    322,525 CONFIDENTIAL RECORDS THAT WERE PUBLICLY THROWN OUT

6    THERE ON THE INTERNET DOWN TO JUST A LITTLE OVER A THOUSAND

7    BY CALLING THEM PAGE VIEWS DEMONSTRATES THAT IT IS PLAUSIBLE

8    AND IT IS NOT SPECULATION THAT THEY CONSPIRED TOGETHER TO

9    SAVE THEIR REPUTATIONS.

10         THEY DO NOT DENY THE VERACITY OF THE EMAILS

11    REFERENCED IN THE PLEADING.

12         THEY DO NOT DENY THAT RICK RANKIN WORKS FOR THE

13    STATE BAR.

14         THEY DO NOT DENY THE EMAIL OR THE ALLEGATION THAT

15    THE DEFENDANTS DISCOVERED THE RECORDS WERE INDEXED ON

16    GOOGLE TOO.  BUT THEY NEVER GAVE THAT NOTICE TO ANYONE.

17         THEY DON'T DENY THAT THERE WAS NO NOTICE MAILED TO

18    THE VICTIMS OF THE BREACH UNTIL MAY OF 2023 WHICH WAS THREE

19    MONTHS AFTER THE DEFENDANTS DISCOVERED IT.

20         THEY DON'T DENY THAT STATE LAW ACTUALLY REQUIRED

21    THEM TO DO IT LIKE WITHIN I THINK THE ATTORNEY GENERAL

22    SUGGESTED WITHIN 10 DAYS.

23         THEY DON'T DENY THAT THEY HAVE USED THE DISCIPLINE

24    SYSTEM TO CONTROL WHO CAN PRACTICE IN FEDERAL COURT.  THEY

25    ONLY SAY THAT THERE WASN'T BROAD ENOUGH BECAUSE THERE

1    WERE ONLY TWO CASES  -- TWO EXAMPLES GIVEN.

2            BUT THEY NEVER GAVE AN EXAMPLE SHOWING WHERE THEY

3    DID ALLOW SOMEONE TO PRACTICE IN FEDERAL COURT.

4            THEY DON'T GIVE ANY  --

5            THE COURT:  WELL, IT'S NOT UP  -- IT'S NOT UP -- IT'S NOT UP

6    TO THEM WHO PRACTICES IN FEDERAL COURT.

7            CORRECT?

8            MS. ALBERT:  CORRECT.  IT ISN'T.

9            THEY DON'T DENY THAT THEY HAVE EMPLOYED A

10   REGRESSIVE PRICE STRUCTURE.

11           THEY DON'T DENY THAT THAT PRICE STRUCTURE ON THE

12   STATE BAR DISCIPLINARY COST IS FAKE OR UNTRUE.

13           THE COURT:  ALL RIGHT.  I THINK  -- I THINK I UNDERSTAND.  I

14   UNDERSTAND WHAT YOU'VE ALLEGED.

15           SO  --

16           MS. ALBERT:  OKAY.

17           THE COURT:   -- IF YOU HAVE ANY OTHER COMMENTS ABOUT

18   WHAT THEY'VE ARGUED, LET ME KNOW.  OTHERWISE, I'D LIKE TO TURN

19   TO THE ISSUE OF WHAT WE DO IF -- IF WE DON'T HAVE ANY SHERMAN

20   ACT CLAIMS LEFT IN THE CASE.

21           MS. ALBERT:  NO, YOUR HONOR.  I MEAN, I DON'T AGREE WITH

22   EVERYTHING THAT THEY SAID BUT  --

23           THE COURT:  WELL, I  -- I --

24           MS. ALBERT:  -- I DON'T THINK THAT IT'S  --

25           THE COURT:  I CERTAINLY UNDERSTAND THAT.

1                    (LAUGHTER.)

