# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| JOHN ROE 1 et al., | No. SA CV 22-00983-DFM |
| Plaintiffs, | Order re: Defendants' Supplemental Motions to Dismiss (Dkts. 112, 113) |
| v. | |
| THE STATE BAR OF CALIFORNIA et al., | |
| Defendants. | |

## I. BACKGROUND

In this putative class action, Plaintiffs allege that Defendants State Bar of California and Tyler Technologies ("Tyler") are responsible for the unauthorized disclosure of confidential disciplinary records that were obtained and published on the Internet.

In June 2022, Defendants moved to dismiss Plaintiffs' First Amended Complaint. See Dkts. 35-36, 38. The Court focused on the two federal antitrust claims, dismissing one with leave to amend and one without. The Court ordered Plaintiffs to file an amended complaint and afforded Defendants the opportunity to file supplemental motions to dismiss addressing the antitrust claims. See Dkt. 94.

Plaintiffs have filed a Second Amended Complaint. See Dkt. 100, Second Amended Complaint ("SAC"). Before the Court are Supplemental

Motions to Dismiss filed by the State Bar and Tyler. See Dkts. 112-13. For the reasons set forth below, the motions are granted, and Plaintiffs' antitrust claims are dismissed with prejudice. A separate order will follow regarding Plaintiffs' remaining claims.

## II.   FACTUAL ALLEGATIONS

### A.   General Allegations

Plaintiffs John Roe 1 and Jane Roe 1 filed confidential complaints with the State Bar. See SAC ¶¶ 1, 2. Plaintiffs Jane Roe 2, Jane Roe 3, and John Roe 2 were State Bar members; each was the subject of a confidential investigation or complaint. See id. ¶¶ 3-5. The State Bar is a public corporation. See id. ¶ 6. Tyler supplied software and related services to the State Bar. See id. ¶ 9.

The State Bar's Office of Chief Trial Counsel ("OCTC") investigates and pursues complaints about attorneys. See id. ¶ 15. The State Bar collects large amounts of confidential information about members. See id. Active attorneys must pay $463 annually to maintain their license, which includes a $25 discipline fee and $40 client security fee. See id. ¶ 18. The State Bar discipline system is a "fee-for-services" activity, with a fixed cost sheet. See id. ¶ 19; Ex. A. It is common that members will be suspended until the attorney pays the discipline costs. See id. ¶ 27. In 2020, the OCTC opened 17,500 cases to investigate for possible discipline, and ultimately filed 180 Notices of Public Disciplinary Charges. See id. ¶ 30. All State Bar complaints and investigations are confidential until charges are filed. See id. ¶ 31.

In 2018, the OCTC launched an online complaint portal, which led to a significant increase in the number of complaints received. See id. ¶ 32. In 2019, the State Bar transferred approximately 516,000 OCTC investigations to a cloud-based case management platform named "Odyssey," which it purchased for $3 million from Tyler. See id. ¶¶ 40-43. The files included 325,525

confidential investigations in addition to 48,144 public disciplinary matters.
See id. ¶ 44.

In February 2022, the State Bar learned that 322,525 nonpublic records
related to lawyer disciplinary proceedings had been "harvested" from the
Odyssey portal and posted on a third-party website, JudyRecords.com. See id.
¶¶ 38, 57-58, 67. The records and other confidential information were publicly
searchable on the Internet between May 31, 2019 and February 26, 2022, and
were published on JudyRecords.com from October 15, 2021 through at least
February 24, 2022. See id. ¶ 84. The State Bar continues to use the Odyssey
system. See id. ¶ 139.

Plaintiffs seek to represent a class composed of and defined as: "All
California residents identified in the approximately 188 to 322,525 confidential
aka 'nonpublic' California State Bar records received by Kevan Schwitzer, the
owner/operator of https://JudyRecords.com which include both
Complainants and Members of the State Bar of California." Id. ¶ 141
(reformatted).

**B.    Antitrust Allegations**

Plaintiffs allege violations of Sections 1 and 2 of the Sherman Act, 15
U.S.C. §§ 1, 2. See SAC ¶¶ 179-280. Plaintiffs allege four theories of antitrust
liability, two under Section 1 and two under Section 2: (1) "conspiracy to
restrain trade by obfuscating the data breach," id. ¶¶ 186-213; (2) "price fixing
as a barrier restraint on trade," id. ¶¶ 214-33; (3) "disciplinary costs as a refusal
to deal," id. ¶¶ 244-48; and (4) "attempt to monopolize the federal bar/courts,"
id. ¶¶ 249-80.

**1.    The Data Breach "Coverup"**

According to Plaintiffs, the State Bar and Tyler conspired to cover up the
lack of security of Plaintiffs' confidential information and minimize the data
breach. See SAC ¶ 186. As a result of the data breach, Plaintiffs claim that

attorneys are less willing to volunteer information in State Bar investigations, which will increase costs for investigations and remove fewer bad attorneys. See id. ¶ 199. As a consequence, State Bar members will have to pay for increased investigative work via increased membership fees. See id. ¶¶ 202-03.[1]

### 2. Price Fixing

Plaintiffs' second theory focuses on the State Bar's fixed Disciplinary Cost sheet. See SAC ¶ 214. Plaintiffs claim that the sheet is regressive because the State Bar member must pay more if he or she chooses to defend him or herself. See id. The costs fall more heavily on solo practitioners than lawyers that represent large corporations. See id. ¶ 218. The State Bar controls which attorneys to file charges against and offer a stipulation to a lower rate. See id. ¶ 220. Plaintiffs assert that disciplinary costs are a barrier to reentry for solo practitioners, who are at the bottom of the fee scale. See id. The reduced number of competitors will raise prices, forcing more people to represent themselves and leading to inefficiencies in the legal services sector. See id. ¶ 228.

### 3. Refusal to Deal

Plaintiffs' refusal to deal claim alleges that the State Bar's Disciplinary Cost sheet has prices that are too high for many lawyers to pay. See SAC ¶ 244. The sheet has such unreasonable terms and conditions that it constitutes a refusal to deal. See id. Additionally, "the plaintiff cannot earn the money to pay the [disciplinary] cost making it such an unreasonable term and condition which also amounts to a practical refusal to deal." Id. ¶ 245.

---

[1] Further, Plaintiffs alleged that the "fake disciplinary records" and other confidential information released online increases the cost to do business for Plaintiffs and class members by (i) creating the risk of making it harder for these attorneys to obtain new clients; and (ii) increasing the risk of "pile on" complaints. See id. ¶¶ 235-36.

### 4. Monopolize Practice in Federal Court

Finally, Plaintiffs allege that the State Bar has attempted a monopoly over who can practice in federal court "by threatening to charge or charging the plaintiffs and class members of unauthorized practice of law (UPL) in federal courts during a suspension in state court." SAC ¶ 254. Additionally, investigations and discipline initiated by the State Bar reduce the supply of solo practitioners in federal court. See id. ¶ 263.

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. See Fed. R. Civ. P. 12(b)(6). A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a 12(b)(6) motion under Twombly, the Court follows a two-pronged approach. First, the Court accepts all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). Nor must the Court "'accept as true a legal conclusion couched as a factual allegation.'" Id. at 678-80 (quoting Twombly, 550 U.S. at 555). Second, assuming the veracity of well-pleaded factual allegations, the Court "determine[s] whether they plausibly give rise to an entitlement to relief." Id. at 679. This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ." Id.

## IV.   DISCUSSION

Defendants argue that the SAC does not satisfy Rule 8 and fails to state a claim for relief.[2] The State Bar separately argues that it is immune from antitrust liability.

### A.   The State Bar Has Immunity from Antitrust Liability

When it dismissed the FAC, the Court concluded that the State Bar was likely immune from antitrust liability. The State Bar argues that the SAC does not plead anything to warrant a different outcome. See Motion at 19-21. The Court generally agrees.

In Parker v. Brown, the U.S. Supreme Court interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. 317 U.S. 350, 350-51 (1943). "A nonsovereign actor controlled by active market participants," such as the State Bar, "enjoys Parker immunity only if it satisfies two requirements: first that the challenged restraint be one clearly articulated and affirmatively expressed as state policy, and second that the policy be actively supervised by the state." North Carolina State Bd. Of Dental Exam'rs v. FTC, 574 U.S. 494, 503-04 (2015) (citations omitted).

The locus of three of Plaintiffs' four antitrust theories—price fixing, refusal to deal, and attempt to monopolize federal court practice—is the State Bar's alleged control over attorney discipline. The State Bar contends that it is entitled to immunity because the challenged disciplinary enactments are controlled by the Legislature and ordered/overseen by the California Supreme Court. See Motion at 21. In response, Plaintiffs argue that there is no clearly

---

[2] The Court did not reach the Rule 8 argument. All citations are to the State Bar's Motion. See Dkt. 113-1 ("Motion").

articulated state policy to support the State Bar's approach to attorney discipline. <u>See</u> Dkt. 113, Opposition ("Opp'n") at 13-18.

As the Court previously noted, federal courts have routinely rejected attempts to bring a Sherman Act cause of action against the disciplinary rules of a state bar or a state Supreme Court. <u>See</u> <u>Bates v. State Bar of Arizona</u>, 433 U.S. 350, 361 (1977) ("Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the appellee acts as the agent of the court under its continuous supervision."); <u>Foley v. Alabama State Bar</u>, 648 F.2d 355, 359 (5th Cir. 1981) ("The disciplinary rules of the Alabama State Bar are effectively the rules of the Supreme Court of Alabama. Moreover, the Bar is a component of the Alabama judiciary, subject to the supervision of the Alabama Supreme Court, and thus it acts as an agent of the state when it regulates attorneys. The Bar's activities, therefore, are within the <u>Parker v. Brown</u> exemption." (internal citations omitted)); <u>Otworth v. The Florida Bar</u>, 71 F.Supp.2d 1209, 1220 (M.D. Fla. 1999) ("As the mandate requiring membership in the Florida Bar cannot be divorced from the Florida Supreme Court's sovereign powers, the actions taken by the Florida Bar are exempt from antitrust liability.").

This case is not distinguishable from this long line of authority. The State Bar is a component of the California judiciary, subject to the supervision of the California Supreme Court. California Business & Professions Code § 6087 states: "Notwithstanding any other provision of law, the Supreme Court may by rule authorize the State Bar to take any action otherwise reserved to the Supreme Court in any matter arising under this chapter or initiated by the Supreme Court; provided, that any action by the State Bar shall be reviewable by the Supreme Court pursuant to such rules as the Supreme Court may prescribe." Section 6076 conditions the State Bar's formulation and enforcement of rules of professional conduct upon the approval of the Supreme

7

Court. And the California Supreme Court has explicitly held that "the judicial power in disciplinary matters remains with this court, and was not delegated to the State Bar." In re Attorney Discipline System, 19 Cal. 4th 582, 600 (1998) (citation omitted). Indeed, "the State Bar is a constitutional entity subject to our expressly reserved power over admission and discipline. The State Bar Act did not delegate to the State Bar . . . our inherent judicial authority over the discipline of attorneys." Id. at 601; see also In re Rose, 22 Cal. 4th 430, 439 (2000) ("The State Bar may make only recommendations to this court, which undertakes an independent determination whether the attorney should be disciplined as recommended.").

Plaintiffs attempt to distinguish this authority on the ground that the Disciplinary Cost sheet is operated by the State Bar without oversight. See Opp'n at 13-19. Plaintiffs concede, however, that the applicable statute includes a required cost structure: "Any order imposing a public reproval on a member of the State Bar shall include a direction that the member shall pay costs. In any order imposing discipline, or accepting a resignation with a disciplinary matter pending, the Supreme Court shall include a direction that the member shall pay costs." Cal. Bus. & Prof. Code § 6086.10(a). The costs required to be imposed include "charges determined by the State Bar to be 'reasonable costs' of investigation, hearing, and review." Id. § 6086.10(b)(3).

Plaintiffs argue that the statute does not "detail" the cost structure, which is the true anticompetitive conduct, see Opp'n at 14, but that is not persuasive. "[S]tate-action immunity applies if the anticompetitive effect was the 'foreseeable result' of what the State authorized." FTC v. Phoebe Putney Health Sys., Inc., 568 U.S. 216, 227 (2013); see also City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 373 (1991) (concluding that the clear-articulation test was satisfied because the suppression of competition in the billboard market was the foreseeable result of a state statute authorizing

8

municipalities to adopt zoning ordinances regulating the construction of buildings and other structures.). Here, the foreseeable result of what the California legislature authorized in Section 6086.10 of the Business and Professions Code is a cost sheet like the one promulgated by the State Bar.

Plaintiffs compare this case to Goldfarb v. Virginia State Bar, 421 U.S. 773 (1985). There, the Supreme Court held that fee schedules enforced by the Virginia State Bar were not entitled to Parker immunity because neither the Virginia Supreme Court nor any Virginia statute required the fee schedule and its enforcement mechanism. See id. at 789-93. Here, by contrast, the State Bar's activity with respect to attorney discipline is defined by and at the behest of California statutes and the California Supreme Court. See Bates v. State Bar of Az., 433 U.S. at 367 (holding that Parker immunity applied and distinguishing Goldfarb because the challenged disciplinary rule "is the affirmative command of the Arizona Supreme Court," the "ultimate body wielding the State's power over the practice of law"). Plaintiffs' effort to analogize to Goldfarb is thus unpersuasive.

The State Bar has established that its actions with respect to attorney discipline are within the Parker v. Brown exemption. At a minimum, then, Plaintiffs' antitrust theories of price fixing, refusal to deal, and attempt to monopolize federal court practice all fail as a matter of law. The State Bar also contends that Plaintiffs' "coverup" theory is entitled to immunity because it too concerns disciplinary rules. See Motion at 9, 19-21. The Court declines the invitation to dismiss on that basis. However, the coverup theory is deficient in several other respects that are explained below.

## B.  Plaintiffs' Market Definition Is Deficient

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" FTC v. Qualcomm Inc., 969 F.3d 974, 992 (9th Cir. 2022) (quoting Ohio v. Am. Express Co., 138

S. Ct. 2274, 2285 (2018)) ("Amex")). "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted).

"The relevant market must include both a geographic market and a product market." Id. (citation omitted). The relevant product market "must encompass the product at issue as well as all economic substitutes for the product." Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1045 (9th Cir. 2008) (citation omitted). Including economic substitutes ensures that the relevant product market encompasses "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." Id. (citation omitted).

For their antitrust claims, Plaintiffs allege two relevant markets within the general product market of legal services in California: the "PeopleLaw Market" and the "Organizational Clients Market." See SAC ¶¶ 191-92. Plaintiffs define the PeopleLaw Market as mainly solo practitioners such as Plaintiffs who primarily serve individuals. See id. ¶ 192. Plaintiffs define the Organizational Clients Market as consisting of lawyers who work in large firms representing large organizations. See id.

The Court concludes that Plaintiffs have not pleaded plausible product markets. Plaintiffs offer no allegations to support how they have defined the market for legal services in California; their two proposed sub-markets originate from a State Bar report. The fact that a State Bar report once divided the universe of California lawyers into two different groups does not persuade the Court that Plaintiffs have adequately established relevant product markets. See Moore v. James H. Matthews & Co., 550 F.2d 1207, 1218-19 (9th Cir. 1977) (noting that plaintiff failed to establish "the relevant product market" where it failed to introduce adequate evidence regarding "the products

10

involved as to price, use, quality, and characteristics"). Moreover, the fact that Plaintiffs appear to operate in a single market—as solo practitioners serving individuals—does not make it a relevant market for antitrust purposes. "A plaintiff cannot ignore economic reality and 'arbitrarily choose the product market relevant to its claims.'" <u>Epic Games, Inc. v. Apple Inc.</u>, 559 F.Supp.3d 989, 1015 (N.D. Cal. 2021) (citation omitted). Additionally, Plaintiffs' proposed product markets are not natural. They are "artificial and contorted to meet" Plaintiffs' litigation needs, and as such, they are "facially unsustainable." <u>Hicks</u>, 897 F.3d at 1116, 1120. Plaintiffs' antitrust claims fail to state a claim on this basis alone.

## C.  **Plaintiffs' Section 1 Claims Are Inadequate**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in <u>unreasonable</u> restraint of trade." <u>Qualcomm</u>, 969 F.3d at 988-89 (citation omitted). Additionally, the plaintiff must also plead "antitrust injury." <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 334 1990)

### 1.  **Existence of an Agreement**

First, the State Bar argues that Plaintiffs' price-fixing theory fails because the State Bar cannot conspire with itself. <u>See</u> Motion at 23-24. The Court agrees.

Section 1 "applies only to concerted action that restrains trade." <u>Am. Needle, Inc. v. NFL</u>, 560 U.S. 183, 191 (2010). "The relevant inquiry, therefore, is whether there is a 'contract, combination . . ., or conspiracy' amongst separate economic actors pursuing separate economic interests." <u>Id.</u> at 195 (citation omitted). The question "is whether the agreement joins

11

together independent centers of decision-making." Id. (citation omitted). This inquiry is a functional one.

Plaintiffs have not alleged sufficient facts to support a claim that the State Bar is capable of concerted action for Sherman Act purposes. Plaintiffs offer nothing to suggest that the State Bar and its board of governors are separate entities pursuing different economic goals or that they have divergent economic interests. Instead, Plaintiffs' allegations suggest that the objectives of the State Bar are common, not disparate. The SAC makes the conclusory allegation that the State Bar uses the disciplinary system to reduce the number of suppliers in the "PeopleLaw Market" and to increase its own revenue, but those allegations are just that, conclusory. Put simply, there are no plausible factual allegations that the State Bar is comprised of competitors with economic goals distinct from the State Bar as a whole.

Plaintiffs rely on American Needle v. National Football League, 560 U.S. 183 (2010), which held that the NFL's licensing activities constituted concerted action because the teams remained separately controlled, potential competitors with economic interests distinct from the organization's well-being. But the SAC contains no similar allegations. Plaintiffs also cite Summit Health, Ltd. v. Pinhas, 500 U.S. 322 (1991), but that case concerns federal jurisdiction and is not helpful to the issues raised here. Because Plaintiffs' price fixing involves activity happening only within a single enterprise, it fails to state a Section 1 claim.

Second, the State Bar argues that Plaintiffs' coverup theory fails to plausibly allege an agreement between the State Bar and Tyler. See Motion at 24. "A plaintiff can establish a conspiracy through direct evidence, circumstantial evidence, or both." Honey Bum, LLC v. Fashion Nova, Inc., No. 22-55150, 2023 WL 2592287, at *5 (9th Cir. Mar. 22, 2023). "Direct evidence is smoking-gun evidence that establishes, without requiring any

inferences the existence of a conspiracy. Id. (citation omitted). Circumstantial evidence requires parallel action as well as various "plus factors" that tend to exclude the possibility that the alleged conspirators acted independently. See id.

Plaintiffs have not pleaded sufficient facts to provide a plausible basis from which the Court can infer the existence of the alleged agreements. Plaintiffs repeatedly allege that the State Bar and Tyler "conspired" to cover up the data breach. See, e.g., SAC ¶ 186. But those are conclusory allegations. In support, the SAC includes communications concerning the incident, but none of these communications is between the State Bar and Tyler. See SAC ¶¶ 103-19. Instead, the communications are between Tyler and the operator of JudyRecords.com, which Plaintiffs have dismissed from this lawsuit.

### 2. Unreasonable Restraints

Section 1 outlaws "only unreasonable restraints." Amex, 138 S. Ct. at 2283 (citation omitted). Restraints that are not per se unreasonable, as is the case here, are "judged under the 'rule of reason'" Id. at 2284 (citation omitted). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure to assess the restraint's actual effect' on competition." Id. (citation omitted).

A three-step, burden shifting framework applies to the rule of reason. First, the plaintiff has the initial burden to show that the challenged restraint has a "substantial anticompetitive effect that harms consumers in the relevant market." Id. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. See id. If the defendant does so, the burden shifts back to the plaintiff "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." Id.

13

A plaintiff may prove that a restraint has anticompetitive effect with direct or indirect evidence. See id. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." Id. (citations omitted) (cleaned up). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." Id.

Here, Plaintiffs have not offered any direct or indirect evidence plausibly alleging that the restraints had an actual effect on the PeopleLaw Market. Plaintiffs allege that a survey taken after the breach showed that 68% of members are no longer willing to voluntarily provide confidential information during an investigation, which will drive up costs for State Bar investigations. See SAC ¶ 201. Attorneys in the PeopleLaw Market "will be compelled to pass that extra cost off to consumers seeking services," which will force them to represent themselves. Id. ¶ 205. Plaintiffs' unsubstantiated speculation that the costs of the data breach will trickle down to the PeopleLaw Market in this manner is not sufficient.

Moreover, the Court is hard pressed to understand how this restraint "harms competition." The Supreme Court has warned courts not to infer competitive injury from price and output data "absent some evidence that tends to prove that output was restricted or prices were above a competitive level." Brooke Grp. V. Brown & Williamson Tobacco Corp., 509 U.S. 209, 237 (1993). There are no credible allegations in this case.

The same problem afflicts Plaintiffs' price fixing theory.[3] Plaintiffs allege that attorneys who seek to defend against charges pay more than those who

---

[3] The SAC's lack of concerted action is apparent here as well. In horizontal price-fixing, direct or potential competitors at the same level of the market structure agree to fix prices. In vertical price-fixing, firms at different

stipulate, which will increase the price for legal services in the PeopleLaw Market. See SAC ¶¶ 217-220. But the SAC simply does not put forth any credible allegations to support that theory.

There are more problems with Plaintiffs' theories. Perhaps to show anticompetitive conduct, Plaintiffs allege that the State Bar is in cahoots with attorneys in the Organizational Clients Market to harm the PeopleLaw Market. But by Plaintiffs' own admission, attorneys in the PeopleLaw and the Organizational Client Markets serve different populations and are not in competition. Why the State Bar would want to harm the attorneys who serve the PeopleLaw Market is never explained in the SAC. Additionally, there is nothing inherently anticompetitive about the State Bar's disciplinary system. If anything, the system serves to preserve the overall quality of the services lawyers provide for their clients, which has procompetitive benefits for both the PeopleLaw and the Organizational Client Markets.

In sum, Plaintiffs have not satisfied the first step of the rule of reason. They have not carried their burden of plausibly alleging that the State Bar and Tyler's response to the data breach or the State Bar's Disciplinary Cost sheet have anticompetitive effects.

### 3.    Antitrust Injury

Defendants additionally argue that Plaintiffs' claims fail for lack of a cognizable causal antitrust injury. See Motion at 27-28.

"[A]ntitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" Somers v. Apple, Inc., 729 F.3d 953, 963 (9th Cir. 2013) (citation

---

levels of the market structure fix prices. It is hard to understand how a single entity such as the State Bar could engage in price fixing.

omitted). The inquiry focuses on injury to "competition not competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (citation omitted); see also Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." (citation omitted)). In Somers, the Ninth Circuit added that it has also "imposed a fifth element – that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" 729 F.3d at 963.

Plaintiffs have failed to plead antitrust injury in support of their claims. From the outset, Plaintiffs' SAC does not demonstrate antitrust injury because it fails to plausibly allege that the State Bar or Tyler engaged in "unlawful conduct." Even assuming the SAC did, moreover, it still fails to allege an injury of the type the antitrust laws were intended to prevent. Antitrust injury must "flow" from "a competition-reducing aspect or effect of the defendant's behavior." Atlantic Richfield Co. v. USA Petroleum, Inc., 495 U.S. 328, 337, 344 (1990). The SAC, however, does not sufficiently plead that Defendants' behavior was "competition-reducing." For example, the SAC alleges that the State Bar and Tyler conspired to cover up the data leak to protect their respective reputations, not to stifle innovation or eliminate any source of competition.

The SAC sets forth a chain of events that begins with the data breach and ends with less consumer choice in the "PeopleLaw Market." But at the risk of sounding repetitive, these are conclusory allegations, not factual allegations. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . [n]or does a complaint suffice if it tenders naked assertions devoid of further factual

16

enhancement." <u>Ashcroft</u>, 556 U.S. at 662. When the SAC is reviewed for supporting factual allegations, there is—at best—a series of allegations that there will be an increase in the number of pro se litigants, as some unknown number of solo practitioners decide to throw in the towel rather than fight against disciplinary charges. Such allegations, without more, fall well short of establishing antitrust injury.

**D. Plaintiffs' Section 2 Claims Are Also Inadequate**

Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. "Whereas § 1 of the Sherman Act targets <u>concerted</u> anticompetitive conduct, § 2 targets <u>independent</u> anticompetitive conduct." <u>Qualcomm</u>, 969 F.3d at 989-90.

"There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." <u>Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.</u>, 592 F.3d 991, 998 (9th Cir. 2010) (citation omitted). To state a claim for attempted monopolization, the plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." <u>Kaiser Found. Health Plan, Inc. v. Abbott Labs.</u>, Inc., 552 F.3d 1033, 1044 (9th Cir. 2009) (citation omitted).

Plaintiffs' Section 2 theories are predicated on the State Bar's conduct with respect to attorney discipline. <u>See</u> SAC ¶¶ 244-48 ("Disciplinary Costs as A Refusal to Deal"), 249-280 (alleging that State Bar uses attorney discipline to control who can practice in federal court). The Court has already found that Plaintiffs' antitrust claims of this type are deficient for failure to adequately allege a relevant market, an unreasonable restraint, and an antitrust injury. "If,

17

in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." Qualcomm, 969 F.3d at 992. Accordingly, the Section 2 claims fail as a matter of law. The claims also fail for the reasons discussed below.

### 1.    Refusal to Deal

Generally, "there is no duty to aid competitors." Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004). An exception to this rule may arise if there is a "unilateral termination of a voluntary (and thus presumably profitable) course of dealing" between two parties. Id. at 409. "Liability under Section 2 on the basis of a duty to aid a competitor can arise when a defendant voluntarily alters a course of dealing and 'anticompetitive malice' motivates the defendant's conduct." In re Apple iPod iTunes Antitrust Litig., 796 F.Supp.2d 1137, 1145 (N.D. Cal. 2011) (internal quotation marks and citation omitted).

Plaintiffs allege that by forcing attorneys in the PeopleLaw Market to pay significant disciplinary costs, the State Bar is refusing to deal. But as the State Bar points out, it does not provide legal services or compete with lawyers, nor did it terminate a prior course of dealing with attorneys in the PeopleLaw Market. See Motion at 29. There is thus no basis for this theory of antitrust liability.

### 2.    Attempt to Monopolize Federal Court Practice

Plaintiffs allege that the State Bar is attempting to monopolize who can practice in federal court. See SAC ¶ 249. This claim is both fanciful and unsupported. Plaintiffs' SAC does not plausibly allege how the State Bar could control practice in federal court, especially given that "a federal court has the power to control admission to its bar." Lasar v. Ford Motor Co., 399 F.3d 1101, 1118 (9th Cir. 2005) (citation omitted). Nor does the SAC allege why the

State Bar would want to control the practice of law in federal court. Laid bare, all that remains in the SAC are conclusory allegations of conspiracy and illegal activity, which fails to state a claim. See Twombly, 550 U.S. at 556-57.

### E.     Leave to Amend

Leave to amend is properly denied "if amendment would be futile." Carrico v. City & Cnty. of San Francisco, 656 F.3d 1002, 1008 (9th Cir. 2011). The Court finds that Plaintiffs' failures to overcome Parker immunity and allege a viable antitrust claim cannot be overcome by a grant of leave to amend. Plaintiffs have been particularly unable to show an unreasonable restraint of trade or antitrust injury. No additional pleading or discovery will alter this reality. See Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987) ("[I]f the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust") (internal quotation marks and citation omitted). Accordingly, Plaintiffs' antitrust claims are dismissed with prejudice.

## V.     CONCLUSION

Defendants' Supplemental Motions to Dismiss are GRANTED. Plaintiffs' antitrust claims are DISMISSED with prejudice.

A separate order will follow regarding Plaintiffs' remaining claims.


Date: April 3, 2023

DOUGLAS F. McCORMICK
United States Magistrate Judge