2                    MS. ALBERT:  BUT I THINK THAT WE CAN TURN TO

3      SUPPLEMENTAL  -- THE ISSUE  --

4                    THE COURT:  ALL RIGHT.

5                    MS. ALBERT:  -- OF SUPPLEMENTAL JURISDICTION.

6                    THE COURT:  LET ME ASK THE DEFENDANTS.

7                    THERE MAY HAVE BEEN  -- I CAN'T REMEMBER EXACTLY.  I

8      QUICKLY REVIEWED THE TRANSCRIPT.  THERE MAY HAVE BEEN SOME

9      MODEST UNCERTAINTY ABOUT WHETHER YOU WOULD OPPOSE

10     REMAND.

11                   WAS THAT  -- IS THAT FAIR?

12                   MR. ANDERSON:  YOUR HONOR, AT THE TIME I THINK WE

13     WERE UNCERTAIN.  BUT AT THIS POINT I CAN REPRESENT FOR THE

14     STATE BAR THAT WE WOULD PREFER TO KEEP THE CASE HERE IN

15     FEDERAL COURT.

16                   THE COURT:  OKAY.

17                   SO, WHAT I THINK WE WOULD DO IS PROBABLY AFTER A

18     POTENTIAL ORDER THAT DISMISSED THE SHERMAN ACT CLAIMS

19     WITHOUT LEAVE TO AMEND, WE WOULD ISSUE AN ORDER TO SHOW

20     CAUSE DIRECTING BOTH SIDES TO INDICATE THE REASONS WHY

21     SUPPLEMENTAL JURISDICTION  -- I'M PROBABLY GOING TO USE THE

22     WRONG WORD  -- FRAME  -- WORD CHOICE HERE  -- BUT WHY

23     SUPPLEMENTAL JURISDICTION WAS APPROPRIATE.

24                   AND THEN I'D INVITE BOTH SIDES TO, YOU KNOW, RESPOND

25     TO EACH OTHERS' POSITIONS.

1              AND THEN WE WOULD HAVE A RULING ON THAT.

2              SO, WHAT I WOULD ENVISION IS A PROCESS  -- YOU KNOW, NO

3    MORE THAN 14 TO 28 DAYS AFTER THE COURT'S RULING ON THE

4    SHERMAN ACT CLAIMS.

5               AND ASSUMING THAT IT IS A DISMISSAL WITHOUT LEAVE TO

6    AMEND, WE WOULD HAVE SOME SORT OF PROCESS SET FORTH.

7              IF WE NEED A HEARING, I'LL ASK FOR IT.  IF WE DON'T, I DON'T.

8              MS. ALBERT, DO YOU HAVE ANY CONCERNS ABOUT THAT

9    PROCESS?

10             MS. ALBERT:  NO, YOUR HONOR.

11             I JUST – I DO WANT IT ON THE RECORD.  IF THE COURT DOES

12    REMAND, WE WILL BE ASKING FOR COSTS AND FEES UNDER THE

13    STATUTE. BECAUSE THEY REMOVED IT BASED ON THIS ANTITRUST

14    CLAIM KNOWING THEY WERE GOING TO MOVE TO DISMISS IT.

15             THIS WAS JUST A WASTE OF A YEAR FOR THE PLAINTIFFS.

16             THE COURT:  VERY GOOD.

17             MR. ANDERSON.

18             MR. ANDERSON:  YOUR HONOR, I DON'T THINK THAT WE HAVE

19    ANY ISSUE WITH THAT PROCESS AS YOU'VE OUTLINED IT.

20             I WOULD LIKE TO PUT JUST ONE MORE THING THOUGH  --

21             THE COURT:  SURE.

22             MR. ANDERSON:  -- BEFORE THE COURT.

23             AND THAT IS THAT IT'S THE STATE BAR'S POSITION AND OUR

24    HOPE THAT THE COURT MIGHT AT LEAST TAKE A LOOK AT THE STATE

25    LAW CLAIMS AND ARGUMENTS THAT HAVE BEEN BRIEFED.

1    AND I SAY THAT IN THE INTEREST OF THE  -- WHAT I'M SURE

2    YOU'LL SEE IN OUR ORDER TO SHOW CAUSE.

3    BUT UNDER THE GIBBS FACTORS, ONE OF THE

4    CONSIDERATIONS IS ECONOMY.  ANOTHER IS FAIRNESS.

5    AS YOUR HONOR NOTED EARLIER IN THIS CASE, THE SCOPE

6    OF THIS CASE HAS BROADENED.  YOU KNOW, WE HAVE -- WE HAVE

7    CONCERNS ABOUT THE EXPENSE AND THE COST OF RELITIGATING A

8    MOTION THAT WE FULLY BRIEFED IN THE COURT BELOW.

9    AND WE WONDER IF THE COURT WERE TO TAKE A LOOK AT

10    THOSE STATE LAW ARGUMENTS.

11    AND, YOU KNOW, OUR HOPE AND OUR BELIEF IS THAT YOU

12    WOULD FIND THEM TO BE AS DEFICIENT AS THE ANTITRUST CLAIMS AND

13    BE ABLE TO DISMISS ALL OF THEM AT ONCE.

14    BUT EVEN IF ANY OF THEM SURVIVED, IT WOULD

15    SIGNIFICANTLY NARROW THE CASE AND ASSIST THE PARTIES GREATLY

16    IN REACHING A RESOLUTION IF AND WHEN WE DO END UP IN STATE

17    COURT.

18    THE COURT:  OKAY.  I THINK I UNDERSTAND THAT  -- THOSE

19    CONCERNS.

20    AND I THINK I SPOKE BRIEFLY ON THEM LAST TIME, BUT I – I

21    UNDERSTAND WHAT YOUR CONCERNS ARE.

22    ALL RIGHT.

23    COUNSEL ON THE PHONE, ANY FINAL COMMENTS?

24    (NO AUDIBLE RESPONSE.)

25    THE COURT:  ALL RIGHT.

1          SO, THE SUPPLEMENTAL MOTIONS TO DISMISS WILL BE TAKEN

2     UNDER SUBMISSION.

3          AND YOU'LL HEAR FROM US SOON.

4          THANK YOU.

5          MS. ALBERT:  THANK YOU.

6          THE CLERK:  THIS COURT IS NOW ADJOURNED.

7          (PROCEEDINGS ADJOURNED 10:52 A.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      TRANSCRIBER'S CERTIFICATE

2      DISCLAIMER

3      THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

4      DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.

5          I, Dorothy Babykin, attest that the foregoing proceedings provided to

6      me electronically were transcribed by me to the best of my ability.

7              /s/  *Dorothy Babykin*

8

9      Dorothy Babykin

10

11     Date:  3/31/2023

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